1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3   United States of America    )
                                )
4        v.                     )  Docket  No.  5:20-mj-00487-
                                HJB-1 )
5   Cody Donovan Smith,         )  San Antonio, Texas
                                )  April 7, 2020
6       Defendant.              )
    _____ )

7
            TRANSCRIPT OF VIDEO DETENTION HEARING
8        BEFORE THE HONORABLE RICHARD B. FARRER
              UNITED STATES MAGISTRATE JUDGE
9
    A P P E A R A N C E S:
10
    FOR THE GOVERNMENT (BY VIDEO):
11  Priscilla Garcia
    Assistant United States Attorney
12  601 N.W. Loop 410, Suite 600
    San Antonio, TX 78216
13
    FOR THE DEFENDANT (BY VIDEO):
14  Guillermo Lara, Jr.
    Law Office of Guillermo Lara, Jr.
15  310 S. Saint Mary's Street, Suite 965
    San Antonio, TX 78205
16
    COURT RECORDER: FTR Gold
17
    Proceedings reported by electronic sound recording. Transcript
18  produced by computer-aided transcription.

19

20

21

22

23

24

25

1                              INDEX

2                                                        PAGE

3    JACOB OLSON

4    Cross-Examination by Mr. Lara   ................. 10

5    Redirect Examination by Ms. Garcia   ............ 18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      *(2:30 p.m.)*

2          THE COURT: Okay, everyone. I think we're about ready

3   to proceed. Just making sure we have our recording equipment

4   online.

5      Okay. Are we all set, Amy?

6          THE CLERK: [Inaudible].

7          THE COURT: Sounds good?

8          THE CLERK: I can hear everybody.

9          THE COURT: Okay. All right. We'll start -- we'll

10  start things off. I'll go ahead and call this case. Let me

11  see here.

12          And, Amy, the CR number is the current case number?

13          THE CLERK: [Inaudible].

14          THE COURT: Oh, it's this MJ number?

15          THE CLERK: Uh-huh.

16          THE COURT: Okay. All right. Let's go ahead and call

17      this case. So next up before the Court is case number

18   SA:20-MJ-487, United States of America versus Cody Donovan

19   Smith. We are set for an identity hearing and a detention

20   hearing. We're doing this by video teleconference. And so

21      just to ensure that the record is clear, I have on the

22      teleconference from the detention facility is Mr. Smith.

23          And, Mr. Smith, are you able to hear me and see me?

24          THE DEFENDANT: Yes, sir.

25          THE COURT: Okay. Thank you, sir.

1      And then also on the line we have Mr. Lara, who is

2  Mr. Smith's counsel.

3    Mr. Lara, are you able to hear and see me?

4      MR. LARA: Yes, Your Honor.

5      THE COURT: Okay. And Ms. Garcia from the U.S.

6  Attorney's office, can you see and hear me as well?

7      MS. GARCIA: [Inaudible].

8      THE COURT: Ms. Garcia, are you able to hear me and

9  see me?

10      MS. GARCIA: Yes, I can. It's very [inaudible], Your

11  Honor. I don't know why.

12      THE COURT: Okay. I'll try to -- I'll try to speak

13  loudly. Does that help?

14      MS. GARCIA: [Inaudible].

15      THE COURT: I might just be too soft-spoken.

16    And then, also, we have pretrial services on the line. Is

17  that right?

18      PRETRIAL OFFICER: Yes, Your Honor. Alejandro Cruz.

19      THE COURT: Okay. Great.

20    Mr. Lara, let me just start with you. First up, my

21  understanding is that your client wishes to waive the identity

22  hearing. Is that correct?

23      MR. LARA: Yes, Judge. We discussed it last week, and

24    it was our decision to waive the identity hearing and move

25  forward with the detention hearing.

1    THE COURT: Okay. So we're moving forward on

2  detention hearing.

3    And then, as I mentioned at the outset, we're conducting

4  this detention hearing by video teleconference because of the

5  current coronavirus/COVID-19 outbreak and situation. And so I

6  just want to confirm with you, Mr. Lara, that you've had an

7  opportunity to discuss with your client what's involved with

8  conducting this proceeding by video and that your client is

9  comfortable with and does waive his presence at this hearing

10  and also his right to be present here to confront any

11  witnesses. Is that correct?

12    MR. LARA: Yes, Your Honor. We discussed it, as

13  well [inaudible].

14    THE COURT: Okay.

15    MR. LARA: [Inaudible].

16    THE COURT: You're breaking up a little bit. Can you

17  just go ahead and repeat that for me?

18    MR. LARA: Yes, Judge. We want to move forward with

19  the detention hearing. We have discussed the issue of

20  [inaudible].

21    THE COURT: Okay. Thank you.

22    And he's comfortable to waive his presence;

23  is that correct?

24    MR. LARA: Yes, Your Honor.

25    THE COURT: Okay. All right. And then the intent

1   here is to proceed by proffer; is that correct, Ms. Garcia?

2            MS. GARCIA: Your Honor, we'd ask for detention -- to

3   show notice of the pretrial services report prepared by

4   Alejandro Cruz and also the indictment pending in the District

5   of Wyoming, which I had hoped a copy was provided to the Court.

6            THE COURT: Yes. I have -- I have both of those

7   matters, and I am considering them. I have them here on my

8   screen as I'm talking to you all. So let me just -- if I can,

9   just explain to Mr. Smith briefly.

10       So what we're doing, Mr. Smith, is addressing the question

11  of bail or pretrial release in this hearing. You're entitled to

12  the presumption of innocence on the underlying charges. And,

13  obviously, nothing that takes place during this hearing is

14  intended to or should be deemed to affect that underlying

15  presumption of innocence. And, likewise, any findings I may

16  issue are also not intended to affect that presumption.

17       The Bail Reform Act is the statute that applies to the

18  determination that we're -- that we're going to investigate

19  here today and the ruling that I'll make at the end of this

20  hearing with respect to pretrial release or bail. The Bail

21  Reform Act calls me to consider various factors in making my

22  decision. And those include the nature and circumstances of the

23  alleged offense, the weight of the evidence against the

24  defendant, the history and characteristics of the defendant and

25  also the nature and seriousness of the danger to others or the

1    community.

2        The government bears the burden in this hearing to show that

3    you need to be detained between now and further proceedings. And

4    in your case, at least as it stands now, that would be if you --

5    whether you're detained until further proceedings are set in

6    Wyoming or whether you can be released on bond pending those

7    further proceedings. But Mr. Lara will be able to talk to you in

8    much greater detail about how things will go forward in terms of

9    what other proceedings may be conducted.

10        So with that, sort of, general background, I'll turn things

11    over to the government. And, Ms. Garcia, if you'd like to

12    proceed with your --

13            MS. GARCIA: Yes, Your Honor.

14                THE COURT: -- with your presentation.

15                MS. GARCIA: We proffer, Your Honor --

16            THE COURT: It's okay. Go ahead.

17            MS. GARCIA: Can I be heard?

18            THE COURT: Yes.

19            MS. GARCIA: I proffer the application affidavit of

20    Jacob Olson, which was attached to a search warrant that was

21    [inaudible].

22            THE COURT: Oh, I've lost you, Ms. Garcia. Hold on.

23            MS. GARCIA: [Inaudible].

24            THE COURT: Our connection -- our connection's tough.

25

1  I heard you -- just start over with the proffer. And then I

2  lost you a bit.

3          MS. GARCIA: [Inaudible] proffer the affidavit of

4  Agent Olson.

5          THE COURT: Okay.

6          MS. GARCIA: And in Count 1 [inaudible] when

7  she was [inaudible].

8              UNIDENTIFIED SPEAKER: [Inaudible] hear?

9          THE COURT: Yeah. No. You're breaking up,

10  Ms. Garcia. Hold on. I think we have a tough connection.

11          MS. GARCIA: [Inaudible].

12          THE COURT: Yeah. No. We're having a tough time

13  hearing you. So why don't we try one more time, Ms. Garcia.

14  You've --

15          MS. GARCIA: Am I heard at all or --

16          THE COURT: You are. And it sounds like your internet

17  connection is a little bit dicey. And so you're coming in and

18  out. Why don't we try one more time.

19          MS. GARCIA: Okay. I'll get closer. I proffer the

20  affidavit of Agent Olson which accompanies his application for a

21  search warrant in Florida to search the vehicle operated by Cody

22  Smith when he kidnapped the victim and took her into Yellowstone

23  Park. It outlines everything that happened between -- as relayed

24  by the victim, and then the investigation that followed in

25  securing a photograph of [inaudible] car as it

1  entered Yellowstone; and would tender calls, registration

2  communication between he and the victim leading to the search

3  in Florida, the vehicle in which he was operating.

4       And I have Agent Olson online as well, Your Honor,

5  participating in this video conference, in the event that

6  there's questions.

7       THE COURT: Okay. So I have the written proffer, at

8  least the written materials that are proffered.

9     Mr. Lara, how do you -- how would you like to proceed?

10      MR. LARA: Judge, I had a few questions for Agent

11 Olson [inaudible]. Not too many, just a few questions to ask

12 him [inaudible] that affidavit.

13      THE COURT: Okay. Let's see if -- let's see if

14 that -- if we can pull that off. Just don't be afraid to speak

15 up. I think it's better to be loud than not heard.

16    Now, do we have Agent Olson on the line?

17      THE WITNESS: I'm here. Can you hear me okay?

18      THE COURT: Yes. I can hear you.

19    Mr. Smith, can you hear Agent Olson?

20      THE DEFENDANT: Yes, Your Honor.

21      THE COURT: Okay. Mr. Lara, why don't you just

22 proceed?

23      THE WITNESS: [Inaudible] excuse me. My computer just

24 died, for whatever reason. So I'm on a cellphone. So I don't

25 have the affidavit in front of me. So I'll try to do the best

Jacob Olson - Cross

1    I can. I apologize.

2          THE COURT: Okay. And let me just -- since you're

3    going to testify -- so why don't I just go ahead and place you

4    under oath. Will you please raise your right hand?

5        (The oath was administered)

6          THE COURT: Okay. Thank you

7      Mr. Lara, go ahead

8          MR. LARA: Sure.

9                    CROSS-EXAMINATION

10   BY MR. LARA:

11   Q. First of all, I just wanted to -- Mr. Olson, can you hear

12   me clearly?

13   A. Yes, sir.

14   Q. Okay. First of all, I just wanted to clarify, Mr. Smith

15   was booked into custody. And are you aware whether or not he

16   complied with the agents who arrested him on that day, in

17   March?

18   A. Oh, per the arresting officers [inaudible].

19   Q. He didn't attempt to flee or run from the agents that were

20   there on the -- on the scene?

21   A. I was -- I was told that he was very compliant.

22   Q. Okay. Now, I wanted to ask you a few questions. The

23   affidavit, which was proffered to the Court, that was done by

24   you in conjunction with officers from Idaho; is that correct?

25   A. It was drafted by me, using some additional information

Jacob Olson - Cross

1  from Rexburg, Idaho police department.

2  Q. Okay. And I just wanted to clarify a few things that I

3  noticed in the affidavit, if you could answer some of these. Do

4  you have any photographs of the alleged knife that was used in

5  this incident?

6  A. [Inaudible].

7  Q. Is it a no?

8  A. As of right now, no. There was a knife located during the

9  vehicle search. I have yet to see those photos yet.

10 Q. Okay. And are you aware that that was the type of knife

11 described by the complainant?

12 A. I'm unaware because I haven't seen the photos yet.

13 Q. Okay. Now, I wanted to ask you, with respect to the

14 information that [inaudible] by H.P. in this case, did you

15 speak to H.P. directly?

16 A. Yes.

17 Q. Okay. In your conversations with H.P., as far as the

18 initial encounter with Mr. Smith, was the knife in question --

19 do you have information to suggest that that knife was used in

20 direct threat to H.P.?

21 A. The information [inaudible] specific [inaudible] issue. So

22 the knife was pulled out, brandished during the time that they

23 were in the car from [inaudible] pocket of his pants. It was

24 shown to the victim. And then looked at the victim with the

25 knife [inaudible] center console [inaudible].

Jacob Olson - Cross

1  Q. Okay. And just to be clear, that has been reported at some
2  point in your investigation?
3  A. Yes, sir.
4  Q. Okay. Now, let me -- let me follow with that. So was the
5  knife brandished, as you described it -- does that -- did that
6  happen before or after the [inaudible].
7  A. I'd have to go back and review exactly [inaudible]. But I
8  believe --
9  Q. Okay. Had you taken -- were any photographs taken of any
10 injury she may have sustained by the use of a knife or anything
11 of that nature?
12 A. No.
13 Q. Okay. Now, according to the affidavit, these two,
14 Mr. Smith and H.P., met on a dating app?
15 A. Correct.
16 Q. And is that something that's common for individuals at
17 their age, approximately 19 and 18; to meet on these social
18 media apps?
19 A. I would assume so. I'm outside that age group, so I can't
20 [inaudible] say. But I believe [inaudible].
21 Q. Okay. And there's nothing out of the ordinary with someone
22 of Mr. Smith's age getting on an app like that and meeting
23 someone his age as well, right?
24 A. I don't see anything improper about that.
25 Q. Would you agree that -- and I'm not sure what your

Jacob Olson - Cross

1  experience is with respect to investigation -- you know, you've

2  had the opportunity to investigate online predators?

3  A. Yes.

4  Q. Would you agree that this situation is completely different

5  than something where -- let's just say, for example, someone

6  groomed another individual to meet them, you know, and that

7  type of nature of a case, right? This is a completely different

8  case?

9  A. I'm not sure I agree to that.

10 Q. Okay. Do you -- with respect to the information that you

11 obtained from H.P.'s cellphone, do you have a complete list of

12 all the conversations she had with Mr. Smith?

13 A. I have a Tinder conversation that was obtained [inaudible]

14 warrants -- Tinder application. I'd have to go back and review

15 the cellphone for any text messages. But I believe the Tinder

16 conversation [inaudible], and then there were some phonecalls.

17 Q. Okay. Now, the affidavit suggests that H.P. objected to

18 going to the state -- the national park; is that right?

19 A. That's correct.

20 Q. Now, did she indicate in her conversations with you whether

21 or not there was an opportunity for her to get out of the

22 vehicle?

23 A. You're going to have to be more specific about your

24 question. I apologize. I don't know exactly what you mean.

25 Q. Sure. Just [inaudible]. It's a simple question. Did she

Jacob Olson - Cross

1  [inaudible] -- in your conversations with H.P., that at any

2  point there was an opportunity for her to remove herself from

3  the Honda Civic?

4  A. Her indications were that she asked him to take her back to

5  her apartment. He would not take her back [inaudible], and then

6  proceeded to go to Yellowstone National Park where cellphone

7  service and such became way more -- the phone was taken during

8  that time as well.

9  Q. Did she indicate [inaudible] out of her hand? How

10 did -how did he [inaudible]?

11 A. From what I -- from what I understand, she was holding the

12 phone, and he took it from her.

13 Q. Did he use force against her to take that phone?

14 A. I don't know what you mean, sir. He took the phone from

15 her. You know, he didn't punch her before he did it, but he

16 took the phone from her. She was in [inaudible]. He was

17 driving.

18 Q. Okay. And that's what I'm getting at. I was looking at the

19 affidavit. It didn't have any specific with respect to how did

20 it happen, when did it happen. It just says, the phone was

21 taken. Right?

22 A. Okay.

23 Q. And that's the point. I just wanted to find out the nature

24 of how he obtained the phone.

25      So shortly after that, they arrived at a camp site; is that

Jacob Olson - Cross

1  right?

2  A. I'm not sure about "shortly." A couple of hours.

3  Q. Okay. Now, in the affidavit it indicates that she removed

4  herself from the vehicle and got into the tent; is that right?

5  A. No.

6  Q. Now, could you explain that to me then?

7  A. Yeah. She was able to get out of the vehicle when they got

8  to the camp site. She was able to grab her phone at that

9  point. She went into a women's restroom, approximately the

10  third stall down, and then he followed her into the women's

11  restroom, stood outside the stall.

12  Q. And the reason I ask is, it's not in the affidavit, so I

13  wasn't aware of those details.

14  A. Okay.

15  Q. I was simply going based on the affidavit, which suggests

16  that she arrived at the location, got out of the vehicle and

17  entered the -- and entered the tent.

18  A. Okay.

19  Q. So when she's in the tent, she has her phone;

20  is that right?

21  A. No. He ended up keeping the phone on his side of the tent

22  for a portion of [inaudible].

23  Q. Okay. And then -- and did you -- did you verify whether or

24  not she had an opportunity to send any messages while she

25  [inaudible] or at the location of the camp site?

Jacob Olson - Cross

1  A. Yes. There's no -- there was no cellphone service there

2  for her, or at least that's what [inaudible] her. So she

3  wasn't able to get messages out till the following day.

4  Q. Okay. And were there any other individuals in that camp

5  site where Mr. Smith and H.P. were located in that tent? A.

6  She was unaware. When they arrived, it was very dark, late at

7  night, and she couldn't see anybody else. [Inaudible] to keep

8  her voice down because he said there was other people. Q.

9  Okay. And, again, would you agree with me that the information

10  that you're providing the Court today is based on the

11  information that was given to you from H.P., right?

12  A. Yes.

13  Q. So would you agree with me that the strength of the

14  information that you're providing is, again, based on the

15  information that was provided to you through another party in

16  this case, correct?

17  A. It was provided by H.P. I don't understand the question. Q.

18  So with respect to the information that the Court has to make

19  their decision as to the offense itself, that information was

20  provided primarily from H.P.?

21  A. What specific information are you -- the question that you

22  just asked, the answers to those questions were provided by

23  information given from H.P., correct.

24  Q. Okay. That's all I wanted to know, is whether or not the

25  information that we're giving the Court, facts that we're

Jacob Olson - Cross

1  giving the Court are, again, provided from H.P. And that's all

2  I wanted.

3      So would you agree with me that these specific types of

4  cases are -- been categorized as a he said/she said type of

5  case?

6  A. I don't particularly agree with categorizing them as that,

7  no.

8  Q. And why is that?

9  A. Because I believe that the initial evidence that we've gone

10 into in regards to [inaudible] search warrant [inaudible] and

11 things help provide more evidence towards [inaudible].

12 Q. Now, that evidence that you just indicated right now, do

13 you have that evidence? Do we have that evidence in front of

14 [inaudible]?

15 A. You have an affidavit, I believe. I don't think

16 discovery's been provided yet.

17 Q. Okay. So the only information that the judge has right now

18 to analyze these facts are provided from H.P., right? Not

19 including the information that was [inaudible], right?

20 A. Okay. I'd have to see which affidavit -- see the affidavit

21 [inaudible] to see if there --

22 Q. Okay.

23 A. -- from [inaudible].

24 Q. Okay. Now, let me just make sure I have this straight.

25 The crime was reported on September the 10th, 2019, correct?

Jacob Olson - Redirect

1   A. Negative. It was provided September 8th.

2   Q. Okay. And I'm just clarifying that because the affidavit

3   would suggest that she provided district court with the agents

4   on -- excuse me -- not the agents but the officers from the

5   police department on September [inaudible] in the probable

6   cause section on Page 2 of the affidavit.

7   A. She did a follow-up with that agency on September 10th, I

8   believe. September 8th, minutes after returning to town, her

9   roommates pick her up, and they went directly to the Rexburg

10  Police Department where [inaudible].

11  Q. Okay. Thank you for clearing that up. [Inaudible] of the

12  affidavit.

13      Now, if you know, do you know if Mr. Smith attempted to

14  contact or threaten H.P. after the alleged incident?

15  A. There is no report of that.

16          MR. LARA: I have no further questions for the agent,

17  Your Honor.

18          THE COURT: Okay. Thank you.

19      Ms. Garcia, do you have anything you'd like to follow up

20  on?

21          MS. GARCIA: Yes, Your Honor. I do.

22                      REDIRECT EXAMINATION

23  BY MS. GARCIA:

24  Q. In regard to the question posed to you whether there were

25  any photographs of injuries as a result of the knife, you said

Jacob Olson - Redirect

1  no. However, will you describe to the Court any photographs

2  where there is displayed injury to the victim?

3  A. [Inaudible].

4  Q. Did you hear me?

5  A. [Inaudible].

6         THE COURT: Why don't you repeat that question?

7         THE WITNESS: [Inaudible].

8  BY MS. GARCIA:

9  Q. Agent Olson.

10  A. Yes, ma'am.

11  Q. Can you hear me?

12  A. Yeah. I can hear you now. [Inaudible].

13  Q. Agent Olson, you were asked questions about any injury as a

14  result of the knife that Mr. Smith had. And you said there

15  were none. Can you describe to the Court any injuries that you

16  observed in photographs of the victim?

17  A. Yes. The victim has photos of a small abrasion on her

18  neck, some marks on her breast, and then reported some initial

19  scratches on her stomach. She also has multiple photos of a --

20  I don't remember the name of it, but the muscle between the top

21  bend in your thumb was torn.

22         THE COURT: Okay. Anything else, Ms. Garcia?

23         MS. GARCIA: Nothing else, Your Honor. Thank you.

24         THE COURT: Okay. Do you have anything further that

25  you'd like to put before the Court, Ms. Garcia, apart from

Jacob Olson - Redirect

1    arguing?

2        MS. GARCIA: Just in regard to -- if the agent will

3    please describe the area that she's in.

4    BY MS. GARCIA:

5    Q. It's not like there's a lot of towns around there, is

6    there? Is it woodsy? Houses? Basic [inaudible].

7        THE COURT: Were you able to hear that, Agent Olson,

8    that question? We have a pretty dicey connection, folks. Can

9    you hear me, Agent Olson?

10        MS. GARCIA: [Inaudible].

11        THE WITNESS: Is this [inaudible]? Yes.

12        MS. GARCIA: That's a lot [inaudible].

13        THE WITNESS: I'm sorry.

14    BY MS. GARCIA:

15    Q. [Inaudible] Would you please describe the environment in

16    which the victim was taken as far as being woodsy, houses?

17    What is it?

18    A. Yes. The area where they left in Rexburg -- they left Idaho

19    and drove toward Montana and then entered the west section of

20    Yellowstone and then went into a campground within the

21    interior of the park. And it's very remote; no cellphone

22    service; really dark; obviously, big woods of Montana and

23    Wyoming.

24        THE COURT: Okay. Anything --

25        MS. GARCIA: Other than that, Your Honor, nothing

1   further.

2           THE COURT: Okay. Mr. Lara, any further questions?

3        MR. LARA: No further questions for the agent, Judge.

4        THE COURT: Okay. Thank you, Agent Olson. You may -you

5        may be excused.

6      Anything else that you'd like to introduce, Ms.

7   Garcia? Other evidence?

8           MS. GARCIA: Nothing for the government, Your Honor.

9        THE COURT: Okay. Mr. Lara, do you have any evidence you'd

10       like to proffer or otherwise introduce?

11          MR. LARA: Yes, Judge. Yesterday afternoon we sent

12   over to the Court a few affidavits as exhibits. Exhibit Number

13   1 is detailed information from Bank of America for Tammy Smith

14   --

15          THE COURT: Okay.

16          MR. LARA: -- Cody Smith's mother. It's a mortgage

17   for her home.

18          THE COURT: I have that.

19          MR. LARA: Exhibit Number 2, Judge, the Court has the

20   flight itinerary from Florida to Wyoming district court for Mr.

21   Cody Smith that was purchased by Tammy Smith to make sure that

22   he can arrive for his Wyoming court date should the Court grant

23   him a bond.

24      Defendant's Exhibit Number 3 are taxes from Cody Smith for

25   2018, the most recent taxes that he has, provided to the Court

to show that he has been employed prior to this incident.

Exhibit Number 4 are documents from Cody Smith of his enlistment with the Navy, Your Honor. That was provided in Exhibit Number 4. And that's exactly where he was apprehended on this matter.

Exhibits 5 through 11, those are a series of affidavits and letters from the family. I'm not sure if the Court had an opportunity to read those. They do provide information from Tammy Smith, Donovan Smith, his father, as well as his grandfather from his maternal side and grandmother from maternal side, as well as his grandmother from the paternal side, all vouching for his character as well as willingness to be a third-party custodian in this matter as well as providing collateral for the Court should they grant a bond.

Exhibit Number 10 and 11, Your Honor, are letters from family friends attesting to his character; provided the Court that as well.

And then, lastly, we have Exhibit Number 12, which is a copy of his passport, which his mother has brought here to Texas. She's presently sitting alongside of me in my office, Your Honor. She brought the passports. The Court may find, as [inaudible] of the bond, he would surrender that as part of the -- of that. So, again, it's Exhibit Number 12, Your Honor.

Those are the exhibits that we ask to present to the Court and submit as evidence on his behalf.

1    THE COURT: Okay. Thank you, Mr. Lara. I do have all
2  those here in front of me and have them on the screen right now.
3    Okay. Anything else, Mr. Lara, to introduce into evidence
4  before we get into argument?
5    MR. LARA: No, Your Honor. I believe that's all we
6  had in terms of exhibits for evidence, Judge [inaudible].
7    THE COURT: Okay. Ms. Garcia, do you want to begin
8  with your argument for detention?
9    MS. GARCIA: Yes, Your Honor. With respect to the
10  affidavits provided by Mr. Lara, it shows that the defendant
11  has a lot of great family support. However, there seems to be
12  this notion that there's a misunderstanding about something.
13  When we're dealing with victims, especially victims who have
14  been kidnapped, sexually abused in any way, there's no
15  misunderstandings, especially when there's evidence to support
16  injuries and documentation by photographs, for example,
17  photographs of the vehicle entering Yellowstone Park, and
18  everything is confirmed as to what the victim reported. So
19  there's no misunderstanding.
20    And in this particular case, kidnapping carries a penalty
21  of up to life, Your Honor. And the fact that he brandished the
22  knife, he showed it to her [inaudible] as a form of
23  intimidation. These are acts that [inaudible] do not warrant
24  one being released on bond.
25

1    The fact that the defendant -- the victim repeatedly told

2    him no, not to take her and he [inaudible] Yellowstone. And he

3    had his tent already set up there. That's all premeditated.

4    They wouldn't accept the [inaudible] self-prove [inaudible]

5    despite the praises that he receives from his family.

6        This is the only incident that we're aware about. We don't

7    know this happened to anyone else [inaudible] has. But the

8    fact that this [inaudible], it did happen.

9        Now, with reference to the affidavits, the mother -- the

10   mortgage shows that she's only been in that house for one year

11   and four months. Therefore, there's little equity in that

12   house.

13       As far as the ticket itinerary, you can buy a ticket.

14   Whether he'd get on that plane and show up, that's a different

15   matter. So it's the government's position that the best

16   decision here is to keep Mr. Smith in detention, especially in

17   light of some of these affidavits describing his -- describing

18   him as an adventurous person who was traveled to Cuba,

19   South Africa, Australia. Then there is a chance of flight

20   risk, Your Honor. So based on a chance of flight risk and the

21   fact that he is a danger [inaudible].

22       THE COURT: Okay. We just missed that last part. You

23   said -- you were just summing up that you're requesting

24   detention based on flight, and then you cut out. Why don't you

25   just repeat that part.

1          MS. GARCIA: And danger to the community as well, Your

2    Honor, based on the facts and circumstances of this case.

3          THE COURT: Okay. Thank you, Ms. Garcia.

4    Mr. Lara?

5          MR. LARA: Yes, Your Honor. First of all, Judge, I want

6    -- I want to just communicate that I don't believe that the

7    government has even come close to providing a preponderance of

8    the evidence standard on the flight risk issue, number one.

9          Number two, on the dangerousness issue, Judge, I think

10   they've fallen completely short of providing clear and

11   convincing evidence to suggest that he's a danger to the

12   community.

13         Now, I wanted to address some of the factors that the Court

14   would consider, this Court is clearly aware of, 3142(g), to

15   determine whether or not detention is warranted here. In

16   looking at the affidavits and the nature of the offense

17   charged, that seems to be the majority of what the government's

18   arguing. The government is essentially just arguing the nature

19   of the offense. That's what they're expecting the Court to make

20   their decision on, in saying, This is the type of offense that

21   we don't let people out on bond for.

22         Now, I would -- I would -- my position, Judge -- and,

23   again, a majority of the information that the Court has to

24   determine is based on an affidavit which was provided from an

25   individual -- again, it's a he said/she said type of situation,

1    Your Honor. And that's what the Court is being asked from the

2    government to make its ruling upon.

3        Now, if the Court looks at the weight of evidence against a

4    person, Mr. Smith is presumed innocent. And the Court is aware

5    of that and has mentioned it, as well. He has a presumption of

6    innocence. And that carries a lot of weight, Your Honor.

7        If we look at the history and characteristics of the person

8    here, the affidavit provided by Mrs. Smith, Tammy Smith,

9    including [inaudible] to the Court, that not only is she

10   willing to sign as a third-party custodian. She is going to put

11   up her own property; not only the home, whatever property she

12   needs to put up, in order to make sure that her son, her 20-

13   year-old son gets out on bond, she is willing to do that

14   because she knows -- again, she knows that -- who her son is.

15   She knows that he is going to comply with every condition this

16   Court would impose.

17       Not only that, Your Honor, if you look at the history

18   and characteristics of this individual, we're talking about

19   Mr. Smith here who recently was [inaudible].

20   (Cellphone ringing loudly)

21       MR. LARA: -- as a medic in the Navy [inaudible], to

22   the point [inaudible] where he was, was in the final stages

23   of completing that training. Mr. Smith has no intention of

24   leaving this country, has no intention of fleeing from the

25   United States and not presenting himself against these false

accusations.

Now, again, there's a time and there's going to be the place for us to argue that, Your Honor, with respect to the elements of the case. We just ask the Court to consider all the factors this Court will consider in making a determination based on, again, his mother standing behind him. She has at least a hundred thousand dollars equity in that home. Her -his grandfather is standing behind him. He's also willing to sign as a third-party custodian. His grandmother is also willing to stand and sign as a third-party custodian. They have strong roots to Florida, Your Honor.

And clearly, the family supports this young man because he's done nothing but be an outstanding, again [inaudible]. Now, when the Court looks at employment history, we provided the Court his history, 2018. He was in high school prior to that. So there wasn't much time to [inaudible] his job. His father has clearly indicated, should he be given a bond, he's going to work with him. And if he's working with his father, that means that he would be an individual that's going to be supervising him throughout the day should the Court allow him to work during the period awaiting for an appearance in court in Wyoming.

Now, when we look at the financial resources -- now, the government made -- indicates that he's a flight risk [inaudible] South Africa. Judge, that doesn't hold [inaudible]

willing to submit to the Court and surrender his passport,
he's not going to travel anywhere. Much less, with the
situation that we have right now with COVID-19, that there are
travel restrictions. He's not going anywhere. He's going to be
home. He's going to be with his family.

And the Court can further even apply house arrest. If that
wasn't enough, the Court could [inaudible] GPS. In the
pretrial services report the pretrial services officer also
indicated that the mother is willing to install a landline and
do anything this Court would ask, to make sure someone is
supervising him at all times. Is it necessary? I don't believe
so. But that's to the extent that they're willing to go to
assure that there are some conditions that can be given to
this individual.

Now, the length of the residence in his community in
Florida, he's lived there all his life. All his family lives
there. And, Judge, he is not going anywhere. We have
affidavits that support that. Friends of the family, community
ties, again, he has people that are looking out for him there
in Florida where his family resides. He's not a flight risk.

Now, past conduct, he has no criminal history. He's never
been in trouble before. There is no indication that he's a
threat to anyone. The [inaudible] officer, the agent testified
that there is no evidence to support that he attempted to reach
out to this individual; that he attempted to speak to this

1  individual after these [inaudible] have occurred.

2      Again, if we were in a situation where this man was a

3  stalker, where he was looking for this individual, possibly

4  I'd understand, at least [inaudible]. But Mr. Smith has made

5  no contact with this individual. He was, again, in the Navy,

6  doing what he wanted to do as a medic.

7      And, Your Honor, if the record -- he doesn't have a

8  record, so we can't really provide the Court assurances of his

9  past appearances in court. But I don't think that should go

10 against him simply because he has [inaudible]. Now --

11          THE COURT: Mr. Lara, can I just ask you -- just break

12 down for me what happens practically next in this case. If

13 he's set for proceedings, he's either going to be in custody

14 and transported or he'll go back to Florida and have a court

15 date in Wyoming; is that right? Is that what's going to happen

16 next for him?

17          MR. LARA: I'm sorry. Were you asking me,

18          Judge? THE COURT: Yes.

19          MR. LARA: Okay. So what would happen if he's not

20 granted a bond in this situation, they would take him out to

21 Wyoming. At Wyoming they would either attempt another

22 detention hearing pending the resolution or the scheduling

23 order from the Court. If he's granted a bond, he would go out

24 to Florida and await a scheduling order. We already have an

25 attorney out there in Wyoming. He's been retained to make sure

1  that he is going to comply with all settings out there in

2  Wyoming.

3      So if he gets a scheduling order, which is typically, in

4  situations like this [inaudible], Your Honor -- it's typically

5  a month and a half when it's out of state, usually when they

6  set hearings [inaudible]. Judge, with the situation right now

7  with the virus, I don't know how soon that would be set.

8  However, it could be even two months, three months down the

9  line before he gets another hearing, another setting. And

10  that's what -- that's what I'm afraid of, Your Honor.

11      THE COURT: Okay. Well, you know, what I wanted to

12  clarify just for the record and also for Mr. Smith's benefit is

13  that if he were to be detained, he would have an opportunity to

14  revisit that decision with the Court in Wyoming, the Court that

15  has jurisdiction over the charged offense. And that's your --

16  that's your understanding as well, it sounds like, Mr. Lara; is

17  that right?

18      MR. LARA: Yes, Your Honor. That is --

19  that is correct.

20      THE COURT: Okay. And I interrupted --

21      MR. LARA: Just --

22      THE COURT: Yeah. I interrupted you. Please go

23  ahead and finish up.

24      MR. LARA: No, Judge. Just looking at our position,

25  Judge, we believe that there are [inaudible] conditions

1  available which would reasonably assure his appearance for all

2  judicial hearings and which would adequately protect the

3  public, Your Honor. And that's the standard here, of would it

4  reasonably assure. There is not a requirement that it

5  absolutely guarantees. I believe with the affidavits provided,

6  that would [inaudible] hearings in the state of Wyoming, Your

7  Honor.

8      We've also provided a release to a third-party custodian,

9  surrender of his U.S. passport, home detention if necessary,

10  GPS monitoring if necessary, any other conditions the Court

11  would impose.

12      And we, frankly, Judge, believe that the only credible

13  argument from the government here is the nature of the offense.

14  The government argues for detention. We believe detention is

15  insufficient to overcome his presumption of innocence and the

16  Court's obligation under the Bail Reform Act to release

17  [inaudible] on the least restrictive combination of conditions.

18  We believe we've presented the Court with sufficient amount of

19  conditions that can be [inaudible] to assure that he's not a

20  flight risk [inaudible] and, two, that he is not a danger to

21  anyone if he's being supervised 24/7, GPS, anything

22  [inaudible].

23          THE COURT: Okay.

24          MR. LARA: And that's all.

25          THE COURT: Thank you.

1  Ms. Garcia, anything to follow up on?

2          MS. GARCIA: Yes, Your Honor. Just as to -- the Navy

3  thing is recent. We believe that all began the end of March.

4  So it's not like he was in the Navy in September when this

5  offense was committed.

6          THE COURT: Okay.

7          MS. GARCIA: And the defense [inaudible] saying it's a

8  he said/she said. No. It's she said. And what she said is

9  supported by evidence, supported by injury to her person,

10  supported by the photographs, supported by records, all

11  consistent with her description of the events that transpired.

12  So it's not a he said/she said.

13      And as far as what's been presented today, there's no

14  evidence rebutting the fact circumstances of the offense.

15  It is truly what the victim has said, what the agent -- his

16  follow-up as far as the investigation for search warrant,

17  et cetera.

18      And [inaudible] they referred to the strong [inaudible] of

19  family in Florida. In all the affidavits, the only thing I

20  ever saw was someone who has known the family for 35 years.

21  Other than that, they don't establish how long they've

22  [inaudible]. They say several, several years. "Several" can

23  mean anything.

24      And it also -- Mr. Lara emphasized that there is no flight

25  risk. Your Honor, this defendant has absolutely no ties to

1    Wyoming, absolutely none. And being in Florida I think would

2    lend itself to a lot of potential ways that he could leave the

3    country. And, therefore, the government maintains that

4    detention is the best thing in this case.

5          THE COURT: Okay. Thanks, Ms. Garcia. Just one follow-

6    up question. There's no presumption in this case; is that

7    correct? The victim here was not a minor; is that right?

8          MR. LARA: That's correct, Your Honor.

9          MS. GARCIA: Other than the --

10         THE COURT: Go ahead.

11         MS. GARCIA: [Inaudible], Your Honor. Just that

12   [inaudible] there is the range of punishment. And this -- the

13   kidnapping is up to life.

14         THE COURT: Okay. But --

15         MS. GARCIA: [Inaudible].

16         MR. LARA: I just wanted to clarify one --

17   just one point.

18         MS. GARCIA: -- [inaudible] factor.

19         THE COURT: Go ahead, Mr. Lara. Go ahead.

20         MR. LARA: Just one point, Judge. Mr. Smith has been

21   enlisted in the Navy since May of 2019. It's not something that

22   he just woke up one day in January and decided to do it. He's

23   been in the Navy. As soon as he graduated, he enlisted. And all

24   of the trips that he's taken, he's taken with family as well,

25   Judge. I just don't see the issue there with the flight

1  risk, Judge.

2           THE COURT: Okay. Thank you, Mr. Lara.

3  All right. Well, I think I have --

4           MR. LARA: Thank you, Judge.

5           THE COURT: I think I have the information that I need

6  here, thanks to all of you.

7      And look, Mr. Smith, this is -- what I said at the outset

8  remains true; that you're entitled to the presumption of

9  innocence in this case. And Mr. Lara has presented a very

10  strong case for you to get bail. I have a recommendation from

11  pretrial services that recommends against that. But he has --

12  he has very ably, you know, attacked that recommendation.

13     But ultimately, my conclusion here is controlled or

14  compelled in my view by the -- by the fact that there was a

15  knife involved in this case. I think if we were to take out the

16  weapon and the credible evidence that we heard today at the

17  hearing about the involvement of a nice -- of a knife in the

18  testimony from Agent Olson -- which, by the way, I credit. I

19  find that testimony credible. That, I think, is what -- is what

20  makes this case one that sort of pushes it over the edge.

21  There's a number of things that play into that, but that's

22  really the -- ultimately the thing that pushes this case for me

23  into one where I'm not going to be able to give you a bond.

24     But I just want to emphasize that, to me, this is a very,

25  very close case and one that I fully expect my -- where this

1  issue might be revisited by the Court in Wyoming. You know,

2  the Court there has got to be assured with respect to your

3  ties to Wyoming or with respect to your ability to get up to

4  Wyoming. And so what we're -- so what we're addressing right

5  now is what happens to you pending when you get on up to

6  Wyoming and have an opportunity for them to take a look at

7  this issue.

8      So I'm going to order that you be detained. I find that

9  the government's met its burden in this case with respect to

10 flight and dangerousness. It's two different burdens. It's a

11 preponderance of the evidence with respect to flight, and it's

12 clear and convincing evidence with respect to dangerousness.

13 And much of that conclusion is informed by the nature and

14 circumstances of the alleged offense. And at this -- at this

15 stage -- at this stage these are just allegations, and I

16 recognize that. But there were injuries involved. The nature

17 of the offense is a -- is a kidnapping. It carries up to a

18 life term of imprisonment. Obviously, your criminal history is

19 clear. And so that would play into things as well later on.

20     But there's also, as we heard, some evidence introduced at

21 this stage of premeditation as well. And so all of that plays

22 into my conclusion and ultimately leads me to conclude that

23 you'll be detained.

24     Okay. Mr. Lara, is there anything further from you, sir?

25         MR. LARA: Nothing further at this time, Judge.

1          THE COURT: Okay. Thank you, sir.

2      Ms. Garcia, anything further from you?

3          MS. GARCIA: No, Your Honor. Thank you.

4          THE COURT: Okay. All right. So, Mr. Smith, as I

5   mentioned, you'll be held in custody, and you'll be moved on up

6   to Wyoming where proceedings will continue. That may take a

7   little bit of time. And, obviously, with the current crisis,

8   we're not sure how long that's going to take. But as I

9   mentioned, I fully expect that this issue may be revisited.

10  Okay?

11      That's all I have. Thank y'all, everybody. You may be

12  excused. Court will be in recess.

13  * * *

14      *(3:18 p.m.)*

-oOo-

1

2     I, court approved transcriber, certify that the foregoing

3     is a correct transcript from the electronic sound recording of

4     the proceedings in the above-entitled matter.

5

6     Date: 4/24/2020      /s/ Chris Poage
                           Approved Transcriber
7