# EXHIBIT 1

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jacob Olson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises of 375 20th Ave NW, Naples FL 34120, to include a silver 2005 Honda Accord Ex., Coupe, Florida license plate HHBG35, Vehicle Identification Number 1HGCM71775A002384 for items as further described in Attachment A, for the items described in Attachment B.

2. I am a Special Agent ("SA") with the National Park Service ("NPS"), United States Department of the Interior. Presently, I am assigned to the Washington Office, based in Yellowstone National Park, Wyoming. I have been employed by the NPS since 2006. From 2006 to 2013, I was a Federal Law Enforcement Officer. I have been a Special Agent since 2013. I have received specialized training at the Federal Law Enforcement Training Center ("FLETC"), having completed the Land Management Police Training Program and the Criminal Investigator Training Program. I have attended and instructed advanced training courses in a variety of law enforcement subjects, and have conducted criminal investigations into a variety of offenses.

3. I have received specialized training regarding criminal investigations through the FLETC. During my law enforcement career, I have participated in numerous investigations involving terroristic threats, murder, disorderly conduct, assault, sexual assault, sexual abuse, felons in possession of firearms, homicide, and attempted homicide. As a result of my training and experience, I have become familiar with the many techniques employed by individuals and organizations that endeavor to further this type of criminal activity.

4. The facts in this sworn statement come from my personal observations, my training and experience, and information obtained from other agents, officers and witnesses. This sworn statement is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

5. On September 10, 2019, Detective Stubbs and Lt. Ron Ball of the Rexburg, Idaho Police Department met with H.B. and her mother at the police department regarding a sexual assault. I spoke with H.B. on September 17, 2019.

6. During an interview with Detective Stubbs and Lt. Ball, H.B. stated she was a student currently living in and attending college in Rexburg, Idaho. H.B. had met the suspect, later identified as Cody D. SMITH, on the communication application, Tinder, utilizing SMITH cell phone for the application's communication and subsequent cell phone communication with her. H.B. provided her cellphone to Detective Stubbs in order for him to conduct a Cellebrite image of the phone. The number associated with that Cellebrite image is (972) 984-8271.

7. On January 9, 2020, the Honorable Mark Carman, Magistrate Judge for the United States District Court for the District of Wyoming issued a search warrant for SMITH's Tinder account. I subsequently served that warrant on Tinder. As a result, the conversation with H.B. and SMITH was located. During the conversation, H.B. stated she would potentially be interested in visiting Yellowstone on September 8th, but not the evening of September 7th. H.B. and SMITH exchanged cell phone numbers during the conversation as well. Tinder also provided photos associated with SMITH's account. Those photos match the description and original identification made by H.B. with Rexburg Police Department.

8. After conversations on Tinder, H.B. agreed to meet with SMITH on the night of September 7, 2019 around 1800 hours. H.B. reported she and SMITH coordinated meeting up and then going to a McDonald's restaurant in Rexburg. The plans were all completed using cell phones. H.B. confirmed her phone number as (972) 984-8271 and that was the number she had used when communicating with SMITH. H.B. reported that she met SMITH in the parking lot of her apartment in Rexburg around 2200 hours, at which time they went in his silver four door Honda to get something to eat at McDonald's on 2nd East in Rexburg.

9. After going through the drive-through, H.B. noted they talked in his car in the McDonald's parking lot for a period of time while SMITH tried to convince her to go to Yellowstone National Park with him. H.B. declined his multiple requests to go to Yellowstone National Park and instead asked SMITH to drive her back to her apartment.

10. Instead, of taking H.B. back to her apartment, however, SMITH started driving towards Yellowstone on Highway 20. H.B. told Detective Stubbs and LT. Ball that she had continually stated her objections to going and continued to state her objections for the duration of the trip until they arrived in Yellowstone, but SMITH refused to return her to Rexburg or to let her out of the vehicle. During the drive to Yellowstone, SMITH took her cell phone and placed it under his leg so she could not use it. After multiple minutes in the car, SMITH brandished a knife from the carpenter's pocket of his pants. The knife was removed from the pocket, with the tip of the knife facing up. In a subsequent interview, H.B. described the knife as a fixed blade hunting type knife with a dark handle, approximately 4-6 inches long with a straight spine.

11. Upon arrival at the campsite, H.B. noted SMITH's site had a tent already in place. During a subsequent interview, H.B. described the tent as a two-person sized tent with one entry described as a zippered door in the middle of the front of the tent.

12. H.B. reported she told SMITH she just wanted to go to sleep and get some sleep because she was tired. H.B. stated that it was around 0030 hours on September 8, 2019 when they arrived at the campsite. H.B. reported going into the tent as she was cold and tired. While in the tent, SMITH bound her hands with his hands and continuously attempted to grab her breasts and pelvic area. SMITH also kissed, grabbed, bit, abraded, and scratched H.B. during different portions of the assault. All of this unwanted touching and contact was conducted while H.B. was asking for SMITH to stop and was attempting to get away. H.B. said that she was telling SMITH the entire time that she did not want him to touch her and that she was tired and just wanted to sleep. According to H.B., at one point SMITH was able to get her bra down around her abdomen, exposing her breasts, and he was feeling her breasts while he was partially on top of her. H.B. reported SMITH tried several times to get his hands down her shorts but she continued to stop him and that the furthest he ever got was her buttocks with his hand. Detective Stubbs asked if she had ever been made to touch SMITH's penis or if he had disrobed to expose himself. She reported he did not take off his clothes.

13. During my interview with H.B., she reported that at around 0300 hours, after only being able to sleep briefly, she woke up to SMITH slowly rubbing against her buttocks area while she was lying down. H.B. reported she believed SMITH ejaculated through his clothes based on how wet his clothing became in conjunction with when he stopped. H.B. reported to Detective Stubbs and Lt. Ball that SMITH asked if she wanted to have sex after the rubbing event, to which she refused. SMITH again started to try to get under her clothes, but she stated that she did not let him. H.B.'s clothing was subsequently collected and transferred to the Wyoming State Crime Lab where it is awaiting to be tested for comparable male DNA.

14. H.B. reported to me that after her alarm went off around 0700 hours, she asked for the keys to the car in order to open it, and warm up, to which SMITH said no. SMITH did unlock the car so she could access it but did not give her the keys. While waiting in the car, SMITH packed up his tent and they left to travel back to Rexburg where SMITH dropped her off at her apartment around 1000 hours. H.B. reported minimal conversation on the ride back, and stated when she did speak it was only one word responses.

15. H.B. later reported to me that SMITH took her phone into the tent with him where she was eventually able to retrieve it. H.B. reported she had no cell service from the campsite.

16. Initially, H.B. did not know SMITH's full name, but via some investigation, SMITH's identity was confirmed using his vehicle information and phone number. SMITH had revealed to H.B. earlier in the evening he had been ticketed by Rexburg police. Rexburg officers were able to match the vehicle, suspect information, and eventual driver's license photo to confirm SMITH as the suspect.

17. H.B. reported to me she had some damage to her inner lip from where SMITH had bit her top lip and tugged on it to the point it bled. She noted SMITH acknowledged the bleeding at the time. She also reported that she had marks on her neck left from a "hicky" and scratches on her breast from SMITH.

18. On January 22, 2020, the Honorable Mark Carman, Magistrate Judge for the United States District Court for the District of Wyoming, issued a search warrant for SMITH's Verizon wireless location information and communication contents. On February 10, 2020, the Honorable Kelly R. Rankin, Magistrate Judge for the United States District Court for the District of Wyoming, issued a search warrant for H.B.'s location information. I subsequently served both search

warrants. SMITH and H.B.'s data both demonstrate travel between Rexburg and Yellowstone National Park from September 7th to September 8th during the time of the assault.

19. Based on my training and experience, I know DNA profiles are unique to each individual and that an individual's tissues, bodily fluids, and hair contain their DNA profiles. I also know that individuals normally shed skin cells, hair, and bodily fluids in their environment, which leaves DNA in places they have spent time. Based on my knowledge and experience I know trace DNA evidence to include hairs and fibers, would still be present in locations where it has been deposited within 8 months, if not for years.

20. H.B. stated that she believed she spent approximately 6 hours in SMITH's tent. Based on the amount of time H.B. spent in the tent, it is reasonable to believe trace evidence may be located in SMITH's tent, likely DNA associated with H.B..

21. Because of my knowledge and experience I know it is common practice for people to store their camping gear in one central location, to include such places as a vehicle, a garage, a storage room, bedroom or other such storage locations and to keep their camping gear for years.

22. During H.B.'s description of the events in the car with SMITH, immediately following their initial meeting at McDonalds, she described SMITH brandishing a fixed blade hunting type knife from the carpenter's pocket of his pants. H.B. described the knife as being tip up in SMITH's pocket prior to him removing, it and eventually placing it in the center console. Thus, the knife is evidence of the crime. Based on the description of the knife as a hunting style knife it is reasonable to believe the knife would be located with SMITH's camping and outdoor gear, rather than a folding blade style knife which is common to keep on one's person for the majority of the time.

23. During the time between the assault and now, SMITH attended Navy Basic in Great Lakes, IL and is currently in attendance of advanced school in Texas at Fort Sam Houston per Naval Criminal Investigative Service (NCIS) agents.

24. On March 17, 2020, the NCIS agents advised me that Naval basic students are not allowed to bring their vehicle to the training base. I was also advised basic Navy graduates attending advanced school in Ft. Sam Houston are also not allowed to bring personally owned vehicles on base initially. With this in mind, I requested Big Cypress Natioanl Park Ranger Joshua Radford to confirm if the 2005 Honda Accord Ex., Coupe, Florida license plate HHBG35, was at the address associated with SMITH's mailing address.

25. Per Florida's Driver and Vehicle Information Database on March 19, 2020, SMITH uses 375 20th Ave NW, Naples, FL as his mailing address. This is also the registered address of SMITH's mother. Per Ranger Radford's observations and photo documentation, he confirmed the 2005 Honda Accord Ex., Coupe, Florida license plate HHBG35, was parked in the driveway of the 375 20th Ave NW address as of March 7, 2020.

26. H.B. described the car-ride to the park as long and consisting of no breaks. An internet search depicts the drive from Rexburg to Norris Campground in Yellowstone as taking over two hours to drive. Based on my knowledge and experience it is reasonable to believe trace DNA evidence to include hairs and fibers, would still be present within 8 months, if not for years. SMITH's Honda was captured by photograph and a license plate reader stationed at the West Entrance to Yellowstone. Among many documented entries and exits, SMITH's Honda (FL license plate: HHB635) was documented leaving the West Entrance at 9/7/2019 at 8:34:55 PM, consistent with SMITH being enroute to meet H.B., and then again the following day, 9/8/2019 at

7

8:19:49 AM, consistent with driving H.B. back to Rexburg, ID. Although driven by SMITH, the title is registered to his mother.

27. It is common practice to process vehicles for evidence in environmentally controlled locations due the sensitivity of detection of such things as hair and other trace DNA evidence. The practice helps to minimize external environmental contamination and create an environment for a controlled and thorough search. Therefore, the federal officers executing this warrant will need to tow the Honda to a secure location utilized by the FBI in the Middle District of Florida, most likely Tampa. Following the search, the vehicle will be returned to the owners. To minimize any damage or intrusion to the vehicle I request the ability to obtain the keys for the vehicle as well.

28. Per the report from H.B., SMITH contacted her via telephone and was seen with his own cell phone. Based on acquired phone call logs for H.B. and SMITH, it is known SMITH utilized his cell phone to contact H.B. among others before and after the kidnapping and assault. It is reasonable to believe that all of SMITH's Tinder Application conversation would also be found on the cell phone as well as any other notes or references regarding his conversation or interactions with H.B.. Through my knowledge and experience I know that many people that use dating applications, commonly do so via mobile applications found on their cell phones. According to acquired records from SMITH's cell provider, the cellphone utilized by SMITH was associated with IMEI "353000093934852" and phone number, (239) 370-1217.

### **CONCLUSION**

29. Based on the forgoing, I request that the Court issue the proposed search warrant for:

    a. The residence of SMITH at 375 20th Ave NW, Naples FL, 34120;

b. Silver 2005 Honda Accord Ex., Coupe, Florida license plate HHBG35, Vehicle Identification Number 1HGCM71775A002384;

and further authorize the seizure of those items further described in Attachment B.

**END OF AFFIDAVIT**

Respectfully submitted,

_____ #32
JACOB OLSON
Special Agent,
National Park Service

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed.R.Crim. P. 4.1 and 41(d)(3) _____ day of _____, 2020.

_____
Nicholas P. Mizell
United States Magistrate Judge