Christyne M. Martens WSB #7-5044
Assistant United States Attorney
District of Wyoming
P.O. Box 22211
Casper, WY 82602
307-261-5434 (phone)
307-261-5471 (fax)
christyne.martens@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CODY DONOVAN SMITH,<br><br>　　　　　Defendant. | Criminal No. 20-CR-45-F |

*SUPPLEMENTAL* **NOTICE OF GOVERNMENT'S INTENTION TO OFFER EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 413 AND 404(b) AND MOTION IN LIMINE TO ADMIT EVIDENCE**

The government hereby supplements its original Notice of Government's Intention to Offer Evidence Pursuant to Federal Rules of Evidence 413 and 404(b), (Doc. 53)[1], and moves this court for an order admitting all such noticed evidence at trial. This evidence regarding other sexual assaults and bad acts committed by Cody Donovan Smith (Smith) that are not specifically charged in the indictment is admissible under Federal Rules of Evidence 413 and 404(b).

The undersigned has attempted to confer with opposing counsel on various evidentiary issues by email without success. Given Smith's objection to the previous notice, (Doc. 55), he likely objects to the presentation of this evidence.

**I.　　Factual and Procedural Background**

---

[1] For the convenience of the court and the parties, new factual information not alleged in Doc. 53 has been bolded.

On March 18, 2020, the grand jury indicted Smith on one count of kidnapping in violation of 18 U.S.C. § 1201(a)(1) and one count of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1). (Doc. 1). This case is presently scheduled for trial on January 11, 2021. (Doc. 49).

H.B., the victim of Smith's charged conduct, met Smith using the dating application Tinder. Smith invited her to go to Yellowstone National Park with him, but she told him she did not want to go. Instead, she agreed to meet him for something to eat. Smith picked her up in the parking lot of her apartment in Rexburg, Idaho, around 10 p.m. on the night of September 7, 2019. From there, they went to the nearby McDonald's restaurant and went through the drive through. They talked in Smith's car in the parking lot. Smith tried to convince H.B. to go to Yellowstone National Park with him that night, but she repeatedly declined his requests and instead asked him to take her back to her apartment.

Instead of taking H.B. back to her apartment, Smith headed toward Yellowstone National Park. During the drive, H.B. continually objected, Smith took H.B.'s phone away from her, and Smith showed H.B. a knife. By the time she got her cell phone back, it did not have service.

When they arrived at the campsite in Yellowstone, Smith had a tent set up. H.B. got out of the car and went to the women's restroom with her cell phone. Smith followed her into the restroom and stood outside the stall. She could not get service on her cell phone. Not knowing what else to do, H.B. went to the tent with Smith. H.B. told Smith she was tired and just wanted to go to sleep. However, Smith kept touching her sexually and trying to remove her clothing. H.B. continuously objected. Smith offered H.B. alcohol, and H.B. refused.

At some point, Smith got on top of her, held her down, and restrained her by pinning her wrists over her head with his hands while he continued to touch her sexually. He wrestled her bra down around her abdomen, exposing her breasts and touching them. Smith choked her. He grabbed at her pelvic area and attempted to put his hands down H.B.'s shorts, but the furthest he got was

touching her buttocks and inner thigh. Smith bit H.B.'s top lip and pulled on it, tearing the frenulum and causing it to bleed. H.B. also had several marks and scratches on her body.

The following morning, September 8, 2019, Smith took H.B. back to Rexburg, Idaho. H.B. immediately reported the kidnapping and sexual assault, and she later photographed her injuries. H.B.'s frenulum was painful and bled for months after the assault.

## II.     Uncharged sexual assault of L.A.

Sometime in early 2019, L.A. met Smith on Instragram when he messaged her telling her he thought she was attractive. Smith was 18 and L.A. was 17. Smith wanted to meet somewhere and she agreed to go to the beach with him. While at the beach, Smith was sexually aggressive. Despite this, they officially began dating in April of 2019. The relationship lasted approximately four months. During the relationship, Smith was quick to anger and abused her emotionally, physically, and sexually.

Smith persisted in seeking nude photos and sexual favors despite being rebuffed. The majority of the sex L.A. and Smith had was not consensual. L.A. would tell him to stop and he would not stop. Smith would get on top of her, restrain her by pinning her wrists over her head with his hands, and repeatedly choked her, restricting her breathing. Smith would pull and bite her lips hard enough to leave sores and make her bleed. Sometimes, L.A. would cry or scream. L.A. had cuts, bruises, and vaginal bleeding resulting from these encounters. Smith was so forceful during oral sex that L.A. would choke and cry. Though L.A. trained in martial arts, Smith also trained in martial arts, and he could overpower her.

L.A. gave specific examples of the sexual abuse Smith inflicted upon her. During one sexual encounter that started as consensual, Smith forced anal intercourse on her that she described as "aggressive and painful." And while she told him to stop and that it hurt, he did not stop. In another instance, knowing that L.A. was terrified of small spaces and closets, Smith forced her into a closet where he forced intercourse on her while she cried and told him "no." L.A. also

reported looking at the contents of Smith's phone and finding photos of her breast exposed that he had taken while she was sleeping and without her consent.

Smith admitted to her that he had touched his younger sister sexually.

**On one occasion, Smith was driving L.A. to a destination when they got into an argument.[2] L.A. told Smith she wanted him to let her out of the car. He did not. He kept driving until they reached their original destination despite L.A.'s repeated requests to be let out of the car. Once they arrived, L.A. asked to go home. Smith did not take her home until he was otherwise ready to leave.**

Not long before they broke up, L.A. received a direct message from another girl telling her that Smith was a "rapist." L.A. took Smith's side and disregarded the warning. Later, another girl messaged L.A. telling her that Smith was asking her for nude photos. L.A. confronted Smith about it and he justified seeking the attention of other women because of L.A.'s choice to move away for college.

L.A. and Smith broke up August of 2019. After they broke up, Smith took a trip to see family that ran an ostrich farm in Boise, Idaho. During that trip, which L.A. recalled was in either late August or early September of 2019, Smith contacted her and asked her for nude photos. He also sent her photos from Yellowstone National Park. He also told her that he was using "a dating site" while he was there. She blocked him from her phone and social media shortly afterward. Later, she got a call from "a random number," and it was Smith calling her from either his little sister's or mother's phone. Smith talked to her about being under house arrest and his charges in this case. After that call, she blocked his number again.

III.  **Uncharged sexual assault of T.G.**

**T.G. dated Smith during the summer of 2018, when she was a sophomore in high school. Smith pushed T.G. to engage in sexual activities. Smith would bite her lips hard, give**

---

[2] L.A. add these details in, a non-recorded witness preparation interview.

her "hickeys," and digitally penetrate her until she bled. T.G. repeatedly told Smith she was not ready to have intercourse. On what T.G. described as the worst night of her life, she went to Smith's house. Even though she believed the topic of intercourse would come up, she "didn't think he's gonna force it." Smith gave her wine and they went outside. They were naked when Smith announced he was getting a condom. T.G. told him she did not want to have sex. When Smith returned with the condom, T.G. froze[3] and then Smith penetrated her with his penis. T.G. left abruptly and then broke up with Smith by text message.

During the text message exchange, Smith stated, "Im sorry if I rushed you into sex." T.G. explained to him that "I'm upset you didn't respect my boundaries and did things you knew I didn't want to do so it wasn't a healthy start to a long term relationship." As part of Smith's response, he stated, "What u mean u know I love you and I want the best for you and I'm sorry that I didn't respect ur boundaries just give me a chance to fix things."

In late 2018, when text messaging with a friend, Smith discussed overcoming lack of consent with alcohol:

[7984]: i like this girl a lot

Smith: Oh really why ur young ur first smash

[7984]: hmm

[7984]: idk if she's let me

Smith: Alcohol

Smith: Makes girls lose there clothes

[7984]: i'll rape her and hopefully she likes it

Smith: lol use alcohol

[7984]: and i'll bring vodkaaaaa

---

[3] T.G. clarified that she froze in a separate, non-recorded witness preparation interview. All of the text messages referenced here have been previously provided to Smith in discovery.

**Smith: 4 shots and she'll be drunk and want to ride you**

**Smith: that's 16 beers**

**Smith: 16 beers = 4 shots**

**[7984]: wtf**

**Smith: its true**

**[7984]: what if she doesn't want to drink**

**Smith: mix the shit**

**Smith: Like with alcohol**

**Smith: Make it romantic with wine**

**[7984]: ohhhh**

**[7984]: smarrtttt**

**[7984]: what if I give her a coke and then i put vodka in it**

**Smith: How do you think the college boys do it**

**Smith: That's good**

**[7984]: smarrtttt**

IV. **Uncharged sexual assault M.M.**

M.M. met Smith when she was a junior in high school while she was working at a shopping mall, approximately 2017-2018. He asked her out. When she did agree to hang out with him, he was "physically aggressive." They went to the beach where he constantly tried to touch her and grope her. He asked her back to his house on the premise of showing her the animals at the exotic animal sanctuary his family operates.[4] Once at the house, he jumped on her, and "forced himself upon" her. While on top of her, he bit her lower lip, causing it to bleed. He refused to get off of

---

[4] The sanctuary is called "Ngala," and it is located in Naples, Florida. (available at: http://ngala.net, last visited November 6, 2020).

her, but she pushed him off and insisted on going home. This was the only time she spent time with Smith.

About a year later, Smith reached out to her and asked her for nude photos. In response, she reached out to Smith's girlfriend, L.A., and told her that Smith was asking for nude photos because she felt it was inappropriate.

## V. Uncharged sexual assault of K.S.

K.S. dated Smith for two months while she was a sophomore in high school and he was a freshman, approximately 2015-2016. She also went to school with M.M. While he was only a freshman, Smith had already turned 16 because he had been held back a year. Smith consistently tried to touch her in ways that made her uncomfortable despite her repeated protestations. She never had sex with Smith. Smith would attempt to pressure her into sex, but she repeatedly told him "no." He would attempt to force sex on her and she would have to physically push him off of her. Smith would bite her lip "like he was trying to bite [her] lip off."

She recalled an incident where she was alone with Smith at his family's wildlife preserve. Smith pinned her in a chair, got on top of her, and groped her "down there," meaning down her pants. She protested and had to physically resist to get him to stop. While he stopped that time, shortly afterward he pinned her again and painfully choked her with one hand. While he held her down, he put his other hand down her pants and forcibly digitally penetrated her vagina despite her protestations. She had to pull his hand out of her pants and physically force him off of her. Because of Smith's repeated and escalating sexually aggressive behavior, K.S. broke up with him.

## VI. The four uncharged sexual assaults are admissible under Federal Rule of Evidence 413 to prove Smith's propensity to commit such crimes.

Federal Rule of Evidence 413(a) provides that "[i]n a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." For this rule, an offense of sexual assault is a crime that violates

7

federal sexual assault laws, is "contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus, [and] contact, without consent between the defendant's genitals or anus and any part of another person's body. . . ." Fed. R. Evid. 413(d).

Because evidence admitted under Rule 413 may be considered by the jury for any relevant purpose, the jury's use of it is not limited like "other acts" evidence admitted under Rule 404(b). Rule 413 thus presents an exception to the general rule prohibiting admission of character evidence against an accused for the purpose of proving his propensity to commit bad acts pursuant to Federal Rule of Evidence 404(a). *United States v. Benally*, 500 F.3d 1085, 1089 (10th Cir. 2007); *see also United States v. Guardia*, 135 F.3d 1326, 1329 (10th Cir. 1998) ("Under Rule 413 . . . evidence of a defendant's other sexual assaults may be admitted 'for its bearing on *any* matter to which it is relevant.' . . . Thus, Rules 413 and 414 supersedes Rule 404(b)'s restriction and allows the government to offer evidence of a defendant's prior conduct for the purpose of demonstrating a defendant's propensity to commit the charged offense.").

Additionally, Rule 413 is a rule of inclusion under which "courts are to 'liberally' admit evidence of prior uncharged sex offenses." *United States v. Meacham*, 115 F.3d 1488, 1492 (10th Cir. 1997). Thus, evidence is admissible under Rule 413 so long as the defendant is accused of a crime of sexual assault; the evidence proffered pertains to the defendant's commission of another sexual assault; the evidence is relevant; and the probative value of the evidence is not substantially outweighed by unfair prejudice or confusion as outlined in Federal Rule of Evidence 403. *United States v. Guardia*, 135 F.3d 1326, 1328 (10th Cir. 1998) (analyzing Rule 413). In the case at hand, all of these requirements are met.

### A.     Smith is accused of a crime of sexual assault in this case.

Under Rule 413, an offense of sexual assault is a crime under federal or state law involving:

(1) any conduct prohibited by 18 U.S.C. chapter 109A;

(2) contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus;

(3) contact, without consent, between the defendant's genitals or anus and any part of another person's body;

(4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or

(5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)-(4).

Fed. R. Evid. 413(d). The grand jury charged Smith with one count of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1). (Doc. 1). Section 2244 is found in title 18, chapter 109A; therefore, it is specifically included in the definition of sexual assault for the purpose of Rule 413. Smith is accused of a crime of sexual assault.

### B. The proffered evidence is evidence of other sexual assaults committed by Smith.

Smith's conduct with L.A., T.G., M.M., and K.S. qualifies as sexual assault under Rule 413(d). Smith's sexual assaults on L.A. included non-consensual oral, anal, and vaginal intercourse. Smith injured her and caused her physical pain by choking and biting her for his sexual pleasure. These acts, described more thoroughly above, qualify as sexual assaults under Rule 413(d)(1)-(4). Smith sexually assaulted T.G. when he penetrated her without her consent, and he sexually assaulted M.M. when he "forced himself on her" and bit her. *Id*. The same is true of K.S, who he choked, bit, and digitally penetrated without her consent. *Id*. Thus, each of these assaults qualifies as sexual assaults for Rule 413.

### C. The evidence is relevant.

Relevant evidence is any evidence that "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "A defendant with a propensity to commit acts similar to the charged crime is more likely to have committed the charged crime than another. Evidence of such a propensity is therefore relevant." *Guardia*, 135 F.3d at 1328 (citing *Old Chief*

*v. United States*, 519 U.S. 172, 181 (1997); *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)).

Smith assaulted each of these young women by holding them down, biting them, and perpetrating sexual contact or sexual acts on them over their protestations. *See* 18 U.S.C. § 2246(2) and (3) (defining "sexual act" and "sexual contact" for the purpose of title 18, chapter 109A). Thus, Smith's assaults on L.A., T.G., M.M., and K.S. show that he has a propensity to commit acts similar to the crimes he is charged with committing against H.B. While Smith's actions vary in degree of severity, that does not affect their relevance or admissibility. *Benally*, 500 F.3d at 1092 (affirming district court's admission of four prior rapes where the charged conduct "only involved genital touching" in one incident). That Smith committed some of these acts as a juvenile similarly does not call their admissibility into question. *United States v. Willis*, 826 F.3d 1265, 1274 (10th Cir. 2016). Consequently, the evidence of his assaults on L.A., T.G., M.M., and K.S. is relevant.

### D. The probative value of this evidence is not substantially outweighed by unfair prejudice or confusion.

While Rule 413 supersedes Rule 404's general prohibition of evidence of character or propensity in sexual assault cases, it does not supersede other general standards under the rules of evidence. In determining the admissibility of Rule 413 evidence, the trial court retains the discretion to perform a gate-keeping role by balancing the probative value of the proffered evidence against the dangers of unfair prejudice to the defendant, as well as the other factors mentioned in Rule 403. *United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998).

In balancing the prejudicial effects of this evidence against its probative value, it must be remembered that in any criminal proceeding, relevant evidence will always be prejudicial. It is only **unfairly** prejudicial evidence that can be excluded. *See generally United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983). And when considering what amounts to unfair prejudice, "[t]he underlying legislative judgement is that the evidence admissible pursuant to [Rule 413] is typically relevant and probative, and that its probative value is normally not outweighed by any

risk of prejudice or other adverse effects." Fed. R. Evid. 413 Historical Notes, Congressional Discussion (cited with approval *see*, *e.g., United States v. Meacham*, 115 F.3d 1488, 1491-92 (10th Cir. 1997); *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998)). Furthermore, juries are instructed to consider only the crime charged in deciding whether to convict, and a central assumption of our jurisprudence is that juries follow the instructions they receive. *United States v. McHorse*, 179 F.3d 889, 897 (10th Cir.1999) (citing *Castillo*, 140 F.3d at 879-883). Consequently, exclusion must be based on factors which distinguish a case from the general run of cases within the scope of Rules 413.

When conducting the Rule 403 balancing test regarding Rule 413 evidence, a district court should consider the following factors:

> 1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the probative dangers, a court considers: 1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct.

*Enjady*, 134 F.3d at 1433; *see also Benally*, 500 F.3d at 1090; *Willis*, 826 F.3d at 1273. No single factor is dispositive. *United States v. Mann*, 193 F.3d 1172, 1175 (1999).

First, L.A., T.G., M.M., and K.S. each gave recorded interviews detailing the sexual assaults Smith perpetrated against them. In *McHorse*, the Tenth Circuit said that "the district court properly required the government to proffer its Rule 414(a) evidence outside the presence of the jury." *McHorse*, 179 F.3d at 899. Thus, in support of this notice, the government has attached transcripts of each interview as a proffer to the court. (Doc. 53, Exhibits 1-5); (Exhibit 6). This evidence is sufficient for the court to determine that a jury could conclude by a preponderance of the evidence that the uncharged sexual assaults occurred. *Benally*, 500 F.3d at 1090. Thus, this *Endjay* factor weighs in favor of admission.

Second, this evidence is highly probative of the material facts it will be admitted to prove. The evidence will show that Smith has a propensity to isolate his victims; to use force against his victims, including restraining them and choking them; to be sexually gratified by choking and biting his victims; to attempt to overcome the lack of consent with alcohol; and to perpetrate sexual acts and sexual contact without consent and in the face of verbal protestations and physical resistance. When considering this factor, the court should examine "(1) the similarity of the prior acts and the charged acts, (2) the time lapse between the other acts and the charged acts, (3) the frequency of the prior acts, (4) the occurrence of intervening events, and (5) the need for evidence beyond the defendant's and alleged victim's testimony." *Benally*, 500 F.3d at 1090–91 (citing *Guardia*, 135 F.3d at 1331).

As to sub-factor one, the acts Smith perpetrated against L.A., T.G., M.M., K.S., and H.B. bear striking similarity. Smith got each of these young women alone. He then held four out of five of these young women down, choking three out of five of them. Smith bit the lips of each victim, pulling until he caused them to bleed. Each young woman verbally protested, and yet Smith persisted in inflicting sexual contact and/or sexual acts on them. It was only through physical resistance that any of these young women had any success in fending off Smith's attacks. Consequently, this subfactor weighs in favor of admissibility.

The second, third, and fourth subfactors may be examined together in this case because the evidence shows that each assault occurred in quick succession, spanning approximately four years. During the trip to Yellowstone where Smith assaulted H.B., he was in contact with L.A. While L.A. was dating Smith, L.A. received a message from M.M. informing her of Smith's request for nude photos. Finally, while M.M. never told K.S. the details of what had occurred between her and Smith, M.M. did tell K.S. she was not comfortable around Smith, which occurred after K.S. stopped dating Smith. Finally, Smith assaulted T.G. between the assaults he perpetrated against L.A. and M.M. Therefore, there is no significant lapse of time between any of these assaults, they

12

occurred with frequency, and there were no intervening events. The second, third, and fourth subfactors weigh in favor of admissibility.

The fifth subfactor examines the need for evidence beyond the testimony of the victim in the charged case. While digital and forensic evidence will also show that H.B. and Smith were together on September 7-8, 2019, this case will boil down to whether the jury believes H.B.'s contention that she did not consent to Smith's advances. Therefore, this case is just the kind of "unresolvable swearing match" Rule 413 was legislatively designed for and this subfactor weighs in favor or admissibility. Fed. R. Evid. 413, Historical Notes, Congressional Discussion. Because each of the subfactors weighs in favor of admissibility, the second factor in the *Endjay* analysis weighs in favor of admissibility.

Third, the material facts that this evidence helps to prove are seriously disputed. "The more seriously disputed the material fact, the more heavily this factor weighs in favor of admissibility." *United States v. Sturm*, 673 F.3d 1274, 1286 (10th Cir. 2012). Smith has pleaded not guilty, and while not required to inform the government of his theory of defense, he has suggested that he will argue that H.B. consented to going to Yellowstone and the sexual contact that occurred there. Thus, every element of this case remains hotly disputed. As such, this factor also weighs heavily in favor of admission.

Fourth, the government cannot avail itself of less prejudicial evidence. As already discussed, this case will come down to whether the jury believes H.B.'s contentions that she did not consent. The government anticipates calling witnesses who observed H.B.'s demeanor after Smith dropped her off in Rexburg on the morning of September 8, 2019. While these witnesses will provide some corroboration for H.B.'s account, they are not eyewitnesses to the crime. As explained in the legislative history of the rule:

> adult-victim sexual assault cases are distinctive, and often turn on difficult credibility determinations. Alleged consent by the victim is rarely an issue in prosecutions for other violent crimes—the accused mugger does not claim the victim freely handed over [his] wallet as a gift—but the defendant in a rape case

often contends that the victim engaged in consensual sex and then falsely accused him. Knowledge that the defendant has committed rapes on other occasions is frequently critical in assessing the relative plausibility of these claims and accurately deciding cases that would otherwise become unresolvable swearing matches.

Fed. R. Evid. 413, Historical Notes, Congressional Discussion. Consequently, the jury will need this evidence to aid in its consideration of H.B.'s credibility and there is not less prejudicial evidence available that will perform this same function. This factor weighs in favor of admissibility.

Finally, when turning to the probative dangers of this evidence, this Court should consider: 1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct." *Enjady*, 134 F.3d at 1433.

None of these final considerations support exclusion of this evidence. First, to ensure that the jury does not improperly consider this evidence, the government will request a limiting instruction, and a central assumption of our jurisprudence is that juries follow the instructions they receive. *McHorse*, 179 F.3d at 897. Thus, there will be no concern that the jury might convict Smith on an improper basis. Second, this evidence will not distract from the central issue at trial. Instead, it will be directly probative of whether Smith ignored H.B.'s protestations when he held her down, bit her, choked her, and perpetrated sexual contact on her. Third, this evidence will not be time consuming since these four witnesses will be called to testify about limited sets of events.

Evidence of Smith's uncharged sexual assaults perpetrated against L.A., T.G., M.M., and K.S. should not be excluded under Rule 403. Therefore, this evidence also is admissible under Rule 413.

**VII. The uncharged sexual assaults and Smith's refusal to let L.A. out of the car are also admissible under Rule 404(b).**

Rule 404 of the Federal Rules of Evidence governs character evidence, including crimes and other acts. The rule states "[e]vidence of a crime, wrong, or other act is not admissible to prove

14

a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *see United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) ("The list of proper purposes is illustrative, not exhaustive . . . ."). Although often misunderstood as a rule of exclusion that prohibits evidence of uncharged misconduct, Rule 404(b) is actually "considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *Id.* (quotation marks omitted).

A four-part test under *Huddleston v. United States* establishes the requirements for admission of evidence under Rule 404(b) as follows:

> (1) the evidence [is] offered for a proper purpose under Fed. R. Evid. 404(b); (2) the evidence [is] relevant under Fed. R. Evid. 401; (3) the probative value of the evidence [is] not substantially outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, instruct[s] the jury pursuant to Fed. R. Evid. 105 to consider the evidence only for the purpose for which it was admitted.

*Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000). Although each requirement must be met, "[t]he standard for satisfying Rule 404(b) admissibility is permissive . . . ." *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009). "[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *Tan*, 254 F.3d at 1208.

Under this standard, the evidence of Smith's other acts summarized above is admissible. The grand jury indicted Smith on one count of kidnapping and one count of abusive sexual contact. (Doc. 1). To convict him of these crimes, the government must prove that Smith acted without H.B.'s consent. Thus, the government intends to offer the evidence of Smith's other sexual assaults

15

and his refusal to let L.A. out of the car to show his motive, intent, identity, knowledge, and lack of accident or mistake, which are all proper purpose under Rule 404(b).

Uncharged misconduct evidence is particularly relevant to *mens rea*, and it can be used to show both specific and general criminal intent. Edward J. Imwinkelried, Uncharged Misconduct Evid. § 5:10 (updated Jan. 2020). As explained above, each of these incidents are strikingly similar to the charged conduct. According to Wigmore's theory of improbability, which is based on the doctrine of chances, "[s]imilar results do not usually occur through abnormal causes; and the recurrence of a similar result tends to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish the presence of the normal, i.e. criminal, intent accompanying such an act. . . ." Uncharged Misconduct Evid. § 5:6. Said another way, the similarity of each event lessens the likelihood that the charged conduct was undertaken by accident or mistake. McCormick on Evid. § 190.4 (8th ed.) (updated Jan. 2020); Uncharged Misconduct Evid. § 5:6. Thus, the similarity of the sexual assaults and his failure to let L.A. out of the car shows the lack of an innocent mental state by Smith, especially any claimed misunderstanding in his communications with H.B. about her consent to sexual contact or going to Yellowstone National Park. Consequently, the evidence of the sexual assaults Smith perpetrated against L.A., T.G., M.M., and K.S. and his failure to let L.A. out of the car is relevant and can be offered to show Smith's motive, intent, knowledge, and lack of accident or mistake.

The government is obligated to prove that it was Smith who kidnapped and sexually assaulted H.B. Thus, evidence of his identity as the perpetrator is relevant. The doctrine of chances also supports an identity theory of admissibility, especially in cases where the defendant claims that the allegations are fabricated. Uncharged Misconduct Evid. § 3:7. Essentially, the recurrence of similar, independent assaults, the accusation of which should be a "once in a lifetime" occurrence, negates the accusation of fabrication. *Id*. The government anticipates that Smith will contend that H.B. has fabricated her claim, which makes this proper theory particularly relevant.

16

The identity of the perpetrator may be established by showing a modus operandi, which requires that the crimes be committed using a "strikingly similar methodology" and that is unique. Uncharged Misconduct Evid. § 3:12. The similarity of the assaults also shows that Smith has a signature way that he perpetrates sexual abuse, which is to get his victims alone, physically restrain and choke them, ignore their protestations, and to bite and pull on their lips until they bleed.

In addition to a modus operandi, another well accepted theory of identity is proof that demonstrates the defendant's capacity to commit a crime. Uncharged Misconduct Evid. § 3:3. If the crime at issue was committed using some amount of strength, "the prosecutor may prove the defendant's misdeeds that evidence his physical strength. In sex offense prosecutions in which the defendant disclaims the sexual power to commit a rape, the prosecutor may introduce evidence of the defendant's sexual misconduct disproving the defendant's claim." *Id*. In four out of five of the sexual assaults, Smith physically restrained his victims, using his physical strength to overpower and gain control of them for his sexual gratification. These facts are particularly relevant to his identity as the perpetrator because they demonstrate his capacity to commit the crime as H.B. described it.

As with admissibility under Rule 413, to admit this evidence under Rule 404(b), the probative value of evidence must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. *Tan*, 254 F.3d at 1211 (quoting Fed. R. Evid. 403); *see also Huddleston*, 485 U.S. at 691-92. Here, unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Tan*, 254 F.3d at 1211. The exclusion of otherwise admissible evidence under Rule 403 "is an extraordinary remedy to be used sparingly." *Id*. (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)). The test for evidence admitted under Rule 404(b) is different than the test for Rule 413 evidence. Even though the Rule 403 analysis above used a different test, it still demonstrates the probative value of the evidence of the other sexual assaults perpetrated by Smith

17

is not substantially outweighed by the danger of unfair prejudice, including the incident in which Smith refused to let L.A. out of the car. *United States v. Cellicion*, —Fed.Appx.— 2021 WL1016420, *4 (10th Cir. 2021) (holding that evidence of defendant's participation in two other kidnappings and killings was not unduly prejudicial in kidnapping and carjacking prosecution). Thus, it need not be repeated here.

Finally, the court may offer a limiting instruction to the jury, upon request, in satisfaction of the final *Huddleston* prong. Because all four parts of the *Huddleston* test are satisfied, this court should also admit the proffered evidence under 404(b).

DATED this 6th day of April, 2021.

        Respectfully submitted,

        MARK A. KLAASSEN
        United States Attorney

By:   */s/ Christyne M. Martens*
       CHRISTYNE M. MARTENS
       Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2021, the foregoing was electronically filed and consequently served on defense counsel via the CM/ECF, the Court's Electronic Filing System.

        */s/ Andi M Shaffer*
        UNITED STATES ATTORNEY'S OFFICE