1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF WYOMING

3    ─────────────────────────────────────────────────────────

     UNITED STATES OF AMERICA,          DOCKET NO. 20-CR-045-F
4
          Plaintiff,                    Volume I (Partial)
5                                        Pages 1- 31

          vs.
6
     CODY DONOVAN SMITH,                 Cheyenne, Wyoming
7                                        May 10, 2021
          Defendant.                    4:19 p.m.
8    ─────────────────────────────────────────────────────────
              TRANSCRIPT OF TRIAL PROCEEDINGS
9    OPENING STATEMENTS AND DIRECT EXAMINATION OF JACOB OLSON

10         BEFORE THE HONORABLE NANCY D. FREUDENTHAL
                 UNITED STATES DISTRICT JUDGE
11         and a jury of twelve and two alternates

12

13

14

15

16

17

18

19

20

21
              JANET DAVIS, RDR, FCRR, CRR
22           Federal Official Court Reporter
     2120 Capitol Avenue, Room 2226, Cheyenne, WY  82001
23        307.314.2356 * jbd.davis@gmail.com

24   Proceedings reported by stenotype reporter; transcript produced
     with Computer-Aided Transcription.
25

```
 1   APPEARANCES:

 2   For the Plaintiff:      CHRISTYNE M. MARTENS
                             Assistant United States Attorney
 3                           District of Wyoming
                             100 East B Street, Suite 2221
 4                           Casper, WY  82604

 5                           NICOLE M. ROMINE
                             Assistant United States Attorney
 6                           District of Wyoming
                             2120 Capitol Avenue, Fourth Floor
 7                           Cheyenne, WY  82001

 8
     For the Defendant:      JEREMY J. HUGUS
 9                           Platte River Law Firm
                             536 South Center Street
10                           Casper, WY  82601

11                           ALEXANDER FREEBURG
                             Freeburg Law
12                           P.O. Box 3442
                             Jackson, WY  83001
13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

OPENING STATEMENTS                                              PAGE

Ms. Martens                                                      4
Mr. Freeburg                                                     8


GOVERNMENT'S WITNESS                                            PAGE

JACOB OLSON
    Direct - Ms. Martens                                        15


GOVERNMENT'S
  EXHIBITS          DESCRIPTION          IDENTIFIED   RECEIVED

  1001        Joint Stipulations              15          15

1      (Proceedings commenced 8:30 a.m., May 10, 2021.)

2      (Pretrial Proceedings and jury selection not transcribed.)

3                    *   *   *   *   *   *   *   *

4           THE COURT:  Thank you.

5           Is the Government ready for its opening statement?

6           MS. MARTENS:  It is, Your Honor.

7           THE COURT:  Ms. Martens, please proceed.

8           MS. MARTENS:  Ladies and gentlemen, the evidence will

9    show that Cody Smith kidnapped and perpetrated abusive sexual

10   contact against Hannah Bye.  In the fall of 2019, Ms. Bye was a

11   freshman at Brigham Young University and finishing her summer

12   semester in Rexburg, Idaho.  Rexburg is approximately 85 miles

13   from West Yellowstone, which is right on the edge of

14   Yellowstone National Park.

15          Ms. Bye had just finished high school and moved to

16   Rexburg from Texas.  She was new in town and just like any

17   teenaged girl out on her own for the very first time, she was

18   exploring life and making friends.

19          She was taking classes and living with five other

20   young women in apartment-style university housing.  And like

21   most people, especially young people, she relied heavily on her

22   phone.

23          Tinder is a dating application with a geofence

24   feature.  That means that it limits the people it matches you

25   with to those in a geographic area, which makes it a pretty

1    handy tool to meet people nearby.  That's how Ms. Bye met the

2    defendant on September 6th, 2019.

3            The pair engaged in fairly innocuous conversation over

4    the application.  The evidence will show that the defendant

5    told her that he was in Yellowstone National Park and asked her

6    to join him.

7            She said she couldn't, but, instead, that they could

8    meet up and they could hang out.  Eventually, the pair made

9    plans to meet on the evening of Saturday, September 7th, 2019.

10           That Saturday, Ms. Bye went about her business.  She

11   met another young man.  They ate frozen yogurt, played

12   basketball.  She talked to her roommates about her outing and

13   her upcoming outing with the defendant.  She talked about how

14   he wanted her to go to Yellowstone National Park, but she

15   couldn't.  Instead, she intended to simply get some food, and

16   she would be back in a little while.

17           As planned, the defendant picked her up outside of her

18   apartment around 10:00 p.m.  He drove her to the McDonald's,

19   and they went through the drive-through.  All the while he was

20   urging her to go to Yellowstone National Park with him, but she

21   didn't want to go.  As they left the parking lot, instead of

22   turning toward her apartment, he turned toward the Park.

23   Ms. Bye protested:  "I can't go.  I don't want to go, I'm

24   uncomfortable," and so on.  But he kept driving.

25           At some point in the drive, he put a knife in the

1    center console.  He didn't wave it at her, but he made sure she

2    knew it was there.  Ms. Bye got the message, nonetheless.

3          Meanwhile, back at the apartment, her roommates stayed

4    up late and watched a movie.  Just before midnight they started

5    to worry.  She was supposed to be home by now.  BYU Idaho has a

6    midnight curfew for its students.  She should have been home by

7    now.

8          So, one of the roommates texted to check in.  Sitting

9    there, next to the defendant, in the passenger seat of his car

10   with her phone in view, she answers that she's okay.  But she

11   was not okay.  While she probably didn't comprehend the

12   magnitude of what was happening, she was scared.

13         Somewhere in the drive, the defendant takes her phone

14   away from her.  They arrive in Yellowstone National Park.  The

15   tent is set up.  It is dark, it is cold.  She gets her phone

16   back, but there's no cell service.  It is an established

17   campground, but she doesn't see any other people.

18         Not knowing what else to do, she goes in the tent.

19   She tells the defendant that she's tired and she's cold, and

20   she just wants to sleep.  But he won't take no for an answer.

21         Despite her protestations, he puts his hands in her

22   shorts and up her sweatshirt.  He kisses her.  He bites her.

23   He chokes her.  He holds her down.  He even dry humps her until

24   he ejaculates, all the while she says no and asks him to stop.

25         Meanwhile, back at the apartment, her roommates are

1   missing her.  They call parents to seek advice, and the advice

2   is generally not to panic.  Teenage girls have been out past

3   curfew before.  Relax.  But with Ms. Bye not home by 5:00 a.m.,

4   they are panicking.

5           They call 911, and they report her missing.  One of

6   the roommates figures out that they can track her on Snapchat,

7   and they can see that she's in Yellowstone National Park.

8           Back in the Park, it is morning.  Ms. Bye reminds the

9   defendant that she needs to go home.  She asks, tired and cold,

10  if she can sit in the car.  And the defendant lets her, but he

11  won't let her have the keys.

12          She sits there while he packs up the tent, and then

13  they leave the Park.  A little after 8:00 a.m., she gets cell

14  service, and she begins to communicate with her roommates.

15  Using Snapchat, she tells them that she is in trouble.

16          The roommates devise a plan.  They're trying to

17  intercept her when she gets back to Rexburg so that they can

18  get his license plate; but, when they get back to Rexburg, the

19  defendant drops her off just short of campus, so the roommates

20  miss the drop-off.  Nonetheless, minutes later they pick her

21  up, and they take her straight to the police department, where

22  she reports what happened to her, that the defendant took her

23  to Yellowstone National Park against her will, touched her

24  sexually over her protestations, all while using force against

25  her.

1          Ladies and gentlemen, the evidence will show that the

2    defendant did those things, and the Government will be asking

3    you for a guilty verdict.

4          THE COURT:  Thank you, Ms. Martens.

5          Counsel for defendant, do you wish to make an opening

6    statement now, or you may defer?

7          MR. FREEBURG:  Your Honor, we would wish to make an

8    opening statement now.

9          Thank you.

10          THE COURT:  Please proceed, Mr. Freeburg.

11          MR. FREEBURG:  May it please the Court.

12          THE COURT:  Counsel.

13          MR. FREEBURG:  The Government.

14          Members of the jury, the prosecution, the Government,

15    and I agree that the Government's job throughout this trial is

16    to rule out reasonable doubt, so I am going to begin by

17    highlighting the evidence that shows reasonable doubt.  And I

18    don't want to waste any time.  I want to get right to it.

19          THE COURT:  Ms. Martens -- hang on.

20          You're certainly free to relocate so that you can see

21    what's being displayed to the jury.  I usually say that just so

22    you don't feel like someone is getting in your space.

23          Ms. Martens?

24          Excuse the interruption, Mr. Freeburg.

25          MR. FREEBURG:  Thank you, Your Honor.

1    MS. MARTENS:  I think I can see.  Thank you.

2    MR. FREEBURG:  This is a photograph.  This is a

3  photograph of the alleged victim, Hannah Bye, taken at 12:50 in

4  the morning in the Yellowstone bathroom 50 minutes after her

5  curfew.  She's got her thumbs up.  She's got a smile on her

6  face, and we don't know what she's doing with it.  Is she

7  texting it?  Is it a selfie?  Is that photo an accident?  At

8  one point, she claims that the defendant was actually in the

9  bathroom with her.

10    There's one more photo.  The evidence will show that

11  this photo was also taken in the Yellowstone bathroom just a

12  split second later.  In this one, it is the peace sign, not the

13  thumbs up.  That's the difference.

14    What does this photo tell us about how she's feeling

15  at that time?  What's going on in her head?  Who is she sending

16  it to?  Is she in communication with someone?

17    And then the person in the middle right there is

18  Mr. Jacob Olson.  He's a Special Agent for the Government for

19  the National Park Service, which means he's coordinating all

20  the law enforcement officers, all of the investigation, and

21  this photo was taken that night, September 7th, 2019.  She --

22  her roommates report it to the police.  She goes to the police

23  that morning, I guess September 8th.  But Mr. Olson doesn't

24  actually see this photo until November 2020.  It was deleted

25  off of her phone.

1    So why is the alleged victim, in communication with

2  law enforcement office, deleting this particular photo when

3  she's in Yellowstone, supposedly being kidnapped?

4    So I want to get right to the reasonable doubt, and I

5  think that photo is a big part of reasonable doubt.  So let's

6  take things forward and set this in chronological context.

7    Ms. Bye is 19 years old, 18 years old.  She graduated

8  from high school, I think, in June.  She had moved to Rexburg

9  to go to Brigham Young University.  It is a school affiliated

10  with the LDS church and faith.

11    And the only reason we're bringing that up is because

12  there's an honor code that goes with it, and there's an honor

13  code that goes with being a student at that school.  And you

14  sign a document, and you actually get what's called an

15  ecclesiastical commendation to go to that school.  So a bishop

16  has to sign off every so often that you're complying with the

17  honor code.

18    And one of the things that's interesting is if you

19  know someone else is violating the honor code, you're supposed

20  to 'fess up, let people know that you know something is going

21  on that's not okay.  So her roommates were actually in a

22  particular position where they needed to disclose what was

23  going on.

24    Anyway, she goes to BYU.  She's at Rexburg.  She's

25  there that summer, July '19 -- 2019, August 2019, September

1    2019.  She's using Tinder to meet folks.  One of the folks she

2    meets, sitting right there, is Cody Smith (indicating), and he

3    was on a trip that summer before starting his career.

4            And so they matched on Tinder.  They messaged.  And it

5    is interesting in those messages, so they -- let's just be

6    straight on the dates.  They messaged, I think, on Friday the

7    6th.  So Labor Day is the -- is the Monday, right, Monday the

8    2nd.  They message first on Tinder on Friday the 6th, and then

9    they meet up on Saturday the 7th.  He picks her up at about

10   10:00 p.m.  But on the 6th and the 7th, they're messaging via

11   Tinder, and they're also talking on the phone.

12           And those Tinder messages are interesting because she

13   actually says she wants to go to Yellowstone.  He offers

14   because he's in Yellowstone, okay, and he's going to go to

15   Boise the next day, so he would drive through Rexburg.  You

16   take -- anyway, you take 15, you go down to 84, and you're in

17   Boise anyway.

18           So they don't actually meet for lunch, which is on his

19   way, on Sunday.  Instead, they meet at 10:00 p.m. on Saturday

20   night, and she has him pick her up not near the apartment, not

21   near her apartment with the roommates, and they go to

22   McDonald's and they start talking.

23           And then they go to -- they go to Yellowstone.  So

24   Cody is staying at the Norris campground, so if you're heading

25   into Yellowstone from West Yellowstone, the

1  Norris Campground is north of the Madison Junctions.  So you

2  enter the Park, you go toward the Madison Junction.  If you go

3  right, or south, then you're heading back to the geyser basin

4  where Old Faithful is, Grand Prismatic.

5       If you go left, or north, then you're going toward

6  Gardiner, Mammoth, sort of the north middle third of the Park

7  is where the Norris Campground is.

8       This is the Saturday night -- excuse me -- yes,

9  Saturday morning, Friday night -- let's just be real

10  specific -- night of the 7th, morning of the 8th -- anyway --

11  and it is right after the holiday weekend.  I think there's

12  something like 90 campsites in that particular campground.

13  There's a pay phone.  There's a pay phone.  It is next to a

14  floodlight.  The bathroom has an exterior light on it.

15       There's a campground host.  It is a fairly populated

16  campground for being in the middle of Yellowstone National

17  Park.

18       Oh, let's talk about that drive up to Yellowstone.  I

19  think there was some comments about around 11:50 she's texting

20  her roommates, and the reason 11:50 is important is because it

21  is ten minutes before the curfew, but that text exchange is

22  something along the lines of, "You good, Hannah?"  "Yeah, I'm

23  good."  "Did you kiss him yet?"  "No."  "Ha-ha-ha, you're so

24  funny, JK."

25       So these are text messages that she's sending after

1    she's been in that car about an hour, just based on cell phones

2    and how long it takes to get up there.  So she's joking with

3    her roommates while she's in that vehicle.

4           Anyway, they get to the campground, and that's when

5    she goes in that bathroom.  You know, there's actually WiFi at

6    that campground.  There's a sign that's got the three little

7    bars, like on the corner of your computer where it shows if

8    there's WiFi or not.  It doesn't make a difference, but she

9    didn't appear to use WiFi.

10          So after that, after she's in the bathroom, they go

11   into the tent.  And what happens in the tent changes a couple

12   times.  It is clear that they make out.  She says she told him

13   no.  She told him no to some of it or all of it.  Sometimes it

14   is, "No, your hands are cold.  No, I'm on my period."  They

15   talk about sex.  She tells him she's a virgin, and apparently

16   he says, "Oh, you're missing out."

17          What else do we know?  In the tent, there's no

18   allegations that anybody is drinking alcohol.  There's no

19   allegations that he's drinking alcohol, that she's drinking

20   alcohol.  He doesn't penetrate her.  Doesn't take off her

21   shorts.  Doesn't expose himself.  At one point, she says she

22   uses a stern voice and tells him to stop and then he stops.

23          He gets annoyed with her, according to her.  They go

24   to sleep.  They set an alarm, because if this is an alleged

25   kidnapping, it needs to end on schedule.  They set an alarm and

1   end -- and he wakes up at 7:00 a.m. and drives her back to

2   Rexburg.  Takes him 30 minutes to check out because you've got

3   to check out with the campground host; you've got to pack up

4   your tent.

5          7:00 a.m. in Yellowstone, there's all these people

6   around.  There's no evidence that you will hear that she talked

7   to anybody, she went up to a family and said, "Hey, I'm having

8   a problem.  Can you help me out?"  No evidence of that.

9          Instead, what happens is she gets back in the car with

10  him, and she gets dropped off at her apartment or near her

11  apartment, but on that drive back, she finds out that her

12  friends have already called the sheriff, and now the train is

13  out of the station.  It is a runaway train, and here we are.

14         Things go out of control.  She makes a report.  She's

15  encouraged to press charges.  She talks to a Rexburg sheriff.

16  She talks to Special Agent Olson here, I think, four times, and

17  then it is only in November that he finds out about that photo.

18         And at the end of trial, your task is to judge whether

19  there is kidnapping or abusive sexual conduct or anything

20  beyond a bad date, anything proved beyond a reasonable doubt.

21  And you're going to be judging the credibility of these

22  witnesses, and you're going to be looking at their evidence and

23  what they say and the enormous pressures a young woman is under

24  when she's subject to that honor code.

25         And we will ask that you return the verdict that your

1   oath requires, not proven beyond a reasonable doubt, not

2   guilty.

3           THE COURT:  Thank you, Mr. Freeburg.

4           The Government may call its first witness.

5           MS. MARTENS:  Your Honor, as a preliminary matter, I

6   would like to move for admission of the parties' joint

7   stipulations into evidence.  I have it here marked

8   Exhibit 1001.

9           THE COURT:  Hearing no objection to the motion to

10  admit the joint stipulations, Exhibit -- Government Exhibit

11  1001 admitted.

12      (Government's Exhibit 1001 received.)

13          MS. MARTENS:  Thank you, your Honor.

14          Your Honor, the Government would like to call Special

15  Agent Jake Olson to the stand.

16          THE COURT:  Agent Olson, if you would step forward to

17  be sworn, please.  Thank you.

18      (Witness sworn.)

19          COURTROOM DEPUTY:  Sir, if you could please state and

20  spell your name for the record.

21          THE WITNESS:  My name is Jake Olson, Jacob Olson.

22  J-a-c-o-b, O-l-s-o-n.

23      **JACOB OLSON, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

24  **BY MS. MARTENS:**

25  Q.  Special Agent Olson, where is it that you work?

1  **A.**  I am having a hard time hearing you, ma'am.  I'm sorry.

2          MS. MARTENS:  May I?

3          THE COURT:  Yes, you may.

4          MS. MARTENS:  Thank you, your Honor.

5          Oh, that's better.

6  **BY MS. MARTENS:**

7  **Q.**  Special Agent Olson, where is it that you work?

8  **A.**  I work in -- Yellowstone National Park is where my office

9  is.

10 **Q.**  And who do you work for?

11 **A.**  I work for the National Park Service.

12 **Q.**  In what capacity?

13 **A.**  I work as a Special Agent.

14 **Q.**  So when I think of the Park Service, I think of folks who

15 are taking tickets for campsites, rangers who are walking

16 around the park, but you said you're a Special Agent, right?

17 **A.**  Correct.

18 **Q.**  Can you explain a little bit about law enforcement and the

19 National Park Service?

20 **A.**  Sure.  The National Park Service, because of the way it was

21 created, it has patrolmen, just like you would see in a city or

22 a county, so uniformed patrol which would be considered the

23 Park Rangers.  And then they have Special Agents, which would

24 kind of be the equivalent of a detective, what most folks are

25 familiar with.

1    Q.   And how long have you been with the Park Service?

2    A.   Since 2006 in law enforcement.

3    Q.   Did you -- what law enforcement role did you start in?

4    A.   I started out as a patrol officer, started out as a

5    seasonal ranger for the first couple years.  So that's a -- you

6    work intermittently six -- six months at a time, usually.  And

7    I worked at, I think, four different parks in the first two

8    years.

9    Q.   Why was that?

10   A.   They encourage you to move around to get different

11   experience, experience different parks, different kinds of law

12   enforcement.

13   Q.   Did you have any training for that level of law

14   enforcement?

15   A.   I did.  I went to Santa Rosa Junior College for that.

16   Q.   And what sorts of things did you learn?

17   A.   That was just -- the junior college was like a basic

18   policing course, so that was after, you know, my regular

19   college, I went there.  And that was kind of the introduction

20   to law enforcement and how to conduct basic investigations and

21   just basic policing tactics.

22   Q.   And what sorts of cases does a seasonal ranger investigate?

23   A.   Almost exclusively misdemeanors for the most part, so your

24   traffic violations, your simple assaults, alcohol violations,

25   camping violations, things like that.

1  Q.  So you're obviously not a seasonal ranger anymore.  When

2  did that position change for you?

3  A.  I became a permanent ranger, I think it was, 2008, and that

4  means I could go somewhere and stay there full time, you know,

5  get all the benefits and things like that.

6          So I became a permanent ranger in 2008.

7  Q.  And how is a permanent ranger different than a seasonal

8  ranger?

9  A.  When you become a permanent ranger, you can be in charge of

10  investigating, or once you complete the Federal Law Enforcement

11  Training Center training, you can be in charge of investigating

12  felonies by yourself rather than just assisting, as I was with

13  the seasonal job.

14  Q.  What sorts of crimes did you investigate as a permanent

15  ranger?

16  A.  All kinds.  So lots of narcotics, narcotics distribution or

17  possession, all kinds of driving-related ones, like DUIs and --

18  all kinds of stuff, assaults, and all those different types.

19  Q.  You mentioned something about additional training.  As a

20  permanent ranger, did you receive additional training?

21  A.  I did.  In 2010, I went to the Federal Law Enforcement

22  Training Center.

23  Q.  What is that?

24  A.  That is kind of the standard for federal law enforcement.

25  So you go there for approximately four months.  You get more

1  police training, little bit more advanced than the seasonal

2  training.  You deal with all kinds of different trainings, in

3  regards like evidence handling, patrol tactics, control

4  tactics, driving, shooting, all kinds of things.

5  Q.  Let's focus a little bit on evidence handling.  What sorts

6  of training have you received in handling evidence?

7  A.  Starting out at the Federal Law Enforcement Training

8  Center, you get a pretty extensive course in regards to

9  handling evidence, whether that be physical evidence or trace

10  evidence, meaning DNA and things like that, electronic

11  evidence.

12          And then I went back to the Federal Law Enforcement

13  Training Center again once I became a Special Agent and had

14  additional training in that to include more of the specialized

15  training in evidence handling with trace evidence and physical

16  evidence collection and all that.

17  Q.  So when you're talking about physical evidence collection

18  and handling, let's break that down just a little bit.

19          What sorts of physical evidence have you been trained

20  to collect?

21  A.  Oh, so if you go on a crime scene, it could be anything

22  from, you know, a traffic accident where there's physical

23  evidence available or if there's perhaps like let's say an

24  assault, physical evidence would include, you know, clothing,

25  tools that were used in the crime, cell phones, DNA evidence,

1  those kinds of things.

2  Q.  So you've been trained to collect all of those types of

3  evidence?

4  A.  Correct.

5  Q.  What about handling that kind of evidence?

6  A.  That's included in the training as well.

7  Q.  So you mentioned that you did the original course at the

8  Federal Law Enforcement Training Center in 2010?

9  A.  I believe so, yes.

10  Q.  And then when did you do the more extensive course?

11  A.  I believe that was 2015.

12  Q.  So where was it that you were working as a permanent ranger

13  during these times?

14  A.  So at that time I was working as a permanent ranger in

15  Yosemite National Park, which is out in California, and I was

16  working as a patrol officer or patrol ranger at the time.  I

17  took a temporary assignment or a temporary detail into the

18  Investigative Services Branch to do more focused investigations

19  like I do now.  And after that detail, I got picked up full

20  time in that job and was sent to that training.

21  Q.  What is the Investigative Services Branch?

22  A.  The Investigative Services Branch is a group of

23  approximately 30 Special Agents throughout the National Park

24  Service.  We work in regions, so I keep an office in

25  Yellowstone, but I can kind of respond all over the west.  So

1    my area of responsibility is, like, Alaska to Arkansas, along

2    with a few of my peers.

3         And we do more of that focused, long-term kind of

4    complex investigations, mostly felonies, and it would be the

5    equivalent to, like I said, a detective.

6    Q.  So when you say you did some assignments with the Special

7    Investigations Branch, what does that mean?

8    A.  Yeah, the Investigative Services Branch allowed me to come

9    on as a patrol officer and get experience doing assisting with

10   and starting to lead some of those more complex investigations.

11   So for me, it started with a lot of the narcotics distribution

12   stuff or illegal growing operations in national parks by -- you

13   know, big marijuana gardens and stuff like that.

14   Q.  And when did you become full time with the special

15   investigative -- or I'm fumbling that -- Investigative

16   Services?

17   A.  Yeah, the Investigative Services Branch, yeah, I believe

18   that was 2015.

19   Q.  And you mentioned Yellowstone.  When did you move into

20   Yellowstone?

21   A.  I believe I moved to Yellowstone in 2017.  When I left

22   Yosemite, there was an opening in Montana, which I was looking

23   forward to getting back to, and that's where I ended up

24   transferring to, where I reside now.

25   Q.  And during your time in Yellowstone, have you become

1   familiar with the Park?

2   A.   I have.

3   Q.   In what ways?

4   A.   Like I said, I work -- I work regionally, so I work all

5   over the place, but a lot of my cases do come out of

6   Yellowstone.  So I'm able to travel through the Park for work

7   and respond to different areas for work pretty often.

8           You know, I live in the general area, recreate in the

9   general area, so --

10  Q.   Are you, therefore, familiar with the boundaries of the

11  Park?

12  A.   I am.

13  Q.   Campgrounds in the Park?

14  A.   Yes.

15  Q.   And then you're in Yellowstone with your same job with

16  special investigations, right?

17  A.   Yes.

18  Q.   In terms of the role of federal law enforcement in the

19  Park, what do you know about that?

20  A.   Well, depending on what park you're in, there's different

21  kinds of jurisdiction; but Yellowstone in particular is what is

22  referred to as an exclusive jurisdiction, so the only law

23  enforcement that takes place in that park, whether it is the

24  traffic tickets or parking tickets all the way up to, you know,

25  the felony-level investigations, will be managed by the

1    National Park Service because it is a land management agency

2    that was created by Congress, and I think Yellowstone was maybe

3    even before the state of Wyoming was, so --

4    Q.  I skipped over this, but we talked some about evidence

5    handling.  I want to go back to your training to do with

6    electronic evidence.

7    A.  Okay.

8    Q.  What sorts of training have you received regarding

9    electronic evidence?

10   A.  Mostly the training for handling electronic evidence is

11   just how to properly obtain it, secure it, and then be able to

12   transfer it to someone else that can look at it that's much

13   more specialized than myself.

14   Q.  And so when you do those sorts of things, what is it that

15   you hope to accomplish?

16   A.  I hope to -- the idea is to obtain the evidence and be able

17   to secure it in a way that kind of preserves it in the fashion

18   that you found it and then be able to present it to a

19   specialist to look at later.

20   Q.  When we're looking at your familiarity with Yellowstone

21   National Park, you said that you were familiar with its

22   boundaries.

23           How about cell service in the Park?

24   A.  Cell service is spotty in Yellowstone National Park.

25   Q.  And how do you know that?

1   A.  Just from being around it a lot and traveling through it.

2   Q.  What about the lighting in the Park?

3   A.  Uhm, the lighting in the Park, you know, depending on where

4   you're at, tends to be pretty dim.  So, you know, Yellowstone

5   is -- they've actually made an initiative to try to keep it

6   darker.  Obviously, Yellowstone, people are attempting to go

7   there to get away from things, so they're trying to keep it

8   more of a wilderness area and experience, so there's all kinds

9   of stuff that Yellowstone's done to, you know, kind of reduce

10  the light pollution.

11  Q.  Like what?

12  A.  They change fixtures so they point directly down, like

13  light fixtures that point directly down.  They've changed --

14  they've removed light fixtures, you know, big -- big

15  illuminated areas that didn't need to be illuminated they got

16  rid of.

17  Q.  How does a person enter or leave the Park?

18  A.  Uhm, there's multiple entrances to the Park.

19          On the north, as mentioned prior, that's that Gardiner

20  entrance on the north side coming from Montana.  On the east

21  side, that's the Cody entrance, so that kind of comes through

22  the east side of the park.  The south entrance kind of comes up

23  from the Tetons area, and then the west entrance comes from

24  West Yellowstone, which is Montana, and then it goes into

25  Wyoming pretty quickly.

1  Q. And particularly the west entrance --

2  A. Yes.

3  Q. -- what do we find there?

4  A. The west entrance, you know, is a multi-lane entrance that

5  has a building there where people drive up and, you know, pay

6  their fee to access or show their pass, and then on the other

7  side, there's some lanes to leave the Park.

8  Q. Is there any equipment or --

9  A. Yeah, there's --

10 Q. -- anything special at the entrance?

11 A. Yeah, so there's -- you know, it's a lighted building.

12 They've got all kinds of different tech equipment that's there.

13 They have license plate readers that are mounted there at the

14 west entrance.  You know, they have buildings with computers

15 and things like that to process all the fees.

16 Q. You mentioned license plate readers.  What do you know

17 about those?

18 A. Yellowstone utilizes or utilized license plate readers at

19 the time, at the time that we're talking about, anyway.  And

20 they had some of those mounted at West Yellowstone entrance.

21 Q. And do they catch every single license plate that passes

22 through them every single time?

23 A. No, no.  Different factors play into that, from what I

24 understand, to include environmental factors, nighttime,

25 daytime, you know, reflection of a license plate, things like

1    that.

2    **Q.**  I want to turn your attention to the allegations in this

3    case.

4              How is it that you're related to this case?

5    **A.**  I am the lead investigator for this case.

6    **Q.**  And so you're familiar with the indictment and the

7    allegations?

8    **A.**  I am.

9    **Q.**  So how did this case come to you?

10   **A.**  This case came to me via my supervisor after he was alerted

11   to it from Rexburg Police Department.

12   **Q.**  And briefly, why or what did you receive from Rexburg?

13   **A.**  We received -- are you referencing the story or kind of

14   like --

15   **Q.**  Well, at that time, what sort of material did you receive?

16   **A.**  So at the time, we received a report from Rexburg Police

17   Department to include a written report, a recorded report or

18   recorded interview, and just a statement from the detectives on

19   scene that alleged that Ms. Bye --

20             THE COURT:  Sir, hang on.  I think the question was

21   what materials.

22             THE WITNESS:  Okay.  Sorry.

23             THE COURT:  So you can follow up.

24             MS. MARTENS:  Thank you, your Honor.

25   **BY MS. MARTENS:**

1  Q.  So when you received those materials, did you review them?

2  A.  I did.

3  Q.  And what did you do after you reviewed them?

4  A.  I contacted the police department and contacted multiple

5  people involved to follow up on what I was told.

6  Q.  Did you make any sort of plan?

7  A.  Yeah, I created an investigation plan at that point.

8  Q.  Can you explain a little bit about what an investigation

9  plan is?

10  A.  Yes.  So depending on what the crime is or how the

11  investigation is going to go, the investigation plan just kind

12  of helps outline what needs to be done to get all -- as many

13  facts that are available as possible.  So sometimes that

14  includes interviews; it includes physical evidence; it includes

15  statements, things like that.

16  Q.  And how is it that you create an investigative plan?

17  A.  Based on what I'm told, so based on the allegations that

18  are given.

19  Q.  Why is that?

20  A.  Because that helps kind of tailor the information that you

21  need.  So, you know, depending on what the allegation is will

22  help tailor how fast or slow or what's priority and what's not

23  priority, things like that.

24  Q.  Does it determine where you look?

25  A.  Yes.

1  Q.  Or for what kinds of evidence you look for?

2  A.  Yes.

3  Q.  Why?

4  A.  Because certain evidence can go away fairly quickly.  So,

5  you know, there's digital evidence that vanishes fairly

6  quickly.  There's trace evidence that goes away fairly quickly,

7  depending on what it is exposed to.

8          So, you know, just depending on what the allegations

9  are and what the evidence is kind of helps dictate what needs

10 to happen.

11 Q.  And so we've already talked about how the allegations in

12 this case are kidnapping and sexual assault.

13          In that type of case, what are typical things you're

14 going to be looking for in your investigative plan?

15 A.  I would be looking for interviews to talk to, you know, the

16 alleged victim, the alleged perpetrator.  I would be looking

17 for trace evidence.  So particularly with sexual assaults, DNA

18 evidence tends to be really important if it can be found.

19          I'm also looking for evidence and kind of like context

20 of the meet-up, so conversations that took place before,

21 during, after, so a lot of times that's on a cell phone, things

22 like that.

23 Q.  So electronic evidence?

24 A.  Yes.

25 Q.  What types of electronic evidence might you look for?

1  A.  Particularly the cell phone tends to be where a lot of that

2  evidence shows up.  So, you know, obviously electronic evidence

3  could include recordings as well, you know, but like the

4  license plate readers and things like that.

5          But the phone, in particular, tends to show the most.

6  So it can show previous calls, you know, text messages, GPS

7  coordinates, depending on what applications are running and

8  things like that.

9  Q.  So you received this batch of material from Rexburg.  You

10  reviewed it.  And what was your investigative plan in this

11  case?

12  A.  My investigative plan was to conduct interviews of the

13  alleged victim, the alleged perpetrator; to contact the officer

14  that took the original report, the detective that took the

15  original report; to try to collect any cell phone evidence that

16  was available, whether that's actual cell phones or cell phone

17  provider evidence; try to collect the trace evidence and

18  physical evidence that was available.

19  Q.  What were some of the first steps you took to execute that

20  plan?

21  A.  I contacted Rexburg Police Department, spoke to the

22  detective.  I reviewed the report and the recording that was

23  provided to me.  I attempted to interview Ms. Bye, or I did

24  interview Ms. Bye.  I attempted to interview Mr. Smith,

25  interview all of the other collateral people or witnesses that,

1  you know, that would be privy to the situation.

2  Q.  What about beginning evidence collection?  Did you look for

3  physical evidence?

4  A.  Yes.  Pretty quickly, right after I was alerted to this

5  one, we went to obtain the physical evidence.  It was mentioned

6  before, like the trace evidence, so the clothing that was worn

7  during the encounter.

8  Q.  And do you know how that was collected?

9  A.  Yeah.  The victim advocate at the time went down there to

10 deal with or to talk to the victim, and the victim advocate was

11 able to obtain that and provide it to a ranger.

12 Q.  And you mentioned interviews.  So what were some of those

13 first interviews that you conducted?

14 A.  The first few interviews -- I'm not sure this is in

15 chronological order -- but was Ms. Bye, Mr. Smith, Ms. Bye's

16 roommates -- I think there was five roommates, and then two

17 additional friends that were present and privy to the

18 situation, Ms. Bye's mother, and I'm trying to think who

19 else -- oh, the -- a church person that was contacted, a member

20 of the church that was contacted.

21           THE COURT:  Ms. Martens, there's probably no handy

22 place to stop in the direct with Agent Olson.  Would this be

23 reasonable?

24           MS. MARTENS:  I think it's as good as any, your Honor.

25           THE COURT:  Thank you.

1          To the jury, again, remember the admonition against

2    discussing this case with anyone, including each other.  Please

3    don't do any research about this case or this type of case or

4    the individuals involved in the case.

5          We have just started the presentation of evidence, so

6    as we go along, please keep an open mind until all the evidence

7    is in.

8          You will be recessed out of this door where Abby will

9    meet with you and split you for social distancing purposes into

10   two jury rooms.  I appreciate your patience because that will

11   take you a bit after 5:00.  So thank you for that patience and

12   for your patience throughout the course of today through jury

13   selection.

14         Anything for the attorneys before we recess the jury?

15         MS. MARTENS:  Nothing from the Government, Your Honor.

16         THE COURT:  For defendant?

17         MR. HUGUS:  Nothing for the defendant.

18         THE COURT:  Please stand for the jury to recess.

19         Oh, please be ready to report to the jury room -- be

20   ready to report to the courtroom from the jury room at 8:30

21   tomorrow morning.  So we will stand in recess until 8:30.

22     (Following out of the presence of the jury.)

23         THE WITNESS:  May I step down?

24         THE COURT:  Yes.

25         Anything requiring my attention?

1        MS. MARTENS:  Nothing from the Government, Your Honor.

2        THE COURT:  For the defendant?

3        MR. FREEBURG:  Nothing from the defense, Your Honor.

4    Thank you.

5        THE COURT:  All right.  I am in chambers at 8:00 for

6    each day of trial.  If anything is required of me tomorrow

7    morning to either shorten bench conferences or the like, just

8    give us a shout, and I'll come into the courtroom and we can

9    attend to matters before we bring the jury in.

10        The jury will be ready to report by 8:30, and so

11   please be prompt so we can hopefully get the jury here and

12   started up on time tomorrow morning.

13        Thank you for your patience through the course of

14   today.  It has been a long day.  I appreciate your patience and

15   courtesy.

16        We will stand in recess until 8:30 tomorrow morning.

17        MS. MARTENS:  Thank you, Your Honor.

18        MR. FREEBURG:  Thank you.

19     (Proceedings recessed 5:03 p.m., May 10, 2021.)

20

21

22

23

24

25

C E R T I F I C A T E

I, JANET DAVIS, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Federal Certified Realtime Reporter, and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing pages constitute an excerpted true and correct transcript.

Dated this 10th day of May, 2021.

/s/ *Janet Davis*

_____

*JANET DAVIS, RDR, FCRR, CRR*
*Federal Official Court Reporter*