1

2

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

4    UNITED STATES OF AMERICA,          DOCKET NO. 20-CR-045-F

5         Plaintiff,                    Volume II
                                        Pages 1- 210
6         vs.

7    CODY DONOVAN SMITH,                Cheyenne, Wyoming
                                        May 11, 2021
8         Defendant.                    8:30 a.m.

9              TRANSCRIPT OF TRIAL PROCEEDINGS

10        BEFORE THE HONORABLE NANCY D. FREUDENTHAL
               UNITED STATES DISTRICT JUDGE
11        and a jury of twelve and two alternates

12

13

14

15

16

17

18

19

20

21

              JANET DAVIS, RDR, FCRR, CRR
22             Federal Official Court Reporter
        2120 Capitol Avenue, Room 2226, Cheyenne, WY  82001
23             307.314.2356 * jbd.davis@gmail.com

24   Proceedings reported by stenotype reporter; transcript produced
     with Computer-Aided Transcription.
25

```
 1  APPEARANCES:

 2  For the Plaintiff:      CHRISTYNE M. MARTENS
                            Assistant United States Attorney
 3                          District of Wyoming
                            100 East B Street, Suite 2221
 4                          Casper, WY  82604

 5                          NICOLE M. ROMINE
                            Assistant United States Attorney
 6                          District of Wyoming
                            2120 Capitol Avenue, Fourth Floor
 7                          Cheyenne, WY  82001

 8
    For the Defendant:      JEREMY J. HUGUS
 9                          Platte River Law Firm
                            536 South Center Street
10                          Casper, WY  82601

11                          ALEXANDER FREEBURG
                            Freeburg Law
12                          P.O. Box 3442
                            Jackson, WY  83001

13
```

                               I N D E X

GOVERNMENT'S WITNESSES                                    PAGE

JACOB OLSON
    Direct - Ms. Martens                                   10
DAVID STUBBS
    Direct - Ms. Martens                                   43
    Cross - Mr. Freeburg                                   53
    Redirect - Ms. Martens                                 72
BRIAN KIMBALL
    Direct - Ms. Romine                                    79
JENNIFER MCGRATH
    Direct - Ms. Romine                                    83
FREDERICK LINDBERG
    Direct - Ms. Martens                                   88
    Cross - Mr. Freeburg                                  105
HANNAH BYE
    Direct - Ms. Martens                                  113
    Cross - Mr. Freeburg                                  151
    Redirect - Ms. Martens                                189
SARAH DECARVALHO ROMAO
    Direct - Ms. Martens                                  195
    Cross - Mr. Hugus                                     204

| GOVERNMENT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 100A | Tinder Search Warrant Results | 25 | 25 |
| 200 | Pertinent Download of Bye Phone | 50 | 50 |
| 203 | Photograph | 140 | 140 |
| 204 | Life 360 Data | 31 | 31 |
| 205 | Photograph | 50 | 51 |
| 206 | Photograph | 50 | 52 |
| 207 | Photograph | 142 | 143 |
| 208 | Photograph | 142 | 143 |
| 209 | Photograph | 142 | 143 |
| 210 | Photograph | 142 | 143 |
| 211 | Photograph | 142 | 143 |
| 212 | Photograph | 142 | 143 |
| 213 | Photograph | 142 | 143 |
| 214 | Photograph | 142 | 143 |
| 400 | Copy of Smith phone | 38 | |
| 401 | Photograph | 40 | 40 |
| 600 | License Plate Reader Data | 34 | 34 |
| 601 | YNP Campground Receipt | 36 | 36 |
| 602 | ISP License Plate Reader Data | 35 | 35 |
| 603 | Photographs | 147 | 148 |
| 604 | Photographs | 147 | 148 |
| 605 | Photographs | 147 | 148 |
| 606 | Photographs | 147 | 148 |

| GOVERNMENT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 607 | Photographs | 147 | 148 |
| 608 | Photographs | 147 | 148 |
| 609 | Photographs | 147 | 149 |
| 610 | Photographs | 147 | 148 |
| 900 | Smith Interview | 12 | 17 |
| 901 | Smith Interview Recording | 42 | 42 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| GG | | | 159 |
| RR | Video | 207 | 208 |
| VV | Video | 164 | |

1          (Proceedings reconvened 8:24 a.m., May 11, 2021.)

2          (Following out of the presence of the jury.)

3               THE COURT:  Please be seated.

4               In 20-CR-45, I have been advised that there are some

5      pretrial matters for the Government or for defendant?

6               MS. MARTENS:  Yes, Your Honor.

7               THE COURT:  Ms. Martens.

8               MS. MARTENS:  We have discussed some stipulations, and

9      I know Mr. Freeburg wanted to raise some issues with the

10     Marshals.

11              MR. FREEBURG:  Yes.

12              THE COURT:  All right.  Mr. Freeburg.

13              MR. FREEBURG:  Judge, I confess to being a bit

14     disappointed.  My understanding is my client did not eat

15     yesterday at all.  And when he was returned to the jail, there

16     was no food for him.  There was no food for lunch.

17              We have, like, bars, and we can eat lunch with him --

18              THE COURT:  Have you communicated with the Marshal

19     Service directly?  We usually --

20              MR. FREEBURG:  No, no.  I learned about this this

21     morning, and I haven't seen the Marshals.

22              THE COURT:  All right.  We usually leave that, matters

23     concerning defendant's management by the Marshal Service, with

24     defense counsel to solve initially, and then if there are

25     ongoing issues, to bring it to the Court's attention.  There's

1  nothing either you or I can do about the circumstances

2  yesterday, but the Marshal Service is not, kind of, under my

3  immediate direction.

4      MR. FREEBURG:  Understood, Judge.  Thank you for the

5  guidance.  I'm sure we can revolve it without further Court

6  involvement.

7      THE COURT:  I can't understand you.

8      MR. FREEBURG:  Thank you for the guidance.  I'm sure

9  we can resolve it without further Court involvement.

10      THE COURT:  All right.  Please let me know, because I

11  obviously want him fed and well cared for.  I know the

12  circumstances of trial can be challenging.  If the Marshal

13  Service advise you in the conversations that there's something

14  that we're doing on our end, scheduling in terms of too quick

15  of a turnaround or whatever, Abby is your best point of contact

16  on those sorts of matters.  We don't want to be contributing to

17  it.

18      MR. FREEBURG:  Thank you.

19      THE COURT:  All right.  Thank you.

20      MS. MARTENS:  Additionally, we talked about some

21  stipulations last night, so I wanted just to, this morning on

22  the record, document those to make sure that our record is

23  clear.  So I would invite defense counsel to tell the Court

24  exactly what they're willing to stipulate to.

25      THE COURT:  Will this be in the form of something

1  ultimately written and admitted as an exhibit?

2      MS. MARTENS:  I think so.  It is just in terms of --

3  we could do it that way.  I think that we already have the

4  defense making some admissions in front of the jury, but I

5  wanted to make sure we were clear about exactly what those

6  admissions meant before I started cutting down my evidence this

7  morning.

8      THE COURT:  All right.  Thank you.

9      MR. FREEBURG:  Judge, I think the Court and Government

10  can rely on the defendant not to contest the fact that he met

11  Ms. Bye in Rexburg, that they traveled to Yellowstone, and that

12  they traveled back to Rexburg.  And the Court can take judicial

13  notice of all of the state and federal boundaries associated

14  with that travel.

15      And, Judge, let me look at my co-counsel and see if I

16  was -- I think that would be how we'd propose it, and we're

17  happy to work with counsel to reduce it to writing.  Thank you.

18      THE COURT:  Either that, or, depending on how you want

19  to handle it, Ms. Martens, I can certainly advise the jury of

20  those stipulations orally and that the Court takes judicial

21  notice that that travel constitutes interstate travel.

22      But if you -- if you wish something captured in

23  writing and admitted as a written stipulation for the notebook,

24  you just need to, at some point in time, move the admission.

25      MS. MARTENS:  Certainly.  And we can certainly get

1   something done in writing to follow up with this.  I think just

2   for the sake of consistency, it is probably better to have a

3   written stipulation in the notebook.  That way the jurors

4   aren't treating that stipulation or receiving it any

5   differently than any of the other stipulations.

6          And then the one point I just want to clarify is

7   Yellowstone straddles three states, and so in terms of presence

8   in Yellowstone National Park, it would also be presence within

9   the District of Wyoming.

10          THE COURT:  Well, we have exclusive jurisdiction over

11  Yellowstone National Park no matter what state it is in.

12          MS. MARTENS:  There's some weird arguments about the

13  jurisdictional dead zone that I just would rather not deal

14  with, so I had intended my proof to cover that it was clearly

15  within the state of Wyoming.

16          THE COURT:  I will leave you to your level of comfort,

17  but --

18          MS. MARTENS:  Thank you, Your Honor.

19          THE COURT:  -- we are the only -- we are the only

20  federal district that includes portions of other states, so

21  that is -- that is what it is.  So however you want to handle

22  some of those weird theories.

23          I'm just taking a couple of notes, and I will --

24  again, I just would leave it up to you to handle anything that

25  you wish to seek admission and have in the notebook as an

1    actual stipulation in that pocket part that we've talked about

2    before.

3              MS. MARTENS:  Thank you, Your Honor.

4              THE COURT:  Anything else?

5              Anything for the Government?  I'm sorry.  I was

6    looking down or away.  I tell you, I think I'm getting more

7    deaf these days.

8              Anything for you, Ms. Martens?

9              MS. MARTENS:  Masks and COVID do not help with hearing

10   and understanding.  I'm struggling, so I don't know that it is

11   your hearing, Your Honor.

12             But I had nothing further on behalf of the Government.

13             THE COURT:  All right.  Mr. Freeburg, anything further

14   from you?

15             MR. FREEBURG:  No, Your Honor.

16             THE COURT:  All right.  Again, please talk to the

17   Marshal Service at -- perhaps over break or sometime where

18   we -- where they can address the situation so this does not

19   reoccur and that if there's something I need to do in relation

20   to breaks, even -- and even breaks for use of toilets, those

21   sorts of things, we have encountered all sorts of variety of

22   issues.  Don't hesitate if you think there's something at my

23   end that I'm doing that impacts the Marshal Service and their

24   management of Mr. Smith.

25             But thank you very much for bringing that to my

1   attention; and if I don't hear anything, I will consider that

2   it has been handled.  All right?

3            MR. FREEBURG:  Yes, your Honor.  Thank you.

4            THE COURT:  All right.  Thank you.

5            Abby, I think, is taking some temps and calling for

6   the Marshal Service to bring Mr. Smith up, and so I will just

7   step out and wait for her IM.

8        (Recess taken 8:34 a.m. until 8:52 a.m..)

9        (Following in the presence of the jury.)

10           THE COURT:  Please be seated.

11           In Docket 20-CR-45, the Court notes the presence of

12  the jury with roll call waived, presence of counsel and their

13  clients.

14           Agent Olson, let me remind you you remain under oath.

15           Ms. Martens, you may begin -- recommence your direct

16  examination.

17           MS. MARTENS:  Thank you, Your Honor.

18   **JACOB OLSON, PLAINTIFF'S WITNESS, DIRECT EXAMINATION RESUMED**

19   **BY MS. MARTENS:**

20   **Q.**  Agent Olson, when we left off yesterday, we had talked

21  about your experience and your training, and we had also talked

22  about your receipt of some materials and the investigative plan

23  that you developed in this case; is that right?

24   **A.**  Correct.

25   **Q.**  All right.  So I want to go back and talk just a little bit

1  about that investigative plan.  And let's talk -- what exactly

2  is that?  Is that a document you generate?

3  **A.**  No.  It's just kind of a mental map of priorities that need

4  to be taken care of.

5  **Q.**  And so I think we had talked about one of the top

6  priorities for you was collection of physical evidence and then

7  interviews, right?

8  **A.**  Correct.

9  **Q.**  So let's go back to those interviews.

10         Who all did you interview?

11  **A.**  I began -- well, in no particular order, but I believe I

12  began with Ms. Bye, Mr. Smith, the five roommates from Ms. Bye,

13  two of their acquaintances, Ms. Bye's mother, the initial

14  interviewing detective, the initial reporting officer that took

15  the initial report, and I think that's all I can remember

16  offhand without referencing my notes.

17  **Q.**  Yeah.  So when you interviewed Ms. Bye -- well, let me back

18  up.

19         In the materials that you received from Rexburg,

20  Idaho, was there any information in those materials that helped

21  you identify a suspect?

22  **A.**  Yes.  She identified Mr. Smith in that interview.  And then

23  in my interview with her, she identified Mr. Smith.

24  **Q.**  Did she give you any details about Mr. Smith?

25  **A.**  Yeah.  She had mentioned that she had met him on Tinder,

1   and that she kind of talked about the color of his car, phone

2   number, stuff like that.

3   Q.  And so with that information, what did you do?

4   A.  I attempted to contact Mr. Smith.

5   Q.  Were you able to reach him?

6   A.  I was.

7   Q.  So I have marked -- well, first of all, do you remember

8   when about you reached him?

9   A.  It was in September was the first time, sometime

10  mid-September.  And then I reached him a second time

11  approximately a month later.

12  Q.  And have you had an opportunity to review the recording of

13  that interview you conducted with Mr. Smith?

14  A.  I have.

15  Q.  And does it accurately represent that conversation?

16  A.  It does.

17          MS. MARTENS:  I have that entire interview marked as

18  Exhibit 900, and I would like to offer that into evidence at

19  this point, Your Honor.

20          MR. HUGUS:  Judge, if we might approach?

21          THE COURT:  I can't hear you.

22          MR. HUGUS:  If we might approach, Your Honor?

23          THE COURT:  Counsel, please approach.

24      (At sidebar.)

25          MR. FREEBURG:  Judge, if I make the objection here,

1    does that mean I'm doing the cross-examination, or can I just

2    put the objection on the record?

3              THE COURT:  Usually the same attorney addresses the

4    Court.

5              MR. HUGUS:  So the objection, Judge, I guess there's

6    two things, but one is the extent that there is testimony in

7    that call that he then shuts down and indicates that he doesn't

8    want to talk anymore and that that is essentially evidence of

9    him not testifying and he doesn't have the right to testify, so

10   it is a Fifth Amendment issue.  So that's -- that's, I guess,

11   the first concern, so I will stop there.

12             THE COURT:  Ms. Martens?

13             MS. MARTENS:  Your Honor, the agent made a telephone

14   call, which he recorded, to Mr. Smith.  He explained who he

15   was, what he was calling about, and at the end of that call,

16   Mr. Smith says he'll call him back.

17             So there's no "I don't want to talk to you.  I want to

18   get a lawyer."  There is none of that on call number one.  And

19   even when a defendant is like, "Mmm, I don't really want to

20   talk to you," that's not an invocation that's inappropriate for

21   a jury to hear.  This is all admissible as a statement of a

22   party opponent, and it is evidence of his intentions and his

23   understanding of the interactions which the defense has clearly

24   put into issue.

25             THE COURT:  Did you say you had a second objection?

1          MR. HUGUS:  Just the cumulative nature, Judge, of the

2    calls.

3          THE COURT:  I'm sorry?

4          MR. HUGUS:  The accumulative nature of the calls.  I

5    believe it was accumulative evidence.

6          MR. FREEBURG:  Judge, the objection --

7          THE COURT:  Cumulative to what?  I guess I'm --

8          MR. FREEBURG:  The issue -- excuse me, Your Honor.

9          THE COURT:  Mr. Hugus, we have no evidence at this

10   point.

11      (Discussion held between defense counsel.)

12          MR. HUGUS:  This goes generally to other exhibits that

13   will, I'm sure, be played in court, but the request is that

14   they not go back as substantive evidence or exhibits to the --

15   to the jury.  And I don't know what the Court's ruling on that

16   is.  But there's multiple videos, audio clips in this case, so

17   they may be used for impeachment and various purposes, but ask

18   that even to the extent that they're admitted to be played in

19   court, that they not be sent as exhibits back with the jury.

20          THE COURT:  Well, on the second point, I'll overrule

21   that objection.  This isn't offered for impeachment.  It is

22   offered as an exhibit.  All exhibits will go back.  It is not

23   offered for -- as a demonstrative.

24          As to the first issue, how long is this?

25          MS. MARTENS:  Uhm, I think the first call is four or

1    five minutes.  It's -- both calls are very short.  First call

2    is, I think, four or five minutes, and the other one is, I

3    think, two or three.

4         THE COURT:  Not having any understanding of what's on

5    the call, if something surfaces that suggests the defendant has

6    an obligation to speak to the agent, I'll offer -- I'll advise

7    the jury per a limiting instruction.

8         So with that, thank you.

9         MS. MARTENS:  Thank you, Your Honor.

10        MR. HUGUS:  Thank you.

11    (Sidebar ended.)

12        THE COURT:  Ms. Martens, I have now forgotten the

13   number of the exhibit.

14        MS. MARTENS:  The entire audio recording is

15   Exhibit 900, and we have also provided a transcript of that,

16   which I am not offering at this time, but we do have the

17   exhibit to set up -- set up to play as a PowerPoint with the

18   transcript rolling along for the ease of the jury's

19   understanding, which is -- and that one is Exhibit 900B.

20        THE COURT:  Is the -- is the audio recording difficult

21   to hear?

22        MS. MARTENS:  I think it is fairly clear, but we have

23   provided the follow-along transcript for ease of understanding,

24   just in case anyone is hard of hearing.  I wasn't sure how well

25   it would play through the court's audio system, just to cover

1    those sorts of concerns.

2          THE COURT:  I will admit Exhibit 900, note the

3    objections.

4          I won't permit the playing of the PowerPoint.

5          For the jury's understanding, if something surfaces

6    during the -- during an audio recording and the Court discerns

7    that it is -- it may be problematic to understand the

8    conversation, we can stop, we can put up this PowerPoint.  But

9    what is in evidence is the actual call, and I do not want you

10   distracted by another matter showing up on your screen.  You

11   need to attend to the exhibit that's admitted and not any aid

12   which won't ever be admitted for purposes of the trial.

13         So with that, please proceed.

14         MS. MARTENS:  One question for clarification, Your

15   Honor.

16         THE COURT:  Yes.

17         MS. MARTENS:  Will you be then following up with the

18   jury to ensure that they were able to hear it?

19         THE COURT:  I think I can make that decision.  I'm

20   probably harder of hearing than anybody in that panel.

21         MS. MARTENS:  All right.  Awesome.  Thank you, Your

22   Honor.

23         So just -- Exhibit 900 is received?

24         THE COURT:  Yes, Exhibit 900 is admitted.  Thank you

25   for that reminder.

1        (Government's Exhibit 900 received.)

2              MS. MARTENS:  Thank you, Your Honor.

3              At this time, I would like to play that for the jury.

4    May I?

5              THE COURT:  Yes.

6              MS. MARTENS:  Thank you.

7        (Government Exhibit 900 played.)

8    **BY MS. MARTENS:**

9    Q.  So let's talk about that interview just a little bit.  I

10   think in the interview, you explain that you were looking for

11   the other side of the story.

12             Why is that?

13   A.  Because I'm just trying to get the full picture of facts.

14   So at that time, I only had one side of the story, and, you

15   know, serious accusations, so because of those serious

16   accusations, I wanted to get the full spectrum of the story.

17   Q.  And it seemed like you were pretty insistent on doing that

18   in person.  Why?

19   A.  Well, in my experience doing these particular

20   investigations, in person tends to provide more information, so

21   body language, you know, eye rolls, things like that.  Just --

22   you just get more info talking to somebody in person, and they

23   also feel -- in my experience, they also feel it is easier to

24   talk to you when you're in person and not over a cell phone.

25   Q.  And why not share the particulars of the allegations?

1  A.  Uhm, ideally, you know, for these particular

2  investigations, you try to hold on to those until you have the

3  other version of events, and then we can kind of compare and

4  contrast and see where they're similar and see where they're

5  different.

6  Q.  So once you talked to the defendant -- or maybe not in

7  chronological order, but did you gather any physical evidence

8  in this case?

9  A.  Yes.  So the physical evidence, you know, we had

10  mentioned -- I think yesterday we had mentioned we had acquired

11  some clothing from Ms. Bye.  We ended up writing a couple -- I

12  think we talked about the license plate readers, so we got that

13  evidence.  And we talked about -- or I don't know if we did

14  talk about, but we submitted some search warrants at that

15  point, and the search warrants included Tinder, cell phone

16  providers, cell phone analysis, stuff like that.

17  Q.  All right.  So let's break that down and talk about the

18  purpose of each of those investigative steps.

19       We already talked about the clothes and the importance

20  of physical evidence yesterday, just trying to get things

21  before they disappear.

22       Did you ever gather anything else to do with DNA or

23  other trace evidence?

24  A.  Yeah.  Eventually I wrote some search warrants for Florida

25  for Mr. Smith's vehicle.  And we were also looking for some

1    physical evidence that was at his house, so there was a search

2    warrant for that at his residence that was conducted.  And then

3    we wrote a search warrant for Mr. Smith to get DNA.  And we

4    also provided some from the victim as well.

5    Q.  Yeah, let's talk about the DNA collected from the victim.

6          How did that go?

7    A.  Uhm, that was during one of the interviews, one of the

8    in-person interviews that took place in Rexburg.  So myself and

9    another agent conducted an interview with her while we were

10   there, I think, two interviews while we were there, after

11   talking to her roommates and some other folks.

12          And just standing at the back of the pickup truck or

13   my -- my work truck, we ended up doing a collection of DNA

14   right there.

15   Q.  So let's talk about the work truck just a little bit.  Are

16   there certain items that you carry around with you in that

17   vehicle?

18   A.  Yeah, so carry all of the stuff you would need for work.

19   So crime scene investigation stuff, you know, cameras, DNA

20   collection, evidence packaging, things like that.

21   Q.  So the packaging was there, it was available?

22   A.  Yes.

23   Q.  And at this point, you knew who Hannah Bye was through

24   those interviews?

25   A.  Correct.

1  Q.  Then in terms of the actual collection of the DNA, let's

2  explain a little bit how that works.

3  A.  Okay.  Just to kind of put it in terms, they're like -- the

4  DNA swabs are like long sticks, they look like Q-tips on the

5  end, and you use multiple Q-tips.  And the person getting the

6  DNA either applies it themself if they're willing or you take

7  it, you know, with gloves on to keep cross-contamination down.

8          And what they do is they just go inside the cheek, and

9  they swab the inside of the cheek back and forth, front to back

10 and for approximately 30 seconds or so.  And we did multiple

11 DNA swabs.  And so once they're collected, they're dropped into

12 a little sealed container which goes into a sealed paper bag

13 and eventually sent to a, you know, crime lab to be analyzed.

14 Q.  Okay.  So let's talk about how it was done in this case.

15         So you're standing there next to your work truck.  You

16 said you grabbed the DNA collection kit, or was it someone else

17 who grabbed the kit?

18 A.  Yeah, so it was myself and another agent, so Agent Tucker

19 was there as well.  It was myself, Ms. Bye, Mr. Tucker all

20 right next to each other.  While I was talking to Ms. Bye about

21 something, Mr. Tucker obtained that stuff out of the truck, and

22 we administered it right there.  So I watched the whole thing

23 and was present and, you know, participated.

24 Q.  So who was it that opened the bag?

25 A.  I believe that was Mr. Tucker that opened the bag.

1    Q.  And then what happened next?  Who touched what next?

2    A.  Oh, the Q-tips were provided to Ms. Bye, so she was

3    obviously compliant to give the -- use the DNA swabs and so we

4    just instructed her how to use it.  She just took it and, like,

5    we just mentioned, the process with inside of her cheek swabs,

6    and she did that multiple times.  And then she placed them in

7    the container, and then we sealed the bag.

8    Q.  What's the advantage of having her do the cheek swabs?

9    A.  Yeah, there's just -- you're minimizing

10   cross-contamination.  So you don't want -- you know, DNA can

11   come from just your finger tips or all kinds of different

12   stuff.  So the less that you touch that kind of evidence, the

13   better it is for contamination.

14   Q.  And we talked a bunch about your training with evidence

15   collection yesterday.  Is this the process that you have been

16   trained to do?

17   A.  That's correct.

18   Q.  Once the DNA was collected from Ms. Bye, what did you do

19   with it?

20   A.  We sent it to a crime lab.

21   Q.  So you mentioned you interviewed roommates and other

22   collateral folks.  Let's talk about those search warrants.

23        What was the purpose in seeking search warrants for

24   cell phone data?

25   A.  Well, the cell phone data search warrants that we did went

1   to the providers, so like the cell phone providers, like

2   Verizon or Sprint.  And so what you tend to get with those

3   returns, so when you ask for that information from them, is

4   they will give you user attribution data, so who the phone

5   belongs to or who is utilizing the phone.  A lot of times, it

6   is call history, so what calls were placed or received.

7          And then more particular for what we were after was

8   what's called tower data, and so as the cell phone hits

9   different cell phone towers, it kind of gives location data, at

10  least, you know, fairly specific location data on where the

11  cell phone is at.  And, you know, that data gets more specific

12  with more towers, but the point being is that it shows kind of

13  realtime location data for where the cell phone was traveling

14  in time.

15  Q.  And in your mind, how was that relevant to your

16  investigation?

17  A.  Well, what I was trying to do with those -- because I

18  obtained one for Mr. Smith and one for Ms. Bye.  And so I was

19  trying to kind of see if their phones were together, as she had

20  stated.

21         So, you know, she had mentioned that they were

22  together, so I was just trying to confirm that they were

23  together and that they traveled where she said they traveled.

24  Q.  And in -- did you receive -- there's like four questions

25  there.  Let me break them up before I drive the court reporter

1    completely nuts.

2          So you mentioned that you did this for two different

3    cell providers?

4    A.   That's correct.

5    Q.   Which cell providers were they?

6    A.   One cell provider was Verizon.  I believe that was for Mr.

7    Smith.  And one cell provider was Sprint, which I believe was

8    Ms. Bye.

9    Q.   And how did you identify those cell providers?

10   A.   There's cell provider lookups.  Ms. Bye was able to tell me

11   hers as well to confirm it, and then you can -- there's just

12   public source information out there that you can use to just

13   look up cell providers with phone numbers.

14   Q.   And when you receive those warrant returns, do you get any

15   confirmation that you've got the right account for the right

16   person?

17   A.   Yes.  As I mentioned, it comes with user attribution data,

18   so meaning it tells you what the cell phone number is, who is

19   responsible for the account, cell phone, you know, stuff made.

20   I was able to see the phone calls that I was looking for, that

21   kind of thing.

22   Q.   And when you received that data, what did you do with it?

23   A.   Once I received the data, because it can be kind of hard to

24   interpret, I always send it to a specialist.  So we send it to

25   somebody who's an expert in dealing with cell phones.

1      So we send it to an expert with the FBI crime lab, and

2  they deal with cell phones specifically.  And so we sent it to

3  a guy named Kevin Hoyland who interprets that cell phone data.

4  Q.  And your understanding is that data showed what?

5  A.  That data showed them together.  It placed them in the same

6  general area together at the same time as we were looking for,

7  or more specifically, they were at the same place.

8  Q.  Which were?

9  A.  I believe the tower data represented them being together in

10  Rexburg and then kind of leaving Rexburg and then showing up

11  the following day.

12  Q.  You mentioned some other search warrants.  Did you do any

13  other search warrants for electronic data?

14  A.  I did.  I did one for Tinder.

15  Q.  And why did you do a search warrant for Tinder?

16  A.  Tinder was the conversation platform, so that was the

17  communication platform that they were talking on originally.

18  Q.  So you told us that Ms. Bye -- yesterday you told us Ms.

19  Bye had allowed the police department to take a copy of her

20  phone.

21  A.  Right.  Ms. Bye told me in an interview pretty quickly that

22  she had deleted all the information off of Tinder and

23  essentially all the information regarding Mr. Smith fairly

24  quickly, so I wanted to find that information and see what that

25  conversation looked like.

1          So we filed the search warrant for Tinder.

2   Q.  And when you did that, did you get information back?

3   A.  I did.

4   Q.  Have you had a chance to review that information?

5   A.  I have.

6          MS. MARTENS:  Your Honor, I have the results of that

7   Tinder search warrant marked as Exhibit 100 with the relevant

8   portions pulled out as 100A.  That has been previously

9   authenticated as a true and accurate copy by this Court's

10  order, Document No. 67, and I would like to move for admission

11  of those documents at this time.

12         THE COURT:  Is there a need for both of them?

13         MS. MARTENS:  For completeness, I have the whole --

14         THE COURT:  We have no motion for completeness.  Is

15  there a need for you to have --

16         MS. MARTENS:  No.  Then we can skip straight to 100A.

17         THE COURT:  Any objection?

18         MR. HUGUS:  No, Judge.

19         THE COURT:  100A is admitted.

20      (Government's Exhibit 100A received.)

21         MS. MARTENS:  Do I have permission to publish to the

22  jury?

23         THE COURT:  Yes.

24         MS. MARTENS:  Thank you, Your Honor.

25  BY MS. MARTENS:

1  Q.  So do you see, Agent, on your screen what's marked
2  Government Exhibit 100A?
3  A.  Yes.
4          A JUROR:    Excuse me.  Our screens are not on.
5          THE COURT:  Agent Olson, you can pull your screen up
6  if it is not already pulled up so that you're not looking at
7  your knees.
8          THE WITNESS:  Okay.  I think this is as high as it
9  goes, so I'm sorry.
10          THE COURT:  That's fine.
11  BY MS. MARTENS:
12  Q.  All right.  Wonderful.
13          So, Agent, can you describe a little bit about what
14  we're seeing there in the first page?
15  A.  Yes.  So this is part of the data that Tinder returned, and
16  it's essentially identifying the e-mail address associated with
17  the account, the gender of the person using it, and then the
18  gender filters are essentially saying the gender that that
19  person is interested in pursuing, and then the name, obviously,
20  Cody, and his e-mail, runfast1217@gmail.com.
21  Q.  So when you talked about user attribution data before, is
22  that what we're looking at here?
23  A.  That's some of it, yep.  And this -- I mean, for Tinder.
24  User attribution data can be a lot of things, but this is what
25  Tinder provided.

1          MS. MARTENS:  All right.  Ms. Wait, could you advance

2     the slide.

3     **BY MS. MARTENS:**

4     Q.  And so when we get to the user attribution data, then when

5     we move into the conversation, what do you see here?

6     A.  This is Mr. Smith speaking.

7     Q.  So the Tinder warrant was for Mr. Smith's account?

8     A.  Correct.

9     Q.  And when we talk about who the user of that account is, is

10    that why we're talking about the user as Mr. Smith?

11    A.  Yes.

12          MS. MARTENS:  Okay.  Ms. Wait, can we -- we're done

13    with this exhibit for now.

14    **BY MS. MARTENS:**

15    Q.  What other steps did you take to look at various kinds of

16    information in this case?

17    A.  Other than the search warrants?

18    Q.  Yeah.  Let me just tell you a little more particularly

19    where I'm going.

20          So yesterday you mentioned you interviewed Alicia Bye?

21    A.  Yes.

22    Q.  Who is Alicia Bye again?

23    A.  Yeah.  Alicia Bye I think is how she pronounces it.  That's

24    Hannah Bye's mother.  And she ended up showing up pretty quick

25    after the reported incident to be with Hannah.  And she had

1    some information that she wanted to share.

2    Q.   And what kind of information was that?

3    A.   She and Hannah and their family use an application called

4    Life 360, and it's a -- that's a cell phone application.

5    Q.   So have you had an opportunity to educate yourself a little

6    bit about what Life 60 is and -- 360 is and how it works?

7    A.   Yes.

8    Q.   How did you do that?

9    A.   There's a lot of public source stuff on their website about

10   what Life 360 provides and user reviews, and then also speaking

11   with Ms. Bye, she was able to tell me the way that their family

12   uses it.

13   Q.   And did she provide you with anything relative to Life 360?

14   A.   She did.  So just to kind of clarify what it is -- would

15   you like me to?

16   Q.   Please.

17   A.   Yeah.  So Life 360 is a social media or a cell phone

18   platform, and what it does is it provides geo location data for

19   the users on both ends.  So you can set it up a bunch of

20   different ways.

21        The way that she had it set up was the mother would

22   receive location data, realtime location data, for wherever her

23   daughter was at.  So it shows a map where she's at.  It shows

24   how fast they're traveling in cars.

25        It has alerts that you can use if you get into, like,

1    a traffic accident.  So if the phone experiences data that's

2    consistent with, like, a traffic accident, it would alert the

3    mother, that kind of stuff.

4         So what she provided me with was screen captures of

5    that data from the time frame that we're interested in, showing

6    Ms. Bye's location.

7         MS. MARTENS:  Your Honor, at this time, I would like

8    to move for admission of Exhibit 204.  The parties have

9    previously stipulated that this information would come in in

10   our stipulations which we marked Exhibit 1001 yesterday.

11        THE COURT:  Counsel, please approach.

12        (At sidebar.)

13        THE COURT:  Ms. Martens, I frankly don't understand.

14   We have spent probably 40 minutes discussing matters that we

15   talked about stipulating to this morning in order to speed

16   things along.  So I don't quite understand the point or

17   direction of the -- this extended discussion of everything he

18   thought about and did when the defendant has agreed to

19   stipulate that they met and traveled into Yellowstone Park.

20        MS. MARTENS:  Certainly, Your Honor.  So part of what

21   I think we can stipulate to based off of this morning is --

22        THE COURT:  We talked about what we're stipulating to.

23   What's the point of this extended direct with this agent?

24        MS. MARTENS:  So this lays the foundation for exhibits

25   that I'm going to ask other witnesses about also.  So, for

1    example, I'm going to walk through the Tinder conversation with

2    Ms. Bye.  The location stuff is showing that we took steps to

3    corroborate Ms. Bye's account of events when Mr. Smith had

4    said, "Uhm, I don't know what you're talking about," when the

5    agent interviewed him.

6              So in terms of just doing an abbreviated version of

7    what I had intended to show, that the Government did, in fact,

8    do a thorough investigation, trying to make sure that we did

9    what we could to either corroborate or refute Ms. Bye's version

10   of the events.

11             THE COURT:  We need to get to the elements.

12             MS. MARTENS:  Yes.

13             THE COURT:  I'm going to grant you some latitude --

14             MS. MARTENS:  Thank you, Your Honor.

15             THE COURT:  -- but, again, we have things stipulated

16   to.

17             MS. MARTENS:  Absolutely.

18             THE COURT:  I think for the entire time he's been on

19   here, everybody appreciates the thoroughness of the

20   investigative plan and everything else.

21             Please also know and you're cautioned that when

22   exhibits come in, they speak for themselves.  We are not going

23   to have people reading through exhibits.

24             MS. MARTENS:  So in terms of the Tinder conversation,

25   for example, I intend to go through that with Ms. Bye, the

1   back-and-forth between Mr. Smith, I'd like to go through that

2   with the jury rather than --

3           THE COURT:  The conversation will be admitted -- I

4   mean, you can start where you want to start, but we're not

5   going to have a lot of cumulative evidence in this case.

6           MS. MARTENS:  Certainly, Your Honor.

7           THE COURT:  Thank you.

8           MS. MARTENS:  Thank you.

9       (Sidebar ended.)

10          THE COURT:  Exhibit 204 is admitted.  Please continue.

11          MS. MARTENS:  Thank you, Your Honor.

12      (Government's Exhibit 204 received.)

13          MS. MARTENS:  Do I have permission to publish to the

14  jury?

15          THE COURT:  Yes.  And feel free.  Once it is admitted,

16  you don't need to seek admission.

17          MS. MARTENS:  Thank you, Your Honor.

18  BY MS. MARTENS:

19  Q.  So, briefly -- yeah, it's loading.

20          Briefly, what are we looking at here?

21  A.  This is location data from the Life 360 application, and

22  what we're seeing, there's a circle and, like, a little flag

23  there, and the circle is indicative of close to where Ms. Bye

24  lived and went to school right there at BYU-I.

25          And then the flag is indicative of a McDonald's that

1   they stopped at prior to their trip to Yellowstone.

2          MS. MARTENS:  Next slide, please.

3   **BY MS. MARTENS:**

4   **Q.**  What do we see here?

5   **A.**  This is the trip from Rexburg to West Yellowstone.

6   **Q.**  And then on this slide -- let me mark here so I can get

7   everybody's attention.

8          You see the time here (indicating)?

9   **A.**  Yes.

10  **Q.**  So when you spoke to Ms. Bye, where was she?

11  **A.**  At which time?

12  **Q.**  Well, I want to make sure we understand the time that's

13  displayed on this exhibit.  So this comes from Ms. Bye.

14  **A.**  Oh.

15  **Q.**  Is the timestamp correct, or do we need to have a little

16  information here?

17  **A.**  I was confusing which Ms. Bye.

18  **Q.**  I apologize.

19  **A.**  So Alicia Bye lives in Texas, and so this is going to be

20  off by approximately an hour.

21  **Q.**  Which way?

22  **A.**  I believe it goes backwards.  So 10:43 to 12:02, if I

23  remember right.

24         MS. MARTENS:  Next slide, please, Ms. Wait.

25  **BY MS. MARTENS:**

1   Q.  What do we see here?

2   A.  This is the trip from West Yellowstone going east.  You

3   kind of see that red dot there.  That's the difference between

4   Montana and Wyoming, or that's the state boundary there.

5          And then you start seeing -- you see it kind of

6   terminate there, and there's not a ton of cell service after

7   that.  But that's within Yellowstone National Park en route in

8   Madison Campground area.

9   Q.  And I want to direct you back to that timestamp.  Is that

10  timestamp in each of the slides going to be off that hour?

11  A.  That's correct.

12         MS. MARTENS:  Ms. Bye, we're done with these slides --

13  or Ms. Wait.  Sorry.  Good grief.

14  BY MS. MARTENS:

15  Q.  You also mentioned license plate readers.  Why did you grab

16  the license plate readers or look for the license plate

17  readers?

18  A.  Again, all of these actions are just trying to corroborate

19  or verify the information that I was given.  So I was just

20  trying to see if -- you know, Ms. Bye had provided some general

21  time frames on when they entered and when they left, and, you

22  know, she provided information for Mr. Smith's car.  So I was

23  just trying to confirm that that car had been in Yellowstone.

24  Q.  And I think you mentioned yesterday that you were able to

25  get some of that data?

1   A.   That's correct.

2          MS. MARTENS:  All right.  I have what's marked

3   Government's Exhibit 600, and I would like to move for

4   admission of that exhibit at this time.

5          THE COURT:  Hearing no objection, 600 is admitted.

6        (Government's Exhibit 600 received.)

7          MS. MARTENS:  Thank you, Your Honor.

8          Ms. Wait, can we publish that, please?

9   BY MS. MARTENS:

10  Q.   While we're trying to get that working -- it seems we're

11  having a little bit of difficulty getting the exhibit to

12  display -- you started talking about -- oh, never mind.

13         So just to help the jury understand what we're looking

14  at here, so we talked a little bit about the license plate

15  readers yesterday.

16  A.   Yes.

17  Q.   And so we have -- and you can mark your screen, so you see

18  if you touch in the top corner, you can mark, just to help

19  folks follow along.

20  A.   Okay.

21  Q.   But what sorts of information do the readers gather?

22  A.   Well, they're going to identify which entrance they're at.

23  So we have that here, the west entrance.

24         We have the date and timestamp, which we have here.

25  And that's when the vehicle traveled through that particular

1   lane that was being monitored by the license plate reader.

2         Then we have a picture capture of the license plate

3   and a picture capture of the vehicle associated with the

4   license plate.

5   Q.  And I think yesterday we talked a little bit about those

6   readers.  They just don't capture all the time?

7   A.  That's correct.  You can see that these are pretty ideal

8   conditions for captures.  You know, it's light, good

9   reflectivity, things like that.

10  Q.  Got it.

11        And there's a couple of pages of this exhibit, but we

12  don't necessarily need to walk through each page.  So we're

13  done with this one.

14        MS. MARTENS:  I have also got marked Exhibit 602,

15  which is the Idaho State Patrol license plate readers, and I

16  would like to move for admission of that exhibit at this time.

17        MR. HUGUS:  No objection.

18        THE COURT:  Exhibit 602 is admitted.

19     (Government's Exhibit 602 received.)

20        MS. MARTENS:  I think I can clear that.  There we go.

21  BY MS. MARTENS:

22  Q.  So for the jury, can you explain what this notation here on

23  the bottom means (indicating)?

24  A.  Yes.  This was indicating that it was on Interstate 15.  It

25  was southbound at milepost 99 at 11:02 on the 8th of September,

1    2019.

2    Q.  And are you familiar with the Rexburg area?

3    A.  Generally, after a couple visits.

4    Q.  Where is Interstate 15 in relation to Rexburg?

5    A.  This would be pretty much directly west of Rexburg and

6    southbound towards Boise.

7            MS. MARTENS:  You can pull that exhibit down.  We're

8    done with it.

9            I also have marked as Exhibit 601, a campground

10   receipt, which I would like to move for admission at this time.

11           MR. HUGUS:  No objection.

12           THE COURT:  601 is admitted.

13       (Government's Exhibit 601 received.)

14           MS. MARTENS:  Thank you.

15           May we publish that for the jury?  I'm sorry.  I was

16   asking Ms. Wait.

17           Can we go to the next page?

18   BY MS. MARTENS:

19   Q.  And what was the purpose in grabbing this receipt?

20   A.  Again, just trying to corroborate the info that I had that

21   he was in a campground, or he was alleged to be in a campground

22   in Yellowstone National Park.  This is a campground receipt

23   from the Norris Campground, referencing Campsite No. 47 for the

24   purchase date of September 6th, 2019.

25   Q.  Thank you.

1          MS. MARTENS:  Ms. Wait, we're done with that exhibit.

2     BY MS. MARTENS:

3     Q.  Earlier you mentioned some search warrants -- actually, I

4     think we're done talking -- oh, no, we need that one.

5          So you mentioned some search warrants.  I think you

6     listed the house, car and phone?

7     A.  Yes.

8     Q.  All right.  So I want to take you to the search warrant for

9     Mr. Smith's phone.

10    A.  Okay.

11    Q.  Were you ever able to get Mr. Smith's phone into your

12    possession?

13    A.  I was.

14    Q.  And once you were able to get a search warrant for that

15    phone, what did you do with it?

16    A.  I sent the phone -- the phone was locked, and so there's

17    some software tools to extract that data.  And so I sent that

18    away to another cell phone specialist to see if they could

19    extract the data for us.

20    Q.  Were they able to?

21    A.  On the initial try, no; and then on the second try, yes.

22    Q.  And did you receive that data?

23    A.  Yes.

24    Q.  In what form did you receive it?

25    A.  So I received it in a software program, like just a user

1    program of the data.  So it comes back so it's something that

2    you can just toggle through and kind of easily navigate on your

3    screen.

4              So they take -- you know, I can't speak as a

5    specialist, but essentially they're taking a much more detailed

6    image of it, and then they're providing -- the specialist does,

7    and then they're providing me with an image that can be used

8    interchangeably with this software program so laymen can get

9    through it.

10   Q.  And as a layman getting through it, what sorts of things

11   are you doing?

12   A.  Yeah, so there's labels in the software, so it would be

13   labels for text messages, labels for videos, labels for

14   pictures, placed phone calls, location data, things like that.

15   So it's just real -- it makes it fairly easy to navigate and

16   apply search filters to and things like that.  I am not a tech

17   genius by any means, so I can get through it.

18             MS. MARTENS:  Your Honor, at this time, I would like

19   to move for admission of Exhibit 400, which is a copy of Mr.

20   Smith's phone.

21             MR. HUGUS:  Objection.  It is going to be hearsay on

22   that.

23             MS. MARTENS:  You want to approach?

24             MR. HUGUS:  Yes, exactly.

25        (At sidebar.)

1          THE COURT:  Mr. Hugus.

2          MR. HUGUS:  Yeah.  The objection, Judge, is a hearsay

3     objection.  The entire phone is any communication that would be

4     on that phone, any photographs, I mean, that's a very broad

5     move to admit or move to offer, I guess.

6          MS. MARTENS:  I can certainly go through it piecemeal.

7     I'm prepared to do it either way, whatever the Court's

8     preference is.

9          MR. HUGUS:  I think if there's pieces that are on the

10    phone, there's specific data that you've got from the phone

11    that you -- that you want or whatever, then those pieces you

12    can move.  But to just say here's the entire phone file and

13    moving to admit the phone, that's way too -- it's way too

14    broad.  I mean, there would be relevancy objections,

15    potentially hearsay objections.

16          THE COURT:  The --

17          MR. HUGUS:  I can't even know all what you'll get

18    into.

19          THE COURT:  All right.  I think I understand.  I'll

20    address the objection on the record.

21          Please know, I grant permission to approach.  You

22    don't approach.  All right?  So I'm not always going to grant

23    your request to approach, so ask to approach.

24          MR. HUGUS:  I didn't, Judge.

25          THE COURT:  Somebody did, and then everybody moved up

1    here.  But my point is, you don't come up here unless I

2    approve.  All right?  Thank you.

3         (Sidebar ended.)

4              THE COURT:  Thank you.  The objection is sustained.

5              Ms. Romine -- or excuse me -- Ms. Martens.

6              MS. MARTENS:  Certainly, Your Honor.

7    **BY MS. MARTENS:**

8    **Q.**  So in reviewing Mr. Smith's phone, were you able to find

9    anything that was helpful to you in your investigation?

10   **A.**  I was.

11   **Q.**  And specific to that early time frame, how about any

12   photographs in early September?

13   **A.**  Yes.  So there's multiple photographs in there from within

14   Yellowstone, and one in particular was of a tent in a campsite

15   for the same time frame that we were looking for.

16              MS. MARTENS:  At this time, Your Honor, I would like

17   to move for admission of that photograph, which I have marked

18   as Exhibit 401.

19              MR. HUGUS:  No objection, Your Honor.

20              THE COURT:  401 admitted.

21         (Government's Exhibit 401 received.)

22   **BY MS. MARTENS:**

23   **Q.**  All right.  Can we talk to the jury just a little bit about

24   what it is we see here?

25              THE COURT:  Ms. Martens, this is admitted.  I think

1    the jury knows what they are seeing.  Please move on.

2            MS. MARTENS:  Well, Your Honor, I do want the agent to

3    point out -- oops -- that the photograph comes with some data.

4            THE COURT:  Ask your next question, please.

5            MS. MARTENS:  Thank you, Your Honor.

6    **BY MS. MARTENS:**

7    **Q.**  That there's some associated data here with the photograph?

8    **A.**  Yes.

9    **Q.**  And is that displayed by virtue of -- for you, as an end

10   user of that program?

11   **A.**  That's correct.

12           MS. MARTENS:  Your Honor, that's -- may I have just a

13   moment?

14           THE COURT:  Yes.

15           MS. MARTENS:  Thank you.

16           I did skip one thing.

17   **BY MS. MARTENS:**

18   **Q.**  So I want to take you back to interviews of the defendant.

19           Did you have a second opportunity to talk to

20   Mr. Smith?

21   **A.**  I did.

22   **Q.**  And when about was that?

23   **A.**  It was approximately a month after the first one.

24   **Q.**  And have you had an opportunity to review the recording of

25   that interview?

1    A.   I have.

2    Q.   Is it an accurate representation of the conversation that

3    occurred?

4    A.   It is.

5          MS. MARTENS:  Your Honor, I have that interview, the

6    audio recording, marked as Exhibit 901, and I would like to

7    move for its admission at this time.

8          MR. HUGUS:  Your Honor, no objections other than the

9    objections previously noted.

10         THE COURT:  Those objections are preserved.

11         901 is admitted.

12         MS. MARTENS:  Thank you, Your Honor.

13      (Government's Exhibit 901 received.)

14         MS. MARTENS:  Ms. Wait, can we play that for the jury?

15      (Government Exhibit 901 played.)

16         MS. MARTENS:  Your Honor, at this time, I have no

17   further questions for this witness.

18         THE COURT:  All right.  Thank you.

19         The witness is passed for cross-examination.

20         MR. HUGUS:  Your Honor, defendant has no cross on

21   these issues.  Thank you.

22         THE COURT:  All right.  Thank you.

23         Special Agent Olson, you may step down.

24         THE WITNESS:  Thank you.

25         THE COURT:  Thank you so much for your time.  You are

1   subject to recall, as I understand it.

2          THE WITNESS:  Understood.  Thank you, ma'am.

3          THE COURT:  Yes.

4          Ms. Martens, the Government may call its next witness.

5          MS. MARTENS:  Thank you, Your Honor.

6          Our next witness will be Detective Stubbs.  I think

7   we're grabbing him from the witness room now.

8          THE COURT:  Did you say Detective Stubbs?

9          MS. MARTENS:  Yes.

10          THE COURT:  Thank you.

11          Good morning, Detective Stubbs.  If you would step up

12   next to the witness stand to be sworn.

13     (Witness sworn.)

14          COURTROOM DEPUTY:  Please take a seat.

15          Sir, can you please state and spell your name for the

16   record.

17          THE WITNESS:  David Stubbs, last name S-t-u-b-b-s.

18     **DAVID STUBBS, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

19   **BY MS. MARTENS:**

20   **Q.**  Where do you work?

21   **A.**  I am a police sergeant detective for the Rexburg Police

22   Department, Rexburg, Idaho.

23   **Q.**  And what sorts of things do you do?

24   **A.**  I'm sorry, can you speak up just a little bit?

25   **Q.**  Sorry.  What sorts of things do you do?

1  **A.**  Well, I do all aspects of police investigations.  My

2  specialties are more in computers, cell phone forensics.

3       I am a member of the Internet Crimes Against Children

4  task force for the state of Idaho, have numerous certificates

5  in all kinds of digital forensics.

6  **Q.**  So let's talk about those a little bit.  You said you do

7  computer forensics.  What kinds of computers?

8  **A.**  Well, I do any kind of computer that you would use in your

9  household or business.  I also do specifically cell phone

10  forensics, using various softwares, namely, Cellebrite

11  technologies.

12  **Q.**  And you said you had multiple certificates.  What kinds of

13  certificates do you have?

14  **A.**  So I am a CCO, which is a Certified Cellebrite Operator,

15  and also a Cellebrite Certified Forensic Analyst.

16  **Q.**  What does that mean?

17  **A.**  Well, in a nutshell, it means that I am certified to take a

18  cell phone, that I can download its content, whatever it may

19  be, and that I am certified to go through that content and come

20  up with determinations on things that are inside of that data.

21  **Q.**  And the determination on the data, what sorts of analysis

22  does that take?

23  **A.**  Well, if I understand your question, I can take a device,

24  hook it up to a computer that has the Cellebrite software.  It

25  will extract that data from the phone.

1        At that point, the system can analyze it and decide

2   what it is, what context it needs to be put in, whether it's

3   a -- the cell phone's phone book or text messages or chats or

4   websites visited, anything that your phone can do.  Basically,

5   your phone is essentially a computer.

6   Q.   So when you do that, does that create an accurate copy of

7   the device, in your experience?

8   A.   Yes.  And if it doesn't, the software will advise me that

9   it wasn't able to get certain portions of a device.

10  Q.   Does that happen often?

11  A.   Not too often.  Rarely.  And then if it does, a lot of

12  times I can redo it, and it will overcome the errors.

13  Q.   You mentioned that you had several certificates.  Do you

14  have other training?

15  A.   As far as in forensics?

16  Q.   Yeah, in forensics.  Do you -- do you sort of stop at the

17  certificates, or do you go out and get more or additional

18  training?

19  A.   No, we are constantly renewing our certificates.  We, every

20  so often, depending on the software, we have to redo, retake,

21  recertify.  So we're constantly doing that.

22  Q.   I want to draw your attention to this case in particular.

23        Are you familiar with Ms. Hannah Bye?

24  A.   I am.

25  Q.   And how did you become familiar with her?

1   A.   Initially I came in contact with her -- she was a student

2   at our university there in Rexburg.  A -- she had made a

3   complaint of a sexual assault.

4        Our initial officers went out, took a report from her

5   initially, and then it is oftentimes turned over to the

6   Detective Division.  That's when I first came in contact with

7   her and interviewed her.

8   Q.   After your interview, did you do any follow-up?

9   A.   Yes.

10  Q.   Were you able to identify any suspected perpetrator?

11  A.   Okay, so that's where I thought you were going.

12       So at first, Hannah only knew a first name of the

13  gentleman.  However, she made a comment to us that just prior

14  to her being picked up by the gentleman, he had mentioned he

15  had just gotten pulled over near the LDS temple there in

16  Rexburg.

17       So only knowing his first name, I did some checking.

18  I found the -- through our dispatch, I found that there had

19  only been one traffic stop during that time frame in that area

20  by Officer Jordan Jensen with a car matching the description

21  that Ms. Bye had given us.

22       I then took that information from the dispatch, ran

23  the license plate, was able to find out the driver of that

24  vehicle.

25  Q.   And did you pass that information to Special Agent Jake

1  Olson?

2  **A.**  I did.

3  **Q.**  Did you ever do any follow-up in terms of collecting other

4  evidence in this case?

5  **A.**  I did.  After our initial interview with Hannah, she,

6  again, came in, at which time she consented to let us do a

7  forensic download of her cellular phone.

8  **Q.**  Do you do that download?

9  **A.**  I did.

10  **Q.**  And we talked just a little bit about that you -- that

11  process.  What software did you use for that download?

12  **A.**  Uhm, I used Cellebrite for PC is what it's called to

13  extract the information from the phone.

14  **Q.**  And what is Cellebrite?

15  **A.**  So Cellebrite is a forensic tool often used by cellular

16  companies to -- it first started out where, when you got a new

17  phone, you would take your phone, and they could transfer data

18  from your old phone to your new phone.  And then it evolved

19  into a forensic tool for law enforcement to extract information

20  from a cellular device for the purpose of investigation.

21  **Q.**  And what do you do to use that?

22  **A.**  Well, I take the device and hook it up to the machine.  In

23  this case, it was with Ms. Bye's permission.

24        This was an Apple device; all devices are different,

25  but I was able to hook it up to my forensic computer and get a

1  successful download of her cellular device, which, in a sense,

2  is a copy of her phone.

3  Q.  Now, is that copy always complete even if it is successful?

4  A.  Well, this gets into a little deeper thing here, but Apple

5  is its own animal, if you will.

6       There are three basic types of extractions.  There's

7  physical --

8       THE COURT:  Sir, if I could interrupt you.  I think

9  the question is:  Is it complete or not.  That seems to be a

10  yes or no.

11 BY MS. MARTENS:

12 Q.  In this case, was it complete?

13 A.  Yes, it was complete.

14 Q.  And then does the results, even if it is complete, vary

15 based on the make or model or software version of the phone?

16 A.  It can, yes.

17 Q.  And why is that?

18 A.  So when a --

19      THE COURT:  Ms. Martens, I'm having a hard time

20 understanding the relevance of this.  He testified that the --

21 the download was complete.  If we could move on.

22      MS. MARTENS:  May I approach, Your Honor?

23      THE COURT:  No.

24      MS. MARTENS:  Okay.

25 BY MS. MARTENS:

1  Q.  So, when you're talking about your download, does the --

2  does the software retrieve deleted information?

3  A.  It can, but oftentimes it will not.

4  Q.  Why is that?

5  A.  Well, again, as I specified, Apple is its own animal, if

6  you will.  Apple is very good at -- when you delete something

7  from one of their devices, it's very good at totally getting

8  rid of it.

9  Q.  And so when you are talking about the sorts of information,

10  what might affect how or when information is deleted?

11  A.  Say that again?

12  Q.  What might affect how or when information is deleted on an

13  Apple device?

14  A.  Well, when it was deleted, the software it was using at the

15  time, and if the owner or whoever is using the device totally

16  deletes it out of the system.

17  Q.  What about third-party applications?

18  A.  So a third-party application -- and I believe we're talking

19  about things like Facebook, Snapchat, whatever.  So a lot of

20  times when you're using those, if you will, softwares, they're

21  not directly storing data on the device itself, the phone.

22         So, for instance, if I'm using, say, Instagram, taking

23  pictures, whatever else, a lot of times my phone takes those

24  pictures, but it's not being stored or the conversations aren't

25  being stored on the phone; they're being stored on a server

1  that belongs to Instagram.

2  Q.  Do user settings affect how things like photos are stored?

3  A.  Can.  It can.

4  Q.  Can they affect how things like photos get deleted?

5  A.  Yes.

6  Q.  Is that true of the user settings, both on the phone or a

7  third-party application?

8  A.  Yes.

9        MS. MARTENS:  At this time, Your Honor, I would like

10  to move for admission of Government's Exhibit 200.

11        MR. FREEBURG:  What is Government's Exhibit 200?

12        MS. MARTENS:  That is -- here, I have it in paper.

13  Let me -- may I approach with --

14        THE COURT:  Yes.  Thank you.

15    (Discussion held between prosecutor and defense counsel.)

16        MR. FREEBURG:  No objection, Your Honor.  Thank you.

17        THE COURT:  Exhibit 200 is admitted.

18        MS. MARTENS:  Thank you, Your Honor.

19    (Government's Exhibit 200 received.)

20        MS. MARTENS:  May I have just a moment?

21    (Discussion held between prosecutors.)

22        MS. MARTENS:  So I have pulled out as Exhibit 205 and

23  206 some photos that were deleted from Ms. Bye's phone but

24  retrieved from the extraction.

25        MR. FREEBURG:  Okay.  No objection, Judge.

1          THE COURT:  Do we have a motion?

2          MS. MARTENS:  Yes.  I would like to move for their

3     admission at this point.

4          THE COURT:  205 and 206 are admitted.

5        (Government's Exhibits 205 and 206 received.)

6          MS. MARTENS:  Ms. Wait, would you display those?

7          And can you go to the next photo?

8     **BY MS. MARTENS:**

9     **Q.**  Detective Stubbs, have you seen those pictures before?

10    **A.**  I have.

11    **Q.**  And have you looked at some of the data with regard to

12    them?

13    **A.**  Uhm, I have.

14    **Q.**  Can you explain a little bit to the jury how it was that

15    these photos were recovered from the copy of Ms. Bye's phone?

16    **A.**  How they were recovered?

17    **Q.**  Yes.

18    **A.**  Well, in the -- in the analysis, the phone -- or the

19    software was able to find these photos, among others in the

20    download, and then bring 'em up in the analysis portion of the

21    software.

22    **Q.**  So when we are talking about how that happens, we said a

23    little bit about deleted information.

24          Do you --

25          MS. MARTENS:  Here we are.  Let's go, then, to page

1  188 of Exhibit 200.

2      (Discussion held.)

3  **BY MS. MARTENS:**

4  **Q.** Do you recognize what we're looking at here?

5  **A.** I recognize that as being one of the pages of the

6  extraction and the report that I gave to Agent Olson.

7  **Q.** And so when we're looking at this information, uhm, can you

8  tell whether or not this photo was taken using a third-party

9  software application?

10 **A.** Gosh, that's awfully small.  Does the screen move at all

11 or --

12 **Q.** I think we can zoom.

13 **A.** And you're asking me if this was taken with a third-party

14 application?

15 **Q.** Yeah, I'm asking whether you can tell whether or not it

16 was.

17 **A.** I can tell you that this was taken -- taken with an Apple

18 iPhone XR.

19 **Q.** But you don't know whether or not this photo was taken

20 with, like, using something with Instagram or Snapchat or

21 Facebook?

22 **A.** I can't tell you if it was taken and then placed on a

23 third-party site, but the device that took it was an iPhone XR.

24 **Q.** Yeah, but can you tell whether something --

25      THE COURT:  Ms. Martens, I believe he's answered that.

1    So please move on.

2            MS. MARTENS:  I will rephrase.

3            If I may have a moment, Your Honor?

4            THE COURT:  Definitely.

5            MS. MARTENS:  Your Honor, I have no further questions

6    for this witness.

7            THE COURT:  All right.

8            Detective Stubbs is passed for cross-examination.

9            MR. FREEBURG:  No, Your Honor, I would like to

10   cross-examine Mr. Stubbs.  Thank you.

11           Your Honor, I do have an issue I would like to address

12   with the bench, if the Court would.

13           THE COURT:  Do you have a --

14           MR. FREEBURG:  Or Judge --

15           THE COURT: I'm sorry?  If you have a question, please

16   present your question.

17                          **CROSS-EXAMINATION**

18   **BY MR. FREEBURG:**

19   Q.  Good morning, sir.  My name is Alex Freeburg.  I'm an

20   attorney here for Cody Smith, and I will be asking you some

21   questions.

22   A.  Okay.

23   Q.  If I understand, you met with Ms. Smith in Rexburg; isn't

24   that right?

25   A.  Ms. Who?

1  Q.  Excuse me.  Ms. Bye, Ms. Bye, Hannah Bye in Rexburg.

2  A.  I did meet with Ms. Hannah Bye.

3  Q.  And you met with her in your capacity as the detective for

4  the sheriff for Madison County?

5  A.  For the Rexburg Police Department, yes.

6  Q.  Rexburg Police Department.

7       And what day did you meet with her?

8  A.  The initial report was taken on the 8th, and I think I met

9  with her -- I can't -- I think it was the 11th.

10 Q.  If I suggest to you that it was the 10th, does that seem

11 plausible?

12 A.  It could be.

13 Q.  And you did an interview with her for approximately 40

14 minutes?

15 A.  Approximately.

16 Q.  And at the Rexburg Police Department, do you have other

17 duties than besides doing Cellebrite-related forensic work?

18 A.  I do.

19 Q.  You're a detective there?

20 A.  I am.

21 Q.  Do you investigate crime that occurs on the BYU-Idaho

22 campus?

23 A.  I do.

24 Q.  In fact, there isn't a campus police force, is there?

25 A.  No, there's not.

1  Q.  Are you generally familiar with Yellowstone as someone who

2  lives in Rexburg?

3  A.  Yes.

4  Q.  How long have you lived in Rexburg?

5  A.  Fifty years.

6  Q.  Sir, do you go camping up in Yellowstone?

7  A.  I -- I camp just outside of Yellowstone at times, but I

8  visit Yellowstone often.

9  Q.  Is Yellowstone a bit crowded for camping?

10  A.  Depends on the time of year.

11  Q.  In the summer, do you consider Yellowstone crowded?

12  A.  I do.

13       MS. MARTENS:  Your Honor, at this point, I'm going to

14  object, and I would like to approach the bench.

15       THE COURT:  Could you state your objection briefly?

16       MS. MARTENS:  This is outside of the scope of direct.

17       THE COURT:  Sustained.

18       MR. FREEBURG:  Judge, may I be heard on this

19  particular point?  I do believe it is important to the economy

20  of this case.

21       THE COURT:  Why don't we take a break at this time?

22       We'll break until 10:30, approximately, give or take.

23  We're kind of like the airlines when they run.

24       Please remember the admonition against discussing this

25  case with anyone, including each other.  Don't research

1  anything about this case.  Please keep an open mind until all

2  of the evidence is in.

3         Stand for the jury to recess.

4     (Following out of the presence of the jury.)

5         THE COURT:  You may step down, if you wish.

6         THE WITNESS:  Step down?

7         THE COURT:  Yes.

8         Mr. Freeburg?

9         MR. FREEBURG:  Your Honor, I do believe that some of

10  my questions are beyond the scope of the direct examination,

11  and allow me to explain.

12         Mr. -- Detective Stubbs did, in fact, do a forensic

13  interview for 45 minutes with Ms. Bye.  As part of that

14  forensic interview, some of his comments were captured on what

15  I'll call a hot mic.  So after this interview wraps up, as an

16  offer of proof, Detective Stubbs expresses some skepticism

17  about the basis for these charges in ways that I need to put on

18  the record to preserve my client's constitutional right to

19  mount a defense.

20         And so I have prepared a subpoena right there.  For

21  the Court's information, I obtained five by precipe.  If I'm

22  not allowed to cross-examine on only the cell --

23         THE COURT:  You obtained what?

24         MR. FREEBURG:  I obtained a subpoena via precipe.  And

25  for the Court's information, if I'm not -- my intention is if

1    I'm not allowed to -- if I'm limited to cross-examination on

2    the Cellebrite issue because it is beyond the scope, I will

3    serve Detective Stubbs with a subpoena and insist that he

4    return for the defendant's case-in-chief because this evidence,

5    as an offer of proof, is just simply too important for us to

6    pass upon.

7            THE COURT:  For the Government?

8            As I understand it, the suggestion is to avoid

9    inconveniencing the witness and bringing him back for the

10   defendant's case-in-chief, that we be permitted -- that the

11   defendant be permitted some latitude to question outside the

12   scope.

13           MS. MARTENS:  Generally, Your Honor, I do not have an

14   objection to questions outside the scope that do that.  But if

15   the purpose is the fact that Detective Stubbs expressed

16   skepticism as to whether he believed Hannah Bye, that goes

17   directly to a comment on another witness' credibility, which is

18   entirely improper.

19           MR. FREEBURG:  Judge, there is a transcript of this.

20   I could provide it for the Court's review with a few moments.

21   But I would also -- I have a second issue to address when we're

22   done with this one.

23           THE COURT:  Are there questions that you can phrase

24   which don't go directly to the issue of credibility that relate

25   to his observations?

1        MR. FREEBURG:  Judge, it's less that it goes --

2    it's -- it's -- the issue is he expressed doubts as to whether

3    this meets the element of the offense, and I think that's a

4    subtle point and it's an important distinction.  He expressed

5    doubts that even if what she said is true, there is not a

6    kidnapping here.  That's my offer of proof to the Court.

7        And so for those reasons, I think it's slightly

8    different than commenting on the defendant's -- excuse me -- on

9    the alleged victim's credibility.

10       THE COURT:  Well, I am not going to rule on a question

11   that's not presented.  I do agree with the Government's

12   objection on the questions about whether he's visited

13   Yellowstone, and I see limited relevance to that line of

14   questions.  And we'll see -- I think you have some latitude to

15   exceed the scope.

16       Again, I'm not in a position to rule on how a question

17   is framed at this point without the question presented and the

18   defense -- and Government's objection, if any.

19       But this witness is not called for opinion testimony

20   other than perhaps if you want to rely upon his opinion

21   relating to his training and experience on the cell phone data

22   and software.

23       So please remember that direct testimony deals with

24   who, what, when, where; what this man has observed in the

25   course of his connection with Ms. Bye, as opposed to opinions

1    formed.

2          MR. FREEBURG:  Judge, may I be heard on a second

3    issue?

4          THE COURT:  Yes.

5          MR. FREEBURG:  Exhibit 200, which was admitted, I was

6    a bit surprised by.  It is a pdf with 188 pages at least.  I

7    had understood that it had fewer pages.  In general, we are

8    supportive of cell phone evidence being received by the jury.

9          THE COURT:  That exhibit is in without objection.

10         MR. FREEBURG:  And my question is, I would like a copy

11   of it so that I can cross-examine the witness, and I don't have

12   one.

13         MS. MARTENS:  He can borrow mine.

14         THE COURT:  All right.

15         MS. MARTENS:  Your Honor, I know that you don't have a

16   question in front of you, but since we're outside of the

17   hearing of the jury, might I ask a question?

18         THE COURT:  Yes, definitely.

19         MS. MARTENS:  So Mr. Freeburg mentioned some opinion

20   as to whether the elements of kidnapping are present.  The

21   Government would object to any testimony that invades the

22   province of the jury's decision.

23         Certainly, Mr. Stubbs is not a legal expert or in the

24   role of fact finding here, so I just wanted to hopefully

25   streamline things to put that out there.

1              THE COURT:  Thank you.

2              MS. MARTENS:  Thank you, Your Honor.

3              THE COURT:  All right.  We'll take a break so that we

4    have an opportunity to attend to matters before the jury is

5    ready to be called in.  So thank you very much.

6         (Recess taken 10:22 a.m. until 10:33 a.m..)

7         (Following in the presence of the jury.)

8              THE COURT:  Please be seated.

9              We are back on the record in 20-CR-45, with the jury

10   present and roll call waived.

11             Detective Stubbs, I would remind you you remain under

12   oath, sir.

13             Mr. Freeburg?

14   **BY MR. FREEBURG:**

15   **Q.**  Detective Stubbs, what information did you review before

16   coming here to court?

17   **A.**  Just my report and Exhibit 200.

18   **Q.**  Did you review any handwritten statements from the alleged

19   victim, Ms. Bye?

20   **A.**  I have.

21   **Q.**  Did you review any transcripts of your own interview with

22   Ms. Bye?

23   **A.**  Transcripts?

24   **Q.**  Yes.

25   **A.**  Just my report from my interview.

1  Q.  And with Ms. Bye in that interview, where did it take

2  place?

3  A.  At the Rexburg Police Department.

4  Q.  Did you have any trouble understanding her during that

5  interview?

6  A.  I don't recall.

7  Q.  Have you read any of the park rangers' reports?

8  A.  I have not.

9  Q.  Have you listened to any of the park rangers' interviews

10  with Ms. Bye?

11  A.  I have not.

12  Q.  Isn't it true that after talking with Ms. Bye, you thought

13  this was a real sketchy kidnapping?

14       MS. MARTENS:  Your Honor, I object.  This calls to

15  invade the province of the jury.

16       THE COURT:  I'll overrule the objection, but for the

17  jury, I would instruct that the issue will be yours, and yours

18  alone, to decide whether or not the Government has met its

19  burden of proof as to the essential elements of the offense of

20  kidnapping, as well as the other offense charged.

21       I'll permit -- if the witness is able to answer the

22  question, I'll permit it and advise the jury that you can take

23  that answer and assign it the weight that you believe it

24  deserves.  This witness is not qualified to offer any sort of

25  expert opinion testimony, and his opinion cannot substitute for

1   your opinion on the facts, as well as whether or not the

2   Government has met its burden of proof.

3        Do you have the question in mind, sir?

4        THE WITNESS:  Would you repeat it one more time?

5   **BY MR. FREEBURG:**

6   **Q.**  Isn't it true that after you met with Ms. Bye, you thought

7   this is a real sketchy kidnapping?

8   **A.**  So my answer to that would be this:  In law enforcement as

9   an investigator, my job is not only to take what's being

10  complained against but also try and look at all sides of what

11  has been happening, and -- so that I don't wrongfully accuse

12  someone, but that someone who is making an accusation, that I

13  take theirs in mind as well.

14       So I try and be objective that I'm doing the right

15  thing.  So -- but without further investigation, which was then

16  turned over to the feds, I didn't have a total view of the

17  whole situation at that time.

18  **Q.**  So without whatever the feds found out later --

19       THE COURT:  Mr. Freeburg, I believe the witness has

20  answered your question.  If you could please move on.

21  **BY MR. FREEBURG:**

22  **Q.**  Did Ms. Bye have an opportunity to get out of the car at

23  McDonald's?

24  **A.**  Well, that's something that you would probably have to ask

25  her.

1    MR. FREEBURG:  Your Honor, may I publish something?

2  Permission to --

3    THE COURT:  You can certainly show an exhibit to the

4  witness if you believe that he is a witness than can serve as a

5  foundation for admission, but he is here for direct testimony

6  without the aid of documents.

7    MR. FREEBURG:  Ms. Logan, I will need a little bit of

8  help to make sure it doesn't get published anywhere else.

9    COURTROOM DEPUTY:  Of course.

10  BY MR. FREEBURG:

11  Q.  And, sir, if you need to minute to scroll up or down

12  anywhere through this document, please do so.

13    But the lines I will be directing your attention to

14  are the lines 44 and 45 on page 47.

15  A.  Can you tell me what this document is?  I've never seen

16  this before.

17    THE COURT:  Well, before we go into that -- thank

18  you -- is there a question pending?  You cannot use a document

19  unless you intend to help him refresh his memory, and we don't

20  have any answer that he doesn't remember something.

21    MR. FREEBURG:  Judge, this question is being offered

22  for impeachment.  If the court reporter could read back the

23  response to my -- to my previous --

24    THE COURT:  I'm sorry?

25    MR. FREEBURG:  This question is being offered for

1   impeachment as to his previous answer, and so this document is

2   like a deposition transcript which impeaches his testimony.

3            THE COURT:  It is not a deposition transcript.

4            MR. FREEBURG:  It is similar to.

5            THE COURT:  No.

6   **BY MR. FREEBURG:**

7   Q.  Sir, I'd like to show you some of this document.  We can

8   start, and you tell me whether or not you think it's familiar

9   to you.

10           So would you please look at the first page with me?

11  A.  Can I -- can I ask where this document was prepared or

12  who -- this is unknown to me.

13  Q.  Sir, did you provide the Park Service with a recorded copy

14  of your interview with Ms. Bye?

15  A.  I did.

16  Q.  And did that record of that interview have both audio and

17  video?

18  A.  Yes.

19  Q.  I would ask you if this document, as we go through it,

20  matches the audio of that interview you did with Ms. Bye, the

21  40-minute interview that took place on September 10th or

22  September 11th at the Rexburg Police Department?

23  A.  This is what I can tell you:  Without hearing the audio

24  from 2019, and comparing it to this, I can't necessarily tell

25  you exactly that's what was said.

1    Q.  Sir, we can play the audio.  I would be happy to do that.

2         Would you please just look through the first page or

3    two, though, so we can only play the audio this matches up?

4         THE COURT:  Counsel, please approach.

5    (At sidebar.)

6         THE COURT:  Maybe I'm struggling, but we don't -- we

7    don't have a question presented.  His response was that --

8    about getting out of the car was that "I think you would have

9    to ask Ms. Bye" that.  We don't have a follow-up question of,

10   "Isn't it true," or something that would create an impeachment

11   opportunity.  This is not a document such as a deposition.

12        He's unfamiliar and has never seen it, did not prepare

13   it.

14        MR. FREEBURG:  And, Judge, as an offer of proof -- and

15   perhaps it's just my clumsiness with the impeachment mechanism.

16   The next question is, "Isn't it true you said" --

17        THE COURT:  Why don't you ask him that question.

18        MR. FREEBURG:  Okay.

19        THE COURT:  You don't need to prompt him with a

20   written document.  You need to get an answer from him that you

21   think you can impeach.  All right?

22        MR. FREEBURG:  Okay.

23        THE COURT:  Ms. Martens, I'm sorry.  I didn't mean to

24   exclude you if you had an objection or any statement.

25        MS. MARTENS:  I -- I think this line of questioning

1  will continue to call for opinions on whether we've met the

2  legal elements of kidnapping and opinions on the credibility of

3  other witnesses.  And so to the extent it does that, I

4  continue -- I intend to continue to object.

5          MR. FREEBURG:  And, Judge, for the Court's benefit --

6  and I apologize for stepping away.  I assumed I was excused.

7          THE COURT:  No, that's fine.

8          MR. FREEBURG:  This is the last line -- this is the

9  last question in this line of questioning.

10          THE COURT:  All right.  Well, if we could -- if we

11  could get a question on the table, I might not be so clumsy

12  myself.  Thank you, Mr. Freeburg.

13      (Sidebar ended.)

14          MR. FREEBURG:  And if you could present the document

15  to the witness.

16  **BY MR. FREEBURG:**

17  Q.  Isn't it true, sir, that you thought she had an opportunity

18  to get out of the car at the McDonald's parking lot after

19  interviewing her?

20          THE COURT:  And, Detective, just so we're all on the

21  same page, that question isn't really directed for you to read

22  a document.  It is a pretty straightforward question.  And if

23  you remember what you thought or maybe, perhaps, what you said,

24  you can certainly answer that directly.

25          We are here, though -- and I want to make sure

1  everyone understands that -- we are here to get your testimony,

2  all right, not some out-of-court statement.

3          So maybe you could either ask the question again in

4  the same verbiage.

5          MS. MARTENS:  Your Honor --

6          THE COURT:  Yes.

7          MS. MARTENS:  -- I think I have another objection here

8  to foundation for the question.

9          THE COURT:  I -- I -- he certainly has the foundation,

10  if he remembers what he thought or said.  I don't -- maybe I'm

11  misunderstanding the nature of your objection.

12          MS. MARTENS:  Would you like me to explain more or --

13          THE COURT:  Well, I think I understand your question.

14  I will overrule it.

15          Do you have the question in mind, or would you like it

16  restated, sir?

17          THE WITNESS:  Go ahead and restate it, please.

18  BY MR. FREEBURG:

19  Q.  Didn't you think, after you talked to her at the Rexburg

20  Police Station, that she had the opportunity to get out of the

21  car at McDonald's?

22  A.  So I wondered that, if she had the opportunity at the

23  McDonald's parking lot to get out of the car.  That was the

24  question that arose in my mind, but, yet, I wasn't there.

25  Q.  On Exhibit 200, did you see text messages between Ms. Bye

1    and her roommates?

2    A.   Yes.

3    Q.   Do you recall if those text messages were at 11:47 p.m.?

4    A.   I would have to review the document to tell you exactly

5    that that's what was on the document.  Going from memory, I

6    can't necessarily remember all 180 pages.

7    Q.   Understood.

8              Do you recall the file names for those deleted

9    photographs?

10   A.   The entire file name?

11   Q.   Let me ask it this way:  With an iPhone, when an iPhone

12   takes a digital photograph, the file format is .HEIC; isn't

13   that right?

14   A.   HDIM, I believe.

15   Q.   Okay.

16   A.   Or DCMI.

17   Q.   And are the photographs numbered sequentially?

18   A.   To a point, yes.

19   Q.   Do you know --

20   A.   Can I -- can I elaborate on that just a little bit?

21   Q.   Please elaborate on that just a little bit.

22   A.   So I am not an expert in Apple software.  Apple continues

23   to come out all the time with updates to their software.  So to

24   ask me to be an expert as to the operating system of an Apple

25   device itself, I cannot do.

1    Q.  The extract from the Cellebrite --

2    A.  Okay.

3    Q.  -- would contain the file names, correct?

4    A.  Correct.

5    Q.  And --

6         MR. FREEBURG:  Judge, can I show him?  I would like to

7    set up a demonstrative exhibit.

8    **BY MR. FREEBURG:**

9    Q.  Sir, can you see both of those photographs?

10   A.  I can.

11   Q.  And those are the photographs that were deleted on her

12   iPhone?

13   A.  Uhm, no, I can't say that these were deleted because we

14   extracted them.  Like I said earlier, once an Apple device

15   fully deletes something, I'm not going to recover it.  So these

16   would have had to have been on the device.

17   Q.  So you don't -- you don't know if these -- if Ms. Bye

18   deleted them and they were recovered despite being deleted?

19   A.  I can't tell you that.

20   Q.  If these photographs were deleted the day before or two

21   days before the interview, would that be information you would

22   want to know as an investigator?

23   A.  Possibly.

24   Q.  If that photograph is numbered 972 and that photograph is

25   numbered 974, do you think there might be a 973 that's missing?

1   A.   That would stand to reason.

2        MR. FREEBURG:  Judge, may I take these down?

3        THE COURT:  Yes.

4   BY MR. FREEBURG:

5   Q.   Sir, a Cellebrite extraction is similar to an iCloud

6   backup; isn't that right?

7   A.   Can be similar, yes.

8   Q.   And a Cellebrite extraction captures data that is sent

9   through carriers, correct?

10  A.   Restate that.

11  Q.   So let's talk about a phone in general.

12  A.   Okay.

13  Q.   You would agree with me that an iPhone can use data that's

14  passed to it through WiFi, correct?

15  A.   Yes.

16  Q.   And you would agree with me that an iPhone can use data

17  that's passed through the cellular network, through a cell

18  tower, correct?

19  A.   Yes.

20  Q.   Let's do one more question.  A Cellebrite extracts data in

21  a SQL database; isn't that right?

22  A.   Yes.

23  Q.   That SQL, and it's S-Q-L, structured query language, that

24  SQL database that the Cellebrite pulls data from, do you know

25  if it takes events that happened via WiFi and events or data

1  transmission that happens via the cell network or just the cell

2  network?

3  A.   I believe it can do either/or.

4  Q.   With that Cellebrite extraction, is it possible to see

5  artifacts that tell you when someone is using Snapchat?

6  A.   It can.

7  Q.   With the Cellebrite extraction, can you see when someone is

8  using a TikTok server?

9  A.   It can.

10 Q.   With the Cellebrite extraction, isn't it true that what you

11 see for Ms. Bye's phone is her text messages?  Isn't that

12 right -- or her iMessages?

13 A.   That that's what I can see?

14 Q.   Yes.

15 A.   In part, yes.

16 Q.   Are there any messages sent on Snapchat that are in

17 Exhibit 200 where you can see the contents of that message?

18 A.   I wouldn't know without reviewing the document.

19 Q.   Okay.  Are you familiar with any -- with the substance of

20 any Instagram communications that Ms. Bye may or may not have

21 made during the time period in question?

22 A.   Am I familiar with them?

23 Q.   Yes.  Have you looked at the substance of any Instagram

24 communications that she may have made during this time period

25 in question?

1  A.   So this is what I'll point out.  I did the extraction of

2  this device originally.  I did not review it as an analyst.  I

3  sent the document that was prepared to the agents for their

4  review in the entire document.

5       So to ask me if I've reviewed this entire thing, I

6  have not.

7       MR. FREEBURG:  Judge, may I have a moment with my

8  co-counsel?  I'm ready to sit down unless there's something I

9  forgot.

10      THE COURT:  Yes.

11   (Discussion held between defense counsel.)

12      MR. FREEBURG:  Thank you, Judge.

13      And no further questions at this time.

14      THE COURT:  Thank you.

15      Any redirect?

16      MS. MARTENS:  Just a little bit, Your Honor.

17                 **REDIRECT EXAMINATION**

18  BY MS. MARTENS:

19  Q.   Detective Stubbs, Mr. Freeburg talked to you a little bit

20  about the limits of your expertise.  You testified already that

21  you're a forensic analyst, that you have and can do those sorts

22  of analyses, but you haven't done it here; is that right?

23  A.   That's correct.  I just did the download and prepared the

24  report for agents.

25  Q.   And have you looked at a couple of narrow questions as --

1   as the investigation has progressed?

2   **A.**  Questions that have been brought up, I have looked at those

3   specific areas.

4   **Q.**  But not a full analysis?

5   **A.**  That is correct.

6   **Q.**  All right.  So Mr. Freeburg asked you about the sequence of

7   photographs.

8        MS. MARTENS:  And if Ms. Wait could pull up

9   Exhibit 200, page 188.

10       And, Ms. Wait, could you please zoom in on that again?

11  **BY MS. MARTENS:**

12  **Q.**  So can you point out for the jury the image numbers that

13  Mr. Freeburg was talking about?  And you can go ahead and -- or

14  I'll just underline them, if that's easier.

15  **A.**  So -- yeah.  You want me to read those out loud?

16  **Q.**  Sure.

17  **A.**  Okay.  So IMG_0972.HEIC is number one.  Number two is

18  IMG_0974.HEIC.

19  **Q.**  And so I think that what we're looking at here -- and I

20  think the question was what happened to image 0973.  Do you

21  know?

22  **A.**  I really don't know.  Like I said before, I don't -- I'm

23  not an Apple expert in their -- in their user -- in their data.

24  I have theories, but they're theories.

25  **Q.**  Are you relatively familiar with Apple devices perhaps as a

1  user?

2  A.  Yes.

3  Q.  So I'd like to have you look at these timestamps.  And so

4  as a user of Apple iPhones, have you taken photos in quick

5  succession before?

6  A.  I have.

7  Q.  How big is the gap between these pictures?

8  A.  Well, we're talking a second.

9  Q.  Have you ever taken a burst photo with an Apple device?

10  A.  A first photo?

11  Q.  A burst photo.

12  A.  I have.

13  Q.  How does that work?

14  A.  So when you take, when you set your Apple device up to take

15  bursts, it takes a short segment of really fast photos that

16  afterwards you can hold your finger on it and it will play

17  almost like a movie for a very quick moment.

18  Q.  And then I'd like to have you note, also, with these

19  timestamps what does UTC plus 0 mean?

20  A.  Uhm, so that is -- I always butcher this -- union something

21  time.  So basically what it is, there's a part in the world

22  where time starts, and then as you go around the world, you add

23  or minus an hour.  So when you're in Eastern, Central, Pacific,

24  whatever, when it's 5:00 on the East Coast, it's 4:00 in the

25  next time zone.

1          And so UTC minus 0 is the point in the world where

2    time starts, and then you start adding hours as you go around.

3          So in Rexburg, where this was done and where she was

4    at the time, we are at UTC minus 6 or minus 7, depending on

5    whether we're in Daylight Savings or not.

6    Q.   And so the timestamp as displayed here would need to be

7    converted so that it would be easier to understand?

8    A.   Right.  So if that was to say UTC minus 7, it would have

9    been correct in our time zone.  But UTC plus 0 means it is

10   where time begins, and if this was taken in Mountain Time Zone,

11   you would have to subtract the seven hours or add the seven

12   hours.

13   Q.   Do you know whether September 8th was Mountain Daylight

14   Time or Daylight Savings Time?

15   A.   I think we were in Daylight Savings at that time.

16   Q.   So is Mountain Daylight Time minus 6 or minus 7?

17   A.   7, if we're in Daylight Savings Time.

18   Q.   Okay.  Are you sure?

19   A.   Or 6 -- sorry.  Sorry.  6 in Daylight Savings.  When you go

20   back to regular time, it is plus 7 -- or minus 7.

21   Q.   So when we're talking about the Cellebrite and where these

22   images came from, it says here in the report "trash."  What

23   does that mean?

24   A.   So what that would indicate to me is that they were in the

25   trash can, if you will, of your computer or your phone, but

1   they hadn't been deleted entirely from the device.

2   Q.  And whether an image ends up in the trash can, are there --

3   is there more than one way for an image to end up in the trash

4   can?

5   A.  I suppose there would be.

6   Q.  Let's talk a little bit about your interview with Hannah

7   Bye on September 10.

8          When Mr. Freeburg was talking to you, he showed you, I

9   think, what was a transcript of that interview.

10  A.  Okay.

11  Q.  Had you reviewed it?

12  A.  I have not seen that document.

13  Q.  Have you reviewed the video and audio recording?

14  A.  Briefly.

15  Q.  So after the interview terminated, were there just

16  generally people standing around talking about the case?

17  A.  If I recall, myself, the other gentleman, the other

18  detective that was with me and so forth, we had some

19  discussion.

20  Q.  When you discuss a case after an allegation is reported, do

21  you form an investigative plan or a theory?

22  A.  Yes.

23  Q.  In forming those plans or theories, what are some steps you

24  take?

25  A.  Well, we take the information that we had been given and

1   talk about it, see if it was feasible, whatever, that it would

2   fit what's being accused and come up with all sorts of ways of

3   how things would happen or not happen.

4   Q.  Are you always looking for alternative theories?

5   A.  I think that's what we need to do, yes.

6   Q.  So, even using your expertise in forensic analysis, do you

7   know why photo 0973 is missing?

8   A.  I really don't know why.

9         MS. MARTENS:  Okay.  Your Honor, may I have a moment,

10  please?

11        THE COURT:  Yes.

12     (Discussion held at prosecution table.)

13        MS. MARTENS:  Your Honor, I have no further questions

14  for this witness.

15        THE COURT:  All right.  Any objection to releasing

16  this witness?

17        MR. FREEBURG:  No objection to releasing him from the

18  Government's subpoena.

19        THE COURT:  Thank you.

20        Thank you very much, Detective, for your time and

21  testimony today.  You're excused and released.

22        The Government may call its next witness.

23        MS. MARTENS:  Your Honor, if I may, the defense also

24  subpoenaed this witness.  We're just releasing him from the

25  Government's subpoena only?

1    THE COURT:  No.  We're -- as I understood the

2   defendant's comment, we're releasing him.

3    MR. FREEBURG:  Judge, just from the Government's

4   subpoena.  We would like a little bit more time, and we will be

5   sensitive to travel plans and not wasting anyone's time, but

6   I'm not prepared at this point to release him from our

7   subpoena.

8    THE COURT:  All right.  That's my understanding.

9   Thank you.  You may step down.

10    THE WITNESS:  Your Honor, may I -- are we referring to

11   this that I just received (indicating)?

12    THE COURT:  I'm not sure what we're referring to and

13   what's been issued.

14    MR. FREEBURG:  Yes, Judge.

15    THE COURT:  All right.

16    Yes, that's what we're referring to.  You're still

17   subject to that subpoena.

18    MS. ROMINE:  Your Honor, the Government calls Brian

19   Kimball.

20   (Witness sworn.)

21    COURTROOM DEPUTY:  Please take a seat.

22    Sir, can you please state and spell your name for the

23   record.

24    THE WITNESS:  Yes.  My name a Brian Kimball.  That's

25   spelled B-r-i-a-n K-i-m-b-a-l-l.

1    BRIAN KIMBALL, PLAINTIFF'S WITNESS, DIRECT EXAMINATION

2  BY MS. ROMINE:

3  Q.  Are you employed, sir?

4  A.  Yes, I am.

5  Q.  Where are you employed?

6  A.  I'm a special agent with the FBI.

7  Q.  How long have you been a special agent with the FBI?

8  A.  I started in January of 2005, so 16 years.

9  Q.  And what are your general duties in that position?

10 A.  I'm -- I'm located in the Provo office of the Salt Lake

11 City division, and so in that office we typically address

12 regular criminal complaints that come in and criminal referrals

13 that we have.  And so it entails a lot of white-collar crime,

14 bank robbery, kidnappings, and so forth.

15 Q.  Do you have any special team assignments as a special

16 agent?

17 A.  Yes.  Currently I am a team leader on Salt Lake City

18 Division's evidence response team.

19 Q.  Have you received any specialized training in the

20 collecting of prints?

21 A.  Yes, I have.

22 Q.  Could you explain generally what that training is?

23 A.  Sure.

24      As part of becoming a member of an evidence response

25 team, you go to a 40-hour basic training course that takes

1    place in Fredericksburg, Virginia.  And as part of that

2    training, one of the courses of instruction is collecting what

3    we term major case prints, which is a fancy way of saying

4    prints that capture a full hand and the sides and a full side

5    and wrap-around profile of digits as well.

6    Q.  At some point, did you become involved in an investigation

7    regarding a Cody Smith and Hannah Bye?

8    A.  Yes, I did.

9    Q.  How did you become involved in that investigation?

10   A.  I was contacted by an agent out of the FBI's Tampa field

11   office.  That agent advised that they were going to request

12   that I collect the known footprints of Hannah Bye.  As I

13   understood it, Hannah Bye lived in Utah and was attending

14   college at the time when the agent called me.

15   Q.  Did you ultimately arrange to collect those known prints

16   from Hannah Bye?

17   A.  Yes, I did.

18   Q.  On what date did you collect those prints?

19   A.  Sure.

20         On September 29th of 2020, Hannah came to our office

21   in Provo, and I and my supervisor collected those prints from

22   her, the footprints.

23   Q.  What's the general process for collecting such prints?

24   A.  Sure.  Most people are familiar with a standard fingerprint

25   card where you take a finger and you roll it on the card.  It

1    can kind of be a little bit tough with angles and contorting

2    your limbs to make sure you get a good print.

3           And so when we collect these full footprints or full

4    handprints, a lot of times what we do is we ink or powder the

5    hand, and then we actually bring a flexible film to the -- the

6    limb or the digit that's going to be printed, and then we're

7    able to kind of wrap the film around to capture the print.  And

8    that's what we did in the case of Ms. Bye.

9    Q.   So you followed that process on September 29th, 2020?

10   A.   That is correct.

11   Q.   And exactly which prints did you collect from Hannah Bye?

12   A.   I collected her footprints, so her full -- her full

13   footprints on the bottom, and then I also collected individual

14   toe digits, where we put the film on one side and we wrap it

15   around and make sure that we get a good -- a good print.  And

16   then what we do is you unwrap the film and you put it on a

17   clear transparency.  And that's what I did with Ms. Bye.

18   Q.   How did you verify that you were collecting prints from

19   Ms. Hannah Bye?

20   A.   When she showed up at our office, then I asked for a copy

21   of her photo identification.  In this case, it was a driver's

22   license.  I was able to verify her name and date of birth.

23   Q.   And did that photo identification match the person that you

24   were taking the prints from?

25   A.   That's correct, yes, it did.

1   Q.  After you collected the prints we discussed, what did you

2   do with them?

3   A.  So I submitted them to our evidence control room in Salt

4   Lake City with a request that they forward those prints on to

5   the FBI laboratory in Quantico, Virginia.  As I understood it

6   from the case agent in Tampa, they already -- there was an

7   existing request with the FBI laboratory at the time.  And so

8   you referenced that existing case number on the -- on the

9   submission of the known footprints from Ms. Bye.

10          MS. ROMINE:  Your Honor, may I have one moment?

11          THE COURT:  Yes.

12      (Discussion held between prosecutors.)

13          MS. ROMINE:  Your Honor, the Government has no further

14  questions for this witness.

15          THE COURT:  Any cross?

16          MR. FREEBURG:  No, Judge.

17          THE COURT:  All right.  Special Agent Kimball, you're

18  excused and released.  Thank you very much for your testimony.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  The Government may call its next witness.

21          MS. ROMINE:  Your Honor, the Government calls Jennifer

22  McGrath.

23      (Witness sworn.)

24          COURTROOM DEPUTY:  Please take a seat.

25          Ma'am, can you please state and spell your name for

1    the record.

2             THE WITNESS:  Sure.  Jennifer McGrath,

3    J-e-n-n-i-f-e-r.  McGrath is M-c-G-r-a-t-h.

4    **JENNIFER McGRATH, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

5    **BY MS. ROMINE:**

6    Q.  Are you employed?

7    A.  Yes, ma'am.

8    Q.  Where are you employed?

9    A.  With the FBI.

10   Q.  What's your position there?

11   A.  I am a special agent.

12   Q.  How long have you been a special agent with the FBI?

13   A.  I will have been in the FBI 11 years in August, so just

14   about ten-and-a-half years I've been an agent.

15   Q.  Have you received training to hold that position?

16   A.  I have, yes.

17   Q.  Generally what kind of training have you received?

18   A.  Sure.

19             When you're selected to become an FBI agent, they send

20   you to about five to six months at Quantico, where they teach

21   you legal training, tactics training, weapons training, things

22   like that.

23   Q.  What FBI office are you currently stationed out of?

24   A.  I'm currently here in Cheyenne, Wyoming.

25   Q.  How long have you been stationed in that office?

1   A.   About a year and a half.

2   Q.   At some point, did you become involved in an investigation

3   involving a Cody Smith?

4   A.   I did, yes.

5   Q.   How did you become involved in that investigation?

6   A.   Sure.  We got a request from the Park Service to assist

7   with DNA collection of Cody Smith.

8   Q.   Did you ultimately have contact with Mr. Smith in

9   accordance with that request?

10  A.   I did, yes.

11  Q.   When did that contact occur?

12  A.   It was May of last year.

13  Q.   And what was the nature of that contact?

14  A.   They had simply requested someone here in Cheyenne because

15  he -- Cody Smith was in custody with the Marshals here, to come

16  and collect his DNA for investigative purposes.

17  Q.   What's the process for collecting DNA?

18  A.   So I brought a little demonstrative kit here (indicating).

19  The process --

20  Q.   Let's walk that through.  What do you have with you in

21  front of you?

22  A.   Sure.

23          This is an evidence collection kit for DNA.  So it's a

24  pretty simple process to collect someone's DNA.  It consists

25  of -- I would normally wear -- I would put on gloves, and then

1  you take these Q-tips and put a piece of sterile water on the

2  Q-tip and take a swab and just swab the inside of a person's

3  mouth for about 10 seconds, and then you place that swab

4  through the holes here in this evidence box.

5          Then you do the second one on the other side of the

6  person's mouth, place it in the opposite direction so they

7  don't touch.  And then you close up the box and then seal it

8  with evidence tape.

9  Q.  And did you follow that process here, collecting DNA from

10  Mr. Cody Smith?

11  A.  I did, yes, pursuant to a search warrant that the Park

12  Service had obtained.

13  Q.  And do you see Mr. Smith in the courtroom?

14  A.  I do, yes.

15  Q.  Can you identify him for the Court?

16  A.  Yes.  He's over there at the defense table, yes.

17  Q.  Can you identify what he's wearing?

18  A.  Sure.  A vest and an American flag mask.

19          MS. ROMINE:  Your Honor, could the record reflect that

20  she identified Mr. Smith?

21          THE COURT:  The record will so reflect.

22  BY MS. ROMINE:

23  Q.  How many DNA swabs did you collect from the defendant?

24  A.  Sure.

25          So I initially collected two DNA swabs from the

1    defendant, pursuant to the search warrant.  And then I left the

2    courthouse and the -- talked with the case agent from the Park

3    Service, and he told me that they actually requested eight DNA

4    swabs to be taken.

5            So out of an abundance of caution, I went back -- I

6    contacted the Marshals to contact Mr. Smith again.  They had

7    him here at the courthouse.  I met them back here about 45

8    minutes later, and probably would have been okay with just the

9    search warrant, but, again, out of an abundance of caution, I

10   requested his consent to collect the six additional DNA

11   samples, which he gave and signed a consent form.

12           And so then I collected six additional samples, using

13   the same policy and procedures, from Mr. Smith.

14   Q.  What did you do with all the DNA swabs that you took from

15   Mr. Smith?

16   A.  Yes, sure.

17           So I entered them into FBI evidence, and I believe

18   four were sent off to a local laboratory with Wyoming Division

19   of Criminal Investigation, and four were sent to the FBI

20   laboratory.

21           MS. ROMINE:  Your Honor, may I have one moment?

22           THE COURT:  Yes.

23       (Discussion held at prosecution table.)

24           MS. ROMINE:  I have no further questions, Your Honor.

25           THE COURT:  Any cross-examination?

1        MR. FREEBURG:  No, Judge.

2        THE COURT:  All right.  Thank you, Ms. McGrath.

3    You're excused and released.

4        THE WITNESS:  Thank you, ma'am.

5        THE COURT:  The Government may call its next witness.

6        MS. MARTENS:  Thank you, Your Honor.

7        The Government will call Dr. Frederick Lindberg.

8        COURTROOM DEPUTY:  Dr. Lindberg, if you would step up

9    into the witness box, please.

10       (Witness sworn.)

11       COURTROOM DEPUTY:  Please take a seat.

12       Doctor, can you please state and spell your name for

13   the record?

14       Can you please state and spell your name for the

15   record?

16       THE WITNESS:  My name is Fred Lindberg.

17       MS. MARTENS:  I don't know that the microphone is

18   picking him up.

19       COURTROOM DEPUTY:  It is not.

20       THE COURT:  Could you position it perhaps a little

21   higher.  Try to speak more directly.

22       THE WITNESS:  Where do you want --

23       THE COURT:  Well, you need to be speaking directly,

24   but you cannot --

25       THE WITNESS:  I'll hold it.

1      THE COURT:  I don't know that you can hold it.

2      No.

3      COURTROOM DEPUTY:  Can you state and spell your name

4  for the record now?

5      THE WITNESS:  Pardon?

6      COURTROOM DEPUTY:  Can you state and spell your name

7  for the record, please?

8      THE WITNESS:  My name is Fred Lindberg.  Fred is

9  F-r-e-d; Lindberg is L-i-n-d-b-e-r-g.

10  **FREDERICK LINDBERG, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

11  **BY MS. MARTENS:**

12  Q.  Thank you.

13      What is your occupation?

14  A.  I am a psychologist.

15  Q.  When did you become a psychologist?

16  A.  I was licensed in 1972.

17  Q.  Did you have any special schooling to become a

18  psychologist?

19  A.  The private practice was kind of a general nature private

20  practice, but I spent most of my time dealing with issues of

21  children and abuse, mostly sexual abuse.

22  Q.  So I'd like to talk -- I'd like you to talk to the jury

23  about your schooling and your training.

24  A.  I have a Bachelor's degree from the University of Wisconsin

25  at River Falls, major in psychology; a Master's from the

1  University of Wyoming; a Ph.D. in psychology from Utah State.

2  Q.  And after you got your Ph.D., is that when you became

3  licensed?

4  A.  Yes.

5  Q.  After you got licensed, what sorts of work were you doing?

6  A.  Pardon?

7  Q.  What kind of work were you doing?

8  A.  My first employment was at the Wyoming State Hospital in

9  Evanston for two years, where I worked with -- part time with

10 adolescents who had a drug and alcohol problem.  Many of them

11 had been abused.

12        Then I went to the Western Wyoming Mental Health

13 Center.  I lived in Kemmerer, but serviced four different

14 counties.

15        Then I moved to Casper, where I was a clinical

16 director at the Central Wyoming Counseling Center for

17 approximately two years.

18        And then on April 13th of 1980, I went into private

19 practice.

20 Q.  What sorts of things did you do in private practice?

21 A.  Of course, I saw patients, but I was a consultant.  I did

22 some work for the Department of Family Services.  I was a

23 consultant at the Wyoming Behavioral Institute for 30 years,

24 where I worked with adolescents, most of which had either a

25 drug or alcohol problem, an anger problem, had been abused.

1          I was also a consultant for the vet center in Casper,

2    where they worked with vets who had experienced PTSD or other

3    battle trauma.

4    Q.  You mentioned your private practice and some -- what sorts

5    of patients did you see in your private practice?

6    A.  Generally, it was a wide variety of patients with different

7    kinds of problems.  But then in 1982, there was a movie on TV

8    called "Something About Amelia."  It was a show about incest.

9    And then after that, I was, as well as other people in the

10   profession, were flooded with people who said they had been

11   sexually abused.

12   Q.  And following that, did you endeavor to look at research or

13   articles having to do with sexual abuse?

14   A.  Yes.  Yes, ma'am.

15   Q.  Can you describe a little bit your experience in that area?

16   A.  I conducted some research, published two articles on sexual

17   abuse.  One was on PTSD.  It was one of the first articles

18   written connecting Post-Traumatic Stress Disorder to sexual

19   abuse.

20         The other article was on the survival techniques of

21   women who said they had been sexually abused.  I presented

22   conferences -- I presented at conferences.  I presented at

23   conferences in Montreal, Canada; Sidney, Australia; Rio de

24   Janeiro.

25        (Brief interruption.)

1    **A.** I presented at a conference in Kuala Lumpur and one in

2    Bergen, Norway. All of those were papers on sexual abuse.

3    **BY MS. MARTENS:**

4    **Q.** And how many -- and do you have an estimate of how many

5    patients you have seen over the years who have suffered some

6    sort of trauma or sexual abuse?

7    **A.** To answer that question, I talked to the lady at medical

8    records at WBI, Wyoming Behavioral Institute. And she said

9    during my tenure there, there was approximately a low estimate

10   of 2,000 kids that I had worked with in the practice. I have

11   no idea how many. It was a large number of men and women,

12   children who said they had been sexually abused.

13          And then, in addition, the consulting with the vets at

14   the vet center about PTSD with the vets who had experienced

15   combat.

16   **Q.** We have focused so far on your work with folks who say they

17   have experienced trauma.

18          Have you worked with offenders?

19   **A.** Pardon?

20   **Q.** Have you worked with offenders?

21   **A.** (Indicating).

22   **Q.** Offenders?

23   **A.** I can't --

24   **Q.** Have you worked with offenders?

25   **A.** Yes.

1    Q.  And what kind of work have you done with offenders?

2    A.  The district attorney in Casper asked us if we wouldn't

3    work with men who had been convicted of sexual offenses, and we

4    turned him down three times, but the fourth time we accepted

5    his offer.

6            And we ran groups -- I ran groups with sex offenders

7    for approximately 12 years.

8    Q.  So that gave you one-on-one experience?

9    A.  Group experience, yes.

10   Q.  What do you know about how memory is formed when traumatic

11   events are occurring?

12   A.  At the time of a trauma --

13   Q.  I guess I should rephrase the question.

14           How do you know about traumatic events and memory?

15   What kind of research or education do you have?

16   A.  The first education and the best education was from people

17   who said they had been sexually abused.  Then spending time in

18   the literature, continuing education, and going to conferences.

19   Q.  Was traumatic memory formation even a topic when you went

20   to school?

21   A.  Is it?

22   Q.  Was it a topic you learned about in school?

23   A.  When I went to school, the issue of sexual abuse was a

24   nonissue.  So the literature at that time when I was getting my

25   Ph.D. said incest or sexual assaults occur one in a hundred

1    thousand cases.  We now know that to be grossly wrong.

2    Q.  It sounds like you've been with the field as it developed?

3    A.  Yes.  Yes, ma'am.

4    Q.  Have you testified before?

5    A.  Yes, ma'am.

6    Q.  For the prosecution or the defense?

7    A.  Mostly for prosecution, but some for the defense.

8    Q.  What kinds of cases?

9    A.  Most of my work in the court has been with or for --

10   concerning children.  Most of that work has been about sexual

11   abuse cases.

12   Q.  But some of it has been with adults?

13   A.  Pardon?

14   Q.  Have you had some with adults?

15   A.  Yes.

16   Q.  Have you testified in those cases as an expert?

17   A.  Have I testified --

18   Q.  As an expert?

19   A.  Yes, ma'am.

20   Q.  Are there concepts -- are these concepts that you're

21   describing to the jury, would you consider them sort of outside

22   the range of a normal person's experience or expertise?

23   A.  Yes, ma'am.

24   Q.  Why is that?

25   A.  Because a lot of victim behavior is counterintuitive.

1  People who say they have been abused or have experienced

2  traumas, their behavior does not follow what people would

3  normally think.

4  Q.  Have you been given any information particular to the

5  accusations in this case?

6  A.  No.

7  Q.  Have you done any research review in preparation for your

8  testimony today?

9  A.  Yes.

10  Q.  Have you ever met with Ms. Hannah Bye?

11  A.  I don't know who she is.

12  Q.  Have you met with any of the Government's potential

13  witnesses?

14  A.  No.  No, ma'am.

15  Q.  So what is your role here today?

16  A.  Pardon?  What is my role?

17  Q.  Yes, sir.

18  A.  My role is to explain to the jury, from an educational

19  point of view, what victims or people who say they have been

20  victimized may do or how they may react.

21  Q.  I'd like to -- let's first talk about memory.

22        Can you explain to the jury how memory is formed

23  during a traumatic event?

24  A.  Yes, ma'am.  Memory -- during the time of trauma, one of

25  the first things that happens is that the prefrontal lobe shuts

1  down.   The prefrontal lobe is that part of the brain that helps

2  us to make decisions.   And the blood flow, then, is sent to the

3  lower brain where it -- the center of action is fight, flight

4  or freeze.   And, as a result, memory of a traumatic event tends

5  to be fragmented.

6          The way the brain is wired, things like sound, color,

7  smells are remembered better than some of the actual events of

8  the -- of the trauma.   And the trauma may not be remembered in

9  a sequence, meaning that step one, step two, step three, step

10 four of the trauma may not be remembered in that -- in that

11 order.

12 Q.  So if it's jumbled, is there maybe an illustration you can

13 give to the jury about how those memories get jumbled?

14 A.  Well, first, trauma memory is stored in a different part of

15 the brain than regular memory.   That part of the brain is not

16 really connected to the part of the brain that allows for

17 communication.

18         So a trauma memory is, therefore, fragmented and not

19 necessarily very clear.

20 Q.  So if we were to equate individual memory to notes, how

21 would that look like as an illustration?

22 A.  Say that again?   How --

23 Q.  If your individual memories were notes, would it be similar

24 to dumping them on a table?

25 A.  Yes, and then picking them up.   And the memory of the

1  traumatic event may not be totally clear or totally accurate.

2  There may be parts of the trauma that will not be remembered.

3  Q.  You mentioned fight, flight and freeze.

4  A.  Yes, ma'am.

5  Q.  What does that mean?

6  A.  When somebody is overwhelmed, the first -- one of the first

7  things that happen is the brain goes into survival mode.  And

8  there are essentially three choices -- originally, there were

9  two choices, the literature said, fight or flight.

10        Now we know that we have to add another one in,

11  freeze.  And what most people do when faced with a trauma, such

12  as sexual abuse, they tend to freeze, meaning that they don't

13  do anything to actively stop the abuse or the alleged abuse.

14  Q.  So if most people freeze when they're confronting trauma,

15  how about fight and flight?

16  A.  My experience is that people who say they have been

17  sexually abused, very few fight.  I can remember, of the

18  hundreds of cases, only a few that actually tried to fight --

19        MR. FREEBURG:  Judge, may I be heard?  I object on the

20  basis of 702 and also the designation filed in this case and

21  then, of course, the order, Document 91.

22        THE COURT:  For the Government?

23        MS. MARTENS:  Your Honor, this witness is just

24  testifying generally to what his experience tells him, so --

25  and he's well-qualified to offer an opinion based on his

1    experience, education, extensive training.

2           MR. FREEBURG:  Your Honor, may I be heard?

3           THE COURT:  Counsel, please approach.

4        (At sidebar.)

5           THE COURT:  I don't know whatever happens to my masks.

6           Yes.

7           MR. FREEBURG:  Your Honor, thank you for letting me

8    build a record on this.

9           In the Court's order, U.S. v. Magnan, 756 -- that was

10   the Tenth Circuit case regarding Mr. Lindberg's testimony.  In

11   that case, it was impermissible for him to put a mathematical

12   rate on false accusations.

13          This is the inverse of that.  He's putting a

14   mathematical rate on victim behavior which was not part of the

15   Government's disclosures.  He said in his testimony that his

16   common experience is that victims freeze, which, of course,

17   would be consistent with the Government's theory of the case

18   here.

19          So this is both a surprise due to the expert

20   designation and I think impermissible as some sort of

21   mathematical offering to the jury that isn't really grounded in

22   anything other than his recollection.

23          Thank you.

24          MS. MARTENS:  Would you like me to respond, Your

25   Honor?

1          THE COURT:  Sure.

2          MS. MARTENS:  Thank you, Your Honor.

3          So in U.S. v. Magnan, the objectionable testimony was

4   that Dr. Lindberg testified that there was a 2 to 4 percent

5   rate of false accusation of sexual abuse in children that

6   mostly occurred in divorce cases.

7          The Tenth Circuit found in that case that that was

8   objectionable because it amounted to vouching for the victim

9   children's credibility.

10          Here the expert has not assigned any particular

11   mathematical rate.  He's not assigning a truth or falsehood to

12   victim reactions, and he has not met with any of the victims in

13   this case.

14          So when we're talking about his ability to be able to

15   vouch for those things, they're entirely different.  He's

16   speaking in broad generalities, and no mathematical rate has

17   been assigned or related to truth or lie.

18          THE COURT:   Thank you.

19          MS. MARTENS:  Oh, sorry.  I did have one more thing to

20   add, if that's helpful.

21          THE COURT:  All right.

22          MS. MARTENS:  Also, this just goes to the fact that

23   victim behavior can be counterintuitive.  I think that folks

24   get the idea from the movies that, you know, if somebody

25   touches you the wrong way, the response is punch them in the

1  nose, and that is absolutely in the Government's designation.

2        THE COURT:  I will overrule the objection and allow

3  him to -- to respond -- finish his response on his experience.

4  Thank you.

5        MS. MARTENS:  Thank you, Your Honor.

6     (Sidebar ended.)

7        THE COURT:  The objection is noted and overruled.

8        If you can recall, Doctor, where you are in response

9  to the question presented, you may continue with that response.

10        THE WITNESS:  Say that again?

11        THE COURT:  If you recall where you are in the

12  response before the objection, you may continue with the

13  response.  Either that, or maybe Ms. Martens --

14        THE WITNESS:  You will have to repeat the question.

15        THE COURT:  Rather than repeat the question, if you

16  could direct the witness to an area where he can complete his

17  response.

18        MS. MARTENS:  Certainly, Your Honor.

19  **BY MS. MARTENS:**

20  **Q.**  So you were talking about it's pretty rare for folks to

21  tell you that they fought.  How often do they flee?

22  **A.**  In my experience, never.

23  **Q.**  Let's talk a little bit about Stockholm syndrome.  What is

24  that?

25  **A.**  The Stockholm syndrome came from an incident in, I think,

1 1973, a bank robbery in Stockholm that turned into a hostage

2 situation.

3 Q.  Before you explain much further, is that also called

4 traumatic bonding?

5 A.  Originally, the concept was called the Stockholm effect,

6 but then later with research, it was called traumatic bonding.

7 Q.  And you started to explain that that was related to a bank

8 robbery.  Can you continue, sir?

9 A.  During the incident, the hostages started to develop

10 positive feelings towards the hostage taker which was a whole

11 new concept.  In fact, one of the hostages said that they

12 trusted the hostage taker more than the police.

13        The bottom line is that the development of positive

14 feelings towards the hostage taker was seen as a survival

15 tactic.

16        It later was called traumatic bonding.  And what

17 traumatic bonding means --

18        THE COURT:  Sir, why don't we move to the next

19 question.

20        MS. MARTENS:  Certainly.

21 BY MS. MARTENS:

22 Q.  So when we're talking about traumatic bonding, is that

23 something that occurs in relatively short time frames?

24 A.  Yes.  Yes, ma'am.

25 Q.  What about the concept of -- I related to traumatic

1   bonding.   What about the concept of a compliant victim?

2   **A.**   That term usually is applied to a statutory rape situation

3   that has later been expanded by some authors to explain what

4   happens in a dating relationship when the alleged offender has

5   access to the alleged victim through a dating relationship.

6   **Q.**   And so what does -- what does that concept mean?

7   **A.**   It means that the alleged victim is in a relationship that

8   the person sees as a dating-like or love relationship.

9   **Q.**   So when we turn to responses by folks who are in the midst

10  of some kind of trauma, you mentioned that those things can be

11  counterintuitive.

12        Can you explain a little bit why that is?

13  **A.**   It is counterintuitive because the individual has

14  experienced a trauma that is so intense that they're not going

15  to act in normal -- in normal ways.

16  **Q.**   So might folks minimize their trauma?

17  **A.**   Pardon?

18  **Q.**   Might folks minimize trauma?

19  **A.**   Yes.

20  **Q.**   How so?

21  **A.**   Many ways; deny it, minimize it.   They might have amnesia.

22  To recognize it may be more than they can emotionally tolerate.

23  **Q.**   So when we're talking about minimization, what kinds of

24  ways does that occur?

25  **A.**   To minimize?   To ignore it, to not disclose it, to not tell

1   anybody, to act normally, to try and convince themselves that

2   things are back to normal.

3   Q.  So when folks -- when you've worked with victims or folks

4   who say that they have been abused in some way, do they always

5   tell you everything up front?

6   A.  No, ma'am.

7   Q.  Why is that?

8   A.  Disclosure -- that's what it's called when you tell

9   somebody -- disclosure is a very traumatic time.  One, to

10  disclose, you have to acknowledge what has happened to you,

11  and --

12          MR. FREEBURG:  And, Judge, I object.

13          THE WITNESS:  -- to disclose means you have to go

14  through --

15          THE COURT:  Hang on.  Wait a minute.  Hang on, Doctor.

16          MR. FREEBURG:  If I understood the order on delayed

17  disclosure I think needs to be addressed.  My understanding is

18  the delayed disclosure is not part of this.

19          MS. MARTENS:  May I approach, Your Honor?

20          THE COURT:  I will allow the response to stand.

21  Please ask your next question.

22          MS. MARTENS:  Thank you, Your Honor.

23  BY MS. MARTENS:

24  Q.  So, Doctor, you were explaining that the details come out

25  over time?

1  A.  Disclosure is --

2          THE COURT:  Ma'am, please approach.

3      (At sidebar.)

4          THE COURT:  I guess I thought you were at the end of

5  disclosure.

6          MS. MARTENS:  Yeah, I just wanted him to finish

7  talking a little bit more about how the details come out over

8  time.  And while our victim in this case was taken directly to

9  the police, I anticipate that her roommates will talk about her

10  reaction in the car when they said they were going to the

11  police, which was that she wasn't really keen on going.  And

12  that, also, we will be spending some time with Ms. Bye talking

13  about some minor inconsistencies in her statement and details

14  that did come out over time.

15          THE COURT:  Well, he's talked about details coming out

16  over time.  I don't know that there's any more elaboration

17  required.

18          MR. FREEBURG:  And, Judge, this is more of a practice

19  pointer, but I viewed this in violation of the order, and when

20  I stand to make my objection, should I say violates the order

21  and then go to the part of the order that I think violates it?

22  I'm worried that I'm prejudicing the jury somehow by engaging

23  in some long, speaking objection.  But I was objecting based on

24  this page of the order that says:  "Dr. Lindberg's expected

25  testimony does not relate to the facts of the charged conduct

1  with respect to delayed disclosure."

2          THE COURT:  I understood enough from the objection you

3  made to stop the further elaboration on disclosure.  I think

4  we're -- I think we've heard what the point is that he has to

5  make without continuing to have him talk about what he means by

6  what he has said, which is clear and well understood, that

7  people talk about these things over time.

8          MS. MARTENS:  All right.  Thank you, Your Honor.

9          THE COURT:  Thank you.

10     (Sidebar ended.)

11 **BY MS. MARTENS:**

12 **Q.**  Doctor, can you -- I think it is easier for you to

13 understand me without my mask.  I apologize.

14          Doctor, can you talk a little bit about the difference

15 between script and episodic memory?

16 **A.**  Script and episodic memory applies to almost all events.

17 Episodic memory is the memory of one episode.  Script memory is

18 a memory of many similar events.

19 **Q.**  And can you tell us how that affects the ability to relate

20 events?

21 **A.**  An episodic memory, you're more likely to remember the

22 details of the event.  However, if you have done something

23 many, many times or something has been done to you many, many

24 times, you're not going to be able to articulate one event from

25 another.  They kind of blend together.

1    For example, you know, tell me about the fifth time

2  you went to McDonald's, and it is difficult to do, to separate

3  out one from many.

4  Q.  Can you explain the concept of dissociation to the jury?

5  A.  Dissociation?  The American Psychiatric Society says that

6  dissociation is a disruption or discontinuity of the normal

7  process of consciousness, identity, memory, body image, motor

8  control or behavior.

9    What that simply means is that at the time of trauma,

10  many people separate themselves from what is happening so that

11  they don't have a clear memory of what happened.  And they do

12  that in an effort to better survive what is -- what they are

13  experiencing.

14    MS. MARTENS:  Your Honor, if I might have just a

15  moment.

16    THE COURT:  Yes.

17    (Discussion held at prosecution table.)

18    MS. MARTENS:  Your Honor, I have no further questions

19  for this witness.

20    THE COURT:  All right.

21    Any cross-examination?

22    MR. FREEBURG:  Yes, Judge.

23                    **CROSS-EXAMINATION**

24  BY MR. FREEBURG:

25  Q.  Sir, my name is Alex Freeburg, and I'll be asking you a few

1   questions on behalf of Mr. Smith.

2   A.  Yes, sir.

3   Q.  If at any time I ask a bad question or you don't hear me or

4   understand me, just let me know, please.

5   A.  Yes, sir.

6   Q.  So just to be clear, you've never met, interviewed,

7   diagnosed, treated the alleged victim in this case; is that

8   right?

9   A.  That's correct, sir.

10  Q.  Okay.  And you've talked about traumatic memory and

11  fragmented memory.

12          Does every person who experiences trauma then have a

13  fragmented memory?

14  A.  Most, yes, sir.

15  Q.  But not everyone does, right?

16  A.  Most of the people that I have worked with, yes, sir.

17  Q.  And most of the people that you have worked with have been

18  victims of childhood trauma; isn't that right?

19  A.  No; some -- a good -- good share of them, but I worked with

20  a number of adult rape victims.

21  Q.  Some of the people you've worked with have experienced

22  trauma, unfortunately, that lasted over the course of years;

23  isn't that right?

24  A.  That's correct.

25  Q.  Is it generally the case that if someone experiences more

1  trauma, the memory is more fragmented; and if they experience

2  less trauma, then it is less fragmented?

3  A.  It is true that if you have experienced what's called

4  polyvictimization, that you, then --

5  Q.  Excuse me, sir.

6         My question was, is there a relationship between more

7  trauma and more fragmentation and less trauma and less

8  fragmentation?

9  A.  Not that I know of.

10  Q.  If someone has a pretty good memory of events, is that a

11  sign that they haven't experienced trauma?

12  A.  No.

13  Q.  Isn't it true that other psychological principles beyond

14  just trauma, other psychological events and experiences can

15  affect memory formation?  Isn't that true?

16  A.  That's true.

17  Q.  In the field of psychology, your expertise, sir, I

18  understand there's something called cognitive dissonance, which

19  is when a person holds one set of beliefs and engages in a

20  different set of actions, that they experience stress and that

21  that stress, that disconnect between belief and actions is

22  cognitive dissonance; isn't that right?

23  A.  It could be, yes, sir.

24  Q.  And so the stress of cognitive dissonance, between holding

25  a belief and having an action, while under cognitive

1    dissonance, people will do things like minimize those tensions

2    to bring them into equilibrium, to bring into equilibrium their

3    memory or their actions and their beliefs?

4    A.   You're going to have to ask that question again.

5    Q.   According -- okay.  Cognitive dissonance occurs when a

6    person holds a contradictory belief, idea or values, and it is

7    experienced as stress when they participate in an action that

8    goes against their beliefs.  That's what cognitive dissonance

9    is, right?

10   A.   Cognitive dissonance is when you believe something and

11   something else is going on and the two concepts are confusing,

12   causing -- could cause stress.

13   Q.   And then folks act and take actions to reduce that stress,

14   correct?

15   A.   Yes, sir.

16   Q.   Isn't there another phenomenon called confirmation bias in

17   psychology, which is the tendency to recall information in a

18   way that supports someone's beliefs, so you recall information,

19   your memory, in a way that supports your beliefs and your sort

20   of self-identity?

21   A.   Confirmation bias generally is applied to somebody who is

22   interviewing somebody, and they have a preconceived notion, and

23   so they have a bias towards their own beliefs.

24   Q.   So in an interview -- is it something that you want to

25   watch out for?  So confirmation bias in an interview would be

1   hearing things or exaggerating things that confirm with your

2   predisposed beliefs?

3   **A.**   It is something one has to watch out for, yes, sir.

4   **Q.**   They have to watch out for it in your field, sir, of being

5   a psychologist; isn't that right?

6   **A.**   True.

7   **Q.**   Isn't there another psychological principle called sunk

8   cost fallacy or escalation of commitment?  And it basically is

9   the old saying "in for a penny, in for a pound"?

10  **A.**   You're going to have to say that again.

11  **Q.**   Is there any sort of human behavior pattern in which an

12  individual who has invested a lot of time in a project is

13  tempted to see that project through; it is a sunk cost; they've

14  already spent the money; they've put in the time, and they're

15  just going to stick with it even if it no longer makes sense?

16  It is called a sunk cost.

17  **A.**   That could happen, yes, sir.

18          MR. FREEBURG:  Thank you.

19          No further questions, Judge.

20          THE COURT:  Thank you.

21          Any redirect?

22          MS. MARTENS:  May I have just a moment, Your Honor?

23          THE COURT:  Yes.

24      (Discussion held at prosecution table.)

25          MS. MARTENS:  Your Honor, I have no further questions

1  for this witness.

2         THE COURT:  All right.  Thank you very much, Doctor,

3  for your time and attention.  If you want to remove the

4  microphone.

5         THE WITNESS:  May I be excused?

6         THE COURT:  You may step down.  You're excused and

7  released.  Thank you.

8         We will take our lunch recess at this time.  Please

9  remember the admonition against discussing this case with

10  anyone, family, friends, each other.  Please don't do any

11  research about this case, use any technology tools for research

12  purposes.  All evidence must be received here in the open

13  courtroom.  And please keep an open mind until all the evidence

14  is in.

15         We will stand in recess until 1:10.

16     (Following out of the presence of the jury.)

17         THE COURT:  Ms. Romine, did you have a matter?

18         MS. ROMINE:  Your Honor, just a moment if I may.

19         I wanted to avoid -- I wanted to let the Court and

20  counsel know that Detective Stubbs is under another subpoena

21  out of the district of Johnson County out of Idaho.  He was

22  served that subpoena on April 7th and has been ordered to

23  appear tomorrow, May 12th, at 9:00 a.m. as a witness in State

24  of Idaho versus Dalton Scott Allen, Case No. 33-19-1729.  I

25  wanted to make the parties and the Court aware of that so we

1    could work on trying to resolve it before the end of the day so

2    Detective Stubbs does not find himself in a situation of two

3    competing court orders.

4         THE COURT:  Thank you, Ms. Romine.  I was worried

5    about the logistics of his return, just leaving that to the

6    discretion of defense counsel.

7         What's your pleasure?

8         MR. FREEBURG:  Judge, the subpoena we issued was for

9    Friday based on our best guess of the trial time.

10        I think we may be able to release Detective Stubbs.  I

11   don't want to make that decision on the spot without having the

12   benefit of just a few minutes to look at Exhibit 200.

13        THE COURT:  All right.  If you could, please, advise

14   me on -- at 1:10 when we convene before the jury is brought in

15   as to whether Detective Stubbs will be released from your

16   subpoena and, if not released, when you would require him back.

17        MR. FREEBURG:  Yes, Judge.

18        THE COURT:  Thank you.

19        We will stand in recess until 1:10.

20        You should know it will probably be closer to 1:20.

21   We have to have the jury here, make sure everybody's in their

22   respective rooms before we can enable the transport for

23   defendant to be brought back into the courtroom.

24        So I just wanted to give you a heads-up timing-wise,

25   that it is a little longer.  The jury is shorted a little bit.

1    Hopefully, they will understand.  So thank you for your

2    patience.

3            We will stand in recess until approximately 1:20 for

4    the call of the case.

5        (Proceedings recessed 12:05 p.m., May 11, 2021.)

6        (Proceedings reconvened 1:22 p.m., May 11, 2021.)

7        (Following out of the presence of the jury.)

8            THE COURT:  Before we bring the jury in, have we

9    resolved the issue with the detective?

10           MR. FREEBURG:  Judge, I think he is on his way home.

11   We have a plan in place to call him and we've talked to him and

12   reached some understanding, yes.

13           THE COURT:  All right.  Thank you

14       (Following in the presence of the jury.)

15           THE COURT:  Please be seated.

16           In Docket 20-CR-45, the Court notes the presence of

17   the jury with roll call waived.

18           The Government may call its next witness.

19           MS. MARTENS:  Thank you, Your Honor.  The Government

20   calls Hannah Bye.

21       (Witness sworn.)

22           COURTROOM DEPUTY:  Please take a seat.

23           Ma'am, can you please state and spell your name for

24   the record?

25           THE WITNESS:  Can I what?

1    COURTROOM DEPUTY:  State and spell your name for the

2  record.

3    THE WITNESS:  Hannah, H-a-n-n-a-h.

4    COURTROOM DEPUTY:  And your last name?

5    THE WITNESS:  Bye, B-y-e.

6    **HANNAH BYE, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

7  **BY MS. MARTENS:**

8  **Q.**  Ms. Bye, what's your current occupation?

9  **A.**  I do door-to-door sales.

10  **Q.**  So I'm going to take you back to 2019, and specifically in

11  September.  What were you doing then?

12  **A.**  September?

13  **Q.**  Uh-huh.

14  **A.**  Was going to school.  This is in 2019?

15  **Q.**  2019.

16  **A.**  Yeah, I was in school.

17  **Q.**  Where at?

18  **A.**  BYU-I.

19  **Q.**  Is that in Rexburg, Idaho?

20  **A.**  Yes.

21  **Q.**  So when you were going to school, what -- I don't know if

22  grade is the right word, but where were you at in your

23  education?

24  **A.**  I was a freshman.

25  **Q.**  Were you taking classes?

1  A.  Yes.

2  Q.  During that time, had you moved to Rexburg for school?

3  A.  Yes.

4  Q.  Where are you from?

5  A.  Texas.

6  Q.  Is that where you grew up?

7  A.  Yes.

8  Q.  During that time, were you using Tinder?

9  A.  In high school?

10  Q.  Sure.

11  A.  Uhm, I was 18, so yes.

12  Q.  Were you using Tinder when you were at BYU-I?

13  A.  Yes.

14  Q.  What is Tinder?

15  A.  It's a dating app.

16  Q.  And so can you explain a little bit about how you used

17  Tinder?

18  A.  Uhm, in Rexburg, it's more of a small town, so people use

19  it to make friends and -- I mean, everyone is Mormon, so it's

20  more innocent, I guess, than people, I would say, I grew up

21  with.

22  Q.  In Texas?

23  A.  Yes.

24  Q.  So back in September of 2019, were you trying to make

25  friends?

1    A.   Yes.

2    Q.   How did you meet -- well, first of all, I should ask you,

3    do you know who is seated here at the defense table?

4    A.   Yes.

5    Q.   Do you -- how do you know?

6    A.   From Tinder.

7    Q.   I'm sorry, I didn't understand you.

8    A.   From Tinder.

9    Q.   From Tinder?

10        Do you know who that is?

11   A.   That's Cody.

12   Q.   Do you know his last name?

13   A.   Smith.

14        MS. MARTENS:  Your Honor, if the record could reflect

15   that Ms. Bye has identified Mr. Smith.

16        THE COURT:  The record will so reflect.

17        MS. MARTENS:  Thank you.

18   BY MS. MARTENS:

19   Q.   So let's talk a little bit about Tinder.  You were using it

20   back in September.  And how did you meet Mr. Smith?

21   A.   From Tinder.

22   Q.   Did you engage in conversation with him?

23   A.   Yes.

24   Q.   So is there a messaging feature on the application?

25   A.   Yes.

1   Q.  Did he invite you to meet him in Yellowstone?

2   A.  I don't remember.

3   Q.  Did you -- do you remember --

4   A.  Exactly, no.

5   Q.  Do you remember whether you used the application to talk

6   with him about going to Yellowstone?

7   A.  I don't know.

8           MS. MARTENS:  Ms. Wait, would you display

9   Exhibit 100A?

10      (Discussion held between defense counsel.)

11          MS. MARTENS:  Your Honor, can we display this just to

12  the witness?

13          THE COURT:  Yes.

14  **BY MS. MARTENS:**

15  Q.  Ms. Bye, you said that you don't remember your Tinder

16  conversation.  If I were to show that conversation to you,

17  would it help you remember?

18  A.  Yeah.  I just don't remember if it was over the phone or

19  Tinder.

20          MS. MARTENS:  Ms. Wait, can you advance the slide?

21          THE COURT:  Is there a question pending?

22          MS. MARTENS:  Yes, Your Honor.  There -- there is.  I

23  was asking her if -- she couldn't remember what she had told

24  defendant about wanting to go -- she's no longer looking at

25  the -- she couldn't remember, and so I'm just -- and we're just

1    about through what I'm asking her to review.

2          THE COURT:  All right.

3    **BY MS. MARTENS:**

4    Q.  Ms. Bye, did that help you -- help to refresh your

5    recollection?

6    A.  Yes.

7    Q.  So did you engage in a conversation with the defendant

8    using Tinder?

9    A.  Yes.

10   Q.  Did he ask you to go to Yellowstone National Park with him?

11   A.  Yes.

12   Q.  Did you want to go?

13   A.  No.

14   Q.  Let me break that down a little bit.

15         Were you interested in going to Yellowstone National

16   Park generally?

17   A.  Yes.

18   Q.  Did you want to go on Saturday, September 7th?

19   A.  No.

20   Q.  Why not?

21   A.  Because I didn't want to go.

22   Q.  Was the timing good for you?

23   A.  No.

24   Q.  Why not?

25   A.  Because I had church in the morning.

1   Q.   On Sunday?

2   A.   Uh-huh.

3   Q.   Did you have other plans that Saturday?

4   A.   Like, earlier?

5   Q.   Yeah.

6   A.   Yeah.

7   Q.   You mentioned a phone call.  Did you have a phone call with

8   the defendant?

9   A.   Yes.

10  Q.   What did you discuss?

11  A.   About him picking me up to go to McDonald's.

12  Q.   Was that that Saturday night?

13  A.   Uh-huh.

14  Q.   When was he supposed to pick you up?

15  A.   I think it was after my date that I went on previously, so

16  it would have been, like, 10:00.

17          THE COURT:  Ms. Bye, I usually recommend people speak

18  up so that they sound loud in this courtroom.  Otherwise, it is

19  hard to hear.  So if you could keep that in mind and speak up

20  clearly and loudly.  Thank you.

21          THE WITNESS:  Okay.

22  BY MS. MARTENS:

23  Q.   You said he was supposed to pick you up around 10:00?

24  A.   Yes.

25  Q.   What was the plan?

1  A.  To go to McDonald's.

2  Q.  What about after?

3  A.  Take me home.

4  Q.  To?

5  A.  My apartment.

6  Q.  So I want to talk with you about how that evening went.

7  Did he pick you up as planned?

8  A.  No -- I mean, he picked me up later than planned.

9  Q.  But about 10:00?

10  A.  Yeah.

11  Q.  Did you go to McDonald's?

12  A.  Yes.

13  Q.  What happened at the McDonald's?

14  A.  We got food.

15  Q.  Did you talk to the defendant?

16  A.  Yes.

17  Q.  What did you talk about?

18  A.  I don't -- about him -- I don't really know.

19  Q.  Did you talk about going to Yellowstone?

20  A.  Yes.

21  Q.  What sorts of things did you talk about regarding going to

22  Yellowstone?

23  A.  That I didn't want to go.

24  Q.  Did he tell you what he wanted to do in Yellowstone?

25  A.  No.

1  Q.  Did he ask you whether you would go with him?

2  A.  He asked me if I would.

3  Q.  Did he want you to go with him that night?

4  A.  Yes.

5  Q.  And you said what?

6  A.  No.

7  Q.  And this was all at the McDonald's?

8  A.  Yes.

9  Q.  What happened next?

10  A.  He took me to Yellowstone.

11  Q.  So on the way to Yellowstone, did you talk to him?

12  A.  A little bit.

13  Q.  What sorts of things did you talk about?

14  A.  Where he was from.

15  Q.  Did you continue to tell him that you didn't want to go to

16  Yellowstone?

17  A.  Yes.

18  Q.  Did you say that out loud to him?

19  A.  Yes.

20  Q.  How did you say it?

21  A.  "Can I" -- "I don't want to be here."

22  Q.  Did you ask him to pull over or let you out of the car?

23  A.  No.

24          THE COURT:  Counsel, please approach.

25      (At sidebar.)

1          THE COURT:  I appreciate the circumstances, and she

2    strikes me as a difficult witness, but she is your witness, and

3    so please avoid leading questions.

4          MS. MARTENS:  I'm trying, Your Honor.

5          THE COURT:  I know, but you asked what she talked

6    about, and she said she asked him where he was from, and then

7    you went to, "Well, did you say you didn't want to go to

8    Yellowstone?"

9          So I know you have a set of questions and answers that

10   you want to elicit from her, but she needs to tell her story

11   without leading, all right?

12         MS. MARTENS:  Yes.

13         THE COURT:  Thank you.

14     (Sidebar ended.)

15   **BY MS. MARTENS:**

16   Q.  Ms. Bye, so I'd like you to explain what you were thinking

17   and what you were feeling.  I'm looking for you to tell me what

18   happened, and, if you could, please give me more than those

19   one-word answers because we're looking for the explanation.

20         Do you understand?

21   A.  Yes.

22   Q.  Okay.  So let's go back to the parking lot.  Can you

23   describe what was happening as Mr. Smith was pulling out of the

24   parking lot?

25   A.  Well, he was, like, you have to make a decision, like yes

1   or no.  And I was, like, I don't want to make -- I was, like,

2   no.  Like, my answer is no.

3   Q.  All right.  So -- you've got to slow down a little bit.

4   The court reporter has to keep up with you.

5   A.  My bad.

6   Q.  Yep.

7   A.  Okay.

8   Q.  So if you could repeat that more slowly.

9   A.  Okay.  So he told me I had to make a decision, and he was,

10  like, "Left or right?" Because left was towards Yellowstone,

11  right was towards my home, my apartment at the time.

12          And I said, "I want to go home.  I don't want to go to

13  Yellowstone today."

14  Q.  And what did he do?

15  A.  He insisted and kept telling me that it would be an

16  adventure and that it would be fun.  And I told him I didn't

17  care, and I did not want to go.

18  Q.  Okay.  And which direction did he turn?

19  A.  Left.

20  Q.  Towards?

21  A.  Yellowstone.

22  Q.  And as the car is traveling that direction, what's

23  happening in the car?

24          What were you saying?  What were you doing?

25  A.  Uhm, I -- I was just kind of, like, really confused at

1   first.  And so I was, like --

2   Q.  So there's a little bit of time before you get out to the

3   highway.

4   A.  Yes.

5   Q.  What was happening in the car while you were still driving

6   in town?

7   A.  I think my roommates were texting me.

8   Q.  Were you talking to Mr. Smith?

9   A.  Yes.

10  Q.  What sorts of things did you say?

11  A.  More that I just, like, didn't want to go, and I don't

12  think he cared.

13  Q.  Did you ever agree to go with him?

14  A.  No.

15  Q.  You mentioned your roommates.  Had you talked to your

16  roommates before going with Mr. Smith?

17  A.  Yes, I did.

18  Q.  What sorts of things did they talk to you -- or did you

19  talk to them about?

20  A.  That we were going to go to McDonald's and that I would

21  come back.

22  Q.  What were you wearing that evening?

23  A.  Wearing black Nike shorts and a sweatshirt with Vans.

24  Q.  Were you planning on being out overnight?

25  A.  No.  It was really cold, so, no.  I didn't plan on going.

1  Q.  If you had planned on being out overnight, would you have
2  worn something warmer?

3  A.  Yeah.  It was like 10 degrees, so, yes.

4  Q.  So let's go back to the car with Mr. Smith.

5  A.  Okay.

6  Q.  What happened next in the car?

7  A.  He ended up taking my phone, and my roommates were texting
8  me.

9  Q.  What else?

10 A.  He got annoyed that they were texting me.

11 Q.  Did you talk to him?

12 A.  About what?

13 Q.  Anything.

14 A.  Just about his family, I guess.

15 Q.  Did you continue to state your objections?

16 A.  Yeah, but I was really nervous.

17 Q.  Why?

18 A.  Because he had a knife.

19 Q.  When did you see that?

20 A.  In the -- it was, like, early on in the drive.  So I'm in a
21 car with someone I barely know.

22 Q.  Can you describe how you saw the knife?

23 A.  How did I see it?

24 Q.  Yeah.  When did you first notice it?

25 A.  He had it, like, in his middle console.

1  Q.  Do you remember what it looked like?

2  A.  It was, like, this big (indicating).  I don't really

3  remember.

4  Q.  Do you remember whether it was a pocket knife or --

5  A.  No.  It was, like, one that's not a pocket knife.

6  Q.  So when you were telling Mr. Smith that you didn't want to

7  be in the car, do you remember if you were -- how you said it,

8  tone of voice or the words that you used?

9  A.  When I was in the car?

10  Q.  Yes.

11  A.  Are you talking about, like, when we were on our way?

12  Q.  Yes.

13  A.  I just told him I didn't want to go and that I had church

14  in the morning, like, I said that probably, like, 20 times

15  throughout the whole night.

16  Q.  Were you quiet about it or loud or --

17  A.  Uhm, I was definitely -- he definitely knew because we

18  talked about me being Mormon.

19  Q.  So you had your phone, and I know you said at some point he

20  took it away from you.

21       Why didn't you call someone?

22  A.  Because I didn't have my phone.

23  Q.  But before he took it, why didn't you call someone?

24  A.  Because I was scared.

25  Q.  Do you remember receiving a text message from your

1  roommates?

2  A.  Yes, I do.

3  Q.  Do you remember what they were asking you?

4  A.  That was -- if I was okay.

5  Q.  And how did you respond?

6  A.  "Yeah, I'm okay."

7  Q.  Why?

8  A.  Because he was looking at my texts.

9  Q.  When you arrived in Yellowstone National Park, what did you

10  see?

11  A.  It was pretty dark, so not -- like, trees.  Nothing,

12  really.

13  Q.  Do you remember entering the campground?

14  A.  I do.  No one was there.

15  Q.  Do you remember any lights?

16  A.  Not really.  It was pretty dark.

17  Q.  Could you tell where you were?

18  A.  Could I tell?

19  Q.  Yeah.

20  A.  Like, I knew I was in Yellowstone.  That was the first time

21  I had ever been there, so not really.

22  Q.  Can you describe what happened when the car was parked?

23  A.  When?

24  Q.  What happened next?  So you're driving --

25  A.  When we get to the --

1   Q.   Yes.

2   A.   I had to use the restroom.

3   Q.   Did you tell him that?

4   A.   Yes.

5   Q.   So --

6   A.   That's when he gave me my phone back.

7   Q.   So then the car is parked?

8   A.   Uh-huh.

9   Q.   You will have to answer yes or no.

10  A.   Yes.

11  Q.   Okay.  Thank you.

12  A.   Sorry.

13  Q.   So the car was parked, and then what happened?

14  A.   We went to the restroom.

15  Q.   What happened at the bathroom?

16  A.   I went to the restroom.

17  Q.   Where was he?

18  A.   In the bathroom.

19  Q.   Like, inside?

20  A.   No; outside the stall.

21  Q.   Like, can you --

22  A.   Not outside the bathroom; outside the stall in the

23  bathroom.

24  Q.   And was that bathroom divided by gender?

25  A.   Yes, it was.

1   Q.  So he was --

2   A.  No, there's two bathrooms.  He was in the girls' bathroom

3   with me.

4   Q.  Got it.

5          And what were you -- I mean, other than using the

6   toilet, what were you doing in the bathroom?

7   A.  He, like, ended up going outside, and I was trying to see

8   if I had service, and I didn't.

9   Q.  Did you take some pictures while you were in the bathroom?

10  A.  I did.  And I was -- I think I was just responding -- I was

11  responding to Snapchats, and none of them sent, so I saved them

12  to my camera roll.

13  Q.  Why were you taking pictures?

14  A.  Because that's how Snapchat works.  You send pictures.

15          MS. MARTENS:  So, Ms. Wait, could you put up

16  Government Exhibit 205?

17          THE COURT:  Is there a question?

18          MS. MARTENS:  I would like to present -- there we go.

19  There will be momentarily, Your Honor.

20  BY MS. MARTENS:

21  Q.  Ms. Bye, do you recognize the Government's Exhibit 205?

22  A.  Yes.

23  Q.  Tell me what you were thinking in that photograph.

24  A.  I was just really -- honestly, I was just kind of -- I was

25  just scared.  So I -- people, like -- like, I could literally

1  be dying, like, and I could be taking a picture like that.

2  Like, it isn't -- that wasn't an accurate representation of how

3  I was feeling.  I was just responding to Snapchats.  So, mind

4  you, my friends are, like, in Texas, but, I don't know, it

5  is -- I can't -- that's --

6  Q.  So you're smiling in that picture.  Were you happy?

7  A.  No.

8  Q.  How were you feeling?

9  A.  Just anxious.

10        MS. MARTENS:  Can we go to 206?

11  BY MS. MARTENS:

12  Q.  In this picture and in the next one there is a vest.  Whose

13  vest is that?

14  A.  It's Cody's.

15  Q.  Why are you wearing his vest?

16  A.  Because I was cold.

17  Q.  Had he given it to you?

18  A.  He let me borrow it.

19  Q.  When did he give it to you?

20  A.  I think when we got out of the car.  I told him I was cold.

21  Q.  What did you do after you took this picture?

22  A.  What did I do?

23  Q.  Yes.

24  A.  I went outside the bathroom.

25  Q.  And what happened next?

1   A.   We went back to the tent.

2   Q.   Was the tent set up?

3   A.   Yes.

4   Q.   What happened at the tent?

5   A.   What happened?

6   Q.   Yes.  Can you describe what happened at the tent?

7   A.   Well, we walked back.  We get back inside the tent; takes

8   my phone again, like, turn on this, like, lantern thing, and

9   then he tried to -- that's when I think he got on top of me and

10  tried to, like, start making out with me.

11  Q.   What did you do?

12  A.   I kept turning my head, and I was like, "What are you

13  doing?"

14  Q.   How did he respond?

15  A.   He -- I don't think he cared 'cause he kept going, and he

16  was grabbing my face.

17  Q.   Where did he touch you?  Just on your face or other places?

18  A.   No.

19  Q.   Can you please describe to the jury how he touched you?

20  A.   Uhm, he touched -- he touched my boobs, touched my -- all

21  around my torso, my neck, my legs, my whole body, touched my

22  butt, grabbed my butt.

23  Q.   What did you do?

24  A.   I kept telling him, "No."  And he told me, "No is your

25  favorite word, isn't it?"

1   Q.  So let's talk a little bit about how he touched your boobs.

2   A.  Yeah.

3   Q.  Where exactly were his hands?

4   A.  On my boobs.

5   Q.  So did he remove any of your clothing?

6   A.  Yeah.  I was wearing a strapless bra, so it's a little

7   bit -- it's a lot tighter than a normal bra.  So instead of

8   taking it off, he just pushed it down.

9   Q.  Did he actually remove any clothing, or was this all

10  happening with other clothing on?

11  A.  This is while clothes -- obviously, my vest wasn't on, and

12  in that picture was also his sweatshirt, and I had a sweatshirt

13  under that.  So his clothes that he had given me were taken

14  off.

15  Q.  Did your sweatshirt stay on?

16  A.  Yes, because it was very cold.

17  Q.  So you were wearing shorts?

18  A.  Yes.

19  Q.  Did those ever come off?

20  A.  Uhm, no.  But he was, like, inside my shorts.

21  Q.  And you said that he touched your butt.

22  A.  Yes.

23  Q.  What about your legs?

24  A.  Uh-huh.

25  Q.  Is that a yes?

1   A.   Yes.  It's a yes.

2   Q.   Can you describe for the jury how he touched your legs?

3   A.   Well, when I kept telling him to stop, he eventually put my

4   arms over my head with both of his hands so I couldn't move.

5   And then he was in between my legs, so I couldn't move them

6   either.

7   Q.   And what was he doing?

8   A.   Uhm, he just kept trying to kiss me.  And then he

9   eventually ended up ripping my lip right here (indicating), the

10  middle part of it.  I don't know what it's called.  And then

11  he, uhm, like, kept touching me just really inappropriately

12  while I couldn't do anything.

13  Q.   What does it mean to touch you inappropriately?

14  A.   He was touching my boobs, grabbing my ass.

15  Q.   Did he ever touch the inside of your thighs?

16  A.   Yes, he did.

17  Q.   How far up did his hands go?

18  A.   Up to my underwear.

19  Q.   Did they ever go under your underwear?

20  A.   No, because I was on my period, and I was wearing a pad.

21  Q.   You said that he tore your lip?

22  A.   Yes.

23  Q.   Can you describe a little more in detail how that happened?

24  A.   He ripped it with his mouth, with his teeth.

25  Q.   So did he bite down?

1  A.  He, like, yeah, he bit it and just -- uhm, like -- like,

2  grabbed it with his teeth.  And then I told him I was bleeding,

3  and he didn't care.

4  Q.  What happened next?

5  A.  I think he tried to give me a hickie.  He did.  That's one

6  of the pictures I sent you because that was when my mouth was

7  bleeding, so he stopped kissing me.

8  Q.  Was he still on top of you?

9  A.  Yes.  He was on top of me the whole time.

10 Q.  Were you able to push him off at all?

11 A.  No.  I tried.

12 Q.  How long were you in the tent with him?

13 A.  Six hours, seven hours.

14 Q.  So was this going on -- how long did this go on?

15 A.  About four hours.

16 Q.  So he stopped for a little while?

17 A.  Yeah, because he fell asleep.

18 Q.  Did you ever fall asleep?

19 A.  No.

20 Q.  Did it start back up again, or was it over after he fell

21 asleep?

22 A.  Uhm, it started again after he woke up.

23 Q.  What happened then?

24 A.  Uhm, he fell asleep on top of me.  So he woke up, and he --

25 he started dry humping me.

1  Q.  Can you describe that for the jury a little bit?  How were

2  you laying?

3  A.  I was laying facedown.

4  Q.  And what was he doing?

5  A.  What was he doing?

6  Q.  Yes.

7  A.  So he woke up, and so just when I'm facing -- my body is

8  facing the ground, as my face -- he just started dry humping

9  me.  And I couldn't move.

10  Q.  Could you feel an erection?

11  A.  Yes -- well, no.

12  Q.  When did he --

13  A.  Because he asked me if I could feel it, and I said no.

14  Q.  So did he keep going?

15  A.  Yes.

16  Q.  When did he stop?

17  A.  When did he stop?

18  Q.  Yes.

19  A.  When he came.

20  Q.  Do you know -- how do you know he --

21  A.  'Cause his shorts got wet.

22  Q.  How else did he put his hands on you?

23  A.  How else --

24  Q.  Yes.

25  A.  -- did he put his hands on me, besides on my body.

1  Q.  Yeah.  Where else on your body?  How did he use his hands?

2  A.  Can you ask, like, a more --

3  Q.  Sure.

4  A.  -- different question?

5  Q.  So you mentioned that he had his hands, and he had your

6  arms above your head?

7  A.  Above my head.

8  Q.  Was it one arm or both arms?

9  A.  Both arms.

10  Q.  So he has one hand and both of yours?

11  A.  Grabbing both of my hands.

12  Q.  Where is his other hand?

13  A.  Touching my body, and that's how there's scratches on my

14  stomach and on my boobs.

15  Q.  Where -- did he ever put his hand on your face?

16  A.  Uhm, only when he was grabbing it when I wouldn't kiss him.

17  Q.  How about your neck?

18  A.  Yes.

19  Q.  Can you --

20  A.  That was a different part of the night.  That was the

21  second time.

22  Q.  Okay.  Can you please describe that for the jury.

23  A.  When I was facing down, he had both of his hands around my

24  neck.

25  Q.  What was he doing with his hands around your neck?

1   A.   He was choking me.

2   Q.   So was he -- was he squeezing?

3   A.   Kind of more like holding it, but I couldn't really breathe

4   already since he was on top of me.

5   Q.   So in that second part, how else did he touch you?

6          Well, how about this:  Are there other ways that he

7   touched you that we haven't talked about?

8   A.   Not that I remember right now.

9   Q.   Okay.  What sorts of things did he say while all of this

10   was happening?

11   A.   Uhm, all I can remember is I just kept saying, "No," or

12   "stop," and that's just when he said, "No is your favorite

13   word, isn't it?" And I said, "Yeah, it is."

14   Q.   You mentioned that you were on your period.

15          Did you talk to him about that?

16   A.   I did.  I did talk to him about that.

17   Q.   Can you please explain that?

18   A.   He kept asking me if I wanted to have sex with him, and I

19   said no.  And I told him I was on my period and that I was a

20   virgin, and he told me I was missing out.

21   Q.   And then what happened?

22   A.   He just kept, like, dry humping me, and I kept taking his

23   hands away from where my vagina is because I was not

24   comfortable.

25   Q.   Where was your phone during all of this?

1    **A.**   I don't know.  I didn't have it.  That's when he took it

2    when we got back inside the tent.

3    **Q.**   Where was the knife?

4    **A.**   On the side, next to -- on the side of the sleeping bag

5    next to the lantern thing.

6    **Q.**   Do you remember if there was anything else in the tent?

7    **A.**   There was a pillow.  Nothing else.

8    **Q.**   Did you ever discuss alcohol?

9    **A.**   He asked me if I wanted a drink of alcohol when we got

10   there, and I said no.

11   **Q.**   Did you see the alcohol?

12   **A.**   He told me it was in his trunk when he got, uhm, the

13   lantern, so yes.

14   **Q.**   Did you drink any alcohol?

15   **A.**   No, I did not.

16   **Q.**   When did -- when did this stop?

17   **A.**   Like -- like, almost 5:00 in the morning.

18   **Q.**   How did you know what time it was?

19   **A.**   'Cause he set an alarm for 7:00.

20   **Q.**   Do you know why there was an alarm set for 7:00?

21   **A.**   'Cause I told him I had church.

22   **Q.**   Once the alarm went off, what happened?

23   **A.**   He tried to kiss me, and I did not kiss him.

24   **Q.**   And then what happened?

25   **A.**   Then I asked him if I could have the keys to the car, and

1  he said no, he'd just unlock it for me.  So I just sat in the

2  car while he took the tent down and put everything in the car.

3  **Q.**  Did you see any other people?

4  **A.**  No.

5  **Q.**  Where was your phone?

6  **A.**  I had it, but I didn't have any service.

7  **Q.**  Say that again?

8  **A.**  I had it, but I did not have any service.

9  **Q.**  So what were you doing in the car?

10  **A.**  Just sitting.

11  **Q.**  What happened next?

12  **A.**  He put everything in the car, and then, uhm, he just left.

13  **Q.**  And so he was still driving?

14  **A.**  Yes, he was driving.

15  **Q.**  When did you get service?

16  **A.**  Probably when we got out of it.  I got a call from the

17  police department in Rexburg.

18  **Q.**  Did you answer it?

19  **A.**  No.  Like, what am I going to say?  I don't -- no.

20  **Q.**  Did you realize it was from a police officer at that time?

21  **A.**  They left a voicemail that you can read on my iPhone, like,

22  on your iPhone.

23  **Q.**  What else was happening on your phone?

24  **A.**  I got all the texts from my roommates.  Uhm, on the way

25  home --

1    Q.  Did you --

2    A.  What?

3    Q.  Go ahead.

4    A.  On the way home, he tried talking to me, and I just

5    wouldn't respond to anything he said because I was just so

6    angry and mad that he thought I thought that was okay, what he

7    did to me.  He asked me if I wanted to eat brunch before he --

8    before that.  But when I was getting the texts from my

9    roommates, they -- I guess they had sent it earlier in the

10   night, and over text I told them I was fine, but over Snapchat

11   I was telling them how I really felt.

12   Q.  And why the difference?

13   A.  I think that's just my natural reaction is if someone asks

14   me if I'm okay to say I'm okay.

15   Q.  In terms of the texts?

16   A.  In terms of the texts.

17   Q.  But why say something different using Snapchat?

18   A.  I guess it's more personable.  You can see -- they're

19   seeing my face and from one of the screenshots one of my

20   roommates took, you can tell I was not okay.

21        MS. MARTENS:  Ms. Wait, would you display Exhibit 203

22   to the witness.

23   BY MS. MARTENS:

24   Q.  Ms. Bye, do you recognize what's there in front of your

25   screen?

1  A.  Yes.

2  Q.  How do you recognize it?

3  A.  It's a picture of me I sent to one of my roommates.

4  Q.  Does it accurately represent the circumstances as they

5  existed at that time?

6  A.  Yes.  I meant to say I was scared, not scarred.

7          MS. MARTENS:  Your Honor, at this time, I would move

8  for admission of Exhibit 203.

9          MR. FREEBURG:  No objection, Judge.

10         THE COURT:  Exhibit 203 is admitted.

11      (Government's Exhibit 203 received.)

12  BY MS. MARTENS:

13  Q.  Ms. Bye, do you remember what was happening in the car at

14  that time?

15  A.  He was driving me to my home.

16  Q.  What happened next?

17  A.  Uhm, I didn't want him to take -- I didn't want him to take

18  me to my apartment, so I just told him to take me to the math

19  building on my campus, and that's where I told my roommates to

20  pick me up.

21  Q.  Did your roommates pick you up?

22  A.  Yes.

23  Q.  What happened when they picked you up?

24  A.  They wanted to go find him, and he -- is that the question

25  you're asking me?

1  Q.  Yeah.  What did you do?

2  A.  I just got in the backseat, told them -- told them what car

3  he drove, and they found him at a gas station.  But then they

4  took the wrong turn, so when they took a U-turn, he wasn't

5  there anymore.  So then they took me to the police station.

6  Q.  What did you do when you got to the police station?

7  A.  Talked to the police officer for, like, two minutes, and

8  then I said I couldn't talk to him, and I went back home.

9  Q.  Why didn't you want to talk to him?

10 A.  Because it just happened to me.

11 Q.  Did the officer say or do anything that made you not want

12 to talk to him?

13 A.  I was just more exhausted than anything else.  I hadn't

14 slept all night.

15 Q.  So once you come out of the police station, what happened

16 next?

17 A.  My roommates ended up going to church, and then one of my

18 roommates took me to her house because she's from Rexburg.

19 Q.  Which one of your roommates?

20 A.  Brynn.

21 Q.  What's her full name?

22 A.  Brynn Leatham.

23 Q.  What did you do at the house?

24 A.  Took a shower, and then I fell asleep.

25 Q.  Did you talk to anyone?

1    A.  I think my mom tried to text me.

2    Q.  Did you see Ms. Leatham's parents?

3    A.  I did.  I did talk to her parents.

4    Q.  Why did you want to shower?

5    A.  Because I felt gross.  I slept in a gross pad all night --

6    or not slept.  I was just sitting there, so I felt gross.

7           MS. MARTENS:  Ms. Wait, would you display photograph

8    214 to the witness?

9           And then photographs 207 through 210.

10          And then 211 through 213.

11   BY MS. MARTENS:

12   Q.  Ms. Bye, do you recognize those photographs?

13   A.  Yes.

14   Q.  What are they?

15   A.  Pictures of me.

16   Q.  Who took them?

17   A.  Myself after I took a shower.

18   Q.  Are they an accurate representation of the circumstances as

19   they existed then?

20   A.  Yes, but then I didn't get the pictures of the scratches on

21   my stomach.

22          MS. MARTENS:  Your Honor, I move for admission of

23   these exhibits, specifically 214, 207 through 210, and 211

24   through 213.

25          MR. FREEBURG:  No objection, Judge.

Janet Davis, RDR, FCRR, CRR                    jbd.davis@gmail.com

1    THE COURT:  Exhibits 207, 208, 209, 210, 211, 212, 213

2  and 214 are admitted.

3    (Government's Exhibit 207-214 received.)

4  **BY MS. MARTENS:**

5  Q.  So let's talk about these photographs a little bit.  Let's

6  start with 214.

7    Ms. Bye, can you describe what's pictured there?

8  A.  A picture of my neck.

9  Q.  Were you trying to document anything in particular?

10  A.  Yes, because of the hickie he tried to make on my neck.

11  Q.  And you can touch that screen in front of you --

12  A.  Yeah.

13  Q.  -- and circle things.

14  A.  You want me to circle it?

15  Q.  Yes.

16  A.  (Witness complies.)

17  Q.  Let's look at 207 next.

18    What do we see here?

19  A.  That's where my lip was ripped.

20  Q.  Can you circle that for the jury?

21  A.  (Witness complies.)

22  Q.  Let's look at 208.

23  A.  You want me to circle it?

24  Q.  No, I think it's fine.

25  A.  Okay.

1  Q.  But is that the same?

2  A.  Yeah.

3  Q.  How about 209, what's that?

4  A.  It's another picture -- another picture of my -- I don't

5  know what it's called.

6  Q.  That's okay.

7  A.  But yes, yes.

8  Q.  And that's what bled?

9  A.  Yeah, and then it was also really swollen behind me teeth

10  for about, like, three months, so every time I would eat, my

11  mouth would bleed, so I couldn't use my front teeth.

12  Q.  Let's go to 210.

13        And that's the same?

14  A.  Uh-huh.

15  Q.  How about 211, what do we see here?

16  A.  Just scratches.

17  Q.  What about this (indicating)?

18  A.  That would have been from his nail when he took -- when he

19  tried to take my bra off.

20  Q.  So those are marks the defendant left on your breast?

21  A.  Yes.

22  Q.  How about these (indicating)?

23  A.  Those are the same thing.

24  Q.  Let's look at 212.

25        What do we see here?

1  **A.**   That's where the scratch -- that's where his, like,

2  fingernail went in.

3  **Q.**   Just a different angle?

4  **A.**   Just a different angle.

5  **Q.**   What about 213?

6  **A.**   A different angle.

7  **Q.**   So we're looking at the same marks?

8  **A.**   Yes.

9  **Q.**   While you were at the Leatham home, did you Google

10  anything?

11  **A.**   Yes.

12  **Q.**   What did you Google?

13  **A.**   You want to show them?

14  **Q.**   I want you to tell me about it.

15  **A.**   How to deal with sexual assault.

16          MR. FREEBURG:  Objection, Judge.  Hearsay.

17          THE COURT:  I believe the question is:  What did you

18  Google?  And I'm not sure I answered her -- or I heard her

19  answer very clearly, but that does not call for hearsay, so the

20  objection is overruled.

21          If you could articulate and speak louder.  What did

22  you Google?

23          THE WITNESS:  How to deal with sexual assault.

24  **BY MS. MARTENS:**

25  **Q.**   Did you Google anything else?

1   A.   Not that I can remember right now.

2   Q.   What happened next?

3   A.   After that?

4   Q.   Yeah.  So you were at the Leatham home.  What else did you

5   do while you were at the Leatham home?

6   A.   Talked to her parents.  I think that was after I woke up.

7   Q.   Did you -- so you just said you woke up.  Did you take a

8   nap?

9   A.   I did.  I was very tired.

10  Q.   Did you spend the night with the Leathams?

11  A.   I don't -- no, I don't think so.  No.

12  Q.   Who else did you talk to?

13  A.   My roommates.

14  Q.   Was that once you went back to your apartment?

15  A.   Yes.

16  Q.   Did you ever go back to the police station?

17  A.   I did.

18  Q.   How did that come about?

19  A.   How did that come about?

20  Q.   Yeah.

21  A.   Uhm, I thought I should say something.

22  Q.   Did you bring anything with you when you went?

23  A.   Brought my clothes I was wearing that day.

24  Q.   Let's talk about the clothes.

25       So when you showered, what did you do with the

1  clothes?

2  A.  Put them in a plastic bag.

3  Q.  Did you do anything to them when you took them --

4  A.  No, I did not.  I was the only one that touched them.

5  Q.  And then what kind of plastic bag did you use?

6  A.  Like a Wal-Mart bag.

7  Q.  So you said you took those with you?

8  A.  I did.

9      MS. MARTENS:  Ms. Wait, would you please display for

10  the witness Exhibits 603 through 610?

11  **BY MS. MARTENS:**

12  Q.  Ms. Bye, did you see those as Ms. Wait was pulling them up?

13  A.  Yes.

14  Q.  Do you recognize the items pictured there?

15  A.  Yes, I do.

16  Q.  And what are they?

17  A.  My clothes I was wearing that night.

18  Q.  Are those pictures an accurate representation of your

19  clothing?

20  A.  Yes, they are.

21      MS. MARTENS:  Your Honor, I would like to move for

22  admission of Exhibits 603 through 610.

23      MR. FREEBURG:  Judge, there is an objection as to 610,

24  and I would need to see all of them again to confirm that

25  there's no other objections.

1        And the basis for the objection is that those are

2   not -- the form of the exhibits, Judge, is not how -- there's

3   been markings on the clothes that are separate and apart from

4   any markings she would have any personal knowledge of.  I can

5   voir dire her, if necessary, but I think --

6        THE COURT:  For the Government?

7        MS. MARTENS:  Your Honor, another witness will testify

8   as to where a couple of those marks came from.  My intention

9   was to have Ms. Bye point them out and explain her knowledge or

10  lack thereof about those specific marks.  But the witness has

11  testified that these were her clothes.

12       THE COURT:  The objection is overruled.  Exhibits 603,

13  604, 605, 606, 607, 608, 609 and 610 are admitted.

14       (Government's Exhibits 603, 604, 605, 606, 607, 608, 609,

15       610 received.)

16  **BY MS. MARTENS:**

17  **Q.**  Ms. Bye, do you recognize what's pictured there in

18  Exhibit 603?

19  **A.**  Yes.

20  **Q.**  And what is that?

21  **A.**  That is the strapless bra I was wearing.

22  **Q.**  Let's turn to 604.

23       Do you recognize what's pictured here?

24  **A.**  That's my underwear I was wearing that night.

25  **Q.**  So I want to have you explain a little bit about the

1  markings in your underwear.

2  A.  Yeah.

3  Q.  Do you know where that came from?

4  A.  It came from my period.

5  Q.  How about 605?

6  A.  Same thing.

7  Q.  So do you see those -- maybe they're pen or marker marks

8  (indicating)?  Did you make those marks?

9  A.  I did not.

10  Q.  Were they on your clothing at the time you submitted them

11  to the police?

12  A.  No.

13  Q.  Let's look at the next exhibit.

14       What do you see here?

15  A.  More pictures of blood.

16  Q.  And, again, that is from your period?

17  A.  That is from my period.

18  Q.  So those marks -- same question:  Did you put those marks

19  on your clothing?

20  A.  I did not.

21  Q.  Were they on your clothing at the time?

22  A.  They were not.

23  Q.  Let's look at 607.

24       What do we see here?

25  A.  My sweatshirt.

1    Q.  So also in this photograph there's a paper bag.

2          Did you have anything to do with that paper bag?

3    A.  No.

4    Q.  Let's turn to 608.

5          What do we see here?

6    A.  It's a picture of my sweatshirt.

7    Q.  And then 609?

8    A.  The Nike shorts I was wearing.

9    Q.  And 610?

10   A.  The back of my Nike shorts.

11   Q.  Did you have anything to do with the markings on the Nike

12   shorts?

13   A.  No.  They were my favorite pair.

14   Q.  Ms. Bye, when you are out overnight, do you pack extra

15   feminine hygiene products?

16   A.  Yes, I do.

17   Q.  Did you have anything with you that night?

18   A.  I didn't.

19   Q.  I'm sorry.  I didn't --

20   A.  I did not.

21          MS. MARTENS:  Your Honor, may I have just a moment?

22          THE COURT:  Of course.

23      (Discussion held at prosecution table.)

24          MS. MARTENS:  Your Honor, I have no further questions

25   for this witness.

1       THE COURT:  Counsel for defendant.

2       MR. FREEBURG:  Judge, I'm happy to proceed, but --

3       THE COURT:  Why don't you.  Thank you.

4       MR. FREEBURG:  May I --

5                          **CROSS-EXAMINATION**

6  **BY MR. FREEBURG:**

7  **Q.** Good afternoon, Ms. Bye.  My name is Alex Freeburg.  I am

8  one of Cody Smith's attorneys.  If you have any trouble

9  understanding me or need me to repeat a question, please let me

10 know.

11      We've never met before today, have we?

12 **A.** No.

13 **Q.** So I have a number of questions.  I don't mean to embarrass

14 you, but by the nature of what we're talking about, they're

15 going to involve some personal questions.

16      I would like to start with some background.

17      You graduated from high school in 2019?

18 **A.** I did.

19 **Q.** Where did you choose to go to college?

20 **A.** BYU-I.

21 **Q.** And so we're clear, BYU-I is BYU-Idaho in Rexburg?

22 **A.** That's correct.

23 **Q.** Why did you choose that school?

24 **A.** Because the school has the same values that are aligned

25 with mine, and I like to be around people who have the same

1    values as me.

2    Q.  And you actually started in some sort of summer program?

3    A.  I did.

4    Q.  What was that?

5    A.  It was called a summer session.  It's -- the school has

6    three semesters.  They're 14 weeks each, and then they have a

7    summer session.  So I wanted to go to school early from when I

8    graduated, start early.

9    Q.  When did the summer session start approximately?

10   A.  July 27th of 2019, I think.

11   Q.  And if I understand, at the time of this incident you were

12   living with five roommates?

13   A.  I was.

14   Q.  Where were you living?

15   A.  Center Square.

16   Q.  And did all, I guess, six of you attend that same summer

17   program?

18   A.  We did.

19   Q.  So at least -- and did you meet these other women at the

20   time of your summer program?

21   A.  When it started, yes.

22   Q.  So you didn't know any of the -- of your roommates from

23   high school or anything like that?

24   A.  No.  They were randoms.

25   Q.  I apologize.  Please finish that.

1   A.   They were random.

2   Q.   Did you generally get along with your roommates?

3   A.   I did.

4   Q.   Is there an honor code for the summer program?

5   A.   There's an honor code for every semester.

6   Q.   Where does the honor code come from, if you know?

7   A.   From the church.

8   Q.   Do all students who go to BYU-Idaho agree to follow the

9   honor code from the church?

10  A.   Yes.

11  Q.   I want to talk about some of the behavior that is

12  prohibited by the honor code.

13       Does the honor code have a curfew?

14  A.   They do.

15  Q.   What is that curfew?

16  A.   It's 12:00 on weekdays, and 1:00 on Saturday -- on

17  Friday -- my bad -- and then 12:00 on Saturday -- on Saturday,

18  as well.  So Friday is one hour later.

19  Q.   Is camping with the opposite sex prohibited by the honor

20  code?

21  A.   Not that I know of.  Me and my friends do it all the time.

22  No.

23  Q.   Is being unchaperoned overnight with a member of the

24  opposite sex, so a young man -- is that prohibited by the honor

25  code?

1  A.  No.

2  Q.  How did you learn what was and what wasn't prohibited by

3  the honor code?

4  A.  My bishop.

5  Q.  Are there any orientation programs, or anything like that,

6  that address the honor code?

7  A.  Can you -- what do you mean by that?

8  Q.  So an orientation program, like when you're starting that

9  summer semester, was there anything when you got to --

10  A.  No.

11  Q.  Let me just finish my question.  I think you understand me,

12  but we're making a record here, and if it is okay, I just want

13  to finish my question here.

14  A.  Okay.

15  Q.  Were there any orientation programs, for example, when you

16  started the summer semester, put on by the dean of students or

17  any other BYU organization where they went over what was

18  prohibited and not prohibited by the honor code?

19  A.  They don't do that for the summer session.

20  Q.  Do they do that for the fall session?

21  A.  They do.

22  Q.  Had that happened by the time you met Cody?

23  A.  No.

24  Q.  Did you ever sign an honor code?

25  A.  I did.

1  Q.  And did you sign that before starting the summer session?

2  A.  I did.

3  Q.  Now you said your bishop explained it or was part of the

4  honor code.

5        What is an ecclesiastical commendation?

6  A.  Your bishop has to interview you.

7  Q.  So your bishop interviews you about what?

8  A.  And the stake president.  There's two people that interview

9  you so you can go to school there.  It's just if you will

10  follow certain rules.

11  Q.  And then the commendation part is the bishop certifying to

12  BYU and the church that you've agreed to follow those rules; is

13  that right?

14  A.  That is correct.

15  Q.  Is the BYU -- is the bishop also certifying that you

16  followed the rules?

17  A.  Yes.

18  Q.  If you know of another student who is breaking the rules

19  and you don't report it, is that a violation of the honor code?

20  A.  I don't think so.

21  Q.  And I'm almost done here, but can you get expelled for an

22  honor code violation?

23  A.  They will talk to you first before getting expelled.

24  Q.  In this case, how many times have you talked to Jacob Olson

25  about what happened, or about anything?

1  A.  How many times have I ever talked to him?

2  Q.  Yeah.

3  A.  I couldn't name a number.

4  Q.  Is it more than five?

5  A.  More than five, yes.

6  Q.  Is it more than ten?

7  A.  Yes, because this has been going on for over a year.

8  Q.  Have you ever talked to Ms. Martens, the Assistant United

9  States Attorney, about this?

10  A.  Who?

11  Q.  Ms. Martens, the Assistant United States Attorney, about

12  this?

13  A.  About honor code?  No.

14  Q.  About this case, this investigation, Mr. Smith?

15  A.  Yes.

16  Q.  How many times?

17  A.  Like, five.

18  Q.  Have you ever seen her take notes?

19  A.  No.

20  Q.  Did she ever share with you the concept of traumatic

21  memory?

22  A.  No.

23  Q.  Did she ever talk to you about memory fragmentation or

24  anything like that?

25  A.  No.

1  Q.  When you and folks in your peer group use social media, do

2  folks -- do you use slang ever?

3  A.  Yes.

4  Q.  And let me be more specific -- yes.  Okay.

5       If someone says, "Would you like to get ice cream?"

6  and they're talking to a teenager or a Gen Z or even a young

7  Millennial and that person says, "Bet." Like, question:  "Do

8  you want to get ice cream?" Response, "Bet."

9       What does "bet" mean?  "Bet" means you want to get ice

10  cream, right?

11  A.  "Bet" can mean sure, or, like, I'm -- like, I'm down.

12  Q.  "Sure" or "I'm down"?

13  A.  Yes.

14  Q.  And I guess now we're defining slang with slang, which I

15  like.  But "I'm down" also means yes, right?

16  A.  Yes.

17  Q.  Okay.  Now, you talked about your conversation with

18  Mr. Smith on Tinder, and if I understand, some of that

19  conversation was on Friday, the 6th, and some of that

20  conversation was on Saturday, the 7th.

21       Does that sound right?

22  A.  Yes.

23  Q.  And you were clear a moment ago that when you communicated

24  with Mr. Smith on Tinder, you said you did not want to go to

25  Yellowstone; is that right?

1    A.   Told him I did not want to go that day.

2    Q.   Well, you don't want to go that day, or you just didn't

3    want to go?

4    A.   I did not want to go with him.  I did not want to go that

5    day either.

6         MR. FREEBURG:  Judge, I would like to get something

7    teed up and then I will ask the Court's permission before I

8    publish it.

9         MR. HUGUS:  May I approach, Judge?

10        THE COURT:  Of course.

11        MR. HUGUS:  There's a technical --

12    (Discussion held between defense counsel.)

13        MR. FREEBURG:  And, Judge, I would like -- can the

14   witness see this?

15   **BY MR. FREEBURG:**

16   Q.   Ma'am, I'm going to ask you to read through this document,

17   and I'll just ask you if you recognize it as your Tinder

18   conversation with Mr. Smith.  And there are, I believe, two

19   pages.

20        Did you see the first page and the second page?

21   A.   I cannot read that.

22   Q.   Does that help you?

23   A.   Yes.

24   Q.   And I will represent this is similar, I think, to

25   Exhibit 100A, but it is a little bit of an easier format for

1  me.

2          Am I going too fast?  Are you able to see that?

3          So I would like to just walk you through this

4  conversation, okay?

5          MR. FREEBURG:  And, Judge, at this point, I think I'd

6  ask permission to publish to the jury.

7          THE COURT:  It is not moved -- there's no motion for

8  admission.  Do you want to move to admit?

9          MR. FREEBURG:  Judge, I'm offering this for

10 impeachment, but I suppose I can move to admit as Defense

11 Exhibit -- Judge, we'd offer Defense Exhibit GG.

12         THE COURT:  We have a motion.

13         MS. MARTENS:  Your Honor, this is cumulative.  It is

14 the same as Government Exhibit 100A.

15         MR. FREEBURG:  Judge, I'd be happy to work with 100A.

16 Just for the Court's clarification, 100A is 36 pages, where

17 each page has essentially one text on it, and this is

18 everything on one page, so it is absolutely cumulative.  It's

19 just --

20         THE COURT:  Is this misleading or incorrect?

21         MS. MARTENS:  No.

22         THE COURT:  I'm sorry.  The objection is overruled.

23         GG is admitted.

24     (Defendant's Exhibit GG received.)

25 BY MR. FREEBURG:

1  Q.  Okay.  So do you recognize this as your Tinder conversation

2  with Mr. Smith?

3  A.  Yes.

4  Q.  And are you the -- well, is Mr. Smith the user in red who

5  says, "What's up?"

6  A.  Yes.

7  Q.  And then it's, "I just woke up."  That would be you; is

8  that right?

9  A.  I don't see that.

10  Q.  Oh --

11        MR. FREEBURG:  How is this not displaying what's on my

12  screen on this screen?

13        THE COURT:  That's page 2.

14        MR. FREEBURG:  Judge, I'm on page -- I'm on page 1 on

15  my side.  Is there a way to -- Judge, I believe there's a

16  setting where it's set so when I use the monitor, it's going to

17  mark up, and I actually just -- I don't want to mark this

18  exhibit anymore.  I just want to move back and forth, so I

19  would like to go to the first page of my exhibit.

20        COURTROOM DEPUTY:  You can't scroll on the court's

21  monitors.  It all has to be done on the iPad.

22        MR. FREEBURG:  Judge, I need to shut this down.  I

23  have a problem.

24        Judge, could I have my learned counsel drive the bus

25  while I continue to ask my questions?  I apologize.

1            THE COURT:  Why don't we go ahead and take our

2    midafternoon break, if that's convenient for you.

3            MR. FREEBURG:  Thank you.  I appreciate it.

4            THE COURT:  We will take our midafternoon break at

5    this time.  I'd ask the jury to be ready --

6            THE WITNESS:  Sorry.

7            THE COURT:  -- to be ready to return to the courtroom

8    at 3:10.  Please remember the admonition against discussing

9    this case with anyone, including each other.  Don't research

10   anything about this case.  Please keep an open mind until all

11   the evidence is in.

12           Please stand for the jury to recess until 3:10.

13       (Following out of the presence of the jury.)

14           THE COURT:  We will stand in recess until 3:10.

15           MS. MARTENS:  Thank you, Your Honor.

16       (Recess taken 2:54 p.m. until 3:17 p.m.)

17       (Following in the presence of the jury.)

18           THE COURT:  Please be seated.

19           We're back on the record in 20-CR-45 with the jury

20   present.  Roll call is waived.

21           Ms. Bye, I would remind you that you remain under

22   oath.  Thank you, Ma'am.

23           Mr. Freeburg?

24           MR. FREEBURG:  If the court reporter would publish

25   that document.

**BY MR. FREEBURG:**

Q.  Ma'am, a minute ago you testified that you said to

Mr. Smith via Tinder that you would not meet with him in

Yellowstone.  I'm now going to zoom in here.

MS. MARTENS:  Your Honor, I object.  I believe that

misstates the witness' answer.

THE COURT:  The objection is sustained.  Maybe I would

just ask you to either move to your question or -- the record

stands as it does -- or rephrase your question.

**BY MR. FREEBURG:**

Q.  The user in red asks:  "Are you free on Saturday, September

7th?"

And it looks like you respond, "Tomorrow."

Do you see that?

A.  Where is that?

Q.  Now is it easier to see?

A.  Yes.

Q.  And you say, "But I can't today on Saturday, but I can

tomorrow"?

Do you see that part?

A.  I do.

Q.  Down below he says, "Okay.  I'm heading to Boise tomorrow.

I can meet you on my way."

And you say, "Okay.  Bet."

Is that an example of where "bet" means yes, like you

1   talked about?

2   A.  It's like, yeah, sure.

3   Q.  Okay.  So the conversation continues.  That's on Saturday,

4   and it is apparently 2126 GMT.

5         And just to be clear, what you're talking about before

6   then is he says, "Hang out in Yellowstone."

7         You say, "I've never been."

8         He says, "You want to go?"

9         And you say, "Bet, LOL, but I don't have a car up

10  here."

11        So that statement by you, "Bet, LOL, but I don't have

12  a car up here," that is an indication that you want to go to

13  Yellowstone with Mr. Smith?

14  A.  I told him not today, though, that day.

15  Q.  You told him not that day?

16  A.  Yes.

17        MR. FREEBURG:  Okay.  Judge, I would like to --

18  BY MR. FREEBURG:

19  Q.  Okay.  So you told him not that day, right?  That's what

20  you just said?

21  A.  I did.

22  Q.  Isn't it true that you told the Rexburg police officer,

23  Detective Stubbs, when he asked you that, that you were, like,

24  "Just go," meaning just go to Yellowstone?

25  A.  No.

1       MR. FREEBURG:  Judge, I would like -- I would like to

2  present this video to the jury.

3       THE COURT:  You have to first move its admission and

4  identify it for the record.

5       MR. FREEBURG:  Judge, this is Exhibit VV, and I think

6  it's just fine if it's just an impeachment video, but if the

7  Court wants me to move to admit it, I'll move to admit.

8       THE COURT:  You have a motion?

9       MR. FREEBURG:  I move to admit Exhibit VV, Your Honor.

10      THE COURT:  Yes, I'm sorry.  I was talking to

11  Ms. Martens.

12      MS. MARTENS:  Your Honor, this exhibit has not been

13  properly authenticated, and there is not a proper foundation

14  laid for it at this time.

15      MR. FREEBURG:  Your Honor, I'll represent to the Court

16  it's a 15-, 30-second video.  If there's a way I can play it

17  for the witness, I'm happy to ask her more questions about it.

18      MS. MARTENS:  Your Honor, if I may?

19      THE COURT:  Yes.

20      MS. MARTENS:  If it's only 15 to 30 seconds, then I

21  would also object based on the rule of completeness.  I believe

22  that will take the statements out of context.  And in fairness,

23  much more of it should be presented to the jury if it is to be

24  presented at all.

25      THE COURT:  The motion is denied.

**BY MR. FREEBURG:**

**Q.** Before this date with Mr. Smith, what were you doing?

**A.** It was not a date.

THE COURT: Ma'am, you have to wait until he finishes his question.

Go ahead. Please ask the question again.

**BY MR. FREEBURG:**

**Q.** Before you met with Mr. Smith, what were you doing?

**A.** I was on a date.

**Q.** That evening around 10:00, is that when you met up with Mr. Smith?

**A.** Yes.

**Q.** That evening around 10:00 immediately before you went up -- met up with Mr. Smith, where were you?

**A.** I had just gotten home. I was at my apartment.

**Q.** And who were you with in your apartment?

**A.** My roommates.

**Q.** Were you talking to your roommates?

**A.** Probably.

**Q.** Did you talk to Casey Stegall?

**A.** I did.

**Q.** Who is she?

**A.** She's my friend from Texas.

**Q.** Isn't it true that you talked to her right before you left to go with Mr. Smith?

1   A.   I did.

2   Q.   Isn't it true you told her that you were going on a date

3   with Mr. Smith?

4   A.   No.

5   Q.   I'm sorry?

6   A.   Not true.

7   Q.   Your roommate, Ms. Romao, the Brazilian, were you asking

8   her if she kissed on a first date at 9:30, about half an hour

9   before you met up with Mr. Smith?

10  A.   That was about the first date I went on prior.

11  Q.   Were you joking with her about how soon it is to kiss

12  someone on the first date about 30 minutes before you met up

13  with Mr. Smith?

14  A.   Yes.  Because she told me -- she asked me if I had kissed

15  John.  That's the guy I went on a date with prior.  And I said

16  no.  And then she was making a joke, and she was like, "Oh, I

17  kissed my" -- fiance now -- "on our first date."

18  Q.   You didn't meet up with Mr. Smith in your apartment, did

19  you?

20  A.   I did not.

21  Q.   You didn't meet him with your roommates present or anyone

22  else present, did you?

23  A.   No.  I was on FaceTime with Casey when he pulled up.

24  Q.   When you were driving to Yellowstone in Mr. Smith's

25  vehicle, isn't it true he had a stick shift?

1  A.  Yes.

2  Q.  Isn't it true that you put and accessed the Apple maps

3  function on your phone?

4  A.  I'm not sure.

5  Q.  Isn't it true that you looked up something about NGALA, an

6  animal refuge in Florida, on your phone, that you Googled that?

7  A.  I don't know.

8  Q.  I'm showing you something that's been previously admitted

9  into evidence as Exhibit 200.  I will represent to you it's

10  page 151 and that this is your cell phone.

11      Do you see a log entry for Apple Maps, 35177, so

12  that's the log entry on the side, and that you're accessing

13  Apple Maps at 2256?

14  A.  Yes.

15  Q.  Do you have any memory of accessing Apple Maps at 2256?

16  A.  No.

17  Q.  I'm now showing you that same exhibit, page 152.

18      And there is also a log entry, 35189, and here it

19  looks like your phone searched for NGALA at 2311, so 11:11.

20      Do you remember searching for NGALA to learn about

21  Mr. Smith's family's animal refuge?

22  A.  No.

23  Q.  The campground in Yellowstone -- actually, I do have one

24  more.

25      This is also Exhibit 200, page 152.  I want to look at

1    the bottom of the screen here.

2          It looks like you received a message from your

3    roommate, Hannah Egbert, at 11:47, and she asked you, "You

4    good, Hannah?"

5          Do you remember that?

6    A.  Yes, I do.

7    Q.  And it also looks like you then responded at 11:48:  "Yeah,

8    I'm good."

9          Do you remember that?

10   A.  I do.  I mentioned earlier that, like I said, with those

11   Snapchats --

12         THE COURT:  Ma'am, there's no question pending.  Thank

13   you.

14   **BY MR. FREEBURG:**

15   Q.  And I guess, I mean, let's talk about that.

16         So you mentioned earlier that you talk one way on text

17   messages and another way on Snapchat?

18   A.  Yeah.

19   Q.  Is that common?  You just talk one way in text messages and

20   another way on Snapchat?

21   A.  I think the natural answer is that when someone asks if

22   you're good, that you're good, even though you're not.

23   Q.  And you would do that in a text message, but in a Snapchat,

24   you'd be your true self?

25   A.  Yeah, because you can see their face and you'd be able to

1    tell that they're not okay.

2    Q.  So if you can see the face in a Snapchat and that's how you

3    know if they're okay or not, what about in TikTok; same thing?

4    A.  You would see their face, so I would say yeah.

5    Q.  So in TikTok, you're being your true self?

6    A.  No.

7    Q.  Well, is --

8    A.  Social media isn't -- you just show the way you want to

9    portray yourself.

10   Q.  And what I don't understand -- let's just go do this.

11        MR. FREEBURG:  And, Judge, may I approach to set up

12   that demonstrative?  And I want to put up the photographs and

13   ask her about them.

14        THE COURT:  Yes.

15        MS. MARTENS:  Your Honor, if I may?

16        THE COURT:  Yes.

17        MS. MARTENS:  Can we back those up so they don't block

18   the jury's view of the witness?

19   **BY MR. FREEBURG:**

20   Q.  Ma'am, this demonstrative is a photograph with you in it,

21   and it's -- I guess is it your position this was taken for

22   Snapchat?

23   A.  Yes.

24   Q.  I don't understand.  If you're scared and you want help,

25   why would you have the photograph with a thumbs up and a happy

1   face and not something more serious?

2   A.   Can you ask that question again?

3   Q.   So my question is with the photograph and someone is doing

4   a thumbs up, if you want to get your friends' attention to let

5   them know you're in a situation and you have this photograph

6   and the text is, like, "Help, I'm kidnapped," how would your

7   friend know that the -- whether the text, "Help, I'm

8   kidnapped," is what's serious or the image of your face and the

9   thumbs up and the smiling is what's serious?  How would you

10  know which is the right message?

11  A.   I mean, I think me trying to respond to my friends that are

12  in Texas have nothing to do with what was actually going on.

13  Q.   This photo here, with the peace sign --

14  A.   Yep.

15  Q.   -- does that photo also have nothing to do with what's

16  going on?

17  A.   No.  I mean yes, it had nothing do with what's going on.

18  Q.   Isn't it true that you deleted these photographs off your

19  phone on September 10th?

20  A.   I delete a lot of photos.  It was probably I just was not

21  wanting to remember anything about that night.

22          MR. FREEBURG:  And I would like to be able to present.

23          COURTROOM DEPUTY:  What exhibit is this?

24          MR. FREEBURG:  This is also 200, been admitted into

25  evidence, and this is the very last page.

1  **BY MR. FREEBURG:**

2  Q.  So, ma'am, do you see where it says "deleted" for each

3  photo?

4  A.  Yes.

5  Q.  And it says "9/10/2019" -- I'll bend this back up.  I

6  apologize -- "9/10/2019, 6:18 a.m., UTC plus 0."  Do you see

7  that timestamp?

8  A.  Yes.

9  Q.  And so if we adjust for UTC plus 0 and we go back six

10  hours, it looks like that photograph was deleted on September

11  10th, just after midnight, so really like the night of the 9th,

12  midnight, very early morning on the 10th.

13       Do you see that, or would you agree that that's when

14  you deleted it?

15  A.  Is that the correct time?

16  Q.  I will represent that it is, but the question is, I mean,

17  did you delete it just after midnight or at 6:00 a.m., and I'm

18  saying based on UTC, it would be just after midnight?

19  A.  Okay, yes.

20  Q.  So my question is, it looks like it was midnight on the

21  10th you deleted it.  Isn't it true that you then went to bed,

22  got up the next day and went into the Rexburg --

23       THE COURT:  Ma'am, please don't mess with that

24  microphone.

25       THE WITNESS:  I'm trying to fix it so she can hear me.

1      THE COURT:  Could you start your question over,

2   please?  Thank you.

3   **BY MR. FREEBURG:**

4   Q.  Isn't it true that you deleted it at midnight or just after

5   midnight on the 10th, went to bed, and then the next day had

6   your meeting with the Rexburg Police Department, where you

7   showed them your phone?

8   A.  What are you asking me?

9   Q.  I'm asking you that I have the sequence of events correct,

10   and the sequence of events is that after midnight, you delete

11   the photos.  I assume you go to bed.  And the next day in the

12   afternoon is when you go to the Rexburg Police Department and

13   you show them the text messages on your phone.

14   A.  Yeah, those were the pictures I was trying to respond to

15   with my friends, and they didn't end up sending, so they saved

16   to my phone on Snapchat and I didn't want those on my phone

17   because my memory is also saved to my camera roll, and I didn't

18   want those.

19   Q.  And I can understand not wanting them, but you deleted them

20   12 hours before you went and made a police report; isn't that

21   right?

22   A.  Yes.

23   Q.  In testimony -- well, was he in the room with you?  Was he

24   in the bathroom stall with you?

25   A.  When I first went to the restroom, yes.

1  Q.  Was he -- and I don't even know what I mean by stall.  So

2  there's the building.  Let's talk about the building, and just

3  the stall is where the toilet is.

4          Was he, when those photographs were taken, inside the

5  building or outside the building?

6  A.  Outside.

7  Q.  So you were inside the bathroom for some period of time?

8  A.  Yes.

9  Q.  How come you never told Jake Olson about that photo?

10  A.  'Cause I didn't think about it.  I was not thinking about

11  that photo.  Photos.

12  Q.  The Yellowstone campsite, is it your opinion that the

13  campsite was dark?

14  A.  Yes.

15  Q.  Did you see any other tents there?

16  A.  No.

17  Q.  Do you have any idea how many tents are at the -- or how

18  many campsite spots, so places you could pitch a tent, are at

19  the Norris Campground in Yellowstone?

20  A.  That was the first time I had ever gone camping, so no.

21  Q.  Was there a flood light on the exterior of the bathroom?

22  A.  I'm not sure.

23  Q.  So a flood light is like a really bright light, like you'd

24  see in a parking lot when it's -- when it's dark, like just a

25  parking lot to try and provide a lot of light outside.

1              Was there a flood light above the bathroom?

2    A.   I don't remember.

3    Q.   Did you see any pay phones there?

4    A.   No.

5    Q.   Did you see any lighting next to a pay phone near the

6    bathroom you were in?

7    A.   No.

8    Q.   Did you see any signs for a campground host?

9    A.   What is that?

10   Q.   So a campground host might be someone who is there all

11   summer and sort of monitors the campground, answers questions,

12   that kind of thing.

13              Did you see any campground hosts?

14   A.   No.  I don't know what that is.  I ...

15   Q.   When you were in the tent with Mr. Smith, did you ever kiss

16   him back?

17   A.   No.

18              MR. FREEBURG:  Judge, I would like to show something

19   to the witness.

20   **BY MR. FREEBURG:**

21   Q.   Can you read this?  I'm just asking if you can read it, not

22   what it says.

23   A.   Where do you want me to start?  Because it's, like,

24   mid-sentence.

25   Q.   You know, I'm having a little trouble both redacting where

1  I want you to start and not, but -- so do you -- do you
2  recognize this?
3  A.  Yeah, that's my handwriting.
4  Q.  And is it a statement you made to Rexburg Police
5  Department?
6  A.  Yeah.
7  Q.  And isn't it true that you told the police department that
8  90 percent of the time, you wouldn't kiss him back?
9  A.  Yeah, because he would force me to kiss him.
10  Q.  You didn't say, "90 percent of the time I would kiss
11  him" -- "I wouldn't kiss him back and the rest of the time I
12  was kissing him it was because he forced me."  You just said,
13  "90 percent of the time I wouldn't kiss him back"; isn't that
14  right?
15          MS. MARTENS:  Your Honor --
16          THE COURT:  Yes.
17          MS. MARTENS:  -- I object here because I believe that
18  misstates the written statement.
19          THE COURT:  The objection is overruled.
20          I'm not sure the witness has the question in mind.
21  BY MR. FREEBURG:
22  Q.  You didn't tell the Rexburg Police Department that 90
23  percent of the time you wouldn't kiss him back and that 10
24  percent of the time you weren't kissing him back because you
25  were forced, right?  That's not what you said?

1        MR. FREEBURG:  Judge, I will move on.

2        THE COURT:  All right.  Thank you.

3   BY MR. FREEBURG:

4   Q.  Isn't it true there were times you would tell him to stop,

5   and he would stop?  Isn't that true?

6   A.  He would stop doing that certain thing, but he would

7   keep -- he'd go on to doing something else, so he wouldn't stop

8   completely.

9   Q.  And that next morning, the alarm was set for 7:00 a.m.?

10  A.  I'm pretty sure.

11  Q.  And that was because you needed to be back in Rexburg?

12  A.  Yes.

13  Q.  And so when the alarm went off, how long were you sitting

14  in his car while he packed up the tent?

15  A.  Like, 20 minutes.

16  Q.  Was anyone else checking out of the campground at that

17  time?

18  A.  I didn't see anyone.

19  Q.  You didn't see a line at the check-out with the host or the

20  park employee?

21  A.  I just learned what a host was, so no.

22  Q.  And I apologize.  I know you just learned what a host was.

23        But you didn't see -- did you see where Mr. Smith went

24  with a receipt or whatever?

25  A.  No.

1   Q. Did you see any other people doing the same thing?

2   A. I didn't see anyone.

3   Q. So if you didn't see anyone, you didn't have an opportunity

4   to go up to somebody and say, "Hey, I need a ride to Rexburg,"

5   or, "I'd like a ride," right?

6   A. No, I didn't see anyone, so no.

7   Q. 7:00 a.m., September, was it light out in the morning?

8   A. I think the sun was rising.

9   Q. The next morning when you're going back to Rexburg, did you

10  do a search on your phone for Chris McCandless, the guy from

11  Into the Wild?

12  A. I might have.

13  Q. Is that something you and Cody were talking about -- or

14  excuse me -- Mr. Smith were talking about?

15  A. No.  I just think I looked him up because I read that book

16  in high school, and it was about someone who camped.

17  Q. Let's talk a bit about your texting with your roommates the

18  next morning.

19          MR. FREEBURG:  I'm going to need a moment.

20          And, Judge, I would like to present now, this is page

21  72 of Exhibit 200, which has been previously admitted.

22  **BY MR. FREEBURG:**

23  Q. And do you see, I think it's No. 102 in the corner, a text

24  from -- to Hannah Bye from your roommate, Sarah Romao, and

25  it's:  "Hey, are you okay?"

1            And then text message 100:  "Yeah, I'm good."

2            Do you see that?

3    A.   I do.

4    Q.   Is it -- when you said, "Yeah, I'm good," weren't you in

5    your -- in the car with Mr. Smith going back to Rexburg?

6    A.   Yes.

7    Q.   And then there's another text message, and this text

8    message is a group chat.  And it is text message 101 in the

9    corner, and it's to you from Bron, and she says, "Are you

10   kidnapped?"

11           Do you see that message?

12   A.   Yes.

13   Q.   And you say, "Let's just say that's the last time I have a

14   dating app"; is that right?

15   A.   I did say that.

16   Q.   Was that the last time you had a dating app?

17   A.   That's the last time I had Tinder, yes.

18   Q.   And then they want to know -- your roommates want to know:

19   "Are you really okay?  What time did you send that text?"

20           And you said, "I sent it, like, right now.  I just got

21   service."

22           Do you see that?

23   A.   Yes.

24   Q.   Let's just kind of go through this whole text exchange.  So

25   starting -- so we'll keep going here.  Now it's 8:17.

1   Roommates said, "Where are you?"

2           You say you're in Yellowstone.  Are you traveling at

3   that point?

4   A.  I'm not sure.

5   Q.  And you say, "I will be back before 10:00."

6           They want to know if you're with Cody.

7           And they ask at 8:18:  "Are you okay?"

8           And you say, "Yeah."

9           Is that right?

10  A.  Yes.

11  Q.  And then you say, "I'm okay"?

12  A.  Yes.

13  Q.  And it looks like this all kind of took place over, like,

14  ten minutes.  Is that kind of your memory?

15  A.  If that's what the time says, yes.

16  Q.  Yes.

17  A.  Then yes.

18  Q.  And isn't it true that you learned your roommates had

19  called the police while you were in the car going back to

20  Yellowstone -- excuse me -- going back to Rexburg?

21  A.  I didn't know.  I just knew the police called me.

22  Q.  Didn't you learn on Snapchat that that's what they'd done?

23  A.  No.

24  Q.  So --

25  A.  Not that I remember.

1  Q. Do you have a friend named Aubrey?

2  A. No.

3  Q. Do you have an acquaintance named Aubrey?

4       Let me just ask this question:  At the same time you

5  were having your conversation with your roommates, were you

6  also texting with someone named Aubrey?

7  A. I don't remember.  I don't --

8       MR. FREEBURG:  Judge, I would like to present, if I

9  can, page 27 of Exhibit 200.

10 **BY MR. FREEBURG:**

11 Q. Okay.  So this is -- if I understand it, this is a

12 conversation with you and Aubrey, and the timestamps on it are

13 9/7, and that's the beginning of the conversation; it is not

14 the important part.

15      And then I'm going to show you the next -- so -- and

16 this one is a little different, so apologize if you need to

17 take a moment to look at it.

18      But someone named Aubrey, last four digits 0057, says:

19  "WTF, did they really call the cops?"

20      And that's timestamp this day 9/8/2019.  And I'm not

21 sure -- I'm so confused.

22      And do you remember receiving that message?

23 A. I don't really remember our conversation, but sure.

24 Q. Now, this is the part -- I don't mean to embarrass you, but

25 I need to ask the question.

1      Aubrey says, "You're so dumb."

2      And you respond, "I know."

3      What did you mean?  What was that about?

4   A.  Just everything, the whole experience.

5   Q.  I just want to be --

6      MR. FREEBURG:  I'd like to just present a different

7   page of that exhibit.  This is page 162.

8   **BY MR. FREEBURG:**

9   Q.  And I just want to highlight this texting with Aubrey is at

10  9:24 UTC minus 6.  So 9:24 is the correct local time.

11     Does that seem correct with your memory?  Like, while

12  you're still in the car with Mr. Smith, you're having this text

13  message exchange with Aubrey as well?

14  A.  Yes.

15     MR. FREEBURG:  Judge, I have some evidence I would

16  request to address the Court at sidebar.

17     THE COURT:  Counsel, please approach.

18     (At sidebar.)

19     MR. FREEBURG:  And, Judge, there are two different

20  areas of evidence.  And on the first area of evidence, I'm

21  mostly making my record.

22     We have some law enforcement interviews where, as an

23  offer of proof, she said something like, "Just go," and the law

24  enforcement officer understood her to mean just go to

25  Yellowstone.

1    Second offer of proof, the law enforcement officer is

2 talking to her, and it is Detective Stubbs, and he's, like, "So

3 did you intend to spend the night at Yellowstone?"  And she's

4 like, "I didn't intend to spend the night."

5    So those are the two interviews, and I understand --

6 it's just tough how you handle this, right, because we

7 certainly don't want a 45-minute interview to go back to the

8 jury, but we do think we need to impeach her, and we have the

9 excerpts teed up.  So I haven't offered any impeachment

10 evidence based on law enforcement interviews, and I'm just

11 looking for a ruling on that.

12    The second issue is, and this one I wasn't sure how

13 the testimony was going to come in, but we have some social

14 media from her that contradicts some of what she says about her

15 use of TikTok and Snapchat and Tinder.  So as an offer of

16 proof, we have a TikTok video where she talks about using

17 Tinder.

18    We have another TikTok video where she talks about

19 dating guys or whatever.  I mean, we've -- so -- we've got some

20 TikTok videos where she says some things that -- it's just

21 weird, because what she said here and why this is so important

22 is she says she's one way on social media and that's her true

23 feelings.

24    So we have these exculpatory text messages, and we

25 have the phantom sort of social media, and the phantom social

1   media is she's saying on Snapchat I'm this way.  We just don't

2   have any of the Snapchat stuff.

3          We do have her on TikTok saying things that are really

4   contradictory, and it would certainly be embarrassing to her.

5   It would certainly be prejudicial -- not prejudicial, but what

6   I think is curious about this whole age --

7          THE COURT:  I guess what's your point?

8          MR. FREEBURG:  What's my point?  One, I would like --

9   can I offer impeachment evidence from her law enforcement --

10          THE COURT:  Under the rule, you have to provide her

11   her prior statement, and, as I understand it, that hasn't

12   occurred.  She needs to have an opportunity to explain it, if

13   it is a prior statement.  What the officer understood from her

14   remark of "just go" isn't her prior statement.

15          And so those were the reasons, in more elaborate

16   detail, concerning why I felt like she was not the proper

17   witness for purposes of whatever segment of that interview you

18   want to seek admission.

19          MR. FREEBURG:  Okay.  Thank you.

20          THE COURT:  And on the other one, if you are just

21   highlighting that this is where we're going next, I appreciate

22   the highlight, but -- and maybe the Government has some

23   objection that they want to state.  But you all know your case.

24   I don't.  You don't have to provide me a road map, but

25   sometimes it's useful to let me know that you know, we're going

1   into an area that may elicit an objection, and that's how I

2   take this whole discussion about the clips that you may be

3   seeking to offer.

4        As I understand it, you may seek to offer that -- the

5   admission of that.

6        MR. FREEBURG:  Yes, Judge.  And we may just -- we may

7   just want to do it through a different witness, I think.  Let

8   me talk to my counsel.  And if that's the case, I will sit down

9   very quickly.

10        THE COURT:  What?

11        MR. FREEBURG:  We may end up doing it through a

12   different witness, and then I'll just talk to Mr. Hugus and

13   perhaps sit down with my --

14        THE COURT:  All right.  I guess maybe we're not here

15   to talk more about that, then.

16        MS. MARTENS:  So I just want to be clear, to make sure

17   I'm understanding:  So there's the video with Detective Stubbs.

18        MR. FREEBURG:  Yes.

19        MS. MARTENS:  And you want to play clips from that.

20        MR. FREEBURG:  Yes.

21        MS. MARTENS:  And there's other social media stuff.

22        MR. FREEBURG:  Yes.

23        MS. MARTENS:  What other social media stuff?  Because

24   nothing has been provided in discovery.

25        MR. FREEBURG:  It's impeachment evidence.

1          MS. MARTENS:  So if we're impeaching her --

2          THE COURT:  It is my understanding that I've already

3    ruled on the video, and the other stuff, as I understand it,

4    they're not going to use in relation to the cross-examination

5    of this witness.

6          MS. MARTENS:  So the social media stuff is not going

7    to be used in her cross-examination?

8          And if I might elaborate --

9          MS. ROMINE:  Your Honor, could we have a moment?

10          THE COURT:  All right.

11       (Discussion held between counsel.)

12          THE COURT:  So where do we stand on the social media?

13          MR. FREEBURG:  I'm going to -- I'm not going to offer

14    it.

15          THE COURT:  All right.

16          MS. MARTENS:  If you're not offering it, then I have

17    nothing further.  Thank you.

18          THE COURT:  All right.  Thank you.

19       (Sidebar ended.)

20    BY MR. FREEBURG:

21    Q.  On September 10, 2019, you did a recorded interview with

22    the Rexburg Police Department, correct?

23    A.  Yes.

24    Q.  And that was two days after you claimed that Mr. Smith --

25    or excuse me.  That was two days after Mr. Smith and you met at

1  McDonald's -- or three days?

2  A.  We didn't meet at McDonald's, but --

3  Q.  That was shortly after you went to McDonald's with

4  Mr. Smith, correct?

5  A.  Yes.

6  Q.  And you knew that the interview was in relationship to a

7  criminal investigation where you were the alleged victim,

8  correct?

9  A.  Yes.

10  Q.  And you knew it was important to tell the truth in that

11  interview; isn't that right?

12  A.  Yes.

13  Q.  Isn't it true that you told Mr. Smith when you were

14  standing there, making -- or in the vehicle making the decision

15  whether or not to go to Yellowstone -- isn't it true that you

16  said, "Just go"?

17  A.  Go home, back to my apartment.

18  Q.  Isn't it true you said to Mr. Smith, "Just go"?

19  A.  Yeah, I meant to my apartment.

20  Q.  But you didn't say to your apartment.  You said, "Just go,"

21  in connection to whether or not you should go to Yellowstone

22  or to your apartment.

23  A.  I think previously if I'm saying "I don't want to go," I

24  mean go home.

25  Q.  So because you said previously you didn't want to go, if

1  you said, "Just go" at that moment, you meant to your house; is

2  that correct?

3  **A.**  Yes.

4  **Q.**  That knife that you claim that Mr. Smith had in his

5  vehicle, how big was it?

6  **A.**  (Indicating).

7          THE COURT:  For the record, could you estimate the

8  length that you're depicting by your fingers?

9          THE WITNESS:  Are you talking about the knife or

10  everything?

11  **BY MR. FREEBURG:**

12  **Q.**  The knife.

13  **A.**  So not the handle?

14  **Q.**  Well, tell me the handle and tell me the blade, however it

15  makes sense to you.

16  **A.**  Say about 4 and 4.

17  **Q.**  4-inch knife and --

18  **A.**  Maybe a 3-inch knife, 4-inch handle.  I'm not that familiar

19  with knives, so --

20  **Q.**  And you were -- was it a fixed-blade knife or a folding

21  knife, like a pocket knife?

22  **A.**  Fixed blade.

23  **Q.**  Do you understand the difference between a fixed blade and

24  a folding blade?

25  **A.**  I do.

1  Q.  Did you understand the difference between a fixed blade and

2  a folding blade at the time you did the interview in Rexburg?

3  I mean, have you learned something about knives and now you

4  know the difference, and before you didn't?

5  A.  I know the difference between, like, a pocket knife and a

6  knife.

7  Q.  Okay.  One thing I want to clear up.

8       Isn't it true that you don't think Mr. Smith -- you

9  didn't ever see him consume any alcohol, correct?

10 A.  I did not see him.

11 Q.  And you didn't smell alcohol on him either?

12 A.  He told me he did drink the night before, but, no.

13 Q.  But the day you were together or the evening you were

14 together, you didn't think he was drunk or impaired or anything

15 like that, right?

16 A.  Not that he told me.

17 Q.  And you didn't -- you have been around drunk people before,

18 correct?

19 A.  I have.

20 Q.  He didn't seem drunk to you either, did he?

21 A.  Not that I know of.

22      MR. FREEBURG:  Judge, may I have a moment with

23 co-counsel before I pass the witness?

24      THE COURT:  Yes.

25    (Discussion held between defense counsel.)

1          MR. FREEBURG:  Your Honor, no further questions for

2    Ms. Bye.

3          THE COURT:  Any redirect?

4          MS. MARTENS:  Thank you, Your Honor.

5                    **REDIRECT EXAMINATION**

6    **BY MS. MARTENS:**

7    **Q.**  Ms. Bye, I would like to take you back to that string of

8    text messages with Aubrey.

9          Can you explain who Aubrey is?

10   **A.**  Aubrey is someone I used to be friends with in high school.

11         MS. MARTENS:  And, Ms. Wait, could you display

12   Government's Exhibit 200 at page 28 to the witness and the

13   jury.

14     (Discussion held.)

15   **BY MS. MARTENS:**

16   **Q.**  Ms. Bye, are those large enough for you to read?

17   **A.**  Zoom it in a little bit, and I will be able to read it.

18   **Q.**  Is that good?

19   **A.**  Yeah, that's fine.

20   **Q.**  All right.  So with Mr. Freeburg, you talked about these

21   text messages.  And he did the conversion on the time for us,

22   so that's around 9:30 in the morning on the 8th.

23         So Aubrey messages you:  "WTF, did they call the

24   cops?"

25         You respond -- what is your response?

1  A.  "Yes."

2  Q.  She messages:  "WTF, Hannah?"

3      What was your response?

4  A.  I said, "What?"

5  Q.  Why did you respond "What?"

6  A.  Because I don't know why she said that.

7  Q.  Then Aubrey says, "You're so dumb."

8      MS. MARTENS:  Ms. Wait, can we go to the next

9  response?

10  BY MS. MARTENS:

11  Q.  And you said?

12  A.  "I know."

13  Q.  What was dumb?

14  A.  Me ever saying yes to going to McDonald's with him.

15  Q.  Then she asks you, "Are you okay?"

16      Do you know why she asked whether you were okay?

17  A.  Would she know why?

18  Q.  Do you know why Aubrey was asking you whether you were

19  okay?

20  A.  Probably because I didn't -- I'm not sure.  Probably

21  because --

22  Q.  So at some point, Aubrey must have found out about

23  something, because she's asking --

24  A.  Oh, yeah, my bad.  Like, she didn't know --

25  Q.  That's --

1  A.  Go ahead.  Oh, like, she didn't know I was going to go to

2  McDonald's with him, so she was probably confused why.

3  Q.  And so then when we go to the next message on page 13 -- I

4  apologize.  I said the wrong number.  I meant 29.  That was not

5  helpful.

6        So the next message is a few days later (indicating).

7        Did you not talk to Aubrey for a while?

8  A.  Yeah.

9  Q.  Why was that?

10  A.  'Cause she said I was dumb.

11  Q.  And here we see, uhm, she's apologizing?

12  A.  Yeah.

13        MS. MARTENS:  Ms. Wait, could we go to page 72 of the

14  same exhibit?

15  **BY MS. MARTENS:**

16  Q.  And we are looking at text message 100 there at the top.

17        You talked with Mr. Freeburg about how you answered,

18  "Yeah, I'm good."

19        What did you mean?

20  A.  I mean I'm not dead, so I'm good.

21        MS. MARTENS:  Ms. Wait -- this is not in evidence, but

22  I would like to show the prior statement to the witness.

23        So can we go to her prior statement, written

24  statement?

25        And we are on page 7, and go about to the middle of

1    the page.

2           Oh, I apologize.  My pagination is page 7 of the

3    written statement, so you'll need to go down a few more pages.

4    The page should start with "I told ..."

5           Yes, thank you.

6    **BY MS. MARTENS:**

7    Q.  Ms. Bye, could you read to yourself that page of your

8    statement, and let us know when we need to scroll down.

9    A.  Okay.

10          Okay.

11          Okay.

12   **BY MS. MARTENS:**

13   Q.  All right.  So I want to go back to the top of the page.

14   And once that -- after that first sentence about being cold,

15   can you read for the jury beginning at, "He asked ..."?

16          THE COURT:  Wait a minute.  This is not in evidence.

17   She cannot read this out-of-court statement.

18          MS. MARTENS:  Certainly.  How about I'll have her

19   summarize for fairness and completeness?

20          THE COURT:  If you could remove it, please.

21          MS. MARTENS:  Certainly.

22   **BY MS. MARTENS:**

23   Q.  So, Ms. Bye, with Mr. Freeburg you talked about your

24   statement with -- you weren't kissing him back 90 percent of

25   the time.

1    Can you explain why you did kiss him back at all?

2  A.  He was forcing me to and was getting mad.

3  Q.  Why did it matter to you that he was getting mad?

4  A.  Because I didn't want him to hurt me.

5  Q.  Mr. Freeburg talked to you about going into the police

6  department on September 10th.

7    Did you know before you went that they would ask to

8  see your phone?

9  A.  No.

10  Q.  When they asked to see your phone, did you let them?

11  A.  Yes.

12  Q.  Have you ever used a pay phone?

13  A.  No.

14  Q.  Do you know how to work a pay phone?

15  A.  No.

16  Q.  Mr. Freeburg talked to you about the number of times that

17  you have talked to Special Agent Jake Olson.

18    In your count, what sorts of talking to did you

19  include?

20  A.  The interviews.

21  Q.  What about other kinds of contacts?

22  A.  Stuff about the case.

23  Q.  Has Special Agent Olson kept in touch with you?

24  A.  Yeah, just to make sure if I was okay.

25  Q.  Helped arrange meetings?

1   A.   Yeah.

2   Q.   Mr. Freeburg talked to you about whether or not you and I

3   had spoken.

4   A.   Yeah.

5   Q.   When we met, what sorts of things did we do?

6   A.   Talked about the case.

7   Q.   Did I show you pictures?

8   A.   Yeah, pictures of me.

9   Q.   Like the ones we talked about in court today?

10  A.   Uh-huh, yes.

11  Q.   Mr. Freeburg talked to you about your prior date.

12  A.   Uh-huh, yes.

13  Q.   What did you do on that date?

14  A.   We got frozen yogurt and played basketball, walked around a

15  park.

16          MS. MARTENS:  Your Honor, may I have just a minute?

17          THE COURT:  Yes.

18      (Discussion held at prosecution table.)

19          MS. MARTENS:  Your Honor, I have no further questions

20  for this witness.

21          THE COURT:  All right.

22          Any objection to excusing and releasing Ms. Bye?

23          MR. FREEBURG:  No objection, Judge.

24          THE COURT:  Thank you for your testimony.  Ms. Bye,

25  you're excused and released.

1        The Government may call its next witness.

2            MS. MARTENS:  Your Honor, our next witness will be

3    Sarah Romao.

4        (Witness sworn.)

5            COURTROOM DEPUTY:  Please take a seat.

6            Ma'am, can you please state and spell your name for

7    the record.

8            THE WITNESS:  State and spell my name?  So my name

9    is --

10           THE COURT:  You need to speak up and articulate.  You

11   should sound loud in the courtroom.

12           THE WITNESS:  Okay.  So my name is Sarah Decarvalho

13   Romao.  So it is S-a-r-a-h D-e-c-a r-v-a-l-h-o, R-o-m-a-o.

14   **SARAH DECARVALHO ROMAO, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

15   **BY MS. MARTENS:**

16   **Q.**  Ms. Romao -- and I'm pronouncing that correctly?

17   **A.**  Romao.

18   **Q.**  Romao.  What's your current occupation?

19   **A.**  I'm a student.

20   **Q.**  Where at?

21   **A.**  Brigham University, Idaho, so it's BYU-Idaho.

22   **Q.**  And what are you studying?

23   **A.**  Occupational safety and health.  I changed my major last

24   semester.

25   **Q.**  I notice that you have an accent.  Is English your first or

1    second language?

2    A.   English is my second language.

3    Q.   In the fall of 2019, were you a student at BYU?

4    A.   Yes.

5    Q.   And who were you living with at that time?

6    A.   I was living with Hannah Egbert, Hannah Bye, Miranda -- I

7    don't remember her last name -- and Ellie Perkins and myself --

8    Bron, Bron was there, too, but now she's on her mission.

9    Q.   Is that how you met Hannah Bye?

10   A.   Yes.

11   Q.   How long were you roommates?

12   A.   We were roommates just for the seven weeks of the semester.

13   Q.   So I want to take you to the evening of September 7, 2019.

14        Do you remember that day?

15   A.   Yes.

16   Q.   Do you remember talking to Ms. Bye that evening?

17   A.   Yes.

18   Q.   Did she talk to you about her plans?

19   A.   Briefly, yes.

20   Q.   Do you remember what she told you?

21   A.   Yes.  So she came to our room.  I was roommate with Ellie.

22   So she came to our room asking if it was, like, normal to

23   someone -- like, to go, like, camping on a first date.  So she

24   asked if it was okay to do that and said no.

25   Q.   Did you continue to talk about that?

1  A.  I think she continued -- I'm not remember, like,

2  everything, but I think she continue maybe talking to the other

3  girls in the living room, but I went back to my homework.  I

4  was doing homework at that time when she came asking this.

5  Q.  Did she tell you whether or not she intended to actually go

6  camping that night?

7  A.  No.  Uhm, and we thought and also she probably would just

8  think that was weird, the question, that's what I think --

9  that's why she asked us, because I was the oldest one, and then

10 Ellie was also the oldest one, so that's why I believe she did

11 that, but --

12 Q.  And just to be clear, did she tell you she was going?

13 A.  No.  She didn't tell us she was going.  She just asked a

14 question.

15 Q.  Got you.  Did she say what her plans were?

16 A.  Uhm, she had a date before, and then I think she came back,

17 and then she said she was going to McDonald's.  That was the

18 thing after the question.

19 Q.  Did she tell you whether or not she would be home after

20 McDonald's?

21 A.  Yes.

22 Q.  What did she say?

23 A.  Uhm, the plan was Ellie to pick her up, so we were talking

24 to her, like, just to make sure she was fine.  Like, before say

25 message us if you need a ride.  And Ellie, like, told her to

1    message her.  It was, like, yeah, messaging her and messaging

2    with El, so was kind of checking with her when she went, and

3    that was it.  And I don't think she -- you know, she didn't say

4    anything about not going anywhere.  Just go to McDonald's.

5    Q.  And what happened after Ms. Bye left?

6    A.  We texted her, so we're doing -- the girls were doing

7    something different.  I was, like, texting her and saying, "Are

8    you okay?  Is everything fine?"  Saying, "Yeah, everything is

9    fine."

10           The girls were watching a movie in the living room.  I

11   went to my room because I usually -- I was working that summer

12   8:00 a.m.  Then I was texting her until it was, like, 12:00

13   something, like a last message before to go to sleep, and,

14   yeah, that was pretty much it.

15           We started texting her, actually, it was a little

16   late, close to curfew, because the curfew is 11:00.  I don't

17   remember if it was a Friday.  I don't remember the day of the

18   week, but curfew is at midnight, and it was getting close to

19   that midnight.  And we were talking to her about texting her

20   close to midnight to make sure she was fine, and she needed a

21   ride for her -- Ellie -- because Ellie offered her, and she

22   said she was fine, and she would message us if she needed

23   anything.  And I went to bed.

24           So just the last thing I texted her was if she was

25   okay, and she didn't answer.  So it was just -- I went to bed

1  because I needed to work the next morning.

2  Q.  When did you get up the next morning?

3  A.  8:00 -- well, 4:00 a.m. in the morning, me and Miranda

4  asking her -- not asking her -- talking to her.

5          So I woke up 4:00 a.m. in the morning with Miranda

6  coming to the room, waking up Ellie to tell us that she wasn't

7  in her room.

8  Q.  And what did you -- what happened next?

9  A.  We all freaked out.  Everyone was awake in the apartment.

10  We contact the police.  And I think tried to contact her, too,

11  but I don't remember.  But we contacted police.  We're all,

12  like, freaking out in the living room.

13  Q.  Whose idea was it to call the police?

14  A.  I think it was Miranda's idea to call the police, but

15  everyone agree about because she wasn't there.  It was 4:00 in

16  the morning.  We were worried, but I don't remember who.

17  Q.  Do you remember contacting anybody in addition to the

18  police?

19  A.  Later we contact the -- I think it was the bishop, the

20  stake president, a church leader -- church leader, but other

21  than that, no.  And we contact also -- I think Miranda contact

22  her mom.  I didn't have anybody to contact to.  I don't

23  remember if the other girls contacted anybody else.  But that

24  was pretty much I remember:  The police, the church leader, and

25  later Miranda's brother and his roommate.

1  Q.  Yeah, let's talk about that.

2        Did Ms. Bye ever answer your text messages?

3  A.  No.

4  Q.  What about the group texts?

5  A.  The group text was like 8:00 a.m. in the morning that she

6  started to answer, was something like later that morning as

7  well.  And then she started to answer.

8        I just don't remember what we talked about, but we're

9  definitely, like, "Are you okay?  Where are you at?"

10        And then she start communicating with us.

11  Q.  Were text messages the only way that she was communicating?

12  A.  At the beginning, at first it was.  And then she was --

13  after she was sending us Snapchat.  She send a Snapchat when

14  she was closer to get here, was getting closer to -- not here,

15  but getting close to Rexburg.

16  Q.  Did you see the Snapchat messages?

17  A.  Yes.

18  Q.  Do you remember what they said?

19  A.  I think the first one was, "Help," or the second one -- I

20  don't remember the orders, but it was:  "Help.  I'm scared,"

21  and that's all I remember.

22  Q.  After receiving those messages, what did you do?

23  A.  Well, we asked her if everything was -- I don't remember

24  who asked her, I don't think was me, but someone asked her what

25  happened, if everything was okay.  And said, "Yeah, I'm just

1    scared."  And we were just waiting for her to come back.

2           We were in the car waiting for her to come back when

3    she send us the pictures and then Snapchat.  I don't remember

4    who she was talking to, like, either Hannah Egbert or Brynn.

5    Q.  You said you got in the car.  When did you decide to do

6    that?

7    A.  We decided to do that when she told -- I'm pretty sure she

8    told us that she was getting closer, she was coming back.  And

9    then we're just ready, so because she was coming, we were in a

10   group chat.  Ellie was looking more at the message than I was

11   doing it and the other girls in the car.

12          So we said, like, we're in Rexburg, I think was

13   something like that.  I just don't remember, but we gather

14   information that she was getting closer.  And we got -- like,

15   hopped on the car to get ready to follow the car, like, the car

16   that she was in so we could get the plate, but didn't get the

17   apartment.

18   Q.  Were you there when Hannah got into the car?

19   A.  Yes.

20   Q.  What did she look like to you?

21   A.  She looked -- well, she was not Hannah.  She was

22   completely, like -- Hannah is all bubbly and happy.  That's

23   things I remember, and she was not that way.  She was very,

24   like, scared, and, I don't know, she was wearing a hoodie, a

25   blue hoodie.  I think it was a blue hoodie, but she was wearing

1    a hoodie, looking like someone, I don't know, being persecuted

2    or something, like someone running away of something.  She was

3    very scared, looked very scared.

4    Q.  And once she was in the car, where did you go?

5    A.  We tried to find the car that drop her somewhere, like,

6    close to all the buildings at school.

7    Q.  Did she tell you what kind of car?

8    A.  Yes.  I remember it was silver.  I remember the color she

9    told us.  She told us, like, the car, but I don't remember what

10   type of a car, but she told us it was silver, was silver car,

11   and we went, like, trying to find.  And then I remember, like,

12   she looked and found him, I guess, in a gas station, then tried

13   to -- Ellie, she was driving, tried to follow him but couldn't.

14   Like, we couldn't find him.  So that was it.

15   Q.  So when she saw the silver car at the gas station, how did

16   she react?

17   A.  "Oh, my gosh.  That's him.  Oh, don't go there," or

18   something, like she didn't want us to follow him.  We just

19   wanted to get the plate so we could, like, have evidence, but,

20   yeah, we couldn't follow him, but she didn't want us to -- to

21   follow him.

22   Q.  Later on, did you continue to live with Hannah, Ms. Bye?

23   A.  After that semester, no.  I moved apartment complexes.

24   Q.  So how long did you live with Ms. Bye after this incident?

25   A.  Until the end of the semester.  I just don't remember,

1  like, how long it would take.  Not how long it would take --

2  like, the date, specifically.

3  Q.  That's okay.

4  A.  So was just the end of the semester.

5  Q.  So in living with her, did you have an opportunity to see

6  her injuries?

7  A.  I didn't see her -- like, all her injuries at the

8  apartment, but first when she first enter -- well, we were

9  walking -- we were walking with her to the police station, I

10  saw, like, something on her lips and something on her neck.  I

11  just don't remember which side, but also her lips.  But she did

12  have injuries on the lips and on the neck.

13  Q.  Did you ever see injuries anyplace else on her body?

14  A.  I think her back, but I don't -- also don't remember.  But

15  I'm pretty sure she was, like, I have here, and then on the

16  neck and in the lip.  That was the only thing that I remember

17  seeing, like, for sure seeing.

18  Q.  So you gestured just now sort of on your --

19  A.  It was (indicating).

20  Q.  -- back and maybe lower torso?

21  A.  Yeah, like (indicating).  I don't know how to call this.

22  Q.  I think that we could probably describe that as the lower

23  left-hand side of her back?

24  A.  Sure.

25  Q.  What kind of injuries did she have there?

1  A.  Just bruises.  Just a bruise.  I don't remember anything

2  else.  For me, it always looked like a bruise.  My eyes are not

3  good.

4          MS. MARTENS:  Your Honor, may I have just a moment?

5          THE COURT:  Yes.

6      (Discussion held at prosecution table.)

7          MS. MARTENS:  Your Honor, I have no further questions

8  for this witness.

9          THE COURT:  For defendant?

10          THE WITNESS:  Maybe you can hear me?  I don't know.

11                    CROSS-EXAMINATION

12  BY MR. HUGUS:

13  Q.  Good afternoon.

14  A.  Good afternoon.

15  Q.  On the night of September 7th, 2019, just before midnight,

16  around 11:47, you were part of a group or roommate text

17  exchange to Ms. Bye, correct?

18  A.  Yes.

19  Q.  And in that exchange, she was asked if she was okay,

20  correct?

21  A.  Yes.

22  Q.  And her response about 45 seconds later was, "Yeah, I'm

23  okay," or, "Yeah, I'm fine," correct?

24  A.  Yes.

25  Q.  And then you tried reaching out to her about an hour later,

1  right?

2  A.  Yes.

3  Q.  And didn't get a response sometime after 1:00 a.m.,

4  correct?

5  A.  Yes.

6  Q.  And at that point, you were a little bit concerned but

7  trying to calm down, right?

8  A.  Yes.

9  Q.  And the reason for that is because you thought she might be

10 coming back and just didn't have signal at that time, right?

11 A.  Can you clarify the question?

12 Q.  The reason you were trying to calm down -- calm yourself

13 down is because you thought to yourself, "Well, maybe she's

14 just coming back and doesn't have signal right then"; is that

15 right?

16 A.  I don't remember that, but I remember not, like, calming

17 down, the feeling of me calming myself down because she told

18 Ellie that she would message her if she need anything, she

19 needed -- if she needed a ride.  And then that's why I was

20 trying to calm myself down to go to sleep, but not because she

21 didn't have a signal.

22 Q.  Do you remember a conversation that you had with Agent

23 Olson on January 15th, 2020?

24 A.  Who is Olson?

25 Q.  He's this gentleman right here.  I know it is hard to see

1    people, recognize people with our masks, but --

2    A.  Oh, okay.

3    Q.  -- I will represent to you --

4    A.  Yes.

5    Q.  -- he's the gentleman at the prosecution's table.

6         Do you remember that conversation?

7    A.  Yes.

8    Q.  And the purpose of that conversation was to investigate

9    this alleged kidnapping, correct?

10   A.  Yes.

11   Q.  And so he was asking you questions, and you understood at

12   that time that you were to answer his questions truthfully?

13   A.  Yes.

14   Q.  And you did that?

15   A.  Yes.

16   Q.  Okay.  I want to play for you a clip of your interview with

17   him about what you tell him during the interview and ask about

18   that, okay?

19   A.  Uh-huh, yes.

20        MR. HUGUS:  And I believe I'm outputting now.  I don't

21   know if you can see my signal.

22        THE COURT:  Ms. Martens?

23        MS. MARTENS:  I would object.  This item is not in

24   evidence.

25        THE COURT:  The objection is sustained.

1          MR. HUGUS:  Judge, I would offer Defense Exhibit RR,

2    which is a video clip of the interview between Mr. Olson and

3    Ms. Romao.

4          THE COURT:  I'm having a hard time hearing you.

5          MR. HUGUS:  Sorry.  I would like to offer Exhibit RR,

6    which is a video clip of the interview between Agent Olson and

7    Ms. Romao, which she just testified about.

8          THE COURT:  For the Government, we have a motion?

9          MS. MARTENS:  Your Honor, I would object to this.

10   Again, I don't think that this is the proper method to impeach

11   the witness, and this would be an incomplete version of the

12   statement.  Your Honor, to the extent that the exhibit is

13   incomplete, certainly if the prosecution wants to cue up or

14   play more of it, but it is specific -- the purpose of this is

15   specifically limited to the question about what was happening

16   that day and the reason that she was calming down or calming

17   herself down and what it was that she had told Agent Olson

18   about that.

19         THE COURT:  I'll permit it.

20         MR. HUGUS:  Thanks, Your Honor.

21         COURTROOM DEPUTY:  Is it admitted, then?

22         THE COURT:  RR is admitted only for the purpose of, as

23   it has been explained to me, as this witness' prior

24   inconsistent statement.  It may be -- my decision to admit it

25   is qualified on defense counsel affording this witness an

1  opportunity to explain any perceived inconsistency and

2  certainly subject to reexamination.

3           MR. HUGUS:  Thank you, Judge.

4      (Defendant's Exhibit RR received.)

5      (Defendant's Exhibit RR played.)

6  **BY MR. HUGUS:**

7  Q.  So in that conversation with Mr. Olson, you explained to

8  him that the reason you were calming yourself down is because

9  you were just trying not to worry about it.  I understand you

10 care for your roommate.  And you were thinking, "Well, maybe

11 she's just coming back -- coming back and had lost signal,"

12 right?

13 A.  Yes.

14 Q.  There's good signal in Rexburg, right?

15 A.  Yes.

16          MR. HUGUS:  Thank you.  I have no other questions for

17 this witness.

18          THE COURT:  This witness is available for redirect.

19          Thank you, Mr. Hugus.

20          MS. MARTENS:  Your Honor, I have no redirect.

21          THE COURT:  All right.  Any objection to excusing and

22 releasing this witness?

23          MS. MARTENS:  Nothing from the Government, Your Honor.

24          MR. HUGUS:  No, Judge.  Thank you.

25          THE COURT:  Thank you, ma'am, for your testimony

1  today.  You're excused and released from your subpoena.

2      Don't forget to unclip our microphone there.

3      Safe travels.

4      At this time, we will recess for the evening.

5      MS. MARTENS:  Is she excused from the witness stand as

6  well, Your Honor?

7      THE COURT:  Yes, you are excused.  I thought I said

8  that.  You are excused.  You may step down.

9      At this time, we will recess for the evening.  I would

10  ask the jury to be ready to report to the courtroom at 8:15

11  tomorrow morning.

12      Over the recess, again, please remember the admonition

13  against discussing this case with anyone, including each other,

14  family or friends.  Please don't research anything about this

15  case, this type of case, or any of the people involved in this

16  case.  Please keep an open mind until all the evidence is in.

17      We will stand in recess until 8:15 tomorrow morning.

18  (Following out of the presence of the jury.)

19      THE COURT:  As with the lunch recess, please know that

20  the jury has been asked to report a bit earlier in order to

21  facilitate movement and take temperatures and everything to be

22  able to start, hopefully, closer to 8:30.

23      I will be, as usual, in chambers if my attention is

24  needed for any matter.  Just let either Ms. Davis or Ms. Logan

25  know, all right?

1          Is there anything that requires my attention from the

2   parties?

3          MS. MARTENS:  Nothing from the Government, Your Honor.

4   Thank you.

5          THE COURT:  For defendant?

6          MR. HUGUS:  No, Judge.  Thank you.

7          THE COURT:  All right.  We will see you, then,

8   tomorrow morning with the jury ready to report at 8:10 -- 8:15,

9   and with an anticipated call of trial at 8:30.

10          We will stand in recess.

11      (Proceedings recessed 5:00 p.m., May 11, 2021.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5          I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter, Federal Certified Realtime

8    Reporter, and Certified Realtime Reporter, do hereby certify

9    that I reported by machine shorthand the foregoing proceedings

10   contained herein on the aforementioned subject on the date

11   herein set forth, and that the foregoing pages constitute a

12   full, true and correct transcript.

13

14          Dated this 11th day of May, 2021.

15

16

17

18                              /s/ *Janet Davis*

19                              _____

20                              *JANET DAVIS, RDR, FCRR, CRR*
                                *Federal Official Court Reporter*

21

22

23

24

25