1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF WYOMING
_____
3
UNITED STATES OF AMERICA,        DOCKET NO. 20-CR-045-F
4
           Plaintiff,            Volume III
5                                Pages 1 - 154
           vs.
6
CODY DONOVAN SMITH,              Cheyenne, Wyoming
7                                May 12, 2021
           Defendant.           8:30 a.m.
8    _____

                    TRANSCRIPT OF TRIAL PROCEEDINGS
9
              BEFORE THE HONORABLE NANCY D. FREUDENTHAL
10                 UNITED STATES DISTRICT JUDGE
               and a jury of twelve and two alternates
11

12

13

14

15

16

17

18

19

20

21            JANET DAVIS, RDR, FCRR, CRR
              Federal Official Court Reporter
22    2120 Capitol Avenue, Room 2226, Cheyenne, WY  82001
              307.314.2356 * jbd.davis@gmail.com
23

24    Proceedings reported by stenotype reporter; transcript produced
      with Computer-Aided Transcription.

25

APPEARANCES:

For the Plaintiff:          CHRISTYNE M. MARTENS
                            Assistant United States Attorney
                            District of Wyoming
                            100 East B Street, Suite 2221
                            Casper, WY  82604

                            NICOLE M. ROMINE
                            Assistant United States Attorney
                            District of Wyoming
                            2120 Capitol Avenue, Fourth Floor
                            Cheyenne, WY  82001

For the Defendant:          JEREMY J. HUGUS
                            Platte River Law Firm
                            536 South Center Street
                            Casper, WY  82601

                            ALEXANDER FREEBURG
                            Freeburg Law
                            P.O. Box 3442
                            Jackson, WY  83001

1    (Proceedings reconvened 8:39 a.m., May 12, 2021.)

2            THE COURT:  Please be seated.

3            We're back on the record in United States versus Cody

4    Donovan Smith, Docket 20-CR-45, with the jury present.

5            Roll call is waived.

6            Counsel and their clients are here.

7            The Government may call its next witness.

8            MS. MARTENS:  Thank you, Your Honor.

9            As a preliminary matter, I would like to move for the

10   admission of what I've marked as Government Exhibit 1002 which

11   is the second joint stipulation to evidentiary matters entered

12   by the parties.

13           THE COURT:  For the defendant?

14           MR. FREEBURG:  No objection, Judge.

15           THE COURT:  Government Exhibit 1002 is admitted.

16       (Government's Exhibit 1002 received.)

17           MS. MARTENS:  The government would like to call Hannah

18   Egbert.

19       (Witness sworn.)

20           COURTROOM DEPUTY:  Please take a seat.

21           Ma'am, can you please state and spell your name for

22   the record?

23           THE WITNESS:  Hannah Egbert, H-a-n-n-a-h, and then

24   E-g-b-e-r-t.

25

1    HANNAH EGBERT, PLAINTIFF'S WITNESS, DIRECT EXAMINATION

2    BY MS. MARTENS:

3    Q.  Ms. Egbert, how are you employed?

4    A.  Currently I am a missionary for my church, so I don't have

5    employment.

6    Q.  Are you a student?

7    A.  Not right now.

8    Q.  Have you been a student?

9    A.  Yes.

10   Q.  Where?

11   A.  I was a student at BYU Idaho.

12   Q.  When?

13   A.  Um, from the summer of 2019 to the spring of 2020.

14   Q.  So I want to talk about September 7, 2019.

15       Do you remember that day?

16   A.  Yes.

17   Q.  Do you know Hannah Bye?

18   A.  Yes.

19   Q.  How?

20   A.  She was my roommate.

21   Q.  How many roommates did you have?

22   A.  There were six of us.

23   Q.  About how long did you live with Ms. Bye?

24   A.  We were there for, I'm pretty sure, five weeks.  We were

25   there for the semester.

1   Q.  On the evening, or anytime on the day of September 7th, did

2   you talk to Ms. Bye about her plans?

3   A.  Yes.

4   Q.  What did she say?

5   A.  She said she was going to go out with someone just for --

6   to get some food.

7   Q.  And did she explain anything else about her plans that

8   night?

9   A.  No.

10          MR. FREEBURG:  Objection, Judge.  Hearsay.

11          And, Your Honor, given the answer, I will withdraw the

12  objection.

13          THE COURT:  All right.  Thank you.

14          The answer will stand and the objection is withdrawn.

15  BY MS. MARTENS:

16  Q.  Did she talk to you at all about Yellowstone?

17  A.  She said she was going to go --

18          THE COURT:  Ma'am, the answer to that would be yes or

19  no.

20          THE WITNESS:  Okay.  Yes.

21          THE COURT:  All right.

22          MS. MARTENS:  Thank you, Your Honor.

23  BY MS. MARTENS:

24  Q.  What did she say?

25          MR. FREEBURG:  Objection, Judge, hearsay.

1        THE COURT:  I would ask -- I would sustain the

2   objection.

3        Perhaps you could rephrase.

4        MS. MARTENS:  Your Honor, if I may, statements of

5   someone's then-existing mental intention are an exception to

6   the hearsay rule.

7        THE COURT:  If you could ask her for her impression,

8   I'm not sure if --

9        MS. MARTENS:  Sure, I can rephrase.

10  **BY MS. MARTENS:**

11  Q.  Did Ms. Bye explain any plans with regard to Yellowstone

12  National Park?

13       MR. FREEBURG:  Objection, hearsay.

14       THE COURT:  I'll overrule it.

15       Again, ma'am, that's a yes or no.

16       THE WITNESS:  Yes.

17  **BY MS. MARTENS:**

18  Q.  And what did she say about those plans?

19       MR. FREEBURG:  Objection, hearsay.

20       THE COURT:  I would sustain the objection.

21       Ms. Egbert, what was your impression?  What did you

22  understand your roommate was going to do in relation to her

23  plans?

24       THE WITNESS:  She said that she was going to go --

25       THE COURT:  What did you understand?

1    THE WITNESS:  That she was going to go to Yellowstone

2  later in the week, like later in the days, and spend the time

3  in Yellowstone.

4  **BY MS. MARTENS:**

5  Q.  Did you understand her to have any intention to go to

6  Yellowstone that night?

7  A.  No.

8  Q.  Did you understand her to have any intention to be out

9  overnight?

10 A.  No.

11 Q.  What did you do that night?

12 A.  Um, Ellie and I watched a movie.

13 Q.  And what did you do after that?

14 A.  We went to bed.

15 Q.  Did you ever try to contact Ms. Bye?

16 A.  That night?

17 Q.  That night.

18 A.  No.

19 Q.  The following morning?

20 A.  Yes.

21 Q.  Do you remember about when that was?

22 A.  It was really early morning, around 5:00.

23 Q.  And why did you do that?

24 A.  Um, one of the roommates realized that she wasn't there

25 that morning, and so we were worried.

1  Q.  What did you do next?

2  A.  We called -- contacted the police and a local bishop from

3  our church and our parents.

4  Q.  After that, did you have any way to figure out how or where

5  she was?

6  A.  Snapchat.

7  Q.  Can you explain a little bit about how Snapchat works?

8  A.  So with Snapchat, if you send a text message to someone and

9  they answer, on the map it can locate where they are, and

10 that's how we got -- found out where Hannah was.

11 Q.  And do you know where Hannah was?

12 A.  She was in Yellowstone.

13 Q.  Were you able to communicate with her using Snapchat?

14 A.  Yes.

15 Q.  What did she say to you?

16      MR. FREEBURG:  Objection, hearsay.

17      MS. MARTENS:  Your Honor, these are excited

18 utterances.

19      MR. FREEBURG:  Objection, lack of foundation and

20 hearsay.

21      THE COURT:  I will sustain that objection.

22 BY MS. MARTENS:

23 Q.  After you located her on Snapchat, what did you do?

24 A.  We, um, contacted Miranda's brother to come and assist us,

25 and -- when she got to wherever she was going.

1   Q.   Did you know where that was?

2   A.   Where -- where she was currently?

3   Q.   Going?

4   A.   We knew that they were going to drop her off in Rexburg

5   somewhere.

6   Q.   So what did you do?

7   A.   Um, we had people -- or we had a roommate just kind of keep

8   in contact with her and had Ellie going to go find her through

9   the car, if that makes sense.

10  Q.   Yes.  So who all was in the car?

11  A.   I'm not sure.  I know Ellie was the driver, though.

12  Q.   But you were not in the car?

13  A.   I stayed in the apartment complex at the window to see if

14  Cody would drop off Hannah at the complex.

15  Q.   When did you next see Ms. Bye?

16  A.   At the police office.

17  Q.   And did you -- did you observe her demeanor?

18  A.   She was shaken up.

19  Q.   When -- what did you do next that day?

20  A.   After the police officer had released her, we went to

21  Brynn's parents' house.

22  Q.   Did you stay with her for a while that day?

23  A.   I did.

24  Q.   About how long?

25  A.   Um, pretty much the whole day.

1   Q.  How was her demeanor the rest of the day?

2   A.  She was tired, very shaky and confused the whole time,

3   didn't really know, like -- kind of in shock.

4   Q.  Did you observe any injuries on Ms. Bye?

5   A.  I did not see any, but what she's told me.

6   Q.  I want to ask you a couple more questions about Snapchat.

7   A.  Uh-huh.

8   Q.  How many different ways can you communicate with it?

9   A.  You can text message, video call and send pictures.

10  Q.  Do you know if -- well, when you send those pictures, how

11  does that work?

12  A.  Uh-huh, you take a picture and you can send a message,

13  like, in it, and then you send it to them and then they can

14  click on it and see it and vice versa.

15  Q.  And what happens with that picture?

16  A.  It can erase, and if you don't screenshot it or take a

17  picture of it, it will just disappear.

18  Q.  What's a screenshot?

19  A.  Where you hold the power button and the volume button and

20  it captures it on the phone.

21  Q.  Does Snapchat do anything when you take a screenshot?

22  A.  It notifies the other person.

23  Q.  Do you know if anyone attempted to capture the Snapchats

24  that Ms. Bye was sending?

25  A.  We took pictures from another phone of the Snapchat

1   messages she was sending us because we didn't want her to get

2   notified.

3   Q.  When you were doing that, were you aware of Ms. Bye's

4   state?

5   A.  No.

6           MS. MARTENS:  May I have a moment, Your Honor?

7           THE COURT:  Yes.

8       (Discussion held at prosecution table.)

9           MS. MARTENS:  No further questions, Your Honor.

10          THE COURT:  All right.  Thank you.

11          Counsel for defendant.

12                      **CROSS-EXAMINATION**

13  **BY MR. FREEBURG:**

14  Q.  Good morning, ma'am.  My name is Alex Freeburg.  I'm one of

15  Cody Smith's attorneys.  I will be asking you a few questions,

16  okay?

17  A.  Yes.

18  Q.  If at any time you don't understand me, just let me know,

19  okay?

20  A.  Okay.

21  Q.  And because we're making a record, you will have to speak

22  up just a bit.

23  A.  All right.

24  Q.  Great.

25          So did you and Ms. Bye share a room?

1  A.  We did not.

2  Q.  Which roommate shared a room with Ms. Bye?

3  A.  Miranda.

4  Q.  Now, I want to talk about your understanding of Ms. Bye's

5  plans that you testified to a minute ago.

6        Did you ever see Ms. Bye's Tinder conversation with

7  Mr. Smith?

8  A.  No.

9  Q.  And do you know if Tinder is like Snapchat and the messages

10 disappear, or are there still Tinder messages, or do you know?

11 A.  I've never used Tinder.

12 Q.  If someone in your age group -- excuse me -- uses the

13 word "bet," B-E-T, in text, let's say, "Do you want to get ice

14 cream?" and someone responds "bet" that means yes, doesn't it?

15 A.  Yes.

16 Q.  Thank you.  And you don't know if Mr. Freeburg ever

17 said "bet, I'll go to Yellowstone"?

18 A.  I do not know.

19 Q.  At 11:47 you texted Ms. Bye; is that right?

20 A.  At nighttime?

21 Q.  Yes, 11:47, the evening of the date or encounter.

22 A.  Yes.

23 Q.  Okay.  And the time of 11:47 is significant because what's

24 the honor code -- excuse me -- what's the curfew at BYU?

25 A.  The building shuts down and you would have to get locked --

1    have permission to get back into the complex.

2    **Q.** What does it mean the building shuts down and you would

3    have to get permission to get back into the complex?

4    **A.** Meaning the doors lock and you would have to put your pin

5    to get in.

6    **Q.** And the pin is associated with, I suppose, the student's

7    name, correct?

8    **A.** Yes.

9    **Q.** And so is it your understanding that if someone puts in

10   their pin after midnight, that there may be an honor code

11   investigation of a curfew violation?

12   **A.** Yes.

13   **Q.** Is it also your understanding that the honor code

14   violations can result in punishments to the students?

15   **A.** Yes.

16   **Q.** In fact, one punishment of an honor code violation is being

17   expelled, isn't it?

18   **A.** I'm not sure.

19   **Q.** Would it be an honor code violation at BYU Idaho for a

20   student to go voluntarily overnight camping with a member of

21   the opposite sex?

22   **A.** It is a violation.

23   **Q.** If you know of an honor code violation of a roommate and

24   you fail to report it, wouldn't you also potentially be

25   involved in your own honor code violation for failing to report

1  something you knew about?

2  A.  If I knew about it, yes.

3  Q.  When you texted Ms. Bye at 11:47, you texted her, "You

4  good, Hannah?"  Isn't that right?

5  A.  Yes.

6  Q.  Isn't it true that she responded, "Yeah"?

7  A.  I do not remember the text message.

8  Q.  I would like to show you something that's been previously

9  presented as Exhibit 100.

10        MR. FREEBURG:  If I may have control to present?

11        MS. MARTENS:  Page, counsel?

12        MR. FREEBURG:  It is 152.

13  BY MR. FREEBURG:

14  Q.  I will represent to you -- ma'am, can you -- can you see

15  this okay?  Let me just be fair.  Can you see this okay?

16  A.  I can see it, but I don't understand it.

17  Q.  And I will represent to you what it is.

18  A.  Okay.

19  Q.  This is data from Ms. Bye's cell phone that's been admitted

20  in this case.

21        And if you look at the very bottom, do you see in

22  the -- in the right three columns where it says:  "From Hannah

23  Egbert" and there's a number 2441 -- excuse me -- 2441.  Do you

24  see that column?

25        MS. MARTENS:  Counsel, I object.  That misstates

1  what's being displayed.

2          MR. FREEBURG:  Let me do it with the call --

3          THE COURT:  I will permit at least counsel to finish

4  his question.

5          If you could begin again, Mr. Freeburg.  I apologize

6  for the interruption.

7          THE WITNESS:  Okay.

8  **BY MR. FREEBURG:**

9  Q.  So now do you see what's been highlighted on here?

10 A.  Yes.

11 Q.  Do you see -- and let's move from left to right.

12         Do you see log number 35195?

13 A.  Yes.

14 Q.  And then if you skip over several columns, you see a time,

15 2347?

16 A.  Correct.

17 Q.  And then in the next column, it says:  "From," and then

18 "2441."

19 A.  Uh-huh.

20 Q.  Is 2441 the last four digits of your phone number?

21 A.  Yes.

22 Q.  And is -- well, and then below that it is your name, isn't

23 it?

24 A.  Correct.

25 Q.  Do you recognize the other names on that document as your

1  roommates, Ms. Bye -- and I apologize, first name only, Brynn,
2  Miranda Foote and Sarah Romao?
3  A.   Yes.
4  Q.   And then do you see where it says, "You good, Hannah?"
5  A.   Yes.
6  Q.   That would be the message you sent to Hannah?
7  A.   Correct.
8  Q.   Okay.  Now I'm going to attempt to show you Ms. Bye's
9  response.
10        Let's do the same sequence.  And I think I cut off,
11  but do you see the timestamp of 2348?
12  A.   Yes.
13  Q.   And do you see a response:  "Yeah, I'm good"?
14  A.   Yes.
15  Q.   Is that what your memory is of Ms. Bye's response?
16  A.   Yes.
17  Q.   Ms. Romao's question comes a moment later at 2349:  "Did
18  you kiss him yet?"
19        Do you see that question?
20  A.   Yes.
21  Q.   What did you think of that question?
22  A.   I have no thoughts on it.
23  Q.   While you were on Snapchat, Ms. Bye sent you a photo,
24  correct?
25  A.   I'm not sure it was me or Miranda.

1   Q.  Understood.

2        You previously testified that you saw photos, multiple

3   photos, from Ms. Bye; isn't that right?

4   A.  I did see a photo of hers once, yes.

5        MR. FREEBURG:  Judge, may I approach to set up an

6   exhibit?

7        THE COURT:  Yes.

8   BY MR. FREEBURG:

9   Q.  Did Ms. Bye send you this photo via Snapchat?

10  A.  I don't know.

11  Q.  Did Ms. Bye send you this photo via Snapchat?

12  A.  I don't remember.

13  Q.  If you had seen those photos, isn't it true you never would

14  have called 911?

15  A.  Yes.

16        MR. FREEBURG:  Judge, may I have a moment with

17  co-counsel?  And I will put the photos down.

18        THE COURT:  Yes.

19     (Discussion held between defense counsel.)

20        MR. FREEBURG:  No further questions, Judge.  And I'll

21  retrieve my belongings.

22        THE COURT:  Any redirect from the Government?

23        MS. MARTENS:  None, Your Honor.

24        THE COURT:  All right.  Any objection to excusing and

25  releasing Ms. Egbert?

1        MS. MARTENS:  None, your Honor, from the Government.

2        THE COURT:  Any from the defendant?

3        MR. HUGUS:  No, Judge.

4        THE COURT:  Thank you, Ms. Egbert.

5        By the way, where are you doing your mission work?

6        THE WITNESS:  I'm in South Carolina.

7        THE COURT:  Good.  I hope it's going well for you.

8   Thank you for your time here today.  You're excused and

9   released.

10       THE WITNESS:  Thank you.

11       THE COURT:  The Government may call its next witness.

12       MS. MARTENS:  The Government would like to call Elna

13  Perkins.

14     (Witness sworn.)

15       COURTROOM DEPUTY:  Please take a seat.

16       Ma'am, can you please state and spell your name for

17  the record?

18       THE WITNESS:  My name is Elna Perkins, E-l-n-a,

19  P-e-r-k-i-n-s.

20     **ELNA PERKINS, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

21  **BY MS. MARTENS:**

22  Q.  Ms. Perkins, what's your current occupation?

23  A.  I'm a student and a teaching assistant.

24  Q.  Where at?

25  A.  At Brigham Young University Idaho.

1   Q.  Were you a student in the fall of 2019?

2   A.  I was.

3   Q.  Where were you living?

4   A.  I was living in Center Square.

5   Q.  Who were you living with?

6   A.  Um, I was living with Maddie Davis, Valerie Chavez, and

7   Emily Larson.

8   Q.  I think -- is that your fall semester roommates?

9   A.  Yes.

10  Q.  How about the summer semester roommates in September of

11  2019?  I apologize.

12  A.  I was a little confused.  I was, like, what is -- okay.

13          My summer roommates were Miranda Foote, Hannah Bye,

14  Hannah Egbert, Brynn Leatham -- is that five -- and Sarah

15  Romao.

16  Q.  Do you remember September 7, 2019?

17  A.  I do.

18  Q.  Did you form any impression as to Ms. Bye's plans for that

19  day?

20  A.  Um, we knew she was going on a date with a co-worker, and

21  then in the evening she later told us that she was going to go

22  get food at McDonald's with a different guy.

23  Q.  Did you understand her to intend to be out all night?

24  A.  No.

25  Q.  Did you form any plan with her about a ride?

1  A.  She had come into my room before she left for McDonald's

2  with the guy, and asked if she needed a ride if I would give

3  her one.  And I told her to text me when she was ready to be

4  picked up, and then I would come get her.

5  Q.  What did you do the rest of that evening?

6  A.  Um, I finished my homework, and then I watched a couple

7  movies with some of the rest of my roommates.

8  Q.  At any point in the evening, did you begin to wonder where

9  Ms. Bye was?

10  A.  Yes.  We actually texted her a little before midnight

11  because midnight is curfew at BYU Idaho, so we're supposed to

12  be back in our apartments.  So we were just kind of wondering

13  where she was.  And at the time, she told us she was okay, but

14  then she stopped responding to texts after that, so -- yeah.

15  Q.  What did you do next?

16  A.  Um, I stayed up until about 3:00 in the morning, kind of

17  sort of waiting for a text still, to see if I needed to pick

18  her up and calming myself down type of thing because she still

19  wasn't responding.

20       And then I went to bed, and that was it for the night.

21  Q.  When did you wake up?

22  A.  I woke up when, um, Miranda came in and woke Sarah and me

23  up.  Sarah was my roommate, so she woke us both up after she

24  had woken up Hannah Egbert and Brynn in the other room.

25  Q.  What happened next?

1  A.  As soon as Sarah woke up, she said, "We should call the

2  police," and so --

3           MR. FREEBURG:  Objection, Judge.  Hearsay.

4           MS. MARTENS:  Your Honor, this is offered for the

5  effect of the hearer.

6           THE COURT:  I would agree and overrule the objection.

7  This -- the testimony is offered for the impact on the hearer.

8  Consequently, it's not offered for the truth of the statement.

9           You can go -- you can continue, or you can loop back

10 to fully respond.

11          THE WITNESS:  Okay.  What was the question again?  I'm

12 sorry.  I forgot.

13 **BY MS. MARTENS:**

14 Q.  All right.  I was asking what happened next after you were

15 woken up?

16 A.  Um, yeah.  So Hannah said we should call the police, and so

17 we called the police.

18 Q.  Who made that phone call?

19 A.  I did.

20 Q.  Have you had an opportunity to review the recording of that

21 phone call?

22 A.  Yes, I did.

23 Q.  Was it an accurate representation of the conversation from

24 that morning?

25 A.  I believe so.

1     MS. MARTENS:  Your Honor, at this time, I'd move for

2  admission of Government's Exhibit 300, which is the 911 call.

3     MR. FREEBURG:  No objection, Judge.

4     THE COURT:  Government Exhibit 300 is admitted.

5   (Government's Exhibit 300 received.)

6     MS. MARTENS:  Ms. Wait, can you cue that up?

7   (Government Exhibit 300 played.)

8     MS. MARTENS:  May I have just a moment, your Honor?

9     THE COURT:  Yes.

10  (Government Exhibit 300 played.)

11 BY MS. MARTENS:

12 Q.  After you called 911, what did you do?

13 A.  Um, as roommates, we all were kind of trying to distract

14 ourselves from what was going on.  We were also trying to track

15 down people she would know, like her mom and things to let them

16 know what was going on.

17     We watched -- I think we watched a movie.  I know we

18 tried to, and we were trying to wait for more information to

19 come by.  We were waiting for her to come home or getting some

20 kind of text or call from her.

21     We continued trying to reach out to her.

22     Eventually one of us -- I don't remember which one it

23 was, but one of us thought of the fact that Snapchat has a like

24 map my friend function type of thing, if certain settings are

25 on.

1    So Hannah Egbert checked and saw that Hannah Bye was

2   in Yellowstone or near Yellowstone.  That was the last place

3   her Snapchat location had pinged her at.

4   Q.  And how did that make you feel?

5   A.  We were pretty upset --

6    THE COURT:  Wait a minute.

7    MR. FREEBURG:  Objection.

8    THE WITNESS:  Sorry.

9    MR. FREEBURG:  Relevance, Judge.

10    THE COURT:  Overruled.

11    You may answer.

12   A.  We were upset because we had known that this particular guy

13   had asked Hannah to go camping, and she had specifically told

14   him no, but that they would be able to go get food at

15   McDonald's.  And she wasn't dressed for camping, so we were

16   worried about like her safety and her health.  So it just -- it

17   upset us a lot.

18   BY MS. MARTENS:

19   Q.  So what did you do next?

20   A.  We called the police again and let them know that that was

21   where she was and then we just kept on waiting for either them

22   to -- like, the police to do something or something to happen

23   in the national park, or a call or text from Hannah to let us

24   know that she was okay.

25   Q.  Did you ever receive a call or text from Hannah?

1  A.  Um, eventually, yes, we did.  She texted, the first thing

2  she texted us was "I'm never online dating begin."  And that

3  immediately told us that something really wrong happened, and

4  so we, again, called the police to let them know that she had

5  contacted us.

6          Um, and then we started trying to figure out what to

7  do next and decided that, like, after consulting with the

8  police, we were trying to get his license plate number.  We

9  asked Hannah what kind of car he was driving.  We found out

10 what kind of car he was driving, that it was a Florida license

11 plate and things like that.  And so two of us had cars, and we,

12 like, set up a way that we could --

13 Q.  So who had cars?

14 A.  I had a car and Brynn Leatham had a car.

15          And so we -- when we're trying to set up a way so that

16 we could get his license plate, Brynn was in her car on the

17 street, like, lined up on the street in case he just went past.

18 I was actually in the parking lot so that I could follow him,

19 if need be.  And Sarah was in the car with me to take the

20 pictures so that we were safe.  And he never came.

21          We found out that through Map My Friends on Snapchat

22 it kind of -- based on how fast you're moving -- shows whether

23 you're in a car or whether you're walking and all of a sudden

24 she was walking.  So we went to go find her.

25          It was over near kind of the center of campus.  We

1  lived on the south end of campus.  So we just kind of -- we

2  went to go find her.  I had Hannah -- sorry, not Hannah -- I

3  had Sarah in my car and Miranda in my car.  Brynn's phone was

4  dead so she didn't know what was going on until Hannah Egbert

5  came and told her.  And we also had recruited two -- Miranda's

6  brother and one of his roommates to, like, walk around and try

7  to get the license plate as well, and so they were both in my

8  car as well.  We picked them up on our way out of the parking

9  lot to go pick up Hannah.

10        And then we went to -- headed toward the police

11  station once we picked her up.

12  Q.  Once you picked her up -- well, first of all, were you

13  driving?

14  A.  I was, yes.

15  Q.  Once you picked her up, did you have any opportunity to

16  observe her demeanor?

17  A.  I was only really able to hear her voice because of where

18  she got in the car.  She was directly behind me, so I couldn't

19  just, like, look back and see what she looked like,

20  necessarily.  But I can tell you that her voice was panicked,

21  especially once we told her that we were taking her to the

22  police station.  And also, when we happened to see Cody filling

23  up his gas tank at the Maverick on the way down past -- or on

24  Second Street like past -- like going towards the police

25  station.

1  Q.  What happened once you got to -- excuse me.

2      What happened once you got to the police station?

3  A.  Once we got there, um, it was a Sunday morning so the

4  police station was closed, so we had to go out inside like a

5  side door because we had been in contact with them, they

6  unlocked the door for us.  But they only wanted to talk to

7  Hannah Bye, even though she expressed an interest in having one

8  of us in there with her.

9      And so we all waited outside while Hannah was filling

10  in the rest of what happened to the police officer.

11  Q.  I want to back up just a little bit.

12      MS. MARTENS:  Ms. Wait, would you display Government

13  Exhibit 203, which I believe has been previously received in

14  evidence.

15  BY MS. MARTENS:

16  Q.  Do you recognize that photo?

17  A.  Yes.  So that was the reason why Miranda was in my car,

18  actually.  So Miranda and Hannah Egbert were both in the

19  apartment kind of organizing everything, and the next thing I

20  know is Miranda is running out of the apartment complex toward

21  my car without shoes on and she's like, "Hannah just sent me

22  this Snapchat" -- or she had sent -- she had sent a Snapchat

23  before.  I didn't get a picture of it because Hannah -- or

24  Miranda had already opened it.  Snapchat the pictures are only

25  available for like ten seconds.

1          But this was what she sent shortly thereafter when

2    Miranda was already in my car.  So this is Miranda's phone and

3    I had taken a picture of it.

4    Q.  So you didn't get the one before?

5    A.  I did not.

6    Q.  So when you picked her up, we talked a little bit about her

7    demeanor and you said she sounded panicked.

8    A.  Uh-huh.

9    Q.  Did her demeanor change at all on the drive to the police

10   station?

11   A.  No, not really.  She didn't really want to go to the police

12   station.  She wanted to kind of put everything behind her and

13   not bother with it.  She wanted to kind of forget what

14   happened.  And she never wanted to see Cody again, so she

15   expressed that in the car, that she never wanted to see Cody

16   again, and she knew that if she did go to the police, then she

17   would have to -- potentially have to see him again.

18          But since we had already been in contact with the

19   police, we were like, "Sorry, you have to go," unfortunately.

20   Q.  Did she ever ask for anyone to go into the police station

21   with her?

22   A.  If I'm honest, I don't remember specifically, but I know

23   that plenty of us had said something, like asked if we should

24   go in with her, and she seemed like she wanted it, but the

25   officer wouldn't let us in.

1  Q.  Were you with her in the days following?

2  A.  So after the police station, she went with the other Hannah

3  and Brynn to Brynn's house that was like 12 minutes down the

4  road.  And the rest of us went to church.  But she did come

5  back that evening, and we were together that evening and the

6  next day we were all together.

7  Q.  Did you finish your summer semester living together?

8  A.  Yes.

9  Q.  And during that time did you observe her demeanor?

10  A.  Yeah.  So Sunday and part of Monday, at least part of

11  Monday, she was really reserved, she wouldn't really talk to

12  any of us very much, at least when she was home, like in the

13  apartment.

14         She mostly stayed in her room which was a little

15  abnormal for her.  She was more social, so she liked to do

16  things or, like, interact with people.  Um, and she just -- she

17  was very different, very tired, kind of anxious, kind of, you

18  know, like -- it seemed like she was having a hard time to us.

19         MS. MARTENS:  Your Honor, may I have just a moment?

20         THE COURT:  Yes.

21     (Discussion held at prosecution table.)

22         MS. MARTENS:  I have no further questions for this

23  witness, your Honor.

24         THE COURT:  For the defendant.

25

### CROSS-EXAMINATION

**BY MR. FREEBURG:**

Q.   Good morning, ma'am.  My name is Alex Freeburg.  I'm one of
Cody Smith's attorneys, and I will be asking you a few
questions, okay?

A.   Okay.

Q.   If at any time you can't understand me, please let me know,
all right?

A.   Yes, sir.

Q.   So a moment ago you testified that Ms. Bye told you or
indicated to you or you understood from Ms. Bye -- that's the
way it was -- you understood from Ms. Bye that there was no way
she was going to Yellowstone?

A.   Yes, sir.

Q.   So you understood the plan was for Mr. Smith to drive two
and a half hours from Yellowstone, meet her at McDonald's and
drive two and a half hours back, and then see her the next day
or not at all?

A.   So we did not know where he was at at this point.  We
didn't know anything --

Q.   And let's be specific.  When you say "we," you're talking
about yourself, right?

A.   Me and the rest of the roommates.

Q.   Because you didn't know anything because you weren't part
of any Tinder conversations, right?

1  A.   That's correct.

2  Q.   So you don't know what Ms. Bye and what Mr. Smith actually

3  talked about via text message in Tinder; isn't that true?

4  A.   That would be correct, yes.

5  Q.   And you indicated that Ms. Bye did not want to go to the

6  police station, right?

7  A.   That is correct.  She did not want to.

8       (Discussion held between prosecutor and defense counsel.)

9  BY MR. FREEBURG:

10 Q.   Isn't it true that Ms. Bye told you that she could handle

11 herself if he try anything, if Mr. Smith tried anything?

12 A.   There was a text, I believe, about it, that -- it does

13 sound familiar.  I don't remember specifically that happening,

14 but it sounds familiar.

15 Q.   I'm going to present to you an exhibit marked as 200, and

16 it is page 159.

17      I will represent to you that this is -- that this is

18 data from Ms. Bye's cell phone.

19      And let's look at that first message starting with the

20 top left column where it says "35266, SMS messages."

21      Do you see that?

22 A.   Yes, sorry.  I was looking in the wrong spot.  Yes.

23 Q.   Okay.  And let's move from left to right.

24      Do you see a time at 8:32 a.m.?

25 A.   Yes.

1  Q.  Do you see that there was a text message:  "That's okay.

2  Did the dude tried anything?"

3  A.  Yes, I see that.

4  Q.  And then do you see down below -- let's skip down one text

5  message where Ms. Bye says, "I will explain when I get back,"

6  correct?

7  A.  That is correct.

8  Q.  "I will explain when I get back"; she's not telling you she

9  needs to go to the police station immediately, right?

10  A.  That wasn't what we understood because we had already been

11  in contact with the police.

12  Q.  That's right.  You had already contacted the police before

13  Ms. Bye said to you, "I'll explain when I get back," and

14  moments later, "Of course he did," meaning of course he tried

15  something, "But I can definitely handle myself"?

16  A.  Yes.

17  Q.  She also said she would never go online dating again; isn't

18  that right?

19  A.  That was the text that she had sent us, yes.

20  Q.  You saw Snapchat messages from her?

21  A.  Yes, I did.

22  Q.  And you saw -- well, that Snapchat photograph we first

23  talked about or that the prosecutor talked about,

24  Exhibit 203 --

25  A.  Yes.

1   Q.  -- that's the message where the caption is:  "I'm scared"?

2   A.  Yes, I believe that was the message.

3   Q.  And that caption at least matches her face to you?  She

4   looked scared to you; isn't that true?

5   A.  She looks terrified to me.

6          MR. FREEBURG:  Judge, may I approach and set up an

7   exhibit?

8          THE COURT:  Yes.

9   BY MR. FREEBURG:

10  Q.  I will represent to you that these were photos that there

11  has been testimony about that they were from Ms. Bye's

12  Snapchat.

13         Did she send you this photo with the caption:  "I am

14  scared"?

15  A.  She did not.

16  Q.  Did she send you this photo as part of her Snapchat

17  messages?

18  A.  She did not.

19  Q.  How about this photo with the peace sign?  Did she also

20  send that photo to you as part of her Snapchat messages?

21  A.  She did not.

22  Q.  Isn't it true that if you had seen those photographs from

23  her by Snapchat, you would not have told her -- if she -- if

24  you had seen these photographs from her, you would not have

25  been concerned about her; isn't that right?

1  A.  I'm not sure.  I only say that because we -- some of us

2  felt like something was wrong as soon as she stopped responding

3  to our text messages.

4        So the fact that we felt like something was wrong, um,

5  like all of us as a collective felt like something was wrong,

6  um, would have concerned us a little bit.  Seeing these

7  pictures, I don't know what I would have done in the situation

8  because it wasn't the situation that happened.

9  Q.  Let me ask you this:  There was text correspondence with

10  Ms. Bye at approximately 11:47, about ten minutes before the

11  curfew?

12  A.  This is correct.

13  Q.  And she told you in the group chat that she was okay at

14  about ten minutes before the curfew.  You remember that, right?

15  A.  This is true.

16  Q.  If this -- if you had gotten this photo at 12:30 when it

17  was taken, would you have -- you would not have been concerned

18  about her being kidnapped, but you may have been concerned

19  about her violating the curfew; isn't that right?

20  A.  I feel like that would be correct.  I still would have been

21  concerned about her health because of how she's dressed.

22        MR. FREEBURG:  Thank you, Judge.  And if I can have a

23  moment to look at my counsel.

24     (Discussion held between defense counsel.)

25        MR. FREEBURG:  And, Judge, I have no further

1  questions.  And I can remove these.

2          THE COURT:  All right.  Please do.

3          Any redirect from the Government?

4          MS. MARTENS:  Yes, your Honor.

5          THE COURT:  All right.

6                    **REDIRECT EXAMINATION**

7  **BY MS. MARTENS:**

8  **Q.**  Ms. Perkins, so while you were roommates with Ms. Bye, did

9  you get a pretty good opportunity to get to know her?

10  **A.**  All of my classes were online, so I was always at the

11  apartment.  So whenever she was at the apartment, I was able to

12  interact with her, yes.

13  **Q.**  Is she -- does she always have emotionally appropriate

14  responses?

15  **A.**  No, she did not.

16  **Q.**  Can you describe that a little bit?

17  **A.**  So she was 18, and so she would --

18          MR. FREEBURG:  Judge, objection.  701, 702, and also

19  foundation -- well, 701, 702.

20          MS. MARTENS:  Your Honor, I can lay a little more

21  foundation.

22          THE COURT:  All right.

23  **BY MS. MARTENS:**

24  **Q.**  So you mentioned that you were at the apartment, and you

25  spent some time with her.

1   Did you observe her over the course of living with

2   her?

3   A.  Yes.

4   Q.  And did you observe her in various events?

5   A.  Yes, I believe I did.

6   Q.  Did she express happy feelings to you?

7   A.  Yes.

8   Q.  How about sad feelings?

9   A.  Yes.

10  Q.  Angry feelings?

11  A.  Oh, yes.

12  Q.  Did you develop a sense of Hannah as a person and how she

13  expressed her feelings?

14  A.  I felt like I did.

15  Q.  So could you describe how it was in your impression that

16  you felt some of her reactions were sort of socially

17  inappropriate or didn't necessarily align with how -- what you

18  might expect folks to express emotions?

19  A.  There was a level of immaturity in the cases when she would

20  be uncomfortable.  She would laugh at weird times or try to

21  make light of a situation that wasn't light.  And that was a

22  pretty often scenario, or a scenario that happened quite often.

23  Q.  So maybe the kind of thing where she would smile even

24  though she wasn't happy?

25  A.  Definitely.

1  Q.  Laugh at times other people might cry?

2  A.  Yeah.

3          MS. MARTENS:  Your Honor, I have no further questions

4  for this witness.

5          THE COURT:  All right.  Any objection to excusing and

6  releasing --

7          MR. FREEBURG:  No, your Honor.

8          THE COURT:  -- Ms. Perkins?

9          Ms. Perkins, thank you very much for your testimony

10  today.  You're excused and released.  Safe travels.

11          MS. MARTENS:  And, your Honor, just for clarity, this

12  witness is also under subpoena by the defense.  I just want to

13  make sure we're covering both subpoenas.

14          THE COURT:  Any objection to releasing her from the

15  defendant's subpoena?

16          MR. FREEBURG:  No objection, Judge.

17          THE COURT:  All right.  You're released from both.

18          Thank you.

19          MS. MARTENS:  Thank you, your Honor.

20          THE COURT:  The Government may call its next witness.

21          MS. ROMINE:  Your Honor, the Government calls Keith

22  Milks.

23      (Witness sworn.)

24          COURTROOM DEPUTY:  Please take a seat.

25          Sir, can you please state and spell your name for the

1    record?

2           THE WITNESS:  My name is Keith Alan Milks, K-e-i-t-h

3    A-l-a-n M-i-l-k-s.

4     **KEITH ALAN MILKS, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

5    **BY MS. ROMINE:**

6    **Q.**  Sir, are you employed?

7    **A.**  I am.

8    **Q.**  Where are you employed?

9    **A.**  I'm a sergeant with the Howe, H-o-w-e, Police Department in

10   Grayson County, Texas.

11   **Q.**  How long have you been employed there?

12   **A.**  Six years.

13   **Q.**  What's your position?

14   **A.**  I'm a detective.

15   **Q.**  And in that position, what are your duties?

16   **A.**  I investigate violent crimes.

17   **Q.**  Have you received any training for that position?

18   **A.**  Yes, ma'am.

19   **Q.**  Could you summarize that training for the Court.

20   **A.**  Interrogation and interview techniques, crime scene

21   analysis, evidence collection.

22           MR. FREEBURG:  Judge, objection, cumulative.

23           THE COURT:  I --

24           MR. FREEBURG:  Judge, may I explain?  Cumulative to

25   the stipulation that has been admitted as an exhibit in this

1  case.

2          THE COURT:  Thank you for that clarification.

3          Ms. Romine?

4          MS. ROMINE:  Your Honor, I don't believe the

5  stipulation applies to this witness.

6          THE COURT:  I'll overrule the objection for now, see

7  where the scope of the testimony leads us.

8  **BY MS. ROMINE:**

9  Q.  Did you become involved in an investigation involving Cody

10 Smith?

11 A.  I wasn't aware of his name until I got here, yes, but, yes.

12 Q.  How did you become involved in that investigation?

13 A.  An investigator from the National Park Service contacted

14 our agency and asked us to collect evidence, fingerprints and

15 biological evidence, DNA evidence, from a Howe resident.

16 Q.  And who was that Howe resident?

17 A.  Hannah Bye.

18         THE COURT:  Sir, you -- your pace of voice is pretty

19 quick.  If you could slow down the speed of your voice.

20         THE WITNESS:  I will.

21         THE COURT:  Thank you.

22 **BY MS. ROMINE:**

23 Q.  Did you ultimately comply with that request to collect

24 evidence from Ms. Hannah Bye?

25 A.  I did.

1    Q.   When did that occur?

2    A.   We received the request on April 2nd of 2020, and I

3    fulfilled the request on April 3rd.

4    Q.   Is there a general procedure you follow in collecting DNA

5    evidence?

6    A.   Um, it depends on the type of evidence there is.  In this

7    case, they were requesting a buccal swab, which is saliva, hair

8    follicles, hair strands and fingerprints.

9         I bring the individual in, identify her, make sure she

10   doesn't eat or drink anything for at least 30 minutes prior,

11   talk to her for a few minutes to put her at ease, and then I

12   collect the evidence.

13        I wear sterile gloves.  We air dry -- I collect the

14   buccal swab first with sterile Q-tips, cotton swabs inside of

15   her cheeks.  Let that air dry for ten minutes before I seal it.

16   Pretty standard.

17   Q.   Did you follow that procedure here with Ms. Hannah Bye?

18   A.   I did.

19   Q.   And did you ultimately collect --

20        MR. FREEBURG:  Judge, objection.  Cumulative to

21   paragraph 5 of the stipulation that's been -- I'm sorry, I

22   misunderstood.

23        THE COURT:  Is your objection withdrawn?

24        MR. FREEBURG:  It is, your Honor.

25        THE COURT:  All right.  Could you begin your question

1  again?

2           MS. ROMINE:  Thank you.

3  **BY MS. ROMINE:**

4  Q.  Did you ultimately collect DNA evidence from Ms. Hannah

5  Bye?

6  A.  Yes, ma'am.

7  Q.  And did you follow that process that you just described?

8  A.  Yes, ma'am.

9  Q.  How did you verify who you were collecting DNA from?

10  A.  Their state-issued Government ID card with a photo.

11  Q.  What did you do with that evidence after you collected the

12  DNA swabs?

13  A.  After I collected it, I sealed it for -- to mail it to the

14  FBI.  I locked it in a temporary evidence holding locker, which

15  is essentially an after-hours locker we keep until our evidence

16  technician can come in and retrieve it.

17           She came -- this happened on Friday afternoon, so on

18  Monday she came in.  We retrieved it, and that's when we mailed

19  it off.

20  Q.  Who was it mailed off to?

21  A.  The FBI lab in Florida.

22  Q.  Did you also collect hair follicles?

23  A.  I did.

24  Q.  I'm sorry?

25  A.  Yes, I did.

1   Q.  And you briefly discussed the process for doing that.  Did

2   you follow that process with Ms. Hannah Bye?

3   A.  I did.

4   Q.  What did you do with that evidence after you collected it?

5   A.  I -- after I collected the evidence, I put it into a

6   sterile evidence bag, sealed that bag, and put it in the same

7   locker.

8   Q.  And was the same process followed as far as making sure

9   that it got to the FBI laboratory that we discussed previously?

10  A.  Yes, ma'am.

11  Q.  And then, finally, what's the general process when you

12  collect fingerprints from somebody?

13  A.  We make sure they wash their hands.  We make sure they

14  completely dry their hands.  We use hand sanitizer, and then we

15  basically roll their fingers.  I think in this case, I wasn't

16  happy with the way the first set turned out, so I actually did

17  a second set because one of them was smeared.

18          And so I let those air dry, made sure they were

19  completely dry before I put those into an envelope and, again,

20  locked them until we could mail them off.

21  Q.  And, again, the same process we discussed before to make

22  sure they ended up at the correct laboratory?

23  A.  Yes, ma'am.

24          MS. ROMINE:  Your Honor, may I have one moment?

25          THE COURT:  Yes.

1        (Discussion held at prosecution table.)

2              MS. ROMINE:  Your Honor, I have no further questions

3    for this witness.

4              THE COURT:  Counsel for defense.

5              MR. FREEBURG:  No questions, Judge.

6              THE COURT:  Thank you, Sergeant, for your testimony.

7              Any opposition to excusing and releasing this witness?

8              MS. ROMINE:  None from the Government, your Honor.

9              MR. FREEBURG:  No, your Honor.

10             THE COURT:  You're excused and released.

11             THE WITNESS:  Thank you.

12             THE COURT:  Thank you.

13             The Government may call its next witness.

14             MS. ROMINE:  Your Honor, the Government calls Kimberly

15   Ley -- your Honor, let me adjust.  Actually, I will be calling

16   Timothy Orr.

17             THE COURT:  Oh, all right.

18        (Witness sworn.)

19             COURTROOM DEPUTY:  Please take a seat.

20             Sir, would you please state and spell your name for

21   the record?

22             THE WITNESS:  Timothy J. Orr, T-i-m-o-t-h-y, J.,

23   O-r-r.

24

25

1    **TIMOTHY J. ORR, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

2    BY MS. ROMINE:

3    Q.   Sir, are you employed?

4    A.   Yes.

5    Q.   Where are you employed?

6    A.   I'm currently a special agent with the FBI's Tampa division

7    in the Orlando RA.

8    Q.   How long have you held that position?

9    A.   I've been a special agent since 2008.

10   Q.   Have you received any specialized training to hold that

11   position?

12   A.   I have.

13   Q.   What -- could you generally summarize the sort of training

14   you've received?

15   A.   I attended the 21-week new agent training, and as an ERT

16   member, Evidence Response Team, I have participated in multiple

17   basic and advanced evidence collection training.

18   Q.   What is the Evidence Response Team?

19   A.   The Evidence Response Team is a group of special agent and

20   nonspecial agent employees who have received training from the

21   lab in evidence collection techniques, forensic processes,

22   crime scene management, things like that.

23   Q.   And what is your role on that team?

24   A.   I'm the senior team leader.

25   Q.   What does that mean?

1    A.   So that means that I'm responsible for training the team,

2    quarterly.  I'm responsible for acquiring supplies, ensuring

3    that they get the required training from the lab.  And then,

4    operationally, I run the searches that we do, the ones that I'm

5    on scene for.

6    Q.   And in that role, did you become involved in an

7    investigation involving Cody Smith?

8    A.   I did.

9    Q.   How did you become involved in that investigation?

10   A.   In approximate March, Special Agent Nymphgamey Scott from

11   our Fort Myers RA -- Nymphgamey, N-y-m-p-h-g-a-m-e-y, Scott.

12   She goes by Nuffy, N-u-f-f-y.

13        Approximately March 18th, she contacted me and

14   requested ERT assistance to conduct a forensic processing of a

15   vehicle.

16   Q.   And what vehicle were you requested to process?

17   A.   That was a 2005 silver Honda Accord.

18   Q.   Who was involved in the processing of that vehicle?

19   A.   Myself and then we had several ERT members.  We had Agent

20   Shearn -- so Special Agent Jason Shearn.  His last name is

21   S-H-E-A-R-N.  We had Special Agent Thuy, T-H-U-Y; Hibbitts,

22   H-I-B-B-I-T-T-S; Special Agent Dianne Mercurio, D-I-A-N-N-E,

23   M-E-R-C-U-R-I-O; we had intelligence analyst Tayleen Mussenden,

24   T-A-Y-L-E-E-N, M-U-S-S-E-N-D-E-N.

25   Q.   And when was that car processed?

1  A.  That was processed Monday, March 30th of last year.

2  Q.  20 --

3  A.  2020.

4  Q.  And during the processing of that vehicle, were photographs

5  taken?

6  A.  Yes.

7       MS. ROMINE:  I would like to display to the witness

8  only exhibits that have been marked.

9  BY MS. ROMINE:

10 Q.  Sir, I am going to hand you a series of exhibits that have

11 been marked for identification purposes as Government Exhibits

12 613, 614, 615, 616, 617, 618, 619, and 620.

13 BY MS. ROMINE:

14 Q.  Sir, do you recognize those photos?

15 A.  I do.

16 Q.  And how do you recognize those photos?

17 A.  Those are photos from the processing of this vehicle.

18 Q.  Do they appear to accurately reflect what you observed on

19 that day when the vehicle was processed?

20 A.  They do.

21       MS. ROMINE:  Your Honor, Government moves to admit

22 Exhibits 613 through 620.

23       MR. FREEBURG:  Judge, objection as to 619 and 620 for

24 lack of foundation and relevance, and also an earlier one I

25 didn't catch the number for.

1          THE COURT:  I'm sorry, what earlier one?

2          MR. FREEBURG:  Judge, 619, 620 and the one of the door

3   of the vehicle.

4          THE COURT:  I'm sorry, that does not help me.

5          MR. FREEBURG:  I can't see the exhibits.

6          Can we please go through them again?  Not 616 and not

7   168.

8          THE COURT:  You don't need to think out loud.  Are

9   those your objections, or could you articulate what objection

10  you're making to what exhibit?

11         MR. FREEBURG:  617, 619 and 620 for lack of

12  foundation, relevance and prejudice.

13         THE COURT:  Ms. Romine, do you wish to ask the witness

14  any further questions?

15         MS. ROMINE:  Your Honor, I believe the proper

16  foundation has been laid.  The relevance is the car was

17  processed.  As to any weight that that evidence may play in the

18  case, that's ultimately an issue for the jury to resolve.

19         THE COURT:  I agree.  Those objections are overruled.

20  As to the prejudice objection, I find that the relevance

21  outweighs any potential for substantial prejudice.

22         Please proceed.

23         MS. ROMINE:  Your Honor, may --

24         THE COURT:  Actually, perhaps maybe this might be a

25  good time to take a break.  Would that be all right?

1          MS. ROMINE:  Yes, Your Honor, sure.

2          THE COURT:  There's never any good time.

3          We'll stand in recess until 10:20.  Please remember

4    the admonition against discussing this case with anyone or

5    doing any research about this case or this type of case.

6    Please keep an open mind until all the evidence is in.

7          Again, we will stand in recess until 10:20.

8       (Following out of the presence of the jury.)

9          THE COURT:  Anything requiring my attention?

10         MS. ROMINE:  Nothing from the Government, Your Honor.

11         MR. FREEBURG:  No, Judge, nothing from us.  Thank you.

12         THE COURT:  All right.  Thank you.

13      (Recess taken 10:03 a.m. until 10:26 a.m..)

14      (Following in the presence of the jury.)

15         THE COURT:  Please be seated.

16         Docket 20-CR-45, the Court notes the presence of the

17   jury with roll call waived.

18         Agent Orr, you remain under oath.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  Ms. Romine.

21         MS. ROMINE:  Thank you, Your Honor.

22   BY MS. ROMINE:

23   Q.  Sir, before we discuss those photos I want to back up a

24   bit.  I think in spelling some names it looks like we may have

25   missed some people.

*Janet Davis, RDR, FCRR, CRR*                    *jbd.davis@gmail.com*

1      Did we miss anybody that was involved in the
2  processing of the vehicle?
3  A.  I'm not sure if I mentioned Tiffany Gorman.  She's an IA,
4  intelligence -- I'm sorry -- a forensic accountant who
5  conducted the photography.  And Special Agent Lynne Billings
6  was involved at the scene of the house, and she escorted the
7  vehicle back to the Tampa office where our equipment
8  specialist, Richard Geary, G-E-A-R-Y, operated the tow truck
9  and actually transported the vehicle to our office.
10 Q.  Thank you.
11     THE COURT:  Ms. Romine, could you move the microphone.
12 I don't know why it keeps -- it is not like anyone speaks that
13 low.
14     Thank you.
15     MS. ROMINE:  Your Honor, move to publish Government
16 Exhibits previously admitted 613 through 620.
17     THE COURT:  Certainly.
18     MS. ROMINE:  Ms. Wait, could we publish Exhibits 613,
19 614, 625.
20     THE COURT:  I think I overruled the objection, but the
21 Exhibits 613, 614, 615, 616, 617, 618, 619 and 620 are
22 admitted.
23    (Government's Exhibits 613, 614, 615, 616,
24     617, 618, 619, 620 received.)
25     MS. ROMINE:  Thank you, Your Honor.

1        THE COURT:  Thank you for that reminder.

2    BY MS. ROMINE:

3    Q.  Special Agent Orr, what do those photos depict?

4    A.  This is the 2020 Honda Accord that we processed on March

5    30th.

6    Q.  And that was the car that, based on your understanding,

7    belonged to Mr. Cody Smith?

8    A.  Yes.

9        MS. ROMINE:  Could we please publish Government

10   Exhibit 616?

11   BY MS. ROMINE:

12   Q.  What does that depict?

13   A.  This is the interior of the front passenger side of the

14   vehicle.

15   Q.  Moving on to Government Exhibit 617, what does that depict?

16   A.  This appears to be the inside of the driver's door.

17   Q.  Moving on to Government Exhibit 618, what does that depict?

18   A.  This is the interior of the trunk.

19   Q.  And what sort of items were found in the trunk?

20   A.  There were blankets, towels, a backpack with clothing in

21   it.  There was a tent.  As you can see, the charcoal

22   briquettes.

23   Q.  Were any items seized from the trunk?

24   A.  The tent.  And we seized hair from inside the backpack.

25   Q.  Moving on to Exhibit 619, what does that depict?

1    A.   That was a pocket knife.

2    Q.   Where was that knife located?

3    A.   As I recall, that knife was located in the driver's door.

4    Q.   And based on the ruler, how long does the base of that

5    pocket knife appear to be?

6    A.   It appears to be about 120 centimeters.

7    Q.   Moving on to Government Exhibit 620, what does that photo

8    depict?

9    A.   It is the same knife, unfolded.

10   Q.   And, again, based on the ruler on the photo, how long does

11   the blade of that knife appear to be?

12   A.   It appears to be about 200 centimeters -- the blade is

13   approximately -- sorry.  I'm having a hard time reading the

14   numbers.

15        So approximately 80 centimeters.

16   Q.   And just so we're clear, is that the same knife also

17   pictured in Government Exhibit 619?

18   A.   Yes.

19   Q.   Other than taking photos of the vehicle and seizing

20   evidence, what sort of processing was done by your team?

21   A.   We processed the vehicle for trace evidence, for latent

22   fingerprints, and for DNA.

23   Q.   And did you collect trace evidence?

24   A.   We did.

25   Q.   What is trace evidence?

1    A.  So trace evidence can be a variety of things.  The common

2    characteristics of trace evidence are that it is usually fairly

3    small and it is easily transferable.  So common examples of

4    trace evidence would be hairs, fibers, soil, rope, so cut ends

5    of rope, things like that, fabric, those types of things,

6    building materials made from soil, like concrete, things like

7    that could constitute trace evidence.

8    Q.  Focusing on latent prints, how are latent prints collected?

9    A.  First, we visually search the surface.  We identify the

10   latent fingerprints.  If it is on a nonporous surface, such as

11   metal, plastic or glass, oftentimes we will treat it with

12   cyanoacrylate fuming which is basically where we will heat what

13   is commonly known as super glue until it becomes a vapor and as

14   the vapors are attracted to the moisture in the fingerprints,

15   it makes it more durable.

16          And once we super glue fume it, we can apply

17   fingerprint powder and once the powder is applied we can lift

18   it with such as tape or items we call gel lifters, things like

19   that, that are adhesive enough to pull the powder without

20   damaging the prints.

21   Q.  And where were prints collected from?

22   A.  From the driver's side door exterior, from the exterior of

23   the passenger side door, from under the door handles, and from

24   the dashboard.

25   Q.  And I believe you indicated that you also collected DNA; is

1    that correct?

2    A.   Yes.

3    Q.   And what is the process for collecting DNA?

4    A.   So for DNA we use, obviously, we wear protective equipment,

5    Tyvek suits, the white suits that you might have seen, clean

6    gloves and we swab the areas that are likely to contain DNA;

7    textured areas.  Areas, for example, in a vehicle we would

8    focus on areas that were most likely touched:  door knobs,

9    window controls; visors; the seat belt; where your head rests,

10   things like that.

11   Q.   And how many DNA samples did you collect?

12   A.   I believe we collected 17 swabs.

13   Q.   And of all the evidence that you collected -- so the trace

14   evidence, the latent prints, the DNA in the tent -- what

15   happened with those items?

16   A.   So those items are packaged.  They are then entered into

17   our evidence control room in Tampa and from there the case

18   agent coordinates with the laboratory to request examinations.

19   Q.   And is that what occurred in this case?

20   A.   Yes.

21   Q.   Was there anything different about the processing of this

22   vehicle that maybe wouldn't be the same if it happened a year

23   before?

24   A.   So this was March of 2020.  This was, I believe, the first

25   search that we did under the COVID protocols, and so normally

1    we would have eight people.  We tried to limit it to six.  We

2    tried to socially distance while we conducted the search,

3    things like that.

4              Fortunately it was a small vehicle, so really two

5    searchers at a time, but a lot of it was COVID protocol, so

6    face masks, temperature checks, social distancing, things like

7    that.

8              MS. ROMINE:  Your Honor, may I have one moment?

9              THE COURT:  Yes.

10         (Discussion held at prosecution table.)

11             MS. ROMINE:  Your Honor, Government has no further

12   questions for this witness.

13             THE COURT:  All right.

14             Any questions for defendant?

15             MR. FREEBURG:  Yes, Your Honor.

16                        CROSS-EXAMINATION

17   BY MR. FREEBURG:

18   Q.  Sir, my name is Alex Freeburg.  I will be asking you

19   questions on behalf of the defendant, Mr. Smith.  If at any

20   time I ask you a bad question, you don't understand something,

21   let me know, okay?

22   A.  Okay.

23   Q.  You said you used a Tyvek suit?

24   A.  Yes.

25   Q.  Can you describe a Tyvek suit?

1    A.   So it's an over suit, it is a thin white material that we

2    use to cover ourselves.  Before we go into an area where we're

3    going to collect DNA or trace evidence.

4    Q.   So why is it important to cover yourselves when you go into

5    an area to collect DNA?

6    A.   So that we don't leave our own and so that we don't

7    carry -- basically we operate under Lochard's where --

8    L-O-C-H-A-R-D's, principle of exchange where when two items

9    comes together, there's a transfer of material, often.  And so

10   we don't want to leave any of ourselves on the scene and we

11   don't want to pick up any of the scene on to ourselves.

12   Q.   And is that how you were trained at the FBI to collect

13   evidence?

14   A.   Yes.

15   Q.   Were you trained at FBI to collect DNA at the back of a

16   pickup truck without wearing any sort of Tyvek suit?

17   A.   That would not be consistent with our training.

18   Q.   Would that be sloppy?

19   A.   It depends on the circumstances.  I don't know the

20   circumstances of the hypothetical.

21          MR. FREEBURG:  Judge, a moment with my co-counsel?

22          THE COURT:  All right.  Thank you.

23      (Discussion held between defense counsel.)

24          MR. FREEBURG:  Nothing further, Your Honor.

25          THE COURT:  Any redirect?

1          MS. ROMINE:  No, Your Honor.

2          THE COURT:  Any objection to excusing and releasing

3     this witness?

4          MS. ROMINE:  None from the Government.

5          MR. FREEBURG:  None from the defense, Your Honor.

6          THE COURT:  Thank you, Agent.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  You're excused and released from your

9     subpoena.  We appreciate your travel and testimony here today.

10          The Government may call its next witness.

11          MS. ROMINE:  The government calls Kimberly Ley.

12     (Witness sworn.)

13          THE CLERK:  Can you please state and spell your name

14     for the record?

15          THE WITNESS:  My name is Kimberly Ley, that's spelled

16     K-i-m, last name L-e-y.

17      **KIMBERLY LEY, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

18     **BY MS. ROMINE:**

19     Q.  Are you employed?

20     A.  I am, yes.

21     Q.  Where are you employed?

22     A.  I am currently employed at the Wyoming State Crime

23     Laboratory.

24     Q.  What's your position there?

25     A.  I'm a forensic analyst within the biology unit.

1    Q.  How long have you held that position?

2    A.  I've held that position since February of 2016.

3    Q.  What are your responsibilities as a forensic analyst at the

4    Wyoming State Crime Lab?

5    A.  So my duties and responsibilities include receiving items

6    of evidence.  I examine those items of evidence for the

7    presence of biological evidence, and then I process that

8    evidence for DNA.  I issue reports and, if requested, I come to

9    court and testify to my findings.

10   Q.  Have you held any other positions at the State Crime Lab?

11   A.  Yes, so my senior and junior year of college I actually

12   served as an intern within the biology unit of State Crime and

13   in July of 2020 I was appointed the Alternate CODIS

14   Administrator for the State of Wyoming.

15   Q.  Have you received any specialized training for your current

16   position as a forensic analyst?

17   A.  I have, yes.

18   Q.  Could you summarize that training for the Court.

19   A.  Once you are employed with the Wyoming State Crime Lab as a

20   DNA analyst, you are required to complete a formal training

21   program in order to do this job.  What that includes is

22   examining practice items of evidence, mock evidence, reading

23   articles relevant within the field.  Of course then you're --

24   your comprehension of that knowledge is then tested through

25   oral, written and practical examination.

1    Q.   Have you personally performed procedures specific to

2    forensic serology and DNA analysis?

3    A.   I have, yes.

4    Q.   What is your educational background?

5    A.   I have an Associate's from Laramie County Community College

6    in science and I also have a Bachelor's in Science from the

7    University of Wyoming.

8    Q.   Do you have any continuing education requirements to hold

9    your current role?

10   A.   Yes.  We are required to complete, at minimum, eight hours

11   of continuing education every year.

12   Q.   What's a proficiency test?

13   A.   A proficiency test is a way that an accredited

14   organization, such as the Wyoming State Crime Lab, monitors and

15   evaluates performance and the quality of our work.  Those tests

16   are typically distributed by an accredited provider to our

17   organization.

18   Q.   How many proficiency tests have you taken?

19   A.   Thirteen.

20   Q.   Have you ever failed any of them?

21   A.   I have not.

22   Q.   Have you taught or lectured in the areas of forensic

23   serology or forensic DNA analysis?

24   A.   I have given some presentations at the local level to

25   students but not at the academia level.

1  Q.  And have you ever testified in court regarding those topics

2  before?

3  A.  Yes, I have.

4  Q.  We have mentioned the word "serology."  What is it?

5  A.  Serology is the study of body fluids.

6  Q.  What's the process to screen for body -- bodily fluids?

7  A.  So at the Wyoming State Crime Lab we have presumptive and

8  confirmatory tests for human blood, seminal fluid, urine and

9  saliva.  So depending on what fluid you're looking for, you may

10  have some different procedures that you use.

11      To begin with, if you're looking for, say, blood or

12  seminal fluid, or saliva or urine, we do have a piece of

13  equipment, it is called an alternate light source, or ALS for

14  short.  It looks like a black light.  But in a more scientific

15  way it allows us to see stains that might not be visible to

16  your naked eye.

17      It narrows down those areas of staining that we need

18  to then proceed with what's called presumptive testing.  So

19  presumptive testing is called presumptive testing for that

20  reason; that it just indicates whether or not an area of

21  staining may or may not be the fluid that you're looking for,

22  right?

23      So then, once we have a positive presumptive result,

24  then we carry out confirmatory tests for seminal fluid and

25  human blood.

1  Q.  We also briefly discussed DNA.  What is DNA?

2  A.  DNA stands for deoxyribonucleic acid.  In simple terms it

3  is the blueprint on how to make a living organism.  It also

4  provides the instructions on how an organism is to carry out

5  its day-to-day functions.

6  Q.  And in your role as a forensic analyst, where can DNA be

7  found?

8  A.  In your cells.

9  Q.  Is it possible for people to leave their DNA on objects?

10  A.  It is, yes.

11  Q.  How durable is DNA evidence?

12  A.  The longevity of DNA depends on the environment in which it

13  is in.  The more the environment has its effects on it -- so

14  water, UV, sun, heat -- all those things can affect the ability

15  to -- for DNA to persist within the open environment.  Of

16  course within your cells it is very stable.  But once it is

17  subjected to outside forces, those forces can be variable on

18  how much they affect the DNA.

19  Q.  How about passage of time?

20  A.  Yes.

21  Q.  What's a DNA profile?

22  A.  A DNA profile is a series of numbers like a bar code;

23  that's what a DNA profile looks like that we use.

24  Q.  How is a DNA profile developed?

25  A.  So it takes some steps to get to the actual series of

1    numbers, however in a simple sense, the first thing we do is

2    extract the DNA from the cells.  We then quantify the DNA so we

3    determine approximately how much DNA is present in a sample,

4    and then we amplify that DNA.

5         So we make many, many copies of that DNA within a

6    sample, and then we -- the last step is applying it to the

7    genetic analyzer which gives us the numbers or the bar code

8    that we use in a DNA profile.

9    Q.  Can two people share the same DNA?

10   A.  If you're identical twins.

11   Q.  Any circumstances where two people can have the same DNA?

12   A.  You may not have the same identical DNA profile, but of

13   course relatedness, just because you pass on your genetic

14   material to your offspring, so they're not completely identical

15   but you do share your genetic material with your offspring

16   and -- your relatives.

17   Q.  After developing a DNA profile, what are some conclusions

18   you can learn from that?

19   A.  So one thing we can do is evaluate the profiles for

20   comparison suitability.  Some profiles are just not suitable

21   for comparison.  If a profile is determined to be suitable for

22   comparison, then we compare question profiles, DNA profiles, to

23   what's called a reference sample, so those are samples that are

24   taken from an individual.  Another word we use for them is

25   "knowns" because they're coming from a known individual.  We

1   compare those known reference samples to these profiles and an

2   inclusion or an exclusion can be made at that point.

3   Q.  And focusing on suitability of DNA for comparison, whether

4   or not DNA is suitable, is that tied to some of the factors

5   that we discussed before?

6   A.  Correct.  And also how much is detected.

7   Q.  So the more DNA, the easier it is to do a comparison?

8   A.  Not necessarily because we do have a situation where if you

9   get too much DNA from too many contributors, it would be

10  uninterpretable due to complexity.

11  Q.  What's a likelihood ratio?

12  A.  So anytime an accredited -- we are an accredited laboratory

13  at the Wyoming State Crime Lab.  So anytime an inclusion or

14  association is made between a reference sample and a question

15  sample, we are required to generate a statistic.  And that

16  statistic is the likelihood ratio.

17          The likelihood ratio provides us with a strength or

18  weight of how likely it is that the observed profile that we're

19  seeing in a questioned item originated from a person of

20  interest, compared to if it originated from random, unknown,

21  unrelated individuals.

22  Q.  How do you determine that statistic?

23  A.  We have a computer program that helps us do that.  Of

24  course, it is based off of math -- well-established

25  mathematical equations that are used within the program to

1    calculate that out.

2    Q.  Is it possible to have DNA from more than one person in a

3    sample that you're analyzing?

4    A.  Yes.

5    Q.  How do you know the results that you find based on your

6    analysis and testing are reliable?

7    A.  So reliability begins with validation.  So long before we

8    at the laboratory implement any method of testing, it goes

9    through what's called a validation process.  And what that does

10   is it determines the reliability of the test.  It determines

11   the limitations of the test; what the ranges of that test are

12   going to be.

13          Another level of reliability that has been included

14   within our work process is we do perform audits, internal and

15   external, of our results and our procedures and our policies.

16   We have quality control measures within our testing, and we

17   also, lastly, have a 100 percent technical review of all of our

18   results.

19          So what that means is another qualified analyst takes

20   a look at all of my results and evaluates them for accuracy and

21   reliability as well.

22   Q.  You previously discussed that your lab is accredited.  Does

23   it currently hold an accreditation?

24   A.  Yes, we do.

25   Q.  And did it hold an accreditation when you performed the

1   analysis that we're going to discuss here in a bit?

2   A.  Yes.

3   Q.  Beyond that accreditation, is there any additional

4   standards that the DNA Casework Unit is held to?

5   A.  We are.  In addition to being accredited through our

6   laboratory accreditation, the Forensic Biology Unit at the

7   Wyoming State Crime Lab also follows the FBI quality assurance

8   standards.

9   Q.  Did the Wyoming State Crime Lab examine any evidence

10  pertaining to the case that we're here on today?

11  A.  Yes, we did.

12  Q.  What items did the laboratory or the crime lab examine in

13  this case?

14  A.  We were provided a bra, a pair of underwear, a sweatshirt,

15  and a pair of shorts.

16        MS. ROMINE:  Could we publish Government Exhibit 603?

17  BY MS. ROMINE:

18  Q.  Do you recognize that item?

19  A.  Yes.

20  Q.  Is that one of the items that the crime lab examined?

21  A.  Yes, this was Wyoming -- this was crime laboratory Item No.

22  1, the bra.

23  Q.  What kind of examination was performed on this item?

24  A.  When these items were submitted, per agency request, we

25  were requested to screen these items of clothing for the

1   presence of potential seminal fluid and, in this case, for this

2   item, we did examine it for the possible presence of seminal

3   fluid, as well as swabbing the exterior and interior surfaces

4   of this item due to some alleged groping of the victim that may

5   have occurred.

6   Q.  And what were the results of your examination?

7   A.  For the serology results, so there was no indication of

8   seminal fluid on this item.  Using the ALS there was no stains

9   that were present that needed to be tested, so visually it

10  tested negative for seminal fluid.

11  Q.  Could we publish Government Exhibit 604?  Do you recognize

12  that item?

13  A.  Yes, this would be crime laboratory Item No. 2, which is

14  the pair of underwear.

15  Q.  Moving on to Government's Exhibit 605.  What's the marking

16  on that photo?

17  A.  So the marking on that photo, the circle indicates the area

18  where the ALS, or that light source that I spoke about earlier,

19  fluoresced; a stain was glowing there.

20        Again, we can't see these stains with our naked eye or

21  visually, so we apply the circle around so that's where the ALS

22  positive verbiage is written on that.

23        AP negative, that is the presumptive test for seminal

24  fluid.  So what that means is it was swabbed but did not

25  indicate a positive result.

1  Q.  Moving on to Government's Exhibit 606.  Could you explain

2  the markings on that photograph?

3  A.  Yes.  So the five areas that are circled on the back side

4  of this item, same thing.  Those were areas that, using the

5  ALS, indicated there was some staining there that needed to be

6  presumptively tested for the presence of seminal fluid.

7  However, all of those presumptively tested negative for the

8  presence of seminal fluid.

9  Q.  I think we've discussed this -- you can take that down.  I

10 think we discussed this, but I want to make sure I understand.

11        So on the pair of underwear, what tests were all

12 performed?

13 A.  On the pair of underwear, we examined it with the alternate

14 light source and we presumptively tested for the presence of

15 seminal fluid.

16 Q.  And all of those results were negative?

17 A.  Negative.  ALS was positive, of course, because it did

18 indicate an area of staining, but it presumptively tested

19 negative for seminal fluid.

20 Q.  Please publish Government's Exhibit 607.

21        Do you recognize this item?

22 A.  Yes, this would be crime laboratory Item No. 3, the

23 sweatshirt.

24 Q.  What's that paper bag?

25 A.  That's actually the container that it came to the crime lab

1    in.

2    Q.  Moving on to Government's Exhibit 608, do you recognize

3    that item?

4    A.  Yes, it is also the sweatshirt.

5    Q.  Was that item examined by the crime lab?

6    A.  Yes, it was.

7    Q.  And what tests were performed?

8    A.  So we examined it with the ALS and we also did some

9    presumptive testing for seminal fluid.  However, it tested

10   negative for seminal fluid.

11          Additionally, on this item, this is one of those items

12   that was requested that the outside chest area of the sweater

13   be swabbed for DNA due to the alleged groping that may have

14   occurred.

15   Q.  And what was the result of that?

16   A.  We did perform DNA testing on that sweatshirt.  It

17   indicated that it was a mixture of -- assumed to be from three

18   contributors.  There was one distinct profile that was detected

19   that was consistent with Hannah Bye.

20          What that means is that when we say it's a distinct

21   mixture, that means that one person in particular contributed

22   more DNA in that sample.  And that was Hannah Bye.

23          Then we did a statistical analysis of that profile,

24   and it was 1.81 million times more likely that the profile that

25   we generated off of those swabs from that sweatshirt originated

1  from Hannah Bye, Cody Smith, and an unrelated individual than

2  if it originated from three unknown unrelated individuals.

3        And so that is very strong support in favor of the

4  hypothesis that it originated from Hannah Bye, Cody Smith, and

5  an unknown individual.

6  Q.  And, again, so we're clear, that's not seminal fluid; that

7  is touch DNA?  Would that be an appropriate way to frame it?

8  A.  Transfer DNA.

9        MS. ROMINE:  Please publish Government's Exhibit 609.

10  BY MS. ROMINE:

11  Q.  Do you recognize that item?

12  A.  Yeah, That is laboratory Item No. 4, the shorts.

13        MS. ROMINE:  Please publish Government's Exhibit 610.

14  BY MS. ROMINE:

15  Q.  Do you recognize that item?

16  A.  Yes, it is the shorts.

17  Q.  Could you explain the markings on the shorts in that

18  photograph?

19  A.  So those are the four areas that, using the ALS, indicated

20  some areas of staining that needed to be presumptively tested.

21  We presumptively tested those four areas for the presence of

22  seminal fluid.  All four areas tested negative.

23  Q.  And other than that examination, did you perform any

24  examinations on that item?

25  A.  No.

1    Q.   Let's discuss trace DNA just a little bit more.

2         When we're talking about the durability of DNA before,

3    was that in reference to trace DNA?

4    A.   It can be, yes, just because you do have transient transfer

5    of DNA throughout your day-to-day activities.

6    Q.   Were there specific concerns when it comes to the

7    durability of trace DNA?

8    A.   Yes.

9    Q.   What are those concerns?

10   A.   Well, when it's out in the open in the environment, of

11   course, it's being exposed to heat, sun, potentially water, all

12   of the environmental demands that is outside the body.

13        So anytime it's exposed to those types of things, it

14   can degrade and potentially not be present.

15   Q.   And does the nature of trace DNA also change based on the

16   item that the DNA is making contact with?

17   A.   It can, yes.

18   Q.   So, for instance, when I touch this pen, do I leave trace

19   DNA?

20   A.   Presumably.

21   Q.   When I touch my jacket, do I leave trace DNA?

22   A.   You can, yes.

23   Q.   And when I touch this piece of paper, can I leave trace

24   DNA?

25   A.   You can, yes.

1  Q.  And could the amount of DNA that I leave behind on those

2  three items be different based on the nature of those objects?

3  A.  On the nature of those objects or how often or how hard you

4  touched the items previously before you touched the subsequent

5  item, yes.

6  Q.  Are there certain objects that hold trace DNA better than

7  other objects?

8  A.  Ones that, obviously, have some texture can hold DNA or

9  have a larger transfer than, say, a smooth object.  So, yes.

10        MS. ROMINE:  Your Honor, may I have one moment?

11        THE COURT:  Yes.

12     (Discussion held at prosecution table.)

13        MS. ROMINE:  Your Honor, I have no further questions

14  for this witness.

15        THE COURT:  All right.

16        Questions from defendant?

17        MR. FREEBURG:  Yes, Your Honor.

18                    **CROSS-EXAMINATION**

19  BY MR. FREEBURG:

20  Q.  Okay, ma'am, my name is Alex Freeburg.  I will be asking

21  you a few questions on behalf of Cody Smith.

22  A.  Nice to meet you.

23  Q.  There was no seminal fluid on the back side of the shorts

24  you analyzed?

25  A.  Correct.  It tested negative presumptively for the presence

1   of seminal fluid.

2   Q.  And seminal fluid, we mean semen, of course; isn't that

3   right?

4   A.  Correct.

5   Q.  The sweatshirt that you discussed, the sweatshirt you

6   analyzed was a black sweatshirt?

7   A.  Yes.

8   Q.  Is it possible if someone is wearing a black sweatshirt and

9   then another sweatshirt from another individual on top of that

10  black sweatshirt that there could be trace DNA passed between

11  those two sweatshirts?

12  A.  It could happen, yes.

13          MR. FREEBURG:  Judge, can I have a moment with

14  co-counsel?

15          THE COURT:  Yes.

16      (Discussion held between defense counsel.)

17          MR. FREEBURG:  No further questions, Judge.

18          THE COURT:  All right.  Any redirect?

19          MS. ROMINE:  No, Your Honor.

20          THE COURT:  Any objection to releasing and excusing

21  the witness?

22          MS. ROMINE:  None from the Government.

23          THE COURT:  From the defendant.

24          MR. FREEBURG:  None from the defense.

25          THE COURT:  All right.  Thank you very much for your

1    testimony today.  You're excused and released.

2           The Government may call its next witness.

3           MS. ROMINE:  Your Honor, the Government calls Dyanne

4    Carpenter.

5       (Witness sworn.)

6           COURTROOM DEPUTY:  Please take a seat.

7           Ma'am, can you please state and spell your name for

8    the record.

9           THE WITNESS:  Yes.  My name is Dyanne Carpenter.  My

10   first name is spelled D-y-a-n-n-e, my last name is spelled

11   C-a-r-p-e-n-t-e-r.

12   **DYANNE CARPENTER, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

13   **BY MS. ROMINE:**

14   **Q.**  Are you employed?

15   **A.**  Yes, I am.

16   **Q.**  Where are you employed?

17   **A.**  By the Federal Bureau of Investigation.

18   **Q.**  What's your position?

19   **A.**  I am a physical scientist, forensic examiner in the latent

20   print operations unit at the FBI laboratory which is located in

21   Quantico, Virginia.

22   **Q.**  How long have you held that position?

23   **A.**  Approximately ten-and-a-half years.

24   **Q.**  What's your official duties?

25   **A.**  I receive inventory, examine and process items of evidence

1  for the development of latent prints.  I then compare those

2  latent prints to known prints, to other latent prints, or

3  search them through the FBI's automated fingerprint database.

4  I write reports based on the results of my conclusions and

5  testify in court when requested to do so.

6  Q.  What's your educational background?

7  A.  I have a Bachelor's of science in chemistry from the

8  University of Pittsburgh located in Pittsburgh, Pennsylvania.

9  I have a Master's of science in forensic science from Virginia

10  Commonwealth University located in Richmond, Virginia.

11  Q.  What kind of training do you have in the area of

12  fingerprints and footprints?

13  A.  I received my training at the FBI laboratory in the latent

14  print operations unit where I'm currently employed.  My

15  training program was approximately 18 months long, and I was

16  trained in the biology of friction ridge skin.

17        I learned how to properly record and compare inked

18  known prints, how to properly handle and process items of

19  evidence, and how to develop and compare latent prints.

20        Throughout the course of my training, I processed

21  hundreds of items of evidence and completed approximately

22  100,000 comparisons.  I also completed oral boards, moot courts

23  and comparison tests.

24        For approximately 12 months of my 18-month program, I

25  worked cases under the supervision of a qualified examiner.

1   Upon completion of my training, I successfully completed the

2   FBI's comprehensive competency exam in the area of friction

3   ridge analysis.

4   Q.  Have you testified in court before regarding the duties

5   that you previously discussed?

6   A.  Yes, I have.

7   Q.  You've brought up the idea of latent prints.  What are

8   latent prints?

9   A.  So first I need to note that on the underside of the hands,

10  the palms of the hands and the soles of the feet is a

11  specialized type of skin, which is flown as friction ridge

12  skin.  It consists of raised portions, which are called ridges,

13  and valleys in between, which are called furrows.

14          A latent print is the reproduction of the friction

15  ridge arrangement on the underside of the hand from the end

16  joint to the tip.  And it is on a substrate, excuse me, or a

17  surface, left behind in some kind of matrix or a substance that

18  might be coating the friction ridge arrangement.

19          Latent prints are not always visible to the naked eye

20  and may require some additional processing, such as powders or

21  chemical processes, in order to become visible.

22  Q.  What is a known print?

23  A.  A known print is the intentional recording, reproduction of

24  the friction ridge arrangement on the underside of the hand

25  from the end joint of the finger to the tip and is generally

1  taken by taking the finger and rolling it from nail to nail in

2  a thin layer of black printer's ink and then rolling again from

3  nail to nail on a contrasting background, such as a white

4  fingerprint card.

5        This is done to create a permanent record.  The

6  friction ridge arrangement can also be recorded digitally using

7  a method called BioScan in which the fingers are placed on a

8  flatbed scanner, and the friction ridge arrangement is recorded

9  digitally.

10 Q.  What are the basic factors in the use of fingerprints as a

11 means of identification?

12 A.  The basic factors which allow for the use of fingerprints

13 as a means of identification are persistence and uniqueness.

14 The friction ridge arrangement is persistent in that it is

15 formed before birth in utero and stays in the same arrangement

16 throughout life until after death and decomposition, barring

17 any permanent scarring or disease.

18        The fingerprints are unique in that the friction ridge

19 arrangement is not repeated from person to person or finger to

20 finger even with identical twins.

21 Q.  What is the process for print comparison?

22 A.  The process that we use for fingerprint comparison is known

23 as ACE, Or A-C-E.  It stands for analysis, comparison and

24 evaluation.

25        Analysis is the information-gathering, phase and in

1  analysis, I'm going to look at the print and look at all of the

2  information present in the print to include the overall pattern

3  type and the individual ridge flows.

4         In comparison, I'm going to place the latent print and

5  the known print side by side and systematically compare the

6  information present in the latent print to the information

7  present in the corresponding area of the known print, looking

8  for agreement and disagreement.

9         The third step is evaluation.  And this is the

10 decision-making step.  In evaluation, I'm going to come to one

11 of three conclusions:  Identification, or that the latent print

12 and the known print came from the same source; exclusion, or

13 that the latent print and the known print came from different

14 sources; or inconclusive, which in most cases means that there

15 is not enough quality or quantity of information present in the

16 known print for me to either identify or exclude.

17 Q.  Did you perform any examinations relevant to the case that

18 you appear in this court for today?

19 A.  Yes, I did.

20 Q.  What item -- what did you examine?

21 A.  I examined a tent, a bag of tent accessories.  I received

22 three sets of known fingerprints and one set of known

23 footprints and nine latent lifts.

24 Q.  Who were the known prints from?

25 A.  I received known fingerprint cards from Hannah Bye, Tammy

1  Smith and Jordan Smith, and I received known footprints of

2  Hannah Bye.

3  Q.  You indicated that you received nine latent prints.

4  A.  Nine latent lifts.

5  Q.  Lifts.  Where did those lifts come from?

6  A.  To the best of my recollection, they came from the Honda

7  Accord, I believe it was.  Three lifts were from the driver's

8  side door, the exterior.  Five, I believe, were from the

9  passenger side door exterior.  And one was from the dashboard

10  of the inside of the car, I believe.

11  Q.  What were the results of your examination of the latent

12  prints from the vehicle?

13  A.  I examined the latent lifts from the vehicle, and I also

14  examined the electronic images taken of those areas -- areas,

15  excuse me, prior to those lifts being taken, and there were no

16  latent prints suitable for comparison from those lifts.

17  Q.  I believe you also indicated that you examined a tent and a

18  bag of tent accessories; is that correct?

19  A.  Yes, that's correct.

20  Q.  And what did your examination reveal from those items?

21  A.  I processed the tent, looking for the development of latent

22  prints.  From the tent, I found 13 latent prints suitable for

23  comparison.  12 of those latent prints were latent footprints,

24  and one latent print was a latent impression, which in this

25  case indicates it was either a palm print or a footprint.

1  Q.  And did you compare the latent prints from the tent to your

2  known samples?

3  A.  Yes, I did.

4  Q.  What was the result?

5  A.  Of the 13 latent prints from the tent, four latent

6  footprints were excluded as prints of Hannah Bye.  The

7  remaining eight latent footprints and one latent impression

8  were inconclusively compared, which, again, means I did not

9  have enough information present in the known print to be able

10 to conclusively compare those prints.

11 Q.  When did you perform your examination of the tent in this

12 case?

13 A.  It was July and August of 2020.

14 Q.  Is it surprising to you that you weren't able to match any

15 prints from the tent?

16        MR. FREEBURG:  Objection, Judge.  Relevance as to the

17 surprise.

18        THE COURT:  I -- do you wish to restate your question?

19        MS. ROMINE:  I will rephrase, Your Honor.

20        THE COURT:  Thank you.

21 BY MS. ROMINE:

22 Q.  Let's talk about prints a little bit.

23        How does somebody leave a print on an object, whether

24 or not it's a fingerprint or a footprint?

25 A.  So generally a print is left when somebody touches or

1   handles an item in some way and they have something covering

2   their hands, such as sweat or dirt or makeup or what have you,

3   and that substance coats the friction ridge arrangement, and

4   that arrangement is then transferred onto the item which they

5   are touching.

6   **Q.**   And does that apply to both fingerprints and footprints?

7   **A.**   It does, yes.

8   **Q.**   Are there different factors that apply to how well a

9   fingerprint is left behind as opposed to a footprint?

10  **A.**   There are a number of factors that affect whether or not a

11  print is left behind, whether it be a fingerprint or a

12  footprint.  A lot of it has to do with the type of evidence

13  that it is, the condition of the evidence, the condition in

14  which the evidence is stored or held or otherwise is prior to

15  those prints being -- or prior to the evidence being processed.

16  Excuse me.

17          In terms of the person leaving the print or

18  potentially leaving the print, whether or not -- how they

19  handle the item will affect whether or not they leave a print.

20  The condition of their skin on their hands or their feet,

21  whether or not they've just washed their hands, or perhaps they

22  have very dry skin.  If they are overly sweaty or not sweaty

23  enough.  All of those things can factor in as to whether or not

24  a person will touch an item and subsequently leave a latent

25  print.

1  Q.  What sort of factors go into whether or not someone leaves

2  a print or a print of sufficient enough detail that you can

3  compare it?

4  A.  All of the things I just mentioned will factor into that,

5  as well as the item itself.  For example, there are two general

6  types of evidence that we process in the lab, and they're

7  porous and nonporous.

8          For a porous item, it's something that absorbs water.

9  So, subsequently, the fingerprint is absorbed into the item,

10  and a print on that kind of item might be a little bit more

11  stable over time or environment, depending on where it is being

12  stored.

13          A nonporous item is something hard, like a table,

14  where it doesn't absorb water.  So the latent print will just

15  sit on top of that item and is a lot more fragile.  So if an

16  item is overhandled or if it is out in the sun or the rain or

17  it's very dirty, you may -- a person may touch that item and

18  not leave a suitable latent print behind, or it may be

19  destroyed from those environmental factors.

20  Q.  Let's talk about the type of object the tent was.  What

21  kind of material was the tent?

22  A.  I mainly focused on the floor of the tent, the inside floor

23  of the tent.

24          The sides and the roof of the tent were a vinyl

25  material, which is not really suitable for latent print

1   examinations.

2         The bottom of the tent itself was a kind of tightly

3   woven plastic, and plastic is considered a nonporous type of

4   evidence.

5   Q.  And so is that another material that's not suitable for

6   maintaining latent prints?

7   A.  It certainly can --

8   Q.  And correct me if I'm misusing words here.  You're the

9   scientist.

10  A.  It certainly can be a material that doesn't necessarily

11  hold latent prints over a length of time.  Again, depending on

12  how it's stored and what kind of elements it's subjected to,

13  whether or not it's used again, or handled again after the

14  person in question has handled that item.

15        Like I said, nonporous surfaces are generally good for

16  latent prints when they're handed carefully; but if they're not

17  handled carefully, the prints on the item can be very fragile

18  and can be destroyed rather easily.

19  Q.  And when you talk about handling carefully, is it also

20  just -- could a factor be the passage of time from when a print

21  could have been left to when the examination has occurred?

22  A.  It can be, yes.

23        MS. ROMINE:  Could I have a moment, Your Honor?

24        THE COURT:  Yes.

25  (Discussion held at prosecution table.)

1    MS. ROMINE:  Your Honor, the Government has no further

2    questions for this witness.

3         THE COURT:  For defendant?

4         MR. FREEBURG:  Yes, Your Honor.

5                 **CROSS-EXAMINATION**

6    **BY MR. FREEBURG:**

7    **Q.**  Good morning, ma'am.  My name is Alex Freeburg, attorney

8    for Cody Smith.

9    **A.**  Good morning.

10   **Q.**  You never analyzed or lifted any prints from an orange

11   folding pocketknife, correct?

12   **A.**  I don't believe I received that item, no.

13        MR. FREEBURG:  Thank you.  No further questions.

14        THE COURT:  Any redirect?

15        MS. ROMINE:  No, Your Honor.

16        THE COURT:  Any objection to excusing and releasing

17   Ms. Carpenter?

18        MS. ROMINE:  None from the Government.

19        MR. FREEBURG:  None from the defense.

20        THE COURT:  Thank you, Ms. Carpenter, for your

21   testimony today.  You are excused and released from your

22   subpoena.

23        THE WITNESS:  Thank you, Your Honor.

24        THE COURT:  The Government may call its next witness.

25        MS. MARTENS:  Thank you, Your Honor.  The Government

1    calls Karson Semen.

2        (Witness sworn.)

3            COURTROOM DEPUTY:  Please take a seat.

4            MR. HUGUS:  Judge, if we might approach?

5            THE COURT:  Not quite yet, no.

6            COURTROOM DEPUTY:  Ma'am, will you please state and

7    spell your name for the record?

8            THE WITNESS:  Karson Haley Ceglia-Chambrot.  First

9    name Karson, K-a-r-s-o-n.  Middle name Haley, H-a-l-e-y.  Last

10   name Ceglia-Chambrot -- it's going to be hyphenated -- so

11   C-e-g-l-i-a hyphenated Chambrot, C-h-a-m-b-r-o-t.

12           THE COURT:  Counsel, please approach.

13       (At sidebar.)

14           MR. HUGUS:  Judge, I noticed a witness that is in the

15   courtroom and was at least a potential witness, someone who the

16   prosecution has indicated they wanted to call and maybe that's

17   changed, but given the Court's sequestration order, I wanted to

18   raise that issue.

19           MS. MARTENS:  Who is it?

20           MR. HUGUS:  I believe the gentleman in the blue shirt

21   is --

22           MS. MARTENS:  Oh, yeah.  We're not calling him.

23           MR. HUGUS:  -- Mr. Leatham.  Is he under a subpoena?

24           MS. MARTENS:  Not anymore.

25           MR. HUGUS:  Okay.

1    THE COURT:  So you're not calling whoever is here?

2    MS. MARTENS:  Yes.

3    THE COURT:  Does that address your concern?

4    MR. HUGUS:  Have you -- I mean, he's under subpoena,

5  though, right, one way or the other regardless of who

6  subpoenaed him at this point?

7    MS. MARTENS:  Well, he hasn't been called to testify.

8  He won't testify, and I told him he was released from his

9  subpoena because we didn't call him -- intend to call him.

10    THE COURT:  All right.  Any further concerns?

11    MR. HUGUS:  If I can have a moment.

12  (Discussion held between defense counsel.)

13    MR. HUGUS:  Nothing further, Judge.

14    THE COURT:  Thank you.

15  (Sidebar ended.)

16    **KARSON HALEY CEGLIA-CHAMBROT, PLAINTIFF'S WITNESS,**

17    **DIRECT EXAMINATION**

18  BY MS. MARTENS:

19  Q.  I think I called you by the wrong name.  I referred to you

20  as Ms. Semen.  Can you explain your name?

21  A.  So, my name is Karson Ceglia-Chambrot.  I got married when

22  I was 20 years old while I've been in the Navy, so as I may

23  have been mentioned, yes, my last name used to be Semen at the

24  time.

25  Q.  So was that your maiden name?

1   A.  Yes.

2   Q.  You mentioned that you're in the Navy.  What do you do?

3   A.  I'm an aviation ordnance man.  I handle weapons, bombs, and

4   all types of ammunition on helicopters at the moment.

5   Q.  Where are you from?

6   A.  I am from Naples, Florida.

7   Q.  Do you know the defendant?

8   A.  Yes.

9   Q.  Can you point him out in the courtroom?

10  A.  (Indicating).

11       MS. MARTENS:  Your Honor, if the record would reflect

12  that Ms. Ceglia has identified the defendant?

13       THE COURT:  The record will so reflect.

14       MS. MARTENS:  Thank you.

15  BY MS. MARTENS:

16  Q.  How do you know the defendant?

17  A.  I knew him back in high school.

18  Q.  What kind of relationship did you have with the defendant?

19  A.  From the very beginning, we were just friends, and,

20  obviously, it escalated to an actual boyfriend-and-girlfriend

21  relationship for just a little while.

22  Q.  Did you ever have any sexual interactions with the

23  defendant?

24  A.  Sort of, but most of the time, I was uncomfortable.

25  Q.  Let me take you to a particular day that you were with the

1    defendant where you were at his house.

2    A.  Yes.

3    Q.  Can you describe that day?

4            MR. HUGUS:  Objection.  Lack of foundation.

5            THE COURT:  I'm assuming you're referring to at

6    Defendant Smith's house?

7            MS. MARTENS:  Yes.

8            THE COURT:  Perhaps you could ask a more narrow

9    question.

10           MS. MARTENS:  May I approach, Your Honor?

11           THE COURT:  Yes.

12       (At sidebar.)

13           MS. MARTENS:  So I have advised the witness about the

14   limitations of this Court's liminal order, which was to avoid

15   particular discussion of the ages of these victims, and so by

16   asking a rather broad question, I was hoping to avoid running

17   afoul of that by suggesting a particular age because if we go

18   to at his house at a particular date or a year in high school,

19   I think that that gets into an area that I understood the Court

20   didn't want me to go.

21           So the witness and I have discussed in advance what

22   I'm looking for with these questions in an attempt to comply

23   with the Court's order.

24           THE COURT:  Mr. Hugus, I don't understand your

25   foundation question.  She was with the defendant at the

1  defendant's house.

2         MR. HUGUS:  She just said, "Do you remember" -- I

3  think she's directing to a specific location, but there's been

4  no foundation that she had been there more than one time or how

5  many times or what time we're talking about or those kinds of

6  things.

7         THE COURT:  Well, that objection is overruled.

8         You may continue.

9         MS. MARTENS:  Thank you, Your Honor.

10        (Sidebar ended.)

11        THE COURT:  Ms. Martens, if you could state your

12  question again.

13        MS. MARTENS:  Thank you.  And I think I'll maybe back

14  up just a little as well.

15 **BY MS. MARTENS:**

16 **Q.**  So, Ms. Ceglia -- Ceglia, right?

17 **A.**  Yes, that's correct.

18 **Q.**  You said you dated the defendant.

19        Had you ever been to his home before?

20 **A.**  Yes.

21 **Q.**  So, on a particular day at his home, did you have any

22  sexual interactions with the defendant?

23 **A.**  Um, if you're talking about the sexual interactions I did

24  have with him, I mean, we made out.  I mean, any typical

25  teenager would be excited about that; but the other

1    interactions, I felt very uncomfortable and didn't know how to

2    approach it at that time.

3    Q.  Let's walk through that day, that day when you became

4    uncomfortable.

5         What were you doing at the defendant's house?

6    A.  Well, as Cody likes to do back in high school, you know, he

7    would mention all the time that he had a zoo in his backyard,

8    and I thought, you know, that's pretty cool.  Like, his parents

9    were awesome.  And I remember going to a zoo when I was very,

10   very little.  Like, I think I was, like, 6 when I went to their

11   zoo.  I was on a field trip.  And then when he told me that was

12   his zoo, I wanted to actually go see it for myself.

13        And, you know, we were walking around.  I got to see

14   his house for a bit, met his little sister.  She's the cutest

15   little thing ever.

16        Then we went around the zoo, and we were walking

17   around and got to see a bunch of different animals.  I think I

18   got hugged by a giraffe.  That -- that was the most amazing

19   experience I've ever had, just going to say, that giraffe was

20   awesome.  I miss that giraffe.

21        But you know, we were just walking around and just --

22   he was just showing me everything, what he did, you know, how

23   he took care of the animals, like, what his parents did with

24   them and all that.

25        And there were a couple of interactions where, you

1  know, we would make out.  And --

2  Q.  Can you describe those?

3  A.  A lot of tongue action.

4       The other interactions, like, he would try to escalate

5  it a bit.  And, you know, being in high school and being my age

6  at that time, I didn't know how to approach that, nor did I

7  know what to say to any of it.

8  Q.  So when you said he tried to escalate it, what does that

9  mean?

10  A.  Well, he would try to go further with it.  He would try

11  to -- he would put his hands, like, all over me, in, like, you

12  know in a nice manner, I thought it was nice at first.  And

13  then, like, he would go underneath my shirt, try to grope my

14  boobs, and -- sorry, I'm, like, shaking right now.  I'm trying

15  to calm down.

16  Q.  That's okay.

17  A.  And he would -- I remember being out in, like, this grass

18  field where he got on top of me and started making out with me

19  as if he was trying to have intercourse with me.

20  Q.  What did you do?

21  A.  I remember stopping it 'cause I didn't know what else to

22  do.  I never knew what sex was.  I never even did it at that

23  time, so all of that was new to me.  And I had to stop him, and

24  I remember his mother walked by and then, you know, we walked

25  somewhere else and --

1  Q.  How did you stop him?

2  A.  I shoved him off.

3  Q.  Did you say anything to him?

4  A.  I said, "We got to stop."  Like, I didn't know how to

5  respond to it.  I just told him to stop.  And I didn't know

6  what it was like to be uncomfortable until I was in that

7  moment.

8  Q.  And then what happened?

9  A.  Then we walked over, I think it was like a -- like a little

10  gazebo area.  It was, like, this big, white, tented area, very

11  beautiful.  There was like a big ole plant in the middle,

12  everything.  There was couches around.  So it was like a little

13  event area in, I think, like, the middle of the zoo.

14       And, you know, we were just laying on the couch, just

15  having a good time, talking, and, you know, we did get to

16  making out again.  And then, you know, he was getting handsy,

17  you know, touching me all over.

18       And then I remember --

19  Q.  And what did you do in response to that?

20  A.  To be honest, I kind of let it just keep going because I

21  thought it was normal.  I literally, literally thought that was

22  normal.

23       And then I remember him putting his hands down my

24  pants 'cause I think he got the wrong idea from me, and --

25  Q.  What did you do?

1  A.  I was trying to grab his hand out of my pants 'cause he

2  penetrated me with his fingers, and I remember telling him,

3  "Stop" multiple times until I had to grab his hand out of my

4  pants.  And I had to basically get off of him.  And, you know,

5  now being my age now, knowing what this is, that's -- that was

6  the scariest thing I ever had to deal with.  But that wasn't my

7  first time.

8  Q.  So let's talk about that a little bit.  You said he

9  penetrated you.  Where exactly did he touch you?

10 A.  He was going into my vagina.  He penetrated my vagina, and

11 I was very, very uncomfortable with that day.

12 Q.  With both of his hands or just one?

13 A.  It was just one.  The other one, he was -- I don't remember

14 where he was holding me down, but he was.  And just having to

15 rip his hands out of my pants.

16        And then I remember we would walk back to his house

17 and we were spending time with his little sister for a bit, and

18 I think we were in his bedroom.  He kind of, like, had some

19 sort of bunk bed at the time.

20        And then, you know, I didn't think --

21        THE COURT:  Ma'am --

22        THE WITNESS:  Yes?

23        THE COURT:  I think you've answered her question.

24        THE WITNESS:  Oh, I'm sorry.

25 BY MS. MARTENS:

1  Q.  That's all right.  I'm going to back you up just a little

2  bit.

3  A.  Okay.

4  Q.  Was your genitals the only place that he touched you?

5  A.  I mean, when he was getting handsy, he was touching all

6  over my body in a very sexual way.

7  Q.  Did he kiss you?

8  A.  Yes.

9  Q.  Did you protest to any of those?

10  A.  To the kissing, no, I didn't, 'cause, you know, I thought I

11  was going to be in a happy relationship with Cody Smith, and I

12  was going to be dating a guy who had a zoo in his background.

13  I thought that was cool.

14       That's all I wanted, was a good, decent relationship.

15  And then when that escalated and it turned to that, I -- I

16  didn't know what to do.  I didn't -- I knew it wasn't right.  I

17  just didn't know how to respond to any of it.

18  Q.  You mentioned that he held you down with one hand while he

19  penetrated you with the other.

20       Where were your hands?

21  A.  Well, both of them were trying to get him off of me.

22  Q.  Let's go back to I think you said you were laying in the

23  grass in a field?

24  A.  Yes.

25  Q.  You said he got on top of you.

1  A.  Yes.

2  Q.  Where was he touching you then?

3  A.  I would say, like, mainly my boobs and my butt, like in

4  those areas, typically, and we were having a very heated

5  make-out session in that little part of the grass.

6  Q.  And at some point, you became uncomfortable.  What was that

7  point?

8  A.  I think it was when we were kissing, and, you know, he was

9  trying to bite my lip and it was hurting, and I kind of had to

10  like, tell him, like, you know, "Stop," okay, like,"That's not

11  sexy anymore.  That's just you trying to rip my lip off."

12  Q.  Did you -- is that something close to what you said?

13  A.  Yes.

14  Q.  What did you do?

15  A.  Well, I basically shoved him off of me and then, you know,

16  that's when his mom walked on by.  I guess she was doing her

17  own thing around the zoo.  I didn't know what she was doing.

18        MS. MARTENS:  Your Honor, may I have a moment?

19      (Discussion held at prosecution table.)

20        MS. MARTENS:  Your Honor, the Government has no

21  further questions for this witness.

22        THE COURT:  All right.  Thank you, Ms. Martens.

23        For defendant.

24

25

**CROSS-EXAMINATION**

**BY MR. HUGUS:**

Q.   Good morning.  My name is Jeremy Hugus, and I'm one of the lawyers for Cody Smith.

Is it true that you want to get back at Cody?

A.   No.  I'm here today to support someone because they went through this.  I'm not here to get revenge.  I forgot about Cody six years ago, and I didn't think I would have to see him again in this courtroom.

Q.   Do you remember some phone calls with Investigator or Agent Olson?

A.   Yes.

Q.   And in those conversations -- I think there were two conversations that you had with him, right?

A.   Yes.

Q.   And in those conversations he told you about what happened, why he was calling you and what he wanted to discuss with you and he had some questions for you, right?

A.   Yes.

Q.   And his questions were about your relationship with Mr. Smith?

A.   Yes.

Q.   And you were honest with him about what information you had when you talked to him?

A.   Yes.

1  Q.  And you were honest with him about your willingness to help

2  him in this case?

3  A.  Yes.

4  Q.  And the motivations for that?

5  A.  Yes.

6         MR. HUGUS:  Judge, I would like to offer Defense

7  Exhibit J1 as an impeachment exhibit.

8         MS. MARTENS:  Your Honor, I object.  This is improper

9  impeachment through extrinsic evidence.  And he hasn't properly

10  offered it to the witness.

11         THE COURT:  I'm not sure what J1 is.  If you could

12  identify it so that I might -- is it an audio clip?

13         MR. HUGUS:  Yes, Your Honor, it is an audio clip of

14  the conversation that she testified as having had with

15  Mr. Olson regarding what she would testify about in this trial

16  and the motivations for doing so, and I think she's laid the

17  foundation for those things, Your Honor.

18         MS. MARTENS:  Your Honor, I object to the playing of

19  the audio.  There is a transcript available for counsel to

20  properly impeach the witness with, so that it is not put before

21  the jury.

22         MR. HUGUS:  I believe she gets the opportunity to be

23  presented with the exhibit and then to explain anything

24  connected to it or to be cross-examined, Judge.

25         THE COURT:  Counsel, if you could approach.

1        (At sidebar.)

2        THE COURT:  For clarification, Mr. Hugus, is it that

3    snippet of the conversation where she -- I forget exactly what

4    her phrasing is, but about how much she dislikes him or

5    something to that effect?  Is it just that?

6        MR. HUGUS:  It is just that, Judge, yes.  It is a

7    limited snippet very specifically connected to the questions

8    that I just asked her.

9        THE COURT:  Okay.  I guess I don't disagree with your

10   general position, but I would ask that you first say the:

11   "Didn't you tell Agent Smith" so that you actually tee up an

12   inconsistency and then you can play it and then I will grant

13   permission to play that little audio.

14       MR. HUGUS:  Okay.

15       MS. MARTENS:  Just to be clear, it is being

16   substantively offered in evidence, then?

17       THE COURT:  Is it what?

18       MS. MARTENS:  Is it being substantively offered into

19   evidence?

20       THE COURT:  Yes, as impeachment evidence, if he can

21   establish -- if she says no, I didn't tell him that, then I

22   think it is proper extrinsic evidence admissible for

23   impeachment purposes.

24       So I just want it teed up rather than the general, you

25   know, you're trying to get back at him or whatever.  I just

1    don't remember enough, so if you could tee it up with her

2    verbiage, and if she says, "Yes, I told him that," we're not

3    going to admit it.

4            If she denies it --

5            MS. MARTENS:  Your Honor, Rule 613 specifically

6    prohibits the admissibility of this type of impeachment

7    evidence.

8            THE COURT:  A prior inconsistent statement?

9            MS. MARTENS:  That's the hearsay rule, but the --

10           MS. ROMINE:  Your Honor, if I may, Rule 613 does allow

11   for impeachment.  It sounds like there's improper impeachment

12   occurring here.  Rule 613 prohibits the admission of extrinsic

13   evidence in support of impeachment.  Proper impeachment is

14   allowing the witness an opportunity to review the statement

15   without revealing it to the jury and then confronting the

16   witness with that statement.

17           By playing it, what that is, it is the equivalence of

18   extrinsic evidence as opposed to allowing the witness -- if

19   they wanted to --

20           THE COURT:  I agree, which is why I encouraged him to

21   actually read her language because she did not prepare this

22   transcript, it wasn't certified.  I don't care how it is teed

23   up.  You can give her this to review.  You can read it.  But I

24   agree with the Government on that, that it has to actually be

25   teed up for use as proper impeachment and it is not yet.  All

1    right?

2              MS. MARTENS:  Thank you, Your Honor.

3         (Sidebar ended.)

4              MR. HUGUS:  Am I good to proceed, Judge?

5              THE COURT:  Yes.

6              MR. HUGUS:  Thank you.

7    BY MR. HUGUS:

8    Q.  I had asked you earlier about why you were doing this, and

9    you gave some explanation about that.  You also talked about

10   talking to Agent Olson.

11             Did you ever tell Agent Olson that you were giving

12   this testimony to get back -- helping him out to get back at

13   Cody?  Did you ever tell him that?

14   A.  I do not recall.  I don't really have a good memory, I'm

15   sorry.  There was a lot of things that we talked about that was

16   regarding Cody Smith.

17             But yes, to answer your question, I'm doing this to

18   help this girl.

19             THE COURT:  That wasn't his question.

20             THE WITNESS:  Okay.

21             MR. HUGUS:  If I may show the witness a statement,

22   Judge?

23             THE COURT:  Yes.

24   BY MR. HUGUS:

25   Q.  I'm showing you what is a transcript of the conversation

1   that you had with Agent Olson.  I don't want you to read it out

2   loud.  I would just like you to look over that and tell me if

3   that refreshes your recollection about what you told Agent

4   Olson.

5         Does that refresh your recollection about what you

6   told Agent Olson -- Agent Olson about your involvement in this

7   case?

8   A.  Yes.

9   Q.  And you told him that you were doing this because Mr. Smith

10  was a dick to you, correct?

11  A.  I wasn't just doing this because --

12  Q.  I'm asking what you told Agent Olson.  You told him because

13  Mr. Smith was a dick to you, correct?

14        MS. MARTENS:  Objection, Your Honor.  This misstates

15  the witness' statement.

16  BY MR. HUGUS:

17  Q.  And you told Agent Olson that you would kind of like to get

18  back at him even though you hadn't thought about him this

19  entire time, correct?

20  A.  Yes.

21        THE COURT:  The objection is overruled with that

22  supplementation.  Thank you.

23        MR. HUGUS:  Thank you, ma'am.  I have no other

24  questions for you.

25        THE COURT:  All right.  Ms. Martens.

1    MS. MARTENS:  Thank you, Your Honor.

2                    **REDIRECT EXAMINATION**

3  **BY MS. MARTENS:**

4  **Q.**  Ms. Ceglia, are you angry about what happened?

5  **A.**  Yes.

6  **Q.**  Why?

7  **A.**  I apologize for my outburst, though.  I'm sorry about that.

8  **Q.**  Why?

9  **A.**  I'm angry because I've already been in that position

10  before, not just with him but with other people.  I don't want

11  anyone else having to go through this.  It is not okay.  Should

12  never be okay.  It is messed up.

13    MS. MARTENS:  Your Honor, may I have just a moment?

14    THE COURT:  Yes.

15    (Discussion held at prosecution table.)

16    MS. MARTENS:  Your Honor, I have no further questions

17  for this witness.

18    THE COURT:  Any objection to excusing -- excuse me --

19  excusing and releasing Ms. Ceglia-Chambrot?

20    THE WITNESS:  Ceglia-Chambrot.

21    THE COURT:  Thank you.

22    Any objection?

23    MS. MARTENS:  No, Your Honor.

24    THE COURT:  For the defendant?

25    MR. HUGUS:  No.  Thanks, Judge.

1    THE COURT:  Karson is a lot easier.  Thank you, ma'am,

2  for your testimony today.  Safe travels.

3    THE WITNESS:  Thank you.

4    THE COURT:  You're excused and released.

5    And the Government may call its next witness.

6    MS. MARTENS:  Your Honor, we're running a bit ahead of

7  schedule and our next witness will not actually be available

8  until about 2:00, so at this time I would ask for an extended

9  lunch break to help accommodate some of those travel

10  arrangements.

11    THE COURT:  It is always happy news to hear that

12  anyone is running ahead of schedule.

13    MS. MARTENS:  Especially in a courtroom.

14    THE COURT:  Thank you.  Hearing no objection from

15  defendant, we will take our lunch break until 2:00 to report

16  back to the courtroom.

17    I know that Mrs. Davis plans to use some time to do a

18  presentation that she typically does on realtime with the

19  jurors.  I don't know if it will just be with one group or

20  both.  Just one today.

21    What time do you recommend, 1:45 for the jury to be

22  here or -- 1:40?

23    And is that the jurors in 1?

24    So the jurors in juror room 1, please return for the

25  realtime presentation by 1:40.  We will expect to call you in

1    here to resume trial at 2:00.

2            For the other jury room, if you could be in your jury

3    room by 1:50, that will permit us to make sure that we can

4    attend to any business and call you in close to 2:00 without

5    additional delay.

6            So with that, we'll stand in recess for the call of

7    this case until 2:00.

8        (Following out of the presence of the jury.)

9            THE COURT:  For the Government, is there anything

10   requiring my attention?

11           MS. MARTENS:  No.  Thank you, Your Honor.

12           THE COURT:  For the defendant?

13           MR. HUGUS:  No, Judge.

14           THE COURT:  All right.  I would ask the attorneys to

15   be here at 1:45, 1:50 so that hopefully we can wrap up

16   Mrs. Davis' presentation, get all the jurors here and be ready

17   to start close to 2:00.  Thank you.  Thank you very much for

18   your patience.

19           We'll stand in recess until 2:00.

20       (Proceedings recessed 11:53 a.m., May 12, 2021.)

21       (Proceedings reconvened 2:03 p.m., May 12, 2021.)

22           THE COURT:  Please be seated.

23           In Docket 20-CR-45, the Court notes the presence of

24   the jury with roll call waived, the presence of counsel and

25   their clients.

Janet Davis, RDR, FCRR, CRR                    jbd.davis@gmail.com

1          The Government may call its next witness.

2          MS. MARTENS:  Thank you, Your Honor.

3          Government calls Tori Guarino.

4     (Witness sworn.)

5          COURTROOM DEPUTY:  Please take a seat.

6          Ma'am, can you please state and spell your name for

7     the record?

8          THE WITNESS:  Tori Guarino, T-o-r-i, G-u-a-r-i-n-o.

9                **TORI GUARINO, PLAINTIFF'S WITNESS**

10                     **DIRECT EXAMINATION**

11    **BY MS. MARTENS:**

12    **Q.**  Ms. Guarino, what's your current occupation?

13    **A.**  I'm a student at Florida Gulf Coast University.

14    **Q.**  Where are you from?

15    **A.**  I'm from Naples, Florida.

16    **Q.**  Do you know the defendant?

17    **A.**  Yes.

18    **Q.**  Can you point him out in the courtroom?

19    **A.**  Right over there.

20         MS. MARTENS:  Your Honor, may the record reflect that

21    Ms. Guarino has identified the defendant?

22         THE COURT:  The record will so reflect.

23    **BY MS. MARTENS:**

24    **Q.**  Ms. Guarino, how do you know the defendant?

25    **A.**  Um, we met during high school.  I knew him in high school

1   and then he messaged me through Instagram and we started

2   chatting.

3   Q.  And did you develop some sort of relationship after you met

4   him?

5   A.  Yes.  Yes, we -- he asked me out I feel like maybe a week

6   after we met, and then a few more weeks we were in a

7   relationship.

8   Q.  What is NGALA?

9   A.  That was the wildlife reserve that his dad owns.

10  Q.  Did you ever go there?

11  A.  Yes.  Maybe once or twice and then there was this one

12  specific night that we had been planning to hang out for a

13  week.  We had the plan to go out and get dinner beforehand and

14  bring it back to NGALA, and that one night --

15          MS. MARTENS:  Thank you, Your Honor.

16          THE COURT:  Maybe you could turn to your next

17  question.

18  BY MS. MARTENS:

19  Q.  What was the plan that evening for hanging out at NGALA?

20  A.  The plan was to go out, get food and bring it back and then

21  to do, I guess, sexual things which were kind of talked about

22  beforehand but there were some hesitancies discussed.

23  Q.  When you say they were "some hesitancies discussed," what

24  did you say to the defendant?

25  A.  Well, some things were said that --

1    MR. HUGUS:  Objection.  Sorry, Your Honor.  I'm

2   objecting to -- pursuant to the previous order discussed.

3    THE COURT:  The objection is preserved for the record.

4    Ma'am, it would be helpful rather than talk in a

5   passive tense such as, "It was discussed," if you spoke

6   directly about what you said or what he said.

7    THE WITNESS:  All right.

8    THE COURT:  Do you have the question in mind or do you

9   want the attorney to ask --

10    THE WITNESS:  To repeat it.

11    MS. MARTENS:  And I will rephrase to help try to

12   clarify, Your Honor.

13   **BY MS. MARTENS:**

14   Q.  So did you discuss sex with the defendant before that

15   evening that you met him at NGALA?

16   A.  Yes, we did discuss it.

17   Q.  And what did he ask of you?

18   A.  He asked if I was ready and if -- yeah, if I was ready, and

19   I proposed my hesitancies, I'm not sure, I don't think we

20   should do that.  And it was brought up multiple times leading

21   up to that night.

22   Q.  Did you ever talk about whether or not you were ready?

23   A.  Yes.  I said that I was not a few times.

24   Q.  I'm sorry, I didn't catch the last part?

25   A.  A few times, yes.

1    Q.  A few times?

2         So when you met that evening, what were you expecting

3    to do at NGALA?

4    A.  I was expecting to eat dinner and then -- we were in a

5    relationship -- relationship, so making out was okay, you know,

6    but I did not expect it to go all the way.

7    Q.  Did you do those things that night?

8    A.  Yes, yes.

9    Q.  Can you describe that for us?

10   A.  So we ate dinner and I don't really -- so he got off work

11   and then he picked me up.  We went out and then we went to

12   NGALA and then I'm not sure really how long we were there

13   before we ended up with the intercourse.  I didn't -- I don't

14   really know the time frame.

15        But when we got there, we were on the couch, and --

16   Q.  I'm going to slow you down a little bit.

17        So you were there.  You ate your dinner.  Did you

18   drink any wine?

19   A.  Um, he poured me a glass and I'm not a direct quotation,

20   but something along the lines of, "This will make it a little

21   easier," kind of hinting at what the intentions were for the

22   rest of the night.  And -- yeah.  So --

23   Q.  Did you consume it?

24   A.  I think I took a sip of -- just the gesture, but it was

25   placed on another table and I didn't go back to it.

1   Q.  Did you start to touch each other?

2   A.  Yes.  When we were on the couch -- I don't really remember

3   the exact things, per se, but I remember like my clothes came

4   off and then he asked the question, "Oh, do you think you're

5   ready?"  And I said, "Oh, no," like, "Not right now.  I don't

6   know."  Very hesitant, not knowing really what to say but I

7   thought we were on the same page in that matter.  And then he

8   said, "I'm going to go grab the condom from my car," and then

9   he got up and he -- it was just a few steps away but there was

10  a path from the car to the couch.

11  Q.  What happened when he came back?

12  A.  I would say I froze.  I didn't really know what to do

13  because we were on the same page -- I thought we were on the

14  same page right before he went to the car.  I thought that we

15  established that I wasn't ready, and then I just was kind of

16  there, and he put on the condom.

17  Q.  How did he touch you?

18  A.  I guess just really intercourse.  I was just lying there.

19  Q.  So you said you froze and then what body part did he touch

20  with which body part of his?

21  A.  So --

22        MR. HUGUS:  Your Honor, I'm going to object again and

23  renewing the previous objection.  Thank you.

24        THE COURT:  Counsel, please approach.

25      (At sidebar.)

1    THE COURT:  I have a question and then I'll turn to

2  you.

3    MR. HUGUS:  Sure.

4    THE COURT:  I'm uncertain as to the record as it is

5  currently established that we have enough to satisfy the

6  Court's limitation that the alleged victim needs to communicate

7  nonconsent in some fashion, so maybe not words or whatever.

8    MS. MARTENS:  Yes.  So her testimony so far, Your

9  Honor, is that she and the defendant had discussed this in

10  advance, that they had established that they -- that she was

11  not ready for intercourse that night.  She was okay with making

12  out with him.  And when he again prompts her for intercourse,

13  she says, "I don't think I'm ready," that's certainly not

14  consent.  She freezes and then he penetrates her.

15    THE COURT:  Well, he leaves to go and get a condom,

16  and I don't -- I guess I -- I think we should -- I would

17  appreciate more in the lines of --

18    MS. MARTENS:  Clarifying the timeline?

19    THE COURT:  Well, yes.  I mean, she freezes.  He goes

20  to get the condom and then he comes back and I don't -- from my

21  perspective, I don't understand why a person would believe we

22  are on the same page when he says, "I'm going to get a condom,"

23  and leaves.

24    And so that, I guess, is one of the areas that I

25  thought perhaps we could get a little bit more information

1   about.

2          MS. MARTENS:  Certainly, yeah, try and straighten out

3   that timeline.  Because she was elaborating when I asked her to

4   go back and elaborate, so we hadn't -- that's why I asked her,

5   you know, where did he touch you, what happens next.  It is

6   coming out a little jumbled on this end.

7          THE COURT:  Yes, I would agree with that in terms of

8   that for my level of comfort.

9          I think I understand what she's trying to say but I

10  think the record could be a little clearer on that.

11         And, Mr. Hugus, your objection is a little too vague

12  for me to grasp.

13         MR. HUGUS:  I know.  I just wanted to address that it

14  was connected to the order and I appreciate that Your Honor

15  took the initiative to call the sidebar here.

16         So the objection is that the order is specifically

17  limited to these types of contacts, sexual contact that are

18  against the protestations of an alleged victim.  I want to make

19  the objection on the record that all of this testimony so far

20  be stricken because it is not specific to that -- this Court's

21  order on that.  And it is not in a number of ways.

22         When she was asked whether or not she protested, she

23  said, "I don't really remember."  That's her testimony, that's

24  the evidence right now.

25         Then she says, "I was on the couch sitting there

1  naked.  He got up and said, "I'm leaving to go get a condom."

2  And she stayed there.  If the idea that some previous statement

3  that is made is somehow adequate to establish a protestation,

4  then almost certainly the inverse would be true that because we

5  had discussed having sex on a prior occasion, and you said it

6  was okay, now I would be permitted to have sex anytime because

7  we had discussed it and you consented and said it was okay, and

8  so then when we got up later, you know, later in the evening,

9  we're going to have sex because we discussed and you said it

10  was fine.

11       Well, that seems absurd because, as there's been

12  commentary, a person could withdraw their consent at any time.

13       So having discussed it in some vague generalities and

14  saying, "I'm not sure I'm ready," is not a protestation.  A

15  protestation, I think, as I understand it from the Court's

16  order is, "No, don't do this.  Stop," or something to that

17  effect.  Everything that she's testified to so far is that they

18  had intercourse and that she didn't protest to it and that is

19  in direct violation, as I understand it, and as I read it of

20  this Court's order.

21       So for that reason, I'm asking for this witness'

22  testimony to be struck at this point.

23       MS. MARTENS:  If I may, Your Honor?

24       THE COURT:  Um, I'm going to overrule the objection

25  and motion to strike but ask the Government to try to --

1        MS. MARTENS:  Streamline it.

2        THE COURT:  -- manage this in smaller bites so that we

3   have a clearer picture of -- I think what the witness is trying

4   to communicate is that she protested, but I'm not -- I'm still

5   very fuzzy because of -- and I think she's nervous.

6        MS. MARTENS:  Yes, yes.

7        THE COURT:  And certainly that's completely

8   understandable.  And so I will grant some leeway if we could

9   just --

10        MS. MARTENS:  Yes, Your Honor.

11        THE COURT:  -- get into more testimony and you

12   certainly have my permission to do what you need to do to

13   manage the witness so it doesn't all come out with the end, "We

14   had intercourse," although that's what her testimony has been

15   to date.

16        I think I can deal with that if ultimately we can't be

17   sufficiently -- I can't be sufficiently satisfied that it is

18   within the confines of the order.

19        MS. MARTENS:  Thank you, Your Honor.

20        THE COURT:  Thank you.

21        MR. HUGUS:  One more question for clarification,

22   just -- it will help so I'm not making needless objections,

23   certainly.

24        So what is it that the -- I guess what is the Court's

25   requirement or expectation, then, regarding testimony of

1 protestation and what -- and what will constitute that, number

2 one; and number two, if I need to make further objections,

3 what's the Court's pleasure on how I phrase that objection?

4          THE COURT:  Well, I will allow a continuing objection.

5          MR. HUGUS:  Okay.  I will just say "continuing

6 objection."

7          THE COURT:  Well, you can lodge it on the record.

8          MR. HUGUS:  Sure, yeah.

9          THE COURT:  You can -- and I will respect that that's

10 continuing, and -- but I will permit the Government to sort of

11 reposition the testimony of this witness to the point where it

12 comes out a little clearer chronologically in smaller bites so

13 that we know what was communicated.

14          My intent is that it does not have to be orally

15 communicated.

16          MR. HUGUS:  Sure, yeah.

17          THE COURT:  Protestations can occur otherwise, but I

18 need to have a clear picture in my mind.

19          MS. MARTENS:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. HUGUS:  Thanks, Judge.

22     (Sidebar ended.)

23          THE COURT:  Ms. Martens, please continue.

24          MS. MARTENS:  Thank you, Your Honor.

25 BY MS. MARTENS:

1  Q.  Ms. Guarino, you said you were on the couch, and you were

2  making out with the defendant.

3        What happened next?  I just want to walk through it in

4  small pieces.

5  A.  Okay.  And then so we were on the couch.  Um, and then the

6  conversation kind of went down of like, "Are you ready?  Are we

7  doing this right now?"  And I said, "I don't know.  I don't

8  think we should.  Not ready," kind of like what we were texting

9  the previous days, just the not ready.

10        And then even though I said this, he said, "I'm going

11  to go grab the condom from my car."  So then the couch would be

12  right here and then the path, and then his car, so he's walking

13  there --

14  Q.  So then he gets up and he goes from the couch?

15  A.  Yes, to his car, grabs the condom, comes back.  And then

16  I'm still there, and I -- I don't know what to do at this point

17  'cause I said my hesitancies.  I said that I didn't want to.

18        And he was going through the motions, you know,

19  putting on the condom, kind of getting on top and --

20  Q.  So I'm going to slow you down a little bit.

21        Did you do anything to communicate that you might want

22  to be touched?

23  A.  Um, I guess just being there, I guess, not having --

24  Q.  Did you kiss him back?  Did you touch him?

25  A.  I don't remember.

1   Q.  So he's getting on top of you.

2           What happens next?

3   A.  Then, um -- and I can --

4   Q.  Is -- go ahead.

5           MR. HUGUS:  Your Honor, I'm renewing the standing

6   objection as previously noted.

7           MS. MARTENS:  Can I ask a question to clarify?

8           THE COURT:  Yes.

9   BY MS. MARTENS:

10  Q.  So before you said you froze.

11          When was it that you froze?

12  A.  Um, I guess when -- I -- I don't remember necessarily but I

13  guess just him coming back.  I don't know what you mean.

14  Q.  I think you answered my question.

15          THE COURT:  Miss, I know this is uncomfortable, and

16  please relax to the extent you can.

17          So Mr. Smith comes back.  Did you sort of remain in a

18  frozen state?

19          Did you tell him again that you were not ready or that

20  you didn't want to or you didn't know if you wanted to?

21          Did you -- did you communicate anything orally or by

22  your body position or anything like that or -- I'm having a

23  hard time understanding whether you said anything after he came

24  back.

25          THE WITNESS:  I really don't remember the exact words

 1  said, if I'm being completely honest.

 2          THE COURT:  I'm sorry.  You tapered down.

 3          THE WITNESS:  I don't remember the exact words said.

 4          THE COURT:  Did you communicate anything?

 5          THE WITNESS:  I knew that we were on the same page of

 6  that I wasn't ready.

 7          THE COURT:  You knew that?

 8          THE WITNESS:  I thought that we were on the same page.

 9          THE COURT:  And why did you have that belief?

10          THE WITNESS:  Because we were texting the previous

11  days leading up to this.  We had these plans for about a week

12  about what we were going to do, about getting dinner, hanging

13  out that night.

14          THE COURT:  But obviously when he said he was going to

15  go and get the condom, that would signal, I would think -- and

16  please correct me, because I'm not you and I wasn't there --

17  that he wasn't on the same page.

18          Did you do anything to suggest that this isn't the

19  page we were on or -- do you remember?

20          THE WITNESS:  No, I don't remember the exact words

21  said.  But I --

22          THE COURT:  It is okay if you don't remember the exact

23  words, but do you remember whether you said anything?

24          THE WITNESS:  I -- I -- I don't know.  I wasn't into

25  it.  I wasn't in the -- I don't know.

1          THE COURT:  And I appreciate that.  I guess what we're

2   trying to figure out is whether that -- your feeling, whether

3   that was communicated to Mr. Smith in some fashion and, if so,

4   how.

5          You said that you didn't feel like you were into it.

6   Kind of stepping back, looking at it as an observer from the

7   outside looking at that scenario now through your memory, did

8   you communicate that feeling in some fashion?

9          THE WITNESS:  Just saying, "I don't know.  I'm not

10  ready."

11         THE COURT:  Then at the time when he was putting the

12  condom on?

13         THE WITNESS:  I don't remember what I said at those

14  exact -- at that exact time.

15         THE COURT:  Let me turn it back over to you.  Thank

16  you.

17         MS. MARTENS:  Thank you, Your Honor.

18  **BY MS. MARTENS:**

19  **Q.**  So the last thing you said to Mr. Smith was you're not

20  ready?

21  **A.**  Yes.

22  **Q.**  And did you do anything --

23         MR. HUGUS:  Objection, Judge.  It misstates the --

24         THE COURT:  Ma'am -- Mr. Hugus, I -- please wait for

25  her question because if you interrupt then I've forgotten the

1  first part of the question.  I would just ask you wait until

2  her question is presented.

3

4       MR. HUGUS:  Well, I think it was for the prior

5  question.  I do apologize if I stepped on the question.  But I

6  think I'm objecting to the question that was fully formed or

7  the statement that was fully formed insofar as it was a

8  misstatement of the testimony that was just given, I believe,

9  with the Court.

10       THE COURT:  Well, I'll overrule that question at this

11  point and ask you to form a question, and if you believe the

12  question is objectionable, please call that to my attention.

13  Thank you.

14       MR. HUGUS:  Thank you.

15  **BY MS. MARTENS:**

16  **Q.**  As I understand your testimony, the last thing you remember

17  saying to Mr. Smith was that you were not ready; is that right?

18  **A.**  Yes.

19  **Q.**  And did you do anything to take that back?

20  **A.**  No.

21       MS. MARTENS:  Might I have just a moment, Your Honor?

22       THE COURT:  Yes.

23       (Discussion held at prosecution table.)

24       MS. MARTENS:  Your Honor, at this time, I don't have

25  any further questions for this witness.

1       THE COURT:  Thank you, Ms. Martens.

2       For defendant?

3       MR. HUGUS:  No questions from the defense, Judge.

4   Thank you.

5       THE COURT:  Any objections to excusing and releasing

6   this witness?

7       MS. MARTENS:  None from the Government, Your Honor.

8       MR. HUGUS:  No, Your Honor.

9       THE COURT:  Thank you, Miss.  I appreciate your time

10  and travel.  Safe travels back.  You're excused and released

11  from the subpoena.

12      The Government may call its next witness.

13      MS. MARTENS:  Your Honor, regretfully, again, we are

14  ahead of schedule, and my next witness will not be ready until

15  3:00.

16      THE COURT:  All right.  Why don't we take our

17  mid-afternoon break a little early, then.  Again -- well, I

18  forgot the last break.  I was so excited to have a little

19  longer lunch.

20      Please remember the admonition against discussing this

21  case with anyone, including each other.  Please don't do any

22  research about this case, and, as always, please keep an open

23  mind until all the evidence is in.

24      We'll stand in recess until 3:00.

25      (Following out of the presence of the jury.)

1    THE COURT:  Anything for me?

2    MS. MARTENS:  Nothing from the Government, Your Honor.

3    THE COURT:  All right.  We will stand in recess until

4  3:00 p.m.

5    (Recess taken 2:25 p.m. until 3:28 p.m.)

6    (Following in the presence of the jury.)

7    THE COURT:  Please be seated.

8    In Docket 20-CR-45, the Court notes the presence of

9  the jury with roll call waived.

10    The Government may call its next witness.

11    MS. MARTENS:  Thank you, Your Honor.  The Government

12  calls Laura Albertorio-Vasquez.

13    (Witness sworn.)

14    COURTROOM DEPUTY:  Please take a seat.

15    Ma'am, would you please state and spell your name for

16  the record?

17    THE WITNESS:  My name is Laura Albertorio, L-a-u-r-a,

18  and my last name, A-l-b-e-r-t-o-r-i-o.

19  **LAURA ALBERTORIO, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

20  **BY MS. MARTENS:**

21  **Q.**  Ms. Albertorio, what's your current occupation?

22  **A.**  I'm a college student.

23  **Q.**  Where are you from?

24  **A.**  I'm from Florida.

25  **Q.**  What city?

1  A.  Naples.

2  Q.  Do you know Cody Smith?

3  A.  I do.

4  Q.  How do you know him?

5  A.  We dated.

6  Q.  Is he here in the courtroom today?

7  A.  He is.

8  Q.  Can you point him out?

9  A.  (Indicating).

10       MS. MARTENS:  Your Honor, could the record reflect

11  that Ms. Albertorio has identified the defendant?

12       THE COURT:  The record will so reflect.

13  BY MS. MARTENS:

14  Q.  You said you dated.  About how long did you date?

15  A.  About four months.

16  Q.  In that time, did you become familiar with any of his

17  habits?

18  A.  I did.

19  Q.  Did he have any habits regarding a knife?

20  A.  Yes.

21  Q.  And what was that?

22  A.  He would keep the knife in his car.

23  Q.  While you were dating, did you ever have any sexual contact

24  with Mr. Smith?

25  A.  I did.

1    Q.  I'd like to talk about two particular incidents.

2            First, let's talk about the incident in the car.

3            Do you remember what you were doing that day?

4    A.  Not particularly.

5    Q.  Do you remember being with the defendant?

6    A.  Yes.

7    Q.  Where were you?

8    A.  In the car driving to the beach.

9    Q.  Can you speak up just a little bit?

10   A.  I'm sorry.  I was in the car driving to the beach.

11   Q.  Did you spend some time at the beach?

12   A.  Uh-huh.

13   Q.  What did you do at the beach?

14   A.  We mostly just swam, sat in the sand.

15   Q.  What did you do next?

16   A.  Then we went back to the car.

17   Q.  What happened in the car?

18   A.  We started to, um, kiss and then proceeded to have sex.

19   Q.  Was that consensual?

20   A.  (Witness nods head.)

21   Q.  What happened next?

22   A.  As we started --

23           THE COURT:  I'm sorry.  Before you go on, you need to

24   answer the question orally.

25           THE WITNESS:  Uh-huh, yes.

1        THE COURT:  Yes, thank you.

2        MS. MARTENS:  I apologize, Your Honor.

3        THE COURT:  Thank you.

4    **BY MS. MARTENS:**

5    **Q.** So when you said that you consented to sex, let's be a

6    little bit more specific.

7        What kind of sex?

8    **A.** I consented to vaginal penetration.

9    **Q.** What happened after that?

10   **A.** He proceeded to -- sorry -- he proceeded to, um, try and

11   have anal sex with me without my consent.

12   **Q.** How did you communicate your lack of consent?

13   **A.** I told him no.  I started crying.

14   **Q.** You said he tried to.  Did he manage to penetrate you?

15   **A.** Yes.

16   **Q.** How did it feel?

17   **A.** It hurt.

18   **Q.** What did you do?

19   **A.** I told him no and proceeded to lay there and waited until

20   it stopped.

21   **Q.** What happened next?

22   **A.** We just drove.  Afterwards it just ended, and we put on our

23   clothes.

24   **Q.** What were his hands doing while that was happening?

25   **A.** I remember being choked, and that was pretty much it.

1   Q.  I want to turn to the closet incident.

2           Do you remember that day?

3   A.  I do.

4   Q.  What were you doing that day?

5   A.  I was at his house and we were in his room, and then we,

6   um, proceeded to close the door and then have sex.

7   Q.  What kind of sex?

8   A.  Um, just standard.  Just regular sex, just vaginally.

9   Q.  And what happened next?

10  A.  Um, we started kissing, and then he led me to his closet

11  'cause his sister was home.  And then we ended up having sex in

12  the closet.

13  Q.  What did you do?

14  A.  Um, I just laid there, and it was very uncomfortable for

15  me.

16  Q.  What did you say?

17  A.  I said no, that I didn't want to be in the closet.

18  Q.  Why?

19  A.  Because I'm very claustrophobic, and I don't like tight

20  spaces.

21  Q.  When did you first say no?

22  A.  About halfway through.

23  Q.  Halfway through what?

24  A.  Us having sex.

25  Q.  Was that before or after you went into the closet?

1   **A.**  After we went into the closet.

2   **Q.**  Did he stop?

3   **A.**  No.

4   **Q.**  When did it stop?

5   **A.**  After he finished.

6   **Q.**  What happened next?

7   **A.**  We just put on our clothes, and I went to the bathroom and

8   got myself cleaned up.

9   **Q.**  What does that mean?

10  **A.**  Checked to see if there was any blood.

11  **Q.**  Was there blood?

12  **A.**  Yes.

13  **Q.**  Do you remember where his hands were when that was

14  happening, when the sex was happening?

15  **A.**  Around my neck.

16          MS. MARTENS:  Your Honor, may I have a moment?

17          THE COURT:  Yes.

18      (Discussion held at prosecution table.)

19          MS. MARTENS:  Your Honor, I have no further questions

20  for this witness.

21          THE COURT:  Thank you.

22          For defendant.

23                          **CROSS-EXAMINATION**

24  BY MR. HUGUS:

25  **Q.**  Good afternoon.  My name is Jeremy Hugus, and I'm one of

1  the lawyers for Cody Smith.

2          You testified that you and Mr. Smith dated for about

3  four or five months; is that right?

4  A.  Four months.

5  Q.  Four months?

6          When in that period was the two instances that you

7  just discussed?

8  A.  Um, about the second month we were dating.

9  Q.  And that would have been when?

10 A.  Around April and May.

11 Q.  Okay.  And that would be both -- both of those instances?

12 A.  Yes.

13 Q.  In the course of your dating relationship with Mr. Smith,

14 you talked about your relationship with him, correct?

15 A.  Yes.

16 Q.  And the two of you had extensive Snapchat conversations

17 about your relationship, correct?

18 A.  We did.

19 Q.  And in those conversations, you talked about your

20 relationship, your intimacy, all of those things?

21          MS. MARTENS:  Your Honor, I need to object here.

22 There has been no motion under 414 to bring in other instances

23 of conduct with regard to this witness, sexual conduct with

24 regard to this witness.

25          THE COURT:  Mr. Hugus?

1    MR. HUGUS:  Yes.  I think counsel is referring to Rule

2   412, Your Honor.  I haven't asked any questions regarding

3   sexual conduct, and I will represent to the Court that I don't

4   intend to.

5    THE COURT:  I will overrule the objection for now, and

6   certainly, as has been previously extended, we'll see how this

7   line of questioning is pursued.

8    MR. HUGUS:  Thank you, Judge.

9    THE COURT:  Would you restate your question?  I don't

10  believe there was a response.

11  BY MR. HUGUS:

12  Q.  In those -- in those Snapchat conversations, the two of you

13  discussed your relationship extensively, correct?

14  A.  Yes.

15  Q.  You discussed intimate things in those conversations,

16  correct?

17  A.  Yes.

18  Q.  And is it fair to say that Snapchat was a primary way that

19  you and Mr. Smith communicated about your relationship?

20  A.  No.

21  Q.  And by that, what do you mean?  I mean, you had extensive

22  conversation by Snapchat with him, correct?

23  A.  We did.

24  Q.  Okay.  And that was both while you were dating and

25  subsequent to your dating relationship, correct?

 1  A.  Yes.

 2  Q.  Your Snapchat name is Lauriebelle --

 3  A.  Yes.

 4  Q.  -- is that right?

 5          I want to show you, and I'm not publishing to the

 6  jury, but what I'm representing to you is a screenshot of your

 7  Snapchat kind of heading or identifier at the top, and if you

 8  could just confirm for me if that is the Snapchat that would

 9  belong to your account or that's associated with your account?

10  A.  Yes.

11  Q.  Okay.  And do you recognize this as a conversation that you

12  would have had with Mr. Smith?

13  A.  Yes.

14  Q.  And you told him that he was the sweetest, kindest, nicest,

15  hottest, funniest guy that you'd ever met, right?

16  A.  Yes.

17  Q.  After your dating relationship ended, you continued to

18  Snapchat with him, and in those conversations --

19          MR. HUGUS:  I'm sorry.  I lost my --

20  BY MR. HUGUS:

21  Q.  Do you recognize this as a Snapchat that you would have had

22  with Mr. Smith after you were dating?

23  A.  Can you please repeat the question?

24  Q.  Do you recognize this as a Snapchat conversation or

25  exchange that you had with Mr. Smith after you were dating?

1   A.   Yes.

2   Q.   And in that conversation, you told him that you still care

3   about him too much to hurt him, correct?

4   A.   Yes.

5   Q.   And that you'll always remember him, correct?

6   A.   Yes.

7   Q.   And that you loved everything we did together, correct?

8   A.   Yes.

9   Q.   And you told him that you were doing okay after the breakup

10  and you thought it was good that you stayed close friends,

11  correct?

12  A.   Yes.

13  Q.   And that you'd see what happens in the future, correct?

14  A.   Yes.

15  Q.   And you told him that you were happy and doing well and

16  glad that you're really close friends now, correct?

17  A.   Yes.

18          MR. HUGUS:  Just if I might have a minute, Your Honor?

19          THE COURT:  Yes.

20      (Discussion held between defense counsel.)

21  BY MR. HUGUS:

22  Q.   And I just want to go back.  To be clear, those were --

23  those screenshots, those are Snapchats that you recognize from

24  your account, and those are all accurate Snapchat conversations

25  that you had with Mr. Smith, correct?

1    A.  Yes.

2          MR. HUGUS:  Your Honor, defense would move to admit

3    Exhibit KL.  And I have no other questions for this witness.

4          Thank you, ma'am.

5          THE WITNESS:  Thank you.

6          MS. MARTENS:  Your Honor, I object to the admission of

7    this exhibit substantively.  It was never disclosed to the

8    prosecution.

9          THE COURT:  I'll sustain the objection.  While I have

10   no knowledge concerning the disclosures and certainly don't

11   intend to suggest your representation isn't correct, I have a

12   concern that it contains out-of-court statements.  We have the

13   witness here, and she has testified to the effect of the

14   conversations relating to her that counsel wish to pursue, and

15   as to Mr. Smith's responses, they would be inadmissible

16   hearsay.

17         So with that, Exhibit KL is not admitted.

18         MR. HUGUS:  Thanks, Your Honor.

19         THE COURT:  Thank you.

20         Any redirect?

21         MS. MARTENS:  May I have just a moment, Your Honor?

22         THE COURT:  Yes.

23       (Discussion held at prosecution table.)

24

25

1                    REDIRECT EXAMINATION

2    BY MS. MARTENS:

3    Q.  Ms. Albertorio, Mr. Hugus asked you about some instances

4    where you expressed affection for the defendant.

5    A.  Yes.

6    Q.  Did you have affection for him while you dated him?

7    A.  I did.

8    Q.  Was he always kind to you?

9    A.  No.

10   Q.  Did you ever train in martial arts?

11   A.  I did.

12   Q.  Did he?

13   A.  He did.

14   Q.  Could he overpower you?

15   A.  Yes.

16   Q.  Did he overpower you?

17   A.  He did.

18          MR. HUGUS:  Objection, beyond the scope of the --

19          THE COURT:  I agree and sustain the objection.

20          The jury will disregard the witness' response to the

21   last question.

22   BY MS. MARTENS:

23   Q.  Why did you feel the need to keep in touch with him after

24   he left for the Navy?

25   A.  I felt bad.  I felt that -- I felt that it was my fault.

1    Q.   That what was your fault?

2    A.   That he wasn't interested in me anymore.

3              MS. MARTENS:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5         (Discussion held at prosecution table.)

6              MS. MARTENS:  I have no further questions for this

7    witness.

8              THE COURT:  All right.  Any objection to excusing and

9    releasing this witness?

10             MS. MARTENS:  No, Your Honor.

11             MR. HUGUS:  No, Your Honor.

12             THE COURT:  All right.  Thank you, Laura, for your

13   time today and your testimony.  You're excused and released.

14             The Government may call its next witness.

15             MS. MARTENS:  Your Honor, that completes the

16   Government's case-in-chief.

17             THE COURT:  All right.  Thank you.

18             I know it's early today, but the Government's

19   case-in-chief, in large part through stipulations the parties

20   jointly entered into, was shorter than anticipated.  The

21   defendant's case, if any -- and just as a reminder, the

22   defendant has no burden of proof and has no burden or

23   expectation of a case-in-chief.  But I have been advised that

24   there are possible witnesses who have been subpoenaed for

25   appearance tomorrow.

1          Consequently, we will recess for today, having run out

2     of witnesses.

3          So I appreciate your patience as we move along.  I'd

4     ask that the jury be ready to report to the courtroom tomorrow

5     morning at 8:15.

6          Please remember the admonition against discussing this

7     case with anyone, including each other.  Please don't research

8     anything about this case or this type of case, and please keep

9     an open mind until all the evidence is in.

10         Anything from the Government before we recess the jury

11    for the day?

12         MS. MARTENS:  No, Your Honor.  Thank you.

13         THE COURT:  Anything from defendant?

14         MR. HUGUS:  No, Judge.

15         THE COURT:  And is my understanding correct, that the

16    witnesses are expected tomorrow?

17         MR. FREEBURG:  Yes, Your Honor.

18         THE COURT:  Or at least -- all right.  For a minute

19    there, I lost all track of time and thought in all likelihood I

20    misspoke.

21         So we will have an expectation -- again, only by

22    representation and not because the defendant has any burden,

23    but we do have an expectation of additional witnesses.  I think

24    I went through all the advisements, other than the reminder to

25    please keep an open mind until all the evidence is in.

Janet Davis, RDR, FCRR, CRR                    jbd.davis@gmail.com

1    Have a nice evening.  We'll stand in recess until

2  tomorrow morning at 8:15.

3    (Following out of the presence of the jury.)

4    THE COURT:  Please be seated.

5    At this phase of the case, it's customary to inquire

6  as to whether or not there are any motions to present to the

7  Court.  We have moved along very efficiently, with the Court's

8  appreciation to the Government as well as defense counsel, in

9  entering stipulations and managing their case so efficiently

10 and effectively.

11    If you wish a short break prior to the -- any

12 argument; alternatively, if you have no argument at this phase

13 of the case and wish to preserve that for later, please advise.

14    Also, if the defendant may be anticipating taking the

15 witness stand, notwithstanding the fact that he has the

16 constitutional right to remain silent, I normally take some

17 time to address directly with the defendant his rights without,

18 certainly, invading the province of the attorney/client

19 communication or strategy, just to make sure that he is fully

20 advised.

21    MR. FREEBURG:  Judge, we will represent that the

22 defendant does not intend to testify.

23    THE COURT:  I'm sorry.  You know, if anything happens

24 in my zone -- the zone of hearing on my good ear, I can't quite

25 hear anything else.

1      So, Mr. Freeburg, would you state again?

2      MR. FREEBURG:  Judge, at this point, the defendant

3  does not anticipate testifying, and I don't think we need to go

4  over any of those.

5      THE COURT:  All right.  If that changes, certainly,

6  again, I -- those advisements are not intended to be

7  discouraging; it's just to make sure that the defendant is

8  fully advised.  If that were to change, we'll just manage that

9  time within the trial calendar so that we can cover those

10 matters.

11      We're not to the point of dealing with instructions,

12 but I did want to advise that my hope is to have a charging

13 conference, if not earlier, depending upon the length of

14 defense case-in-chief, no later than over the lunch period

15 tomorrow.

16      Does the defense have an estimation of the length of

17 its case-in-chief?

18      MR. FREEBURG:  No, Your Honor.  I think we should

19 be --

20      THE COURT:  Or if you've got -- you know, you don't

21 have to provide an estimate.  If you -- if you've got some

22 other feedback on my expectation to do the charging conference

23 over noon, that basically was what I was driving at.

24      MR. FREEBURG:  No, Your Honor.  But I would ask the

25 Court for an opportunity to make a Rule 29 motion, either now

1    or tomorrow morning.

2          THE COURT:  Yes.  We certainly can address that now,

3    unless you'd like a short break.  I also wanted to address

4    another matter for the benefit of counsel.

5          So what's your pleasure?

6          MR. FREEBURG:  Judge, I would like to hear about the

7    other matter first.

8          THE COURT:  All right.  I wanted to discuss with you

9    my -- the inclination that I may rule to strike Tori Guarino's

10   testimony in total on the conclusion that in order for that

11   testimony to be admitted, I, first, must make the preliminary

12   finding that there's a reasonable expectation that the jury

13   could find a prior act constituting sexual assault occurred.

14         I wanted to give that inclined ruling so that if

15   they're -- for the benefit of argument on that.  Certainly that

16   affects our instructions, and I wanted to hear any argument or

17   anything beyond what has already been placed on the record and

18   what we heard through her testimony so that I might benefit

19   from more than just my observations.

20         So that was the matter that I did want to bring up

21   today so that we can wrap up our instructions.  My intent is to

22   get to some point of -- some fixed point on that matter so that

23   we can finalize those instructions and get them out to counsel

24   today so that you have the benefit of reviewing them, and then

25   we can have a good opportunity for a reasonable charging

1    conference over that lunch hour.

2            So with that, Ms. Martens, is there -- are there

3    observations or arguments you want to bring to my attention

4    on -- as to Ms. Guarino's testimony?

5            MS. MARTENS:  Thank you, Your Honor.  Please.

6            So when we're looking at Ms. Guarino's testimony,

7    certainly it didn't come out as orderly as I had hoped.  But in

8    the end, Ms. Guarino testified that before her encounter with

9    Mr. Smith, there was a clear expectation that she was not ready

10   for intercourse.  She testified that that expectation was

11   established both in conversation and through text message.

12   That evening, she was not expecting to engage in intercourse,

13   and that, even though she consented to him touching her and

14   kissing her and, I think she used the phrase "generally making

15   out," she did not consent to intercourse.

16           She broadcast that lack of consent by telling

17   Mr. Smith that she was not ready.  And despite those

18   statements, Mr. Smith retrieved a condom and then he crawled on

19   top of her and penetrated her.

20           She also testified that she did nothing to change her

21   statement.  While she could not clearly remember exactly what

22   she said, she said the last thing that she remembered saying

23   was that she was not ready and that she did nothing to change

24   that sentiment.

25           And I think that that's enough evidence for this Court

1  to show that there was a lack of consent to the penetration

2  that occurred.  Certainly someone does not have to punch

3  somebody else in the nose or run from the room.  Dr. Lindberg

4  educated myself and the jury about the most common responses to

5  having one's boundaries overwhelmed are fight, flight and

6  freeze.

7          Ms. Guarino testified that she froze.  And I think

8  that on that evidence, this Court can determine that Mr. Smith

9  did, in fact, sexually abuse her, and I think that the jury

10 could reasonably conclude that Mr. Smith did, in fact, sexually

11 abuse her.

12         THE COURT:  Thank you.

13         MS. MARTENS:  Thank you.

14         THE COURT:  For defendant?

15         MR. HUGUS:  Your Honor, the basis for the motion, as

16 the Court knows, is the Court's previous order, and that order

17 says:  "More specifically, this includes the proffered evidence

18 of choking, biting and restraining" -- and this was in

19 reference to another witness, but it was the Court's ruling

20 that this applied to each of the proposed 413 witnesses -- "and

21 perpetrating" -- sorry -- "sexual contact or sexual acts over

22 the alleged victim's protestations."

23         And the basis for the motion is there was no evidence

24 of a protestation.  And a protestation is an emphatic no:  "I

25 protest."  That is not saying, "I'm not sure if I'm ready."

1    It's not ambivalence.  It's not some prior conversation.

2         And the testimony was she went; they hung out; her

3    clothes came off.  She didn't even say they were -- her clothes

4    were removed forcibly or against her protestations.  And then

5    that Mr. Smith left and indicated explicitly his intent, which

6    was to retrieve a condom.

7         And what she did not say is, "I told him, 'No, don't.

8    You better not.  We're not doing this.  Fine, I'm leaving," or

9    even put her clothes back on while he retrieved a condom.

10        And then he returns, and they start having sex, and

11   she does not testify at all that anything about what she did or

12   said -- and the Court instructed earlier from the bench that

13   the protestation need not be verbal only; it could be

14   demonstrated through physical act.  And there was zero evidence

15   of any physical act, that she did anything that would

16   constitute a protestation.

17        She froze, and she doesn't remember what she said or

18   what she did, and I believe the Court questioned her on that

19   point specifically, "Ma'am, did you do anything else?  Did you

20   move your body or position yourself in any way?"  And the

21   answer is no.  There's no protestation, and for those reasons,

22   all of that testimony refers to sexual conduct under Rule 413

23   that is outside the scope of the Court's order in response to

24   the prosecution's motion on 413 testimony.

25        So for that reason, we certainly renew the motion and

1 argue in favor of the motion to have that witness and that

2 testimony stricken completely.

3     Thanks, Judge.

4     THE COURT:  Thank you.

5     Ms. Martens, might I ask a question of you?

6     MS. MARTENS:  Certainly, Your Honor.

7     THE COURT:  I'm trying to recall as well as I can the

8 testimony from the doctor.  And it's -- I want you to help me

9 understand your argument because I agree that the doctor

10 testified about the responses, the three typical responses, and

11 how the freeze or froze response wasn't generally well

12 understood and developed through the work of psychiatrists and

13 psychologists working in this field.

14     But in my recollection of that testimony, the

15 responses were to an event or a trauma or to an assault or

16 abuse; and while it's, I think, certainly understandable that

17 if -- if she perceives this as a trauma, she might not have a

18 clear recollection about what was said when.

19     Her comments about freezing were before anything that

20 was -- that could be considered nonconsensual, so I don't --

21 are you arguing that it was enough to prompt that response that

22 Mr. Smith said he was going to go and get the condom?  That

23 just that alone -- because that's how I recall her testimony,

24 was that that was when she froze.  It wasn't sort of during the

25 event or moments before or whatever.

1    So I'm having a hard time, I guess, with this freeze

2  explaining why nothing else is very clear on this whole consent

3  issue.

4    MS. MARTENS:  Certainly, Your Honor.

5    THE COURT:  Because I feel like I need to find some

6  sufficient evidence to show lack of consent.  And I tried to

7  work with her.  You did, I thought, an admirable job.  She --

8  her testimony was what it was, but we still have -- I'm still

9  left with a conundrum about how that suffices.

10    MS. MARTENS:  Yes.  So I thought that when we sort of

11  stopped and went back through, so we had -- my recollection of

12  the testimony is that she was sort of quickly running through,

13  and she said, "I froze."  And then I asked her to go back and

14  then try and piece those details.

15    And that's when, I think, we had the bench conference.

16  So it wasn't clear when she was saying she froze -- I thought

17  we cleared it up that it was frozen -- I think she might have

18  been triggered when he announced his intention to go get the

19  condom, but I thought we cleared it up that she was frozen when

20  he approached her after getting the condom, that she took no

21  action, that she remained frozen.

22    And so, you know, when we talk about Dr. Lindberg,

23  what he talked about was in the face of trauma, many victims

24  disassociate, which means they completely disconnect from their

25  body, and that goes along with freezing.  And so the ability to

1  resist, verbalize, those sorts of things, essentially evaporate

2  in some people.  In fact, most people.

3      You'll recall the doctor saying that his experience is

4  that most people freeze when confronted with trauma.

5      And after her saying, "I'm not ready," and Mr. Smith

6  announcing his clear intention to violate her boundaries,

7  that's that violation of those set boundaries that is the

8  trauma.  When we start looking at sexual abuse, certainly sex

9  acts are things that people engage in consensually on a regular

10  basis; but they are traumatic when they occur while bypassing

11  boundaries, however they may be set, in relationships, societal

12  expectations, the bypass of those boundaries is the trauma.

13      Now, Dr. Lindberg testified about how the brain

14  functions during trauma and how it is that your prefrontal

15  lobe, the blood shunts away from it, and essentially your

16  ability to reason is greatly diminished, and that's part of why

17  people do things that are weird when under these kinds of

18  stresses.

19      And so her announcing her boundary, "I'm not ready,"

20  him announcing his clear intention to violate that boundary,

21  that is most certainly a trauma.

22      And then, when he comes back and she says, I did

23  nothing to change my position, and yet Mr. Smith penetrated

24  her, that is yet another violation of her boundaries.  And that

25  freeze response, I think, is doubly triggered in a situation

1    like this, along with the behaviors that the doctor explained

2    to the jury in terms of disassociating, fragmented memory,

3    difficulty recalling the details of the event.  All of those

4    things, I think, are exemplified in Ms. Guarino's testimony.

5            THE COURT:  All right.  Thank you.

6            MS. MARTENS:  Thank you.

7            THE COURT:  I appreciate the opportunity to have a

8    frank discussion on that point.  I plan on rereading her

9    testimony and, again, making a decision so that I can -- we can

10   finalize the instructions.

11           MR. HUGUS:  Might I make a brief comment in response,

12   Judge?

13           THE COURT:  Yes.

14           MR. HUGUS:  One of the issues that Ms. Martens brought

15   up is the signalling of intent through the -- the

16   statement on -- her statement, "He says he's going to go get a

17   condom."

18           As the Court noted, the way that we can protest is not

19   just verbal, it's also through our actions.

20           And, similarly, we can also indicate consent through

21   our actions.  And so the idea that she made a statement at one

22   point, the last thing that she remembers, and she doesn't say

23   it even happened that night.  She said they talked about it

24   before, and the last thing she ever remembers communicating

25   verbally was, "I don't know that I'm ready for this yet," at

1   some point.

2          But a lot of things happened in between there which

3   was them getting together, them spending time together, them

4   being on the property, her clothes coming off, all of those

5   things.

6          And so importantly, I think, there were other things

7   communicated nonverbally as well that don't -- that modify

8   someone's understanding about what level of consent that we're

9   talking about.  I mean, every person that has some kind of

10  sexual relationship or let's call sexual intercourse makes a

11  series of moves and dances, and they're communicating the

12  entire time, verbally and nonverbally, to get from a place like

13  where I am right now to where I'm fully clothed to a place

14  where they're having sexual intercourse.  And there's moment by

15  moment, pieces of communication, encoding and decoding that are

16  happening.

17         And so the state of being there without clothes on is

18  a piece of communication that is not communicating specifically

19  protestation, and I think that that's important because there's

20  this interim piece of communication.

21         Also, the -- the signalling of the intent through the

22  walk to the car to get the condom isn't itself a violation,

23  isn't itself forced sexual contact, and isn't itself illegal.

24         And as I said earlier at the bench, just because

25  consent is given for sexual intercourse through a conversation

1    does not mean it cannot be subsequently withdrawn like that

2    (indicating).  And the reverse is true, that just because I

3    say, "No, I'm not in the mood," or "I'm not ready," does not

4    mean I can't also change my mind and my opinion subsequently

5    and communicate that change through other things that I do and

6    the way I communicate with my body and my clothes and those

7    kinds of things.

8              Thanks, Judge.

9              THE COURT:  Thank you, Mr. Hugus.

10             All right.  Are we ready for our motion argument?

11             MR. FREEBURG:  Judge, we make our motion pursuant to

12   Rule 29(a), moving for a judgment of acquittal specifically

13   with respect to the kidnapping charge.

14             The testimony the Court received from the alleged

15   victim was that there was a moment in time at the McDonald's

16   when they were choosing between going to the apartment and

17   going to Yellowstone, and she said, "Just go."  And they went

18   to Yellowstone.

19             There's subsequently a text message at 11:47 from

20   Ms. Bye, "I'm good," in response to, "Are you okay?"  And so

21   for that reason, there's not a jury that could find -- a

22   rational jury could not find beyond a reasonable doubt that

23   there was not consent to that trip to Yellowstone.

24             Secondly, with respect to the sexual contact in the

25   tent, the evidence is generally insufficient.

1      And if the Court has any questions on those points,

2  I'm happy to elaborate, but I wanted to keep it concise.

3      THE COURT:  Thank you.  I -- as I understand your

4  argument, your argument really hones in on the definition of

5  the word "kidnap" in the first element because I -- I don't

6  think that there's any disagreement that her being in the car

7  is a situation where that amounts to a confinement.  It's not

8  like she can -- I guess, she can possibly open the door and

9  jump out, but that's risking some injury.

10      So the issue is whether that confinement is against

11  the victim's will.

12      MR. FREEBURG:  Yes, Judge.

13      THE COURT:  And is that -- is that where you're

14  focusing?

15      MR. FREEBURG:  Yes, Judge, given the evidence that she

16  voluntarily consented to go to Yellowstone.  And further, the

17  prosecution in this case has submitted a jury instruction that

18  coercion or force is an essential element of kidnapping, so

19  related to that jury instruction, there isn't sufficient

20  evidence of any force of confining her in the vehicle.

21      THE COURT:  I'm not sure force is an element.  Isn't

22  it just involuntary or coercion?

23      I guess the prosecutor can perhaps address that.  You

24  and I struggling with it in terms of the elements of the

25  offense -- I just wanted to make sure I was focused on the crux

1    of the argument.  It's on whether the -- whether there --

2    whether the element of kidnapping is present, whether it's

3    involuntary, coercion; whether that has been shown, as well as

4    whether the confinement was against the victim's will.

5         MR. FREEBURG:  Yes, Judge.  And I was using force and

6    coercion interchangeably, and they are different.

7         THE COURT:  No, that's fine.  I just wanted to -- and

8    again, the Government can sort us out on that.

9         Thank you, Mr. Freeburg.

10        For the Government?

11        MS. MARTENS:  I apologize, but I couldn't hear

12   Mr. Freeburg as to the sexual contact.

13        THE COURT:  I don't believe he argued anything as to

14   sexual contact.

15        MS. MARTENS:  All right.  Wonderful.  I just wanted to

16   make sure that I hadn't misunderstood.

17        THE COURT:  I didn't hear anything either, but

18   Mr. Freeburg, did we miss something there?

19        MR. FREEBURG:  Judge, I just said it was generally

20   insufficient, but I didn't point to any specific --

21        THE COURT:  All right.  All right.

22        Thank you for clarifying that.  I think I was not -- I

23   was thinking and not listening.

24        So, Ms. Martens.

25        MS. MARTENS:  Thank you, Your Honor.

1    So I think that we narrowed it down to whether or not

2   Ms. Bye wanted to go to Yellowstone with Mr. Smith.  And so

3   most of the elements of kidnapping I think are not in dispute

4   based on my understanding of counsel's argument.

5    So if we narrow it down to knowingly acting contrary

6   to law, kidnapped Hannah Bye by seizing, confining, inveigling

7   her as charged and kidnapping in the instructions talking about

8   a person who is unlawfully held, kept, detained and confined

9   against that person's will.  So there was plenty of talk about

10  whether Ms. Bye wanted to go to Yellowstone with Mr. Smith.

11    And I think a lot of the evidence, especially on

12  cross-examination that we're looking at here had to do with

13  that Tinder conversation.

14    Now, when you look at the Tinder conversation that

15  Ms. Bye and Mr. Smith engaged in, which is before this Court in

16  Government Exhibit 100A, what you'll find is that Ms. Bye and

17  Mr. Smith engaged in some conversation.  She said she was new

18  in town, didn't have any friends, she was kind of sad.  And

19  then Mr. Smith starts to talk about meeting up.  Ms. Bye joins

20  that conversation.

21    And then when we get to -- I want to be able to point

22  the Court to the specific pages -- so Mr. Smith suggests to

23  Ms. Bye on page 24 of this exhibit to hang out in Yellowstone.

24  Ms. Bye says she's never been.  He asks if she wants to go.

25  "Bet, LOL, but I don't have a car."  So that's Saturday

1   afternoon at 1:49 p.m. on September 7th.  Ms. Bye says she

2   would like to go to Yellowstone.  He offers to pick her up,

3   asks if she is free.  She asks, "Tomorrow?"

4          He says, "Today."

5          She says, "um, I can't today, but I can tomorrow."

6   And that's entirely consistent with her testimony, that she'd

7   never been to Yellowstone National Park, that that Saturday she

8   had intended simply to meet Mr. Smith to go to the McDonald's,

9   and she didn't intend to spend the night with Mr. Smith, simply

10  to hang out with him.

11         Now, when we're talking about the motion for judgment

12  of acquittal, the standard here is that the evidence is viewed

13  in the light most favorable to the Government, and Ms. Bye

14  certainly repeatedly emphasized that she did not want to go to

15  Yellowstone that night.  She had only communicated a general

16  interest in maybe going to Yellowstone at some point and, while

17  in the car with him, repeatedly insisted that she did not want

18  to go to Yellowstone.

19         On cross-examination, she explained that, sure, she

20  said, "Just go," but that was after she told the defendant, "I

21  want to go home."  So in context, it was, "Take me home," not,

22  "Take me to Yellowstone."

23         But even after they turned out of the parking lot, she

24  continued to protest.

25         So in the light most favorable to the Government, I

1  believe there's more than sufficient evidence for that matter

2  to go to the jury, and I think that that was essentially the

3  argument on kidnapping.

4      Now, as to the abusive sexual contact, we have a

5  general denial.  So, most of the elements of that charge are,

6  again, satisfied by the stipulations of the parties.  So we

7  don't have to worry about the timing in terms of September 7th

8  and 8th; within the District of Wyoming or the boundaries of

9  Yellowstone National Park because the parties agree that they

10 traveled and were present in the Park on that day, and then we

11 have to talk about knowingly engage in and cause sexual

12 contact, specifically defined 18 USC 2246(3).

13     So we need the intentional touching, directly and

14 through the clothing of genitalia, anus, groin, breast, inner

15 thigh and buttocks of the victim with intent to humiliate,

16 harass, degrade, and to arouse or gratify the sexual abuse of

17 any person accomplished by force or the attempted use of force.

18     Ms. Bye's testimony stands on its own for this point.

19 She testified about all of the places that the defendant

20 touched her directly and under her clothing, to include her

21 breasts, her groin, her inner thigh and buttocks.  She didn't

22 talk about her anus or her genitalia.  She said that his hands

23 made it up to the edge of her underwear.  But we don't have to

24 get to her genitalia or her anus to satisfy this charge.  We've

25 covered everything else in the definition.

1    So we do have evidence of the contact.  And then

2  accomplished by force, she testified that the defendant choked

3  her and held her down while he did this, that he was on top of

4  her, and she couldn't get out from underneath him.

5    That's more than enough to satisfy use of force or

6  attempted use of force.

7    And then specifically she also testified that she

8  repeatedly told him no.  And, Your Honor, that's more than

9  enough, especially taken in the light most favorable to the

10  Government on its own, and yet we have pictures of the injuries

11  that she sustained, along with other corroborating evidence to

12  satisfy the Government's burden here.

13    Thank you.

14    THE COURT:  Thank you.

15    Anything further, Mr. Freeburg?

16    MR. FREEBURG:  No, Your Honor.

17    THE COURT:  All right.  Thank you.

18    Well, I deny the Rule 29 motion for judgment of

19  acquittal, in large part for the reasons argued by the

20  Government.  I believe that in viewing the evidence in the

21  light most favorable to the Government, I can't conclude that a

22  reasonable juror would find -- there's going to be too many

23  noes in that sentence.

24    But considering the evidence in the light most

25  favorable to the Government, it's my conclusion that the

1  evidence is sufficient to go to the jury as to the essential

2  elements of the charges brought in this indictment.

3          With that, is there anything else that we should

4  discuss?

5          For the Government?

6          MS. MARTENS:  Nothing, Your Honor.

7          THE COURT:  Are you amenable to a charging conference

8  at -- over the kind of longish lunch break tomorrow?

9          MS. MARTENS:  Yes, Your Honor.

10         THE COURT:  And feel free, even though we don't

11 usually permit food in the courtroom, feel free to bring your

12 lunch.

13         MS. MARTENS:  Thank you.  I appreciate that.

14         THE COURT:  For the defendant, anything further?

15         MR. FREEBURG:  No, Judge.

16         THE COURT:  All right.  And to you, again -- I'm

17 sorry, I didn't mean to interrupt you.

18         Are you agreeable to the charging conference as

19 described?  And, again, you're more than welcome to bring your

20 lunch.

21         MR. FREEBURG:  Yes, Your Honor, with the only thought

22 that if we need a moment to speak with our client, we'd ask the

23 Court's grace -- and, excuse me, I've been trained to sit while

24 talking to a microphone.

25         THE COURT:  Oh, yeah, you can remain seated.  You're

1    too tall for me to hear.  So I'd rather hear than attend to

2    those niceties.

3              MR. FREEBURG:  No, Judge.  We're happy to do it over

4    the lunch hour, only with the caveat we may ask the Court's

5    permission to meet with our client around 9:00.

6              THE COURT:  All right.  You bet.

7              With an eye towards that, would it be better to meet

8    right upon our recess, or to give you some time before we

9    reconvene?

10             MR. FREEBURG:  I expect we would want to meet with our

11   client after the charging conference.

12             THE COURT:  All right.  Thank you.

13             Then we'll do the charging conference after we recess

14   the jury and probably give you, you know, some time, likely ten

15   minutes, to get your lunch or get your materials collected for

16   the conference.

17             And, again, we'll have -- we'll have the draft to you

18   sometime today so that you can review it, and hopefully then we

19   can be as productive as possible at the conference.

20             All right?

21             MR. FREEBURG:  Thank you.

22             THE COURT:  Thank you.

23             With that, we'll -- oh, I did want to mention, too,

24   just as a reminder to please give opposing counsel the list of

25   witnesses and accompanying exhibits today for tomorrow, and if

1  you can give those to the court reporter and courtroom deputy

2  either today or tomorrow morning, at the latest, all right?

3          MR. FREEBURG:  Yes, Judge.

4          THE COURT:  And it doesn't have to be typed out or

5  anything, but just something that gives us an opportunity to

6  follow the expected witnesses to be called and the evidence.

7  All right?

8          MR. FREEBURG:  Thank you.

9          THE COURT:  All right.  We'll stand in recess until

10 likely 8:30 in order to bring the defendant up.  All right?

11         We'll stand in recess until 8:30 tomorrow morning.

12     (Proceedings recessed 4:33 p.m., May 12, 2021.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5           I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter, Federal Certified Realtime

8    Reporter, and Certified Realtime Reporter, do hereby certify

9    that I reported by machine shorthand the foregoing proceedings

10   contained herein on the aforementioned subject on the date

11   herein set forth, and that the foregoing pages constitute a

12   full, true and correct transcript.

13

14           Dated this 12th day of May, 2021.

15

16

17

18                        /s/ *Janet Davis*

19                        _____

20                        *JANET DAVIS, RDR, FCRR, CRR*
                          *Federal Official Court Reporter*

21

22

23

24

25

1                    I N D E X

2
     GOVERNMENT'S WITNESSES                              PAGE
3
     HANNAH EGBERT
4        Direct - Ms. Martens                              4
         Cross - Mr. Freeburg                             11
5    ELNA PERKINS
         Direct - Ms. Martens                            18
6        Cross - Mr. Freeburg                            29
         Redirect - Ms. Martens                          34
7    KEITH ALAN MILKS
         Direct - Ms. Romine                             37
8    TIMOTHY J. ORR
         Direct - Ms. Romine                             43
9        Cross - Mr. Freeburg                            53
     KIMBERLY LEY
10       Direct - Ms. Romine                             55
         Cross - Mr. Freeburg                            69
11   DYANNE CARPENTER
         Direct - Ms. Romine                             71
12       Cross - Mr. Freeburg                            81
     KARSON HALEY CEGLIA-CHAMBROT
13       Direct - Ms. Martens                            83
         Cross - Mr. Hugus                               93
14       Redirect - Ms. Martens                          99
     TORI GUARINO
15       Direct - Ms. Martens                           102
     LAURA ALBERTORIO
16       Direct - Ms. Martens                           118
         Cross - Mr. Hugus                              123
17       Redirect - Ms. Martens                         129

18


19

     GOVERNMENT'S
20   EXHIBITS        DESCRIPTION        IDENTIFIED   RECEIVED

21
     300             911 Call                  22         22
22
     613             Photographs               45         48
23
     614             Photographs               45         48
24
     615             Photographs               45         48
25

| GOVERNMENT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 616 | Photograph | 49 | 48 |
| 617 | Photograph | 49 | 48 |
| 618 | Photograph | 49 | 48 |
| 619 | Photograph | 50 | 48 |
| 620 | Photograph | 50 | 48 |
| 1002 | Parties' Second Joint Stipulation | 3 | 3 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| KL | Snapchat Conversation | 126 | |

| MOTIONS | PAGE |
|---|---|
| Guario Testimony - The Court | 134 |
| Guarino Testimony - Ms. Martens | 135 |
| Guarino Testimony - Mr. Hugus | 136 |
| Guarino Testimony - the Court | 138 |
| Guarino Testimony - Ms. Martens | 139 |
| Guarino Testimony - Mr. Hugus | 141 |

| MOTION | PAGE |
|---|---|
| Rule 29(a) - Mr. Freeburg | 143 |
| Rule 29(a) - Ms. Martens | 145 |
| Rule 29(a) - Ruling | 149 |