1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF WYOMING
2    _____

3    UNITED STATES OF AMERICA,          DOCKET NO. 20-CR-045-F

4         Plaintiff,                    Volume IV
                                        Pages 1 - 128
5         vs.

6    CODY DONOVAN SMITH,                Cheyenne, Wyoming
                                        May 13, 2021
7         Defendant.                    8:30 a.m.
     _____

8
              TRANSCRIPT OF TRIAL PROCEEDINGS
9
         BEFORE THE HONORABLE NANCY D. FREUDENTHAL
10             UNITED STATES DISTRICT JUDGE
          and a jury of twelve and two alternates
11
                 RENDITION OF VERDICT
12                  jury of twelve

13

14

15

16

17

18

19

20

21

22
              JANET DAVIS, RDR, FCRR, CRR
23             Federal Official Court Reporter
      2120 Capitol Avenue, Room 2226, Cheyenne, WY  82001
24            307.314.2356 * jbd.davis@gmail.com

25   Proceedings reported by stenotype reporter; transcript produced
     with Computer-Aided Transcription.

APPEARANCES:

For the Plaintiff:      CHRISTYNE M. MARTENS
                        Assistant United States Attorney
                        District of Wyoming
                        100 East B Street, Suite 2221
                        Casper, WY  82604

                        NICOLE M. ROMINE
                        Assistant United States Attorney
                        District of Wyoming
                        2120 Capitol Avenue, Fourth Floor
                        Cheyenne, WY  82001


For the Defendant:      JEREMY J. HUGUS
                        Platte River Law Firm
                        536 South Center Street
                        Casper, WY  82601

                        ALEXANDER FREEBURG
                        Freeburg Law
                        P.O. Box 3442
                        Jackson, WY  83001

```
 1                         I N D E X

 2    DEFENDANT'S WITNESSES                              PAGE

 3     KRISTIE LORDS
          Direct - Mr. Freeburg                            6
 4        Cross - Ms. Martens                              10
       JACOB OLSON
 5        Direct - Mr. Hugus                               12
          Cross - M                                        48
 6     ALEXANDRA BONTECOU
          Direct - Mr. Freeburg                            53
 7        Cross - Ms. Martens                              67

 8
```

| GOVERNMENT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 1003 | CFR | 69 | 70 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| D1 | Photograph | 57 | 58 |
| D10 | Photograph | 57 | 58 |
| D12 | Photograph | 57 | 58 |
| D13 | Photograph | 57 | 58 |
| D15 | Photograph | 57 | 58 |
| D17 | Photograph | 57 | 58 |
| D19 | Photograph | 57 | 58 |
| D20 | Photograph | 57 | 58 |
| D21 | Photograph | 57 | 58 |
| D28 | Photograph | 57 | 58 |
| D30 | Photograph | 57 | 58 |

```
 1   DEFENDANT'S
       EXHIBITS        DESCRIPTION           IDENTIFIED   RECEIVED
 2

 3     D31        Photograph                      57          58

 4     D32        Photograph                      57          58

 5     D36        Photograph                      57          58

 6     D38        Photograph                      57          58

 7     D44        Photograph                      57          58

 8     D45        Photograph                      57          58

 9     D46        Photograph                      57          58

10     D47        Photograph                      57          58

11     D5         Photograph                      57          58

12     D54        Photograph                      57          58

13     EE         Photograph                      16          17

14     M3         Map                             41          42

15     OO         Diagram                         54          55

16
       MOTIONS                                             PAGE
17
       Rule 29(a) - Mr. Freeburg                             74
18     Rule 29(a) - Ms. Martens                              75
       Rule 29(a) - Ruling                                   76
19
       Rule 413 Testimony - the Court                        76
20
       Jury Instruction Conference                           79
21

22     CLOSING ARGUMENTS                                   PAGE

23     Ms. Martens                                           91
       Mr. Hugus                                             99
24     Ms. Martens                                          118

25
```

1    (Proceedings reconvened 8:33 a.m., May 13, 2021.)

2         THE COURT:  Please be seated.

3         Good morning, everyone.  We're back on the record in

4    Docket 20-CR-45.  The Court notes the presence of the jury with

5    roll call waived, the presence of counsel and their clients.

6         For defense, you may begin your case-in-chief.

7         Again, this is an advisement:  Defendant has no

8    obligation to present a case-in-chief.  We have been advised to

9    expect one.

10         Do you have any witnesses?

11         MR. FREEBURG:  Yes, Judge.  At this time, we would ask

12    the Court to allow us to call Ms. Kristie Lords.

13         THE COURT:  All right.  Will someone fetch her,

14    please?

15         Thank you, Mr. Hugus.

16    (Witness sworn.)

17         COURTROOM DEPUTY:  Please take a seat.

18         Ma'am, can you please state and spell your name for

19    the record?

20         THE WITNESS:  Yes.  It's Kristie Lords, K-r-i-s-t-i-e

21    L-o-r-d-s.

22         MR. FREEBURG:  And, Judge, may I inquire?

23         THE COURT:  Yes, please proceed.

24

25

1    **KRISTIE LORDS, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

2    **BY MR. FREEBURG:**

3    Q.  Ms. Lords, where do you work?

4    A.  I work at Brigham Young University Idaho.

5    Q.  And what is your job title?

6    A.  My job title is managing director of student well-being.

7    Q.  What is under you as managing director of student

8    well-being?

9    A.  I oversee student conduct, it's called the student honor

10   office, disability services, and the wellness center.

11   Q.  So you would oversee honor code investigations?

12   A.  Yes.  I oversee the director of that office.

13   Q.  Today I want to talk about the honor code in general.  I

14   will not ask you about any particular student honor code

15   investigation or violation whatsoever.  Understood?

16   A.  Uh-huh, yes.

17   Q.  I'm sorry.  We're making a record.  Is that a yes?

18   A.  Yes.

19   Q.  Thank you.

20          And so we're clear, have we ever met before today?

21   A.  No.

22   Q.  What is your educational background that qualifies you to

23   hold this office, overseeing the person that oversees honor

24   code investigations?

25   A.  My undergrad work is in business and psychology, and my

1    Master's degree is in sociology.

2    Q.  And how long have you worked at BYU Idaho?

3    A.  22 years.

4    Q.  What is the honor code generally?

5    A.  The honor code is a set of standards that students agree to

6    uphold while they're enrolled at BYU Idaho.

7    Q.  And where does the honor code come from?  In other words,

8    does it come from just BYU Idaho, or does it have another

9    source?

10   A.  So it's -- it's a set of standards that -- BYU Idaho is

11   affiliated with the Church of Jesus Christ of Latter Day

12   Saints, and the original author, I am not aware of.  It is the

13   board of education that oversees BYU Idaho approves the honor

14   code, and the sister institutions as well have the same honor

15   code.

16   Q.  And does church doctrine play a role in crafting the honor

17   code, or is church doctrine the source of some of the rules

18   from the honor code?

19   A.  Yes.

20   Q.  What does BYU Idaho do to monitor student compliance with

21   the honor code?

22   A.  So, it's educationally based, and there are -- there are

23   reports that are given.  I'm not sure I understand your

24   question specifically.

25   Q.  Where do reports of honor code violations originate from?

1   A.   They could originate from roommates, managers.

2   Q.   What is the -- is there a role for a bishop or stake

3   president in monitoring student compliance?

4   A.   No.

5   Q.   Is there any sort of endorsement from a bishop or a stake

6   president?

7   A.   Yes.

8   Q.   What's that endorsement called?

9   A.   It's called the continuing ecclesiastical endorsement.

10  Q.   And just generally, what is it?

11  A.   So students meet with their ecclesiastical leader once a

12  year to review the honor code, and they -- they certify with

13  the student that they'll agree to follow those standards.

14  Q.   And is that particular person -- the bishop or the stake

15  president -- are they a BYU Idaho employee or a church

16  employee --

17  A.   No.

18  Q.   -- or neither?

19  A.   Neither.

20  Q.   Okay.  I want to talk about a few specific areas of the

21  honor code.

22           Is there a curfew at BYU Idaho?

23  A.   There is.

24  Q.   What is the curfew?

25  A.   The curfew is 12:00 p.m. -- excuse me -- 12:00 a.m. or

1  p.m.?  a.m. -- 12:00 a.m. Monday through Thursdays.  Friday is

2  1:00 a.m., and Saturday is 12:00 a.m.

3  **Q.**  What is the purpose of the curfew?

4  **A.**  The purpose of the curfew is to encourage educational

5  excellence and to be respectful of roommates and study hours.

6  **Q.**  Are there apartment and living standards for the students

7  that originate from the honor code?

8  **A.**  There are apartment living standards.  I don't know if they

9  originate -- I don't oversee housing.  I don't know if they

10  originate from the honor code.

11  **Q.**  And that may be a bad question.

12         Are there standards relating to unmarried men and

13  women, and can they cohabitate while being students at BYU?

14  **A.**  No.

15  **Q.**  No standards, or no, they can't cohabitate?

16  **A.**  No, they can't.  Thank you.

17  **Q.**  Okay.  Thank you.

18         Can a student have an overnight guest in their

19  apartment?

20  **A.**  They can, as long as it's not a member of the opposite sex.

21  **Q.**  Okay.  So a group of young women living together in an

22  apartment cannot have a man in the apartment overnight?

23  **A.**  Correct.

24  **Q.**  And can students get around that rule by, for example,

25  going camping with a member of the opposite sex overnight?

1   A.  So, no, we don't -- no.  There's a -- no.  That holds true

2   off campus as well.

3   Q.  Is there a specific instruction to students specifically

4   not to go camping with members of the opposite sex?

5   A.  There is a standard that states no camping with members of

6   the opposite sex unless it's an approved activity with wards.

7   Q.  Thank you for that qualification.

8           Isn't -- isn't it true that violations of the honor

9   code can result in punishment to students?

10  A.  There is a consequence, yes.

11  Q.  And in some instances, that consequence can include

12  expulsion.  There is some behavior that can result in

13  expulsion?

14  A.  Yes.

15          MR. FREEBURG:  Judge, if I can have a moment with my

16  co-counsel?

17          THE COURT:  Certainly.

18      (Discussion held between defense counsel.)

19          MR. FREEBURG:  Judge, no further questions for this

20  witness.  Thank you.

21          THE COURT:  Any questions from the Government?

22          MS. MARTENS:  Thank you, your Honor.

23                      CROSS-EXAMINATION

24  BY MS. MARTENS:

25  Q.  Good morning, Ms. Lords.  How are you today?

1    A.  I'm well.  Thank you.

2    Q.  Good.  I have just a couple of questions for you.

3          Mr. Freeburg asked you about violations of the honor

4    code.  And I believe that you just answered that some

5    violations can result in expulsion.

6    A.  Yes.

7    Q.  Do all violations result in expulsion?

8    A.  No.

9    Q.  When we're talking about prohibitions on spending time with

10   the opposite sex, if there is, for example, a sexual assault,

11   does that violate the honor code?

12   A.  Yes.

13   Q.  If it's a sexual assault perpetrated by one student against

14   another, does that violate the honor code?

15   A.  Yes.  It moves over into the Title IX office, but yes.

16   Q.  By being sexually assaulted does someone violate the honor

17   code?

18   A.  No.

19   Q.  Would it be a violation of the honor code to be out

20   overnight if you were held against your will?

21   A.  No.

22          MS. MARTENS:  May I have just a moment?

23          THE COURT:  Certainly.

24   (Discussion held at prosecution table.)

25          MS. MARTENS:  I have nothing further for this witness,

1   your Honor.

2          THE COURT:  All right.  Thank you.

3          Any redirect?

4          MR. FREEBURG:  No, your Honor, and I'd ask that this

5   witness be excused.

6          THE COURT:  Any objection to excusing and releasing

7   this witness?

8          MS. MARTENS:  No, your Honor.

9          THE COURT:  All right.  Thank you, Ms. Lords, for your

10  time and your testimony.  You're excused and released from your

11  subpoena.

12         Defendant may call its next witness.

13         MR. HUGUS:  Defendant calls Agent Jake Olson.

14      (Witness sworn.)

15         COURTROOM DEPUTY:  Please take a seat.

16         Can you please state and spell your name for the

17  record?

18         THE WITNESS:  Jacob Olson, J-a-c-o-b O-l-s-o-n.

19      **JACOB OLSON, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

20  **BY MR. HUGUS:**

21  Q.  Good morning.

22  A.  Morning, sir.

23  Q.  In the course of your investigation connected to this case,

24  you interviewed a bunch of different folks, correct?

25  A.  Correct.

1  Q.  And you used that information that you received from

2  witnesses to build your investigation, yes?

3  A.  In part.

4  Q.  And you also used the information from your interviews and

5  items that you collect, evidence generally, to collaborate or

6  refute various claims from other people that you spoke to,

7  correct?

8  A.  Generally correct, yes.

9  Q.  And to see what information is consistent or contradictory?

10  A.  Are you asking if I was trying to see if things were

11  contradictory?

12  Q.  Yeah.  You use information that you gather to determine

13  other pieces of information and find out if they're consistent

14  with each other or if there's pieces of information that you're

15  getting that might contradict?

16  A.  Yeah, that's correct.

17  Q.  And you also used the information to decide what other

18  evidence you might be looking for, correct?

19  A.  At times.

20  Q.  And you need that information to guide you on your

21  continued investigation, right?

22  A.  The corroborating information, is that what you're

23  referencing?

24  Q.  Or otherwise.  But the information continues to build and

25  guide the investigation?

1  A.  Yes.

2  Q.  And you used this information to guide your follow-up

3  questions with witnesses that you may have already interviewed

4  or with new witnesses?

5  A.  At times.

6  Q.  So, for example, if somebody said, you know, "I saw" --

7  let's say you were investigating a robbery, and someone said,

8  "Well, I saw the man who robbed the bank, and he had bright

9  yellow shoes," you wouldn't be looking for a pair of blue flip

10  flops, you'd be looking for people who had information about

11  the bright yellow shoes?

12  A.  That would -- that would certainly factor into the attempt

13  to look for that person.

14  Q.  And you'd be trying to find witnesses who have information

15  about a bright yellow pair of shoes?

16  A.  I mean, hopefully.  Among other things, hopefully, sure,

17  yeah.

18  Q.  But in part at least?

19  A.  Sure.

20  Q.  You began your investigation in this case in September of

21  2019, correct?

22  A.  That's accurate.

23  Q.  When did you conclude your investigation?  Or maybe I

24  should ask, have you concluded your investigation?

25  A.  I guess I'd have to have a definition of what conclusion is

1    for you.

2    Q.  What would be a definition that you would use to say you've

3    concluded your investigation?

4    A.  I guess that would probably be during the end of the court

5    process.

6    Q.  I'm sorry, end of the court process?

7    A.  Yeah.  I mean, that's how -- I guess that's how my brain

8    thinks about investigation.  Without a definition of

9    investigation, I'd have to -- it is hard to be specific.

10   Q.  Sure.

11          Was there a point in time when you stopped looking for

12   information connected to this case?

13   A.  Can you be specific about what you're asking there?

14   Q.  Did you conduct any -- did you stop at a point conducting

15   any interviews, for example?

16   A.  Uhm, I guess that's hard to answer because there's, you

17   know, kind of informal ones that take place and things like

18   that.  So formal interviews conducted, you know, up until just

19   recently, so . . .

20   Q.  So, let's say the investigation, generally speaking, has

21   been ongoing from September 2019 through April of this year; is

22   that accurate?

23   A.  I don't know how accurate -- I mean, there's been some form

24   of investigation occurring, or the investigation has been

25   active, I would say, since the time I heard about it.

1  Q.  During that period of time, how many hours would you say

2  you've invested in the investigation of this case?

3  A.  Many.

4  Q.  What does that mean?

5  A.  I mean, a lot.  I don't have the total with me.  I'm sorry.

6  But a lot.

7  Q.  Yeah, I mean, if you were to -- if you were to estimate,

8  though, I mean, would you say more than 50 hours?

9  A.  Oh, I'd -- yeah.  I mean, over 500, over a thousand,

10  something like that.

11  Q.  I'm sorry?

12  A.  I would have to look, because I do try to keep a log of

13  that occasionally, so I think around a thousand hours would be

14  accurate, give or take.

15  Q.  I want to show what's been marked as Defense Exhibit EE.

16  A.  Is that going to come on the screen, sir?

17  Q.  It will, I believe.  It has not been entered into evidence

18  just yet.

19  A.  Understood.

20  Q.  All right.  Can you see that?

21  A.  Yes, sir.

22  Q.  Okay.  And you recognize that photo?

23  A.  Yes.

24  Q.  I thought you would.

25  A.  Yeah.

1  Q.  And this one and then also this page here (indicating)?

2  A.  That's -- that's correct.

3  Q.  Okay.  And these are the photos that have already been --

4  these are the actual photos that -- or the photo files that

5  were already admitted as a photocopy, I believe, Exhibits 205

6  and 206.

7  A.  Okay.

8  Q.  Is that -- is that consistent with your recollection?

9  A.  I don't know the numbers, but these have -- we've seen

10  these multiple times.

11  Q.  Yeah, and they've been admitted already?

12  A.  Yeah.

13          MR. HUGUS:  And, your Honor, the defense is offering

14  to admit Exhibit EE under Rule 1002, 1002, to the extent that

15  these are the actual photo files, as opposed to a photocopy.

16  They're a higher resolution version of the same photos that

17  have already been admitted.

18          THE COURT:  Any objection?

19          MS. MARTENS:  Other than they're duplicate copies, I

20  don't have any objection.

21          THE COURT:  Defense Exhibit EE is admitted.

22     (Defendant's Exhibit EE received.)

23          MR. HUGUS:  And, Abby, if you could publish -- oh, it

24  already is.  I'm sorry.

25          COURTROOM DEPUTY:  That's okay.

1      MR. HUGUS:  I need other set of eyes.

2      THE COURT:  We all wish we had eyes in the back of our

3  head.

4      MR. HUGUS:  I don't got any hair to get in the way of

5  them, so . . .

6  **BY MR. HUGUS:**

7  Q.  You learned about these photos in November of 2020?

8  A.  I believe that's accurate.

9  Q.  So about 14 months, approximately, after you began your

10  investigation?

11  A.  Yes.

12  Q.  What percentage of your work on this case would you

13  estimate you had completed by the time you learned that these

14  photos existed?

15  A.  I couldn't estimate.  As we noted, it has been ongoing, so

16  I guess it would be hard for me to quantify that with a

17  percentage.

18      You know, but for whatever the month time frame is,

19  that many months' worth of work.

20  Q.  At least in terms of months, it would be over two-thirds,

21  correct?

22  A.  I don't -- if that's what -- if that's accurate.

23  Q.  Well, I'm just thinking September --

24  A.  October, November, December, January, February, March --

25  Q.  -- to November would be 14 months, right?

1    A.  Yes, correct.

2    Q.  And then from that time until April of this year, we'd have

3    December, January, February, March, April.

4    A.  Yeah, so 14 months is accurate.

5    Q.  So about 70 percent?

6    A.  Okay.

7    Q.  And at that point, you had already interviewed all of the

8    witnesses, correct?

9    A.  I'd have to check my timeline, but that -- that's probably

10   consistent, yeah.

11   Q.  Shortly after you discovered those photos, you contacted

12   Ms. Bye to discuss those, correct?

13   A.  Yeah.  I contacted pretty much as soon as I found out about

14   them.

15   Q.  And the purpose of that was to get an explanation for those

16   photos, right?

17   A.  Yeah.  I just hadn't seen them, so I just wanted to figure

18   out where they -- where they were from.

19   Q.  And you told her you had put a gazillion hours already

20   invested in the case at that time, right?

21   A.  Yeah.  That's probably true.  I think it was in the context

22   of telling her that I had done a gazillion hours of work.

23   Like, it's okay, I'm just checking with you; we've done a

24   gazillion hours of work.

25          I'd like to see the transcript to actually reference

1    the quote, but I think in context, it wasn't -- it wasn't meant

2    to be derogatory or anything like that.

3          MR. HUGUS:  Your Honor, may I play a clip of that

4    piece of conversation?

5          MS. MARTENS:  Your Honor, I object to playing recorded

6    transcript clips for all of the same reasons previously stated

7    when we have been going through this in the courtroom.

8          MR. HUGUS:  Your Honor, it's not being offered to

9    establish that he had a gazillion hours; but it is offered, and

10   I think it is -- well, number one, it's not offered for the

11   truth of the matter asserted.

12         But secondly, under 803(3), I believe, it's admissible

13   to establish motive connected to his investigation and how much

14   time he had invested at that time.

15         MS. MARTENS:  Your Honor --

16         THE COURT:  Ms. Martens, your agent indicated that he

17   would like to see a copy of the transcript.  Within that

18   context, could you please state your objection.

19         MS. MARTENS:  So Mr. Hugus is offering to play the

20   audio clip.  The agent would like to see the transcript.  Both

21   are available.  I object to the playing of the audio.  None of

22   this is in evidence.

23         And if he's trying to refresh the witness on his

24   statement, he needs to show the witness his statement, allow

25   him to read it.  He should ask him if the statement has

1   refreshed his recollection so that he can either adopt or deny

2   the statement.

3          If he's seeking to do something with an inconsistent

4   statement, and I think that's the rule of hearsay that he just

5   cited, then the similar rules apply, which we have been through

6   multiple times with the audio.

7          So -- and then to the extent that these recordings or

8   transcripts have statements by Ms. Bye that were not presented

9   to her during her direct testimony or her cross-examination,

10   it's also entirely improper because she won't have an

11   opportunity to explain them.

12          THE COURT:  Mr. Hugus?

13          MR. HUGUS:  There's a lot there to unpack.  So I can

14   offer the exhibit and say, "Your Honor, we would like to offer

15   this exhibit."

16          But in terms of the statement, there's nothing under

17   Rule 803 that requires it be used for impeachment testimony.

18   Those statements are simply admissible under 803(3) to

19   establish motive, intent, et cetera.

20          So he's laid foundation for having had a conversation,

21   having made the statement, and I'm not refreshing his

22   recollection.  I'm offering the statement under, I believe it's

23   Rule 806.  If the exception to the hearsay rule applies and the

24   statement can come in, the declarant doesn't have to even be

25   available.

1          And I'll represent to the Court that this is a

2    statement of Mr. Olson, not Ms. Bye.  But even still, it would

3    be -- even if it did have a phrase from her, it would be

4    admissible under 806 as well.

5          And again, it's -- it's a piece of evidence that

6    establishes motive, and it's an exception to the hearsay rule.

7          THE COURT:  I think we're done with objection --

8    speaking responses on the motion.

9          I'll sustain the Government's objection.  Certainly

10   you can provide the agent with the transcript.  He's indicated

11   that he'd like to see it.  I'm not sure there's a question

12   presented, but I'll leave the further course of your

13   examination to you, Mr. Hugus.

14         MR. HUGUS:  Okay, yeah.  Thank you, your Honor.

15         Abby, if I might show the transcript to Mr. Olson,

16   please.

17   BY MR. HUGUS:

18   Q.  Have you had time to read that, sir?

19   A.  Yeah, briefly.  Thank you.

20   Q.  Okay.  So does that refresh your recollection any further

21   as to what you had said, what you were discussing with her?

22   A.  Yeah.  I mean, it's only a couple sentences out of the

23   whole interview, but it certainly refreshes my memory on those

24   sentences.

25   Q.  And so you had said to her, you know, "I believe you a

1  hundred percent.  I put, you know, a gazillion hours into this

2  case.  So believe me when I say I believe you," right?  That's

3  what you told her?

4  A.  Yeah.  I was trying to reassure her.

5  Q.  In the course of your investigation, I think you mentioned

6  you interviewed quite a few people to get information about

7  what really happened.

8          That includes Ms. Bye, correct?

9  A.  Yes.

10  Q.  That includes her roommate, Brynn Leatham, correct?

11  A.  Yes.

12  Q.  Brynn Leatham's parents, Wendy and Bron Leatham?

13  A.  Yes.

14  Q.  Ms. Bye's roommates, Ms. Romao, Ms. Perkins and Miranda

15  Foote?

16  A.  That sounds accurate.

17  Q.  Now, when Mr. Smith came to pick up Ms. Bye for their date,

18  she was talking to her friend Kasey Steagall?

19  A.  Yes.

20  Q.  That would have been the last person she was talking to

21  before she left with Mr. Smith.

22          Did you interview Ms. Steagall?

23  A.  No, I attempted to contact her multiple times and was

24  unable to do so.

25  Q.  Didn't Wendy Leatham tell you that Ms. Bye agreed to go to

1    Yellowstone National Park?

2          MS. MARTENS:  Objection, your Honor.  This calls for

3    hearsay, and it misstates that interview.

4          MR. HUGUS:  Your Honor --

5          THE COURT:  His question is not a statement.  It's not

6    evidence.

7          I would instruct the witness that it's not to be taken

8    as eliciting her -- any hearsay or out-of-court statement.  You

9    can certainly testify to your understanding of the conversation

10   and perhaps how it factored into the investigation.

11          And again, to the jury, the question is not hearsay.

12   It's a question.  It's not a statement, and the attorney is not

13   under oath.  He's not the witness.  This is not -- I've

14   instructed that the witness should not address the actual

15   statement made, and it's not to be considered for the truth of

16   the statement.  It's only to be considered for purposes of

17   Agent Olson's work on the case.

18          THE WITNESS:  Thank you for the clarification.

19          THE COURT:  Do you have the question in mind?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  All right.  You may answer.

22   **BY THE WITNESS:**

23   **A.**  I don't recall.  To be honest with you, I'd probably have

24   to, again, reference a transcript or something like that.

25   **BY MR. HUGUS:**

1   Q.  Certainly.  I'd be happy to show that to you.

2           Sir, I'm scrolling to the beginning, just so you can

3   see there --

4   A.  Yes.

5   Q.  -- Q, Q, and Q1, and A and A1 so you know who's saying

6   what.

7   A.  Yes.

8   Q.  You got that?

9   A.  Yeah.

10  Q.  Great.  Thank you.

11          And so, asking my -- does that refresh your

12  recollection about what Ms. Leatham said regarding whether or

13  not Ms. Bye had agreed to go to Yellowstone National Park?

14  A.  I'm not sure I'm reading the same section you are.  I don't

15  see that reference in here.

16          I'm at line 1329.  Is that where you're at?

17  Q.  Okay, yeah.  So let's move down to the bottom, and I'll

18  represent to you that that's Mr. Leatham speaking.

19  A.  Okay.

20  Q.  Okay.

21  A.  Oh, I see --

22  Q.  At then line 1361, I believe, she -- I'm sorry -- at line

23  1355, she starts a sentence, and then I think you --

24          THE COURT:  Counsel, you can't read that sentence.

25          MR. HUGUS:  I'm not.

1        THE COURT:  It is an out-of-court statement.

2        MR. HUGUS:  I'm not, Judge.

3        THE COURT:  Thank you.

4   BY MR. HUGUS:

5   Q.  So she starts that sentence at line 1355, and I think it

6   looks like you kind of interjected, and then she finishes her

7   statement.

8        So if you'll look at line 1355 and then 1361, those

9   are both her.

10       Does that refresh your recollection about what she had

11  said Ms. Bye's intentions were at that time?

12  A.  Well, this is a very small summary of what Ms. Bye's

13  intentions were, but it does refresh my memory about those few

14  sentences.  Thank you.

15  Q.  And she -- and she says that Ms. Bye said, "Okay, fine,

16  I'll go.  Okay, fine, I'll go."

17  A.  I don't believe that those were direct quotes, at least

18  that's not the way I interpreted it.

19       THE COURT:  And that's what we're here to understand.

20       What was your impression from the course of that

21  conversation as you recall it now refreshed?

22       THE WITNESS:  Understood, yeah.

23  BY THE WITNESS:

24  A.  I didn't interpret it that way, so my --

25  BY MR. HUGUS:

1  Q.  I'm sorry, but let me just ask a question that hopefully

2  can clarify.

3       I'm not asking if you had an understanding at that

4  time in -- you know, in no uncertain terms what Ms. Bye's

5  intentions were.  I'm asking you what Ms. Leatham communicated

6  about what she understood those intentions were.

7  A.  If it's in the transcript --

8       THE COURT:  Wait a minute.

9  A.  -- that's what she said.

10      THE COURT:  Wait a minute.

11      Again, within the context of the limited area that the

12 Court's permitted this line of questioning, it is important to

13 focus on what his understanding was --

14      MR. HUGUS:  Correct.

15      THE COURT:  -- and not an out-of-court statement.  We

16 heard quite a bit from Ms. Bye.  We heard quite a bit about her

17 statement.  And so here, again, the direction that the Court

18 intends this line of questioning to go is what he -- what

19 impression he had or what actions he took based on that

20 impression.

21 BY MR. HUGUS:

22 Q.  So based on the statement that you have read, it appears it

23 was -- and, again, I -- reiterating what the Judge said, I'm

24 not asking you about the truth of the matter asserted, whether

25 that was her intention or not her intention.  But it was

1   Ms. Leatham's understanding that that was her intention, and

2   she communicated that understanding to you, correct?

3   A.  Via the interview, yes.

4   Q.  Correct.  Okay.

5        Once you had that understanding as part of your

6   investigation, the understanding that at least someone had the

7   understanding that she intended to go, did you follow up with

8   anyone specifically about why she had that understanding or how

9   she got that impression?

10  A.  I guess I'll talk a little generally there.  I think I

11  addressed that with all my interviews with all the people that

12  I talked to.  And that was certainly a significant

13  investigative point, was did she want to go or did she not want

14  to go.

15       And I addressed that pretty thoroughly, I believe,

16  with as many people as possible to get that corroborating

17  evidence.

18  Q.  Sometimes in your interviews when you were talking to

19  certain folks that you interviewed, you would say, "In talking

20  to so-and-so, I got this piece of information.  Does that sound

21  correct, or does it not sound correct?"  Right?

22  A.  Sometimes you have to reference previous conversations to

23  set up the foundation to talk about the next conversation,

24  particularly when it's something sensitive.

25  Q.  Right.  Kind of like we were talking about earlier, how you

1  take a statement from an interview and information that you

2  gather and step by step, you're building the investigation on

3  pieces of information that you gather along the way, right?

4  A.  I'm not sure how similar those are, but I understand what

5  you're -- you're saying, yeah.

6  Q.  So -- but with respect to this statement, in no interview

7  with any other person did you ever say, "I heard this from

8  Ms. Leatham.  Have you heard anything like that?"  You never

9  asked that question in any interview, did you?

10  A.  I can't recall.  I just can't recall.  There's a lot of

11  interviews done.  I certainly asked the question of intent to

12  go to Yellowstone of many, many, many people.

13  Q.  And Ms. Leatham, I believe, Wendi Leatham, she and her

14  husband Bron are parents of Brynn Leatham who was one of

15  Ms. Bye's roommates, and that's where Ms. Bye went on September

16  8th, the afternoon that she got back from Yellowstone National

17  Park, right?

18  A.  As I understand it, yes.

19  Q.  And that's -- that was the substance of the -- or the

20  subject, I should say, of the conversation that you had with

21  them, was their time spent with her in their home later in the

22  afternoon after she got back from Yellowstone National Park?

23  A.  Yeah, the investigation -- the questions for them were

24  about the time that Ms. Bye spent with them, Bron and Wendi.

25  Q.  We've discussed a knife at times, and it was important to

1   you in the process of your investigation to determine what that

2   alleged knife looked like, right?

3   A.   I was interested in hearing what the knife looked like,

4   absolutely.

5   Q.   And, for example, whether it was a fixed blade or a folding

6   knife, correct?

7   A.   I found that line of questioning to be problematic with

8   Ms. Bye.

9   Q.   But at the time of your investigation, you asked her those

10  kinds of questions, right?

11  A.   Yes.

12  Q.   And did you find it problematic because you got different

13  answers about that?

14  A.   I found it problematic because I don't think she understood

15  what I was saying, necessarily, all the time when I was

16  referencing nomenclature associated with knives.

17  Q.   Like fixed or folding, for example?

18  A.   Yeah.  And then also the way that she described the knife

19  would lend itself to it could be either one based on the way it

20  was presented.

21  Q.   You heard her testify yesterday that she knows the

22  difference between a fixed and folding knife?

23  A.   I heard that.

24  Q.   Or maybe it was Tuesday.  I'm losing my days too.

25  A.   That's okay.  I don't remember the exact testimony, sir.

1   Q.  And that would also include how long the knife was.  That

2   would be important to your investigation, too, right?

3   A.  Well, just general descriptions of the knife I think are

4   important.

5   Q.  But how long it is would be important, too, right?

6   A.  I believe that was a question asked, if that's what you're

7   getting at.

8   Q.  And it would be important because understanding how long a

9   blade is would give some indication of how plausible the idea

10  that it was used as a threat might be, right?

11  A.  I mean, I don't know.  I guess I would argue with that a

12  little bit because I think small blades can be very effective,

13  just like large blades, so -- but it is important, I think, in

14  trying to corroborate that information that she provided.

15  Q.  How long of a knife were you trying to locate?

16  A.  Uhm, I believe during the interview -- and it was fairly

17  consistent with what she demonstrated yesterday when she was up

18  here, that she gave the visual representation with her fingers.

19  So that seemed to vary between, you know, 4 to 6, 8 inches,

20  somewhere in there, so there's a little bit of a variable in

21  there, at least as I understand it, off the top of my head

22  without referencing notes.

23  Q.  In your interview with her on January 16th of last year,

24  she gave you an estimate about the length of the knife,

25  correct?

1   A. Oh, you'd have to refresh my memory on that one, sir.  I

2   believe that was in the interview though.  She gave a general

3   description.  I remember that.

4   Q. Okay.  In one of those interviews, you had met with her in

5   a room where there was a green couch; is that right?

6   A. Well, I don't know what color the couch was, but we met in

7   a room where there was a couch, and she -- yes.

8   Q. And so you were sitting on that couch together discussing

9   the knife, correct?

10   A. I don't remember where I was sitting, but I do remember

11   there was a couch present.

12   Q. I'm just going to show you -- and that was a videotaped

13   interview, correct?

14   A. Video, audio and transcription, I believe, are available.

15   Q. All three?  Great.

16       I'm going to show you just a screenshot of that video.

17       Do you see that?

18   A. I mean, yeah.  Yes.

19   Q. Does that refresh your recollection of kind of her estimate

20   of the knife?

21   A. Not particularly.  I mean, it's a screenshot out of a

22   video, so I don't know if her fingers varied out or if they

23   went back in or anything, so --

24   Q. Well, would it refresh your recollection to see the video

25   to see her estimating --

1  A.  I mean, I believe that that's fairly consistent with what

2  she testified to yesterday, so that does refresh my memory.

3  Q.  And my question, at least right now, isn't whether it's

4  consistent with what she testified to yesterday, but her

5  hand -- her fingers are essentially touching in the middle,

6  right?

7  A.  Well, the picture is cattywampus, so she's facing at about

8  a 45-degree angle, so we're going to have a little bit of a

9  deceptive angle, so let's face each other and do that, so

10  somewhere in there.

11  Q.  Okay.  So that would be about 4 or 5 inches, maybe, so --

12  A.  I don't have a ruler.

13  Q.  But about like that?  Is that accurate, and that's how she

14  described it to you, correct?

15  A.  I don't know how accurate that is.  I can't say -- without

16  measuring the distance, I can't give you a good description.

17  But you're -- generally, sure, 4-plus inches.  It's not that

18  long.

19  Q.  It's not this, right (indicating)?

20  A.  That's correct.

21  Q.  By almost a magnitude of two (indicating)?

22  A.  Yeah.

23  Q.  Correct?

24  A.  Correct.

25  Q.  Now, were you trying to located a fixed-blade knife or a

1  folding knife?

2  A.   Are you referencing the search warrant?

3  Q.   I'm just wondering what it was that you were trying to

4  identify.

5  A.   Well, as I mentioned a little earlier, based on the

6  description that she gave, I was looking for a knife, and the

7  reason being is because the way that she had mentioned that it

8  was displayed, it could kind of lend itself to be either one.

9  Q.   She described it specifically to you as a folding knife,

10 right?

11 A.   I don't recall offhand.

12      Are you at line 18, sir?

13 Q.   Sorry.  I'm nowhere just yet.

14      This is an interview with you, and I believe you can

15 see there is a transcript, and this is an interview with

16 Ms. Bye.  You're listed as the interviewer there.

17 A.   Yes.

18 Q.   Okay.  And she tells you --

19      MS. MARTENS:  Your Honor --

20 BY MR. HUGUS:

21 Q.   Does this refresh your recollection -- sorry.

22      THE COURT:  No, go ahead and ask your question.

23      MR. HUGUS:  Sorry.  I didn't mean to interrupt your

24 ruling, but I knew where I strayed.

25      THE COURT:  Please proceed.

1   BY MR. HUGUS:

2   Q.  Does this refresh your recollection of how she described

3   that knife to you?

4   A.  Yeah.

5   Q.  And what does she describe?

6   A.  She describes some ambivalence towards a pocket knife.

7   Q.  And does she say it was fixed or folding?

8   A.  It's --

9          MS. MARTENS:  Your Honor, this question calls, again,

10  for hearsay.  If Mr. Hugus wanted to impeach Ms. Bye with prior

11  statements, he was required to do that while she was on the

12  stand.

13         MR. HUGUS:  Your Honor, I believe that the evidence

14  and the testimony from Mr. Olson is that it has been described

15  in various ways, and so this is not being offered for the truth

16  of the matter asserted, and the questions have asked what kind

17  of knife he was looking for and why, and it's been directed at

18  his continued investigation.

19         And it is my last question about that subject.

20         THE COURT:  All right.  I'll overrule the objection.

21         Again, the jury is instructed that this all relates to

22  this witness' investigation.

23         If you have the question in mind, you may answer it.

24         THE WITNESS:  Was the question, to clarify, sir, was

25  that referencing is it, like, a pocket life or a folding knife?

1  **BY MR. HUGUS:**

2  **Q.** Yeah, that's how it was described, correct?

3  **A.** Can you bring that back up real quick?

4  **Q.** Sure.  I'm sorry.

5  **A.** It just vanished again.

6         Yeah, I believe there's a reference in there, like I

7  mentioned, a little bit of an ambivalence about what it was,

8  but she mentions folding and pocket.

9  **Q.** In your current role with the National Park Service, you go

10 to Yellowstone National Park, I assume?

11 **A.** Yeah.  Occasionally, yeah.

12 **Q.** How many times would you say you've been there?

13 **A.** I couldn't give you a number, sir.  A lot.

14 **Q.** Yeah.  Like 20, 30, more than that?

15 **A.** I would assume so, yeah.

16 **Q.** Do you -- and you're in Mammoth, Montana?

17 **A.** That's the way I enter the Park.  That's not where I live,

18 but yeah.

19 **Q.** Okay.  So you come in through the West Yellowstone

20 entrance?

21 **A.** Negative.

22 **Q.** Where do you come in?

23 **A.** The Gardiner entrance.

24 **Q.** Okay.  Have you ever been in or out of the West Yellowstone

25 entrance?

1   A.   Yes.

2   Q.   How many campgrounds have you been to within Yellowstone

3   National Park?

4   A.   Just a handful.  I don't -- I don't tend to camp there very

5   often.

6   Q.   Why not?

7   A.   I just -- it's just not where my interests lie for where I

8   choose to camp.

9   Q.   Is it because it's crowded?

10  A.   No.  It's just because I work there.  It kind of sucks the

11  fun out of it when you work there sometimes.

12  Q.   It is crowded, though, isn't it?

13  A.   You would have to be specific.  I mean, half the year it's

14  empty, so --

15  Q.   Well, in the summertime?

16  A.   It depends where you're going.  The visitation varies by

17  the location, and so there's a good portion of the Park that's

18  empty; some of it's busy; just depends where you're at.

19  Q.   When you're going into the Park, what is -- where are you

20  going, or what's -- where are you visiting?

21  A.   Well, I work there, so, I mean, that's one of the locations

22  I work, so it just depends where I get called.

23  Q.   You've been to the Norris Campground?

24  A.   I have.

25  Q.   When?

1   A.  I was just recently there.  It's still closed.  So I was

2   just recently there for training in that general area, but I'm

3   not intimately familiar with it.

4   Q.  How many times have you been to that campground?

5   A.  Maybe twice.

6   Q.  Did you ever go to that campground as part of your

7   investigation in this case?

8   A.  No.

9   Q.  Now, the National Park Service, that's who you work for,

10  that's NPS?

11  A.  That's correct.

12  Q.  And their website is NPS.gov?

13  A.  Correct.

14  Q.  If that website shows Norris as having 112 campsites, you

15  wouldn't disagree with that, would you?

16  A.  I -- I mean, I don't have any basis to disagree with it.  I

17  know there's a lot.

18  Q.  All right.  Sir, I want to show you what's been marked

19  as -- I believe this is Plaintiff's Exhibit 204.

20          Do you recognize this exhibit --

21          MR. HUGUS:  Or maybe it hasn't been published yet.

22  BY THE WITNESS:

23  A.  Is it the Life 360 image?

24  BY MR. HUGUS:

25  Q.  Yes, sir, it is.

1   A.  Yes.

2   Q.  And I think you were asked some questions about this

3   earlier.

4         So on page 2 here, there are two, I guess, map images

5   of what appears to be West Yellowstone; is that correct?

6   A.  As best I can tell.

7   Q.  And the top one is showing the direction of travel from

8   right to left, right?

9   A.  I have -- I have a hard time seeing what you're referencing

10  there.  Sorry.

11        Can you zoom out again?  I'm sorry.

12  Q.  Yeah.  So right here, that's like a destination-type tag,

13  and this shows -- this is from September 8th, and I believe the

14  testimony earlier was that it's an hour off, so -- because this

15  was in Texas, right, and so this would have been at 8:07?

16  A.  The morning after the incident?

17  Q.  Yeah, 8:07 on September 8th, right?

18  A.  That sounds accurate.

19  Q.  And travel would be going from here to here, correct

20  (indicating)?

21  A.  I think so.

22  Q.  All right.

23  A.  I don't own the app, so you'll have to excuse me if I'm not

24  super familiar outside of these photos.

25  Q.  That's okay.

1      And then this one, showing -- it is zoomed in a little

2  bit more, but showing a similar thing, only it's from 12:03

3  Mountain Time, going from right to left, correct (indicating)?

4  A.   And that's from the day prior?

5  Q.   Yes; correct?

6  A.   That's the way I understand it to read.

7  Q.   And this section right here is essentially the same section

8  as that right there, right (indicating)?

9  A.   According to the map, it looks consistent, yes.

10  Q.   And then there's no other transmission from the route --

11  looking at the top photo, there's no transition -- or no line

12  showing the travel prior to reaching that point in the road,

13  correct?

14  A.   I didn't receive any images that represented that.

15  Q.   And there are also no images that show any travel past that

16  point, correct?

17  A.   From the Life 360 app?

18  Q.   Yeah, correct.

19  A.   Not that I recall.

20  Q.   And then the other images show travel generally from

21  Rexburg up to West Yellowstone, correct?

22  A.   As I understand them.

23  Q.   And then also return, it appears, correct, from that --

24  near -- near northeastern Idaho back down to Rexburg, correct?

25  A.   As I understand it, yes.

1   Q.  Okay.  So there's transmission, or there's data being

2   processed through the app all the way from Rexburg until we get

3   to this point here, where signal is lost and then regained

4   again -- lost on the 7th and then picked up again the following

5   morning, correct?

6   A.  As I mentioned, these are the only images I was provided

7   and I asked if there was more.  The application deletes them,

8   so these were the only ones that were provided.  I couldn't

9   tell you if there was other transmissions later after this

10  moment.

11  Q.  You weren't -- but you're not aware of any?

12  A.  That's correct.

13  Q.  I want to show you another map that's been marked just for

14  identification as Exhibit M3.

15          MR. HUGUS:  Am I good, Abby?

16          COURTROOM DEPUTY:  You're good.

17  BY MR. HUGUS:

18  Q.  Do you recognize what this map is depicting?

19  A.  I believe it's depicting a similar route of travel but to

20  include the Norris Campground past Madison Junction and to

21  include West Yellowstone.

22  Q.  Okay.  So you see the Norris Campground, and you see the

23  section of road there that we were looking at earlier from the

24  Life 360?

25  A.  I do.

1   Q.  Okay.  And does this look like an accurate representation

2   of this area of Yellowstone Park at the Wyoming-Montana border?

3   A.  Yes.  It's from Google Maps, I believe, correct?

4   Q.  Correct, it is.

5   A.  Yeah.

6   Q.  All right.  No reason to think that that's not an accurate

7   depiction of that?

8   A.  I don't have any reason to believe that.

9          MR. HUGUS:  Okay.  Your Honor, I would offer Defense

10  Exhibit M3.

11         MS. MARTENS:  No objection, your Honor.

12         THE COURT:  M3 is admitted.

13     (Defendant's Exhibit M3 received.)

14  BY MR. HUGUS:

15  Q.  All right.  I want to move through some additional pages of

16  this same image, same map.

17         And this shows a route of travel from Norris

18  Campground to the -- this bottom right area of this -- I'm

19  going to call it a hump, but you know what I'm -- do you see

20  what I'm referring to, where the road heads north and then --

21  A.  Oxbow.

22  Q.  -- east and then -- thank you.

23  A.  Correct.  Got it.

24  Q.  We'll refer to it as the oxbow.  I learned something today.

25         And generally, that's the same spot from the Life 360

1  app where there was no further signal on the night of September

2  7th and then when signal picked up again on September 8th,

3  correct?

4  A.  I would have to qualify that a little bit, but, I mean,

5  generally, because the Life 360 is an overview and just as this

6  is an overview.  We're not looking at GPS coordinates.

7  Q.  Right.

8  A.  So that's fine.

9  Q.  Yeah, I appreciate that, and I couldn't give you an

10  exacting coordinate.

11        And that appears to be about a 33-minute drive,

12  correct?

13  A.  According to your Google Maps, it is.

14  Q.  Okay.  And then from that west entrance to the

15  Wyoming-Montana border, that shows that's 6.3 miles, right?

16  A.  Well, I believe the west entrance is about two miles west

17  of that.

18  Q.  Well, and I'm just talking from that point, the west

19  entrance road, just that same kind of bottom right of the oxbow

20  from the Wyoming-Montana border.

21  A.  So are you saying it's 6.3 miles from what we referred to

22  as the oxbow to the state line?

23  Q.  Correct.

24  A.  Generally speaking.  It doesn't look like the dot's exactly

25  on the state line.

1   Q.  I think you're right, too.  It looks like it could be off

2   by a small fraction.

3         And then similar from here, from west entrance road

4   right at the Wyoming-Montana border to West Yellowstone, that's

5   about a 7-minute drive, correct?

6   A.  I mean, again, just depending on where you're at in West

7   Yellowstone, I think there's some variables in there, but I

8   generally agree with what you're saying.

9   Q.  And then from West Yellowstone to the Montana border, and

10  that's what -- is that what you understand that dotted line to

11  represent, the border between Idaho and Montana?

12  A.  I think so.  You may have to zoom out for me to confirm

13  that.

14  Q.  Sure.

15  A.  But if that's what you're representing, I'll trust you.

16        Yep, there it is.  Got it.

17  Q.  There.  Does that look accurate to you?

18  A.  Yes, sir.

19  Q.  About 9 minutes?

20  A.  I don't know about the time frame, but your blue line looks

21  accurate to me.

22  Q.  All right.  Well, and, you know, when anybody asks me how

23  far away I am, I guess it depends on how fast you're going, but

24  just generally speaking, assuming approximate speed limit,

25  based on your experience going into the Park and just the

1  general familiarity with the area, you have no reason to

2  dispute --

3  A.  Are you referencing the time or the -- I'm having a hard

4  time tracking a little bit.

5         So are you referencing the time or the distance right

6  now?

7  Q.  Well, this is showing both.  Do you have any reason to

8  disagree that either of those are accurate, assuming driving

9  the speed limit?

10  A.  I mean, I guess if it is dark out or if there's people at

11  the gate, all of those --

12  Q.  Sure.

13  A.  -- qualifiers for the time, but I think the distance is

14  accurate.

15  Q.  Thank you.

16         We heard earlier today about the BYU honor code and

17  some consequences for violations.

18         And from your investigation, you understood that there

19  could be big penalties at BYU if students were out past

20  midnight and not in their dorms, correct?

21  A.  I mean, I think as she mentioned this morning, given a very

22  particular set of circumstances, that is accurate.

23  Q.  Well, I'm asking what your understanding was.  That was

24  your understanding, that there could be big consequences --

25  A.  Given certain circumstances, that's my understanding.

1  Q.  -- if -- sorry.  Let me finish.  I know, I paused.  It's my

2  fault.

3       You knew there could be a big penalty at BYU Idaho if

4  students are out past midnight and not in their dorms, correct?

5  A.  I guess I'm trying to clarify.  Are you asking for this

6  particular case, or, in general, did I learn that there was

7  penalty for -- for that?

8  Q.  Not asking about this particular case.

9       It was your understanding that there could be a big

10 penalty at BYU if students were out past midnight and they're

11 not in the dorms?

12 A.  Generally speaking, that's accurate, yes.

13 Q.  And you came to understand that if you got caught and the

14 students are out past curfew, they could be removed from the

15 school, right?

16 A.  You mean, given circumstances -- given certain

17 circumstances, yes.

18 Q.  And you testified to that in the grand jury proceeding,

19 correct?

20 A.  Yes -- well, I'd have to refresh the grand jury transcript,

21 but if you say I do, I'll believe you on that one.

22 Q.  I'll just show it to you.

23       All right.  I think I've got it set at the top there,

24 sir.

25 A.  Yes, that's accurate.  That first line represents that

1    statement that you made.

2    Q.  You interviewed -- well, I have record of four separate

3    occasions where you recorded interviews with Ms. Bye.  Does

4    that sound accurate to you?

5    A.  Yes.

6    Q.  I watched and listened to every one of those interviews.  I

7    read the transcripts.  And not once did you ever ask her about

8    the honor code and consequences for violating that or being out

9    past curfew, did you?

10   A.  I have asked her.  If they're not in the transcripts,

11   though, I apologize.

12   Q.  So are you saying that there are pieces of your

13   investigation that you haven't provided?

14   A.  No.  I guess I'm just saying, like, in conversation with

15   her.  I don't record every time I've talked to her, so I

16   believe that came up.

17           But in regards to the interviews, I'd have to refresh

18   myself on all four interviews to see if I talked about that.

19           If you're saying that you've read them and reviewed

20   them and that was not addressed, then I'll trust your accuracy

21   there.

22   Q.  That would be pretty important, wouldn't it?

23   A.  I did not understand that to be a concern to her, that the

24   curfew issue was a concern.  That was not where her head was

25   at, in my opinion.

1    MR. HUGUS:  I have no other questions.  Thank you.

2    THE WITNESS:  Thank you, sir.

3    THE COURT:  Any examination from the Government?

4    MS. MARTENS:  May I have just a moment, your Honor?

5    THE COURT:  Definitely.

6    (Discussion held at prosecution table.)

7    MS. MARTENS:  Just briefly, your Honor.

8                    **CROSS-EXAMINATION**

9    BY MS. MARTENS:

10   Q.  Ms. Wait will be pulling up that transcript of the

11   interview with Bron and Wendi Leatham here and just displaying

12   it to you, Mr. Olson, is my hope.

13   A.  Understood.

14   Q.  Do you see it there?

15   A.  I see the first page.

16   Q.  Okay.  Great.

17         So I would like you --

18         MR. HUGUS:  I'll object.  There's been no question

19   posed.

20         THE COURT:  I would sustain the objection.

21         MS. MARTENS:  Sorry.  I got the cart before the horse

22   with the technology.

23   BY MS. MARTENS:

24   Q.  Do you recall the length of that interview?

25   A.  Not offhand.

1   Q.  If you were to look at the transcript, would that refresh

2   your recollection?

3   A.  Of the length of it?

4   Q.  Yeah, the length of the interview, the total time it took?

5   A.  Yes, yes.

6          MS. MARTENS:  Your Honor, I would like to

7   display the --

8          THE COURT:  That's fine.

9          MS. MARTENS:  -- transcript.  I apologize.  I had the

10  cart before the horse.

11  BY MS. MARTENS:

12  Q.  Do you see on the first page of the interview there, the

13  start time of the interview?

14  A.  Yeah.  I believe I verbally timestamp it there.  Would you

15  like me to say that time?

16  Q.  No, that's fine.  I'm just refreshing you.

17         So that refreshes you as to when it begins.

18         MS. MARTENS:  Ms. Wait, can you go to the last page of

19  the interview?

20  BY MS. MARTENS:

21  Q.  Does that refresh you as to when it ends?

22  A.  It does.  My math is poor.  Can you go back up one more

23  time to the top?

24         Yes.

25  Q.  About how long was that interview?

1  A.  25 minutes, approximately.  Like I said, my math is very

2  poor.  So 25 minutes approximately.

3          MS. MARTENS:  You can take the -- or wait.  I have --

4  let's take it down for now.

5  BY MS. MARTENS:

6  Q.  So Mr. Hugus talked to you about your impressions after

7  speaking with Wendi and Bron Leatham.

8          Did you form any impression based on the totality of

9  that interview as to whether or not Ms. Bye intended to go to

10  Yellowstone National Park that night?

11  A.  Yeah.  My impression was that she did not.

12  Q.  And that was based on the totality of the interview?

13  A.  Certainly.

14  Q.  Not just one phrase?

15  A.  Correct.

16          MS. MARTENS:  May I have a moment, your Honor?

17          THE COURT:  Definitely.

18      (Discussion held at prosecution table.)

19  BY MS. MARTENS:

20  Q.  Mr. Olson, Mr. Hugus talked to you about, uhm, traffic in

21  the Park in the summer.

22  A.  Yes.

23  Q.  Now, is the beginning of September part of Yellowstone's

24  summer season?  Well, first of all, I should ask you if you

25  know.

1  A.  It seems like the seasons keep getting longer, so it's a

2  moving target anymore.  But generally speaking, it's kind of

3  the tail end, yeah.

4  Q.  And so in terms of, like, overall Park traffic, is it

5  waxing, waning?

6  A.  That's kind of around the time kids start going back to

7  school, so you start seeing it dropping a little bit.

8  Q.  And as you mentioned in your testimony with Mr. Hugus, it

9  depends on area of the Park?

10  A.  Yes.

11        MS. MARTENS:  I have nothing further.

12        THE COURT:  Thank you.

13        Any redirect?

14        MR. HUGUS:  No, your Honor.  Thank you.

15        THE COURT:  Thank you, Agent Olson, again.

16        THE WITNESS:  Thank you, ma'am.

17        THE COURT:  You may step down.

18        THE WITNESS:  Thank you, your Honor.

19        THE COURT:  I think perhaps I'll ask you to call your

20  next witness -- maybe not.  Maybe I'll just -- we'll just take

21  our mid-morning break at this time, if that's -- if you're

22  agreeable to that.

23        MR. FREEBURG:  Thank you, Judge.  I would like the

24  break.

25        THE COURT:  All right.  Any objection?

1          MS. MARTENS:  None, your Honor.

2          THE COURT:  All right.  We'll take our mid-morning

3     break at this time.  I'd, again, remind the jurors not to

4     discuss this case with anyone, including each other, or do any

5     research.  Please keep an open mind until all of the evidence

6     is in.

7          We'll stand in recess until 10:10.

8       (Following out of the presence of the jury.)

9          THE COURT:  Any matter requiring my attention, for the

10    Government?

11          MS. MARTENS:  Nothing, your Honor.

12          THE COURT:  For defendant?

13          MR. FREEBURG:  No, your Honor.

14          THE COURT:  Thank you.  We will be in recess until

15    10:10.

16       (Recess taken 9:54 a.m. until 10:15 a.m.)

17       (Following in the presence of the jury.)

18          THE COURT:  Please be seated.

19          We're back after break in Docket 20-CR-45 with the

20    jury present and roll call waived.

21          Counsel for defendant may call his next witness.

22          MR. FREEBURG:  Your Honor, we would call Alex

23    Bontecou.

24       (Witness sworn.)

25          COURTROOM DEPUTY:  Please take a seat.

1        Can you please state and spell your name for the

2   record?

3        THE WITNESS:  Alexandra, A-l-e-x-a-n-d-r-a.  Last name

4   Bontecou, B-o-n-t-e-c-o-u.

5   **ALEXANDRA BONTECOU, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

6   **BY MR. FREEBURG:**

7   Q.  Ms. Bontecou, were you hired to take photographs of the

8   Norris Campground in connection to this case?

9   A.  Yes, I was.

10  Q.  Before we talk about that, would you please tell the jury

11  about your educational background?

12  A.  Yes.  After high school, I went to the University of

13  Oregon, where I graduated with two Bachelor's degrees.

14  Q.  And where do you work?

15  A.  I work for Bontecou Investigative Services in Jackson,

16  Wyoming.

17  Q.  What is Bontecou Investigative Services?

18  A.  We're a private investigation company.

19  Q.  And what -- does Bontecou Investigation Services take

20  photographs in relationship to cases?

21  A.  Yes.

22  Q.  Have you done that before?

23  A.  Yes.

24  Q.  Did you go to the Norris Campground in Yellowstone?

25  A.  I did, yes.

1  Q.  And when did you do that?

2  A.  It was May 6th, 2021.

3  Q.  Was the campground open or closed?

4  A.  It was closed at the time.

5  Q.  If it was closed, how were you able to go?

6  A.  Uhm, we had to get special permission from Yellowstone

7  National Park.

8  Q.  And when you say "we," who is we?

9  A.  Myself and Todd Bontecou, my boss and father.

10  Q.  Were you able to walk around the campground?

11  A.  Yes.  There was a gate closing the entrance to the

12  campground, so we had to park across the street and walk in.

13  Q.  As part of walking around the campground, did you observe

14  the campsites and the relative positions of the campsites?

15  A.  Yes, I did.

16  Q.  Did you form a mental map of the campsites and area?

17  A.  Yes.

18  Q.  Have you looked at Exhibit OO in connection with today's

19  case?  And OO is -- have you looked at a diagram of the Norris

20  Campground?

21  A.  Yes, I have, uh-huh.

22  Q.  Is it printed, hand drawn, what is it?

23  A.  I have seen a hand-drawn map.

24  Q.  And does that hand-drawn map generally match your memory of

25  walking around it?

1    A.  Yes, it -- generally, yes.

2    Q.  But nothing is to scale, correct?

3    A.  Correct, I don't believe so.

4          MR. FREEBURG:  Judge, at this time, we would offer

5    Exhibit OO.

6          MS. MARTENS:  Government has no objection, your Honor.

7          THE COURT:  Exhibit OO is admitted.

8        (Defendant's Exhibit OO received.)

9    BY MR. FREEBURG:

10   Q.  What are we looking at here?

11   A.  So this is the hand-drawn map of the Norris Campground.

12   Q.  And again, it's not to scale or anything like that?

13   A.  I don't believe so, no.

14   Q.  Can you indicate the general entrance to the campground?

15   And I believe it is a touch screen.  If you can figure it out,

16   there's a way to highlight it.

17   A.  Right here is the entrance.

18   Q.  And there's -- I will represent to you there's been

19   previous testimony and evidence showing that Mr. Smith was at

20   campsite 47.  Can you circle campsite 47?

21   A.  (Witness complies.)

22   Q.  What is the -- where are the restrooms closest to campsite

23   47?

24   A.  These restrooms right here (indicating).

25   Q.  Are there other restrooms there?

1  A.  In the campground?

2  Q.  Yes.

3  A.  Yes, there are.  There are some restrooms in each of the

4  loops, C and A loop, and then here by the main entrance to the

5  campground.

6  Q.  When you're looking at campground 47, which would be, based

7  on your impression, the bathroom that would make sense to use?

8  A.  The restroom that's in the B loop is the closest to site

9  No. 47.

10  Q.  Are there telephones or pay phones that you observed up

11  there?

12  A.  Yes, there are.

13  Q.  And can you indicate on this map where they are?

14  A.  Yes.  On this map, there are -- right here demonstrates

15  where the phones are, but on further inspection of this, the

16  registration and info board that's shown here is actually

17  swapped with where the pay phones are, the courtesy phones.

18  Q.  And, again, was -- was any -- was the campground open?  Was

19  there anyone there when you were up there?

20  A.  No.

21  Q.  Okay.  Were you able to take photos of it?

22  A.  Yes, I was.

23  Q.  In connection with today's hearing, did you review what's

24  been previously marked D1, D5, D10, D12, D13 -- a series of

25  photographs D1, D5, D10, D12, D13, D15, D17, D19, D20, D21,

1    D28, D30, D31, D32, D36, D38, D44, D45, D46, D47, and D54?

2    A.  Yes, I did review the photographs.

3    Q.  And are those the photographs that you took of the

4    campground on May 6th?

5    A.  Yes, they are.

6    Q.  Were those photographs taken during the daylight?

7    A.  Yes, they were.

8            MR. FREEBURG:  Okay.  And, Judge, at this time, we

9    would offer --

10   **BY MR. FREEBURG:**

11   Q.  Oh, and do those photographs fairly and accurately

12   represent both the photographs you took and kind of what you

13   saw when you were there?

14   A.  Yes, they do.

15           MR. FREEBURG:  And, Judge, I should do this a

16   different way.  I'd like to display them to the witness so that

17   the prosecution and the witness can both see them.

18           THE COURT:  That's fine.

19           MR. FREEBURG:  And, Ms. Martens, if you want to nod

20   after you've had a chance to look at them.

21           Judge, we would move to offer those exhibits.

22           MS. MARTENS:  No objection.

23           THE COURT:  Defense Exhibits D1, D5, D10, D12, D13,

24   D15, D17, D19, D20, D21, D28, D30, D31, D32, D36, D38, D44,

25   D45, D46, D47 and D54 are admitted.

1    (Defendant's Exhibits D1, D5, D10, D12, D13, D15, D17, D19,

2    D20, D21, D28, D30, D31, D32, D36, D38, D44, D45, D46, D47

3    and D54 received.)

4         MR. FREEBURG:  And, Ms. Logan, I'd like to publish

5    those.

6    **BY MR. FREEBURG:**

7    Q.  What is this photograph here?

8    A.  This is the entrance to the Norris Campground.

9    Q.  What is this photograph?

10   A.  After you enter the campground, these are the first

11   structures that you see at the entrance.

12   Q.  And this has been marked D5, although I realize I probably

13   needed an exhibit sticker.  I'll show you now D10.  What are we

14   looking at here?

15   A.  These are two courtesy phones located at the entrance of

16   Norris Campground.

17   Q.  Now I'll show you D12.

18   A.  This is a close-up of one of the courtesy phones.

19   Q.  Do you see a light in that photograph?

20   A.  Yes, it appears that there is a light source in the top of

21   the phone booth.

22   Q.  And what is -- now I'm showing you D13, I believe.

23        What are we looking at here?

24   A.  So these are dialing instructions that are pasted to the

25   inside of the courtesy phone booth that we viewed previously.

1  Q.  What is this?

2  A.  This is the entrance to the B loop for sites 23 through 47.

3  Q.  And just to be clear, you went up there to look at site 47

4  in particular where Mr. Smith was?

5  A.  Yes, that is correct.

6  Q.  What's this photograph of?

7  A.  This photograph shows the parking space for campsite No.

8  47, as well as the tent pad that's just beyond.  You can also

9  see other sites from this photo as well, but this is site 47.

10 Q.  So can you just indicate, maybe by underlining, where the

11 parking space would be?

12 A.  Yes.  So right here is the parking space for 47

13 (indicating).

14 Q.  And where is the tent pad?

15 A.  The tent pad is right here (indicating).

16 Q.  And, again, you have no personal knowledge of where

17 Mr. Smith's tent was or wasn't on the night in question,

18 correct?

19 A.  Correct.

20 Q.  Okay.  Can you see any other campsites in that photograph?

21 A.  Yes.  So the closest site to 47 is No. 24, and this is the

22 tent pad right here (indicating).

23 Q.  And I'm not asking you for an exact figure, but do you have

24 a sense of how far apart the tent pads are?

25 A.  They're approximately 25 feet.

1   Q.  What are those boxes in the photograph?

2   A.  These boxes (indicating)?

3   Q.  Sorry, that was a bad question.

4          Yes, the two brown boxes you've indicated?

5   A.  Those are bear bins that are located at each campsite.

6   Q.  Are there -- so if there's campsites there -- what does a

7   campsite generally have?  What are the pieces of a campsite?

8   A.  Each of the campsites here had a parking space, a tent pad,

9   a picnic table, a fire ring, and a -- and a bear bin.

10  Q.  So the bear bin for campsite 47, is it in this photo, or do

11  you know?

12  A.  It's actually just to the left outside of the photograph.

13  Q.  So from the photographer's left, I suppose?

14  A.  I'm sorry, yes, photographer's left.

15  Q.  This photograph, what are we looking at?

16  A.  Sorry.  My line stayed there.

17         This is with photographer's -- my back to site No. 47,

18  just 180 degrees facing the phones and the ranger station.

19         MR. FREEBURG:  And, Ms. Logan, if you could give me

20  some guidance.  Is there a way for the witness to remove those

21  yellow lines?  I apologize.

22         COURTROOM DEPUTY:  That's okay.  You can, but I can do

23  it as well.

24  BY MR. FREEBURG:

25  Q.  So, I'm sorry, I lost the thread of it.

1              Is this from campsite 47?

2    A.  Yes.   My back is to campsite 47.

3    Q.  What are you able to -- were you able to see the phones?

4    A.  Yes.

5    Q.  Can you indicate where they are?

6    A.  Right there (indicating).

7    Q.  And, Ms. Bontecou, if you look in the top right corner,

8    there's a green triangle.  It looks like you can kind of pop

9    out some controls.  I wonder if that's how you --

10   A.  Would you like me to clear the circle now?

11   Q.  Yes, please.

12   A.  Got it.

13   Q.  Next photo here, what are we looking at here?

14   A.  So the closest tent pad in the photograph is for site No.

15   47, and then the tent pad here is the closest site No. 24.

16   Q.  Next photograph, what is this one?

17   A.  Uhm, so this is also right in front is the tent pad for

18   site No. 47 once again, and then back here kind of in the

19   shadows, but that's the tent pad for site No. 46, which is the

20   second closest.

21   Q.  And, again, not asking for a specific figure, but what

22   is -- what's your best guess or approximation of how far away

23   that other tent pad is?

24   A.  This one was slightly further than No. 24, about 40 feet.

25   Q.  And there's a -- do you see a bear box in this photo?

1    A.  Yes.

2    Q.  Actually, how many do you see?

3    A.  Uhm, well, there's this one closest, and then I believe

4    that's another one in the distance there.

5    Q.  And is the closest one associated with the campsite?

6    A.  That one is associated with site No. 46, I believe.

7    Q.  Next photograph here -- oh, and if you can clear that for

8    us.

9    A.  I got it, yep.

10   Q.  What's -- what are we looking at from this one?

11   A.  Uhm, so just to the photographer's left is site No. 47, and

12   you can see the courtesy phones here.  And right here, this is

13   a bit hard to see, but it's just a path with some steps down to

14   the sidewalk where the phone booths are.

15   Q.  And, again, you don't know whether this path was lighted or

16   not on the night in question here?

17   A.  I do not know that, no.

18   Q.  I'm going to show you the next photograph, which I believe

19   is D30, if I've kept my numbering straight.

20           What are we looking at here?

21   A.  So, once again, to the left you can see -- I'm right by the

22   parking space for site No. 47.  This road is the one-way loop

23   road that goes through B loop campground, and then you can see

24   the phone booths on the far right of the photograph.

25   Q.  I'm going to show you now D31.

1          What are we looking at?

2  A.  So this is a front view of the restrooms that are closest

3  to site No. 47.

4  Q.  Is there any lighting visible in this photograph?

5  A.  Uhm, yes.  Centered above the door in the middle was a

6  light source.

7  Q.  Oh, and I -- I don't know if this is clear to folks, but

8  which side is the men's and which side is the women's?  If you

9  could circle the women's.

10  A.  Yes, the women's restroom is on the left here (indicating).

11  Q.  I'm now going to turn to what I believe is D36 -- oh, if

12  you can clear that.

13          What are we looking at here?

14  A.  So this photograph is taken from the exact same spot as the

15  previous photograph of the restrooms.  It's just a 180-degree

16  turn.

17  Q.  What's visible in this?

18  A.  So this is one of the campground host sites, site No. 41.

19  Q.  We're going to look at D38.

20          Did you take this photograph?

21  A.  I did, yes.

22  Q.  Where is it?

23  A.  This is the interior of the women's restroom.

24  Q.  Okay.  I'm going to blank this photograph out.  I'm going

25  to show you another photograph.  I think this photograph has

1  been admitted as EE.

2        When you look at this photograph, are there any

3  details that match the photograph we just looked at, for

4  example, near the mirror?

5  A.  Can we -- yes.  So, the mirror, the side of the bathroom

6  stall that is on the left side of this photograph.

7  Q.  Specifically in relationship -- do you see any holes in the

8  bottom, I guess, right near the mirror?

9  A.  Yes.  So there are two holes on either side of the mirror.

10 Q.  Okay.  Let me go back to the other photograph.

11 A.  All right.  And you can see those same holes on the sides

12 of the mirror.

13 Q.  But you have no firsthand knowledge of whether Ms. Bye was

14 in this -- you have no firsthand knowledge of where Ms. Bye

15 was; you just know that the holes line up?

16 A.  Correct.

17 Q.  What's this photograph?

18 A.  This is another angle showing the interior of the women's

19 restroom.

20        MS. MARTENS:  What number?

21        MR. FREEBURG:  D38, I believe.

22        MS. MARTENS:  That was the last one.

23        MR. FREEBURG:  D44.  I will be happy to show you any

24 photograph that I have screwed up the numbering on.

25 BY MR. FREEBURG:

1  Q.  What's this one?

2  A.  Uhm, so this is from standing on the one-way Loop Road

3  facing towards campsite No. 47.

4  Q.  And I believe this is D46.  This is -- I think this is D45.

5  Excuse me.

6          What are we looking at here?

7  A.  So this photograph was taken from my feet in the exact same

8  spot as the previous photograph.  I just turned down the road

9  and you can see the structure of the -- the bathrooms in the

10  center here (indicating).

11  Q.  So let's back up.  So in one direction you see the

12  bathrooms.

13          What do you see in this direction?

14  A.  Campsite No. 47.

15  Q.  Can you clear that out for us?  Thank you.

16          I think this one is marked D46.

17          What are we looking at?

18  A.  So this is another campground host site, No. 43.

19          THE COURT:  Counsel, I don't believe that could be

20  marked D46 because we don't have -- we do have.  That's my

21  mistake.  Thank you.

22          MR. FREEBURG:  Thank you, Judge.

23          THE COURT:  I didn't think we went up to those high of

24  numbers.

25          MR. FREEBURG:  I believe there are three more

1  photographs.  There's 21 in total, and if there's anything I

2  can do to assist the Court or counsel in navigating them, I'm

3  happy to.

4          THE COURT:  Excuse the interruption.

5  **BY MR. FREEBURG:**

6  **Q.**  Next photograph, I think this is D47.

7          What are we looking at?

8  **A.**  So you can see in the bottom left-hand side of the

9  photograph, that's the sign for campsite No. 43, the campground

10 host, and then in the upper right, those are the restrooms.  So

11 this site is right next to the other campground host site 41.

12 **Q.**  Last photograph here, D54, what are we looking at?

13 **A.**  So from across the street of the main entrance to Norris

14 Campground I see the courtesy phones that have been previously

15 shown.  Just to the right of that fire hydrant is the steps and

16 the path that were previously shown from -- across from

17 campsite 47, and then there's a lamppost here (indicating).

18 **Q.**  Ms. Bontecou, shifting gears for a moment, where did you

19 grow up?

20 **A.**  I grew up in Jackson, Wyoming.

21 **Q.**  What do you like to do in the summer?

22 **A.**  Besides working, um, camping, backpacking, hiking.

23 **Q.**  Have you camped in Yellowstone in the summer?

24 **A.**  I have, yes.

25 **Q.**  What is your impression as to whether it is generally busy

1    or not?

2    A.   It's a very busy national park.

3    Q.   Does that taper off?

4    A.   Yes, it does.  Summertime is the -- is the busiest, I

5    think, through Labor Day weekend, and then it kind of tapers

6    off from there.

7            MR. FREEBURG:  Judge, no further questions for this

8    witness.

9            THE COURT:  All right.  Thank you.

10           Cross-examination for the Government?

11           MS. MARTENS:  Just a moment, your Honor.

12       (Discussion held at prosecution table.)

13           MS. MARTENS:  Thank you, your Honor, very briefly.

14                       **CROSS-EXAMINATION**

15   BY MS. MARTENS:

16   Q.   Ms. Bontecou -- I think I just butchered your name.

17   A.   No, that was perfect.

18   Q.   Is that right?  The spelling and pronunciation -- I wrote

19   it down --

20   A.   Quite different than it looks.

21   Q.   That's what made me doubt myself.

22           So just to be clear, you weren't in Yellowstone

23   National Park in September of 2019?

24   A.   No, I was not.

25   Q.   Do you know anything about the state of the lighting in

1  Norris Campground in September of 2019?

2  A.  No, I do not.

3  Q.  So things could have been broken or not working?

4  A.  Certainly.  I don't know.

5  Q.  And I think Mr. Freeburg covered this, but you have no

6  personal knowledge to do with, essentially, the facts of this

7  case?

8  A.  No personal knowledge, no.

9  Q.  So you just took pictures?

10  A.  For?

11  Q.  For this case.

12  A.  For this case?  I have been working this, investigating

13  this case.

14  Q.  Do you know what the usage for the Park was in September of

15  2019?

16  A.  I do not know.

17          MS. MARTENS:  May I have a moment, your Honor?

18          THE COURT:  Yes.

19      (Discussion held at prosecution table.)

20          MS. MARTENS:  Your Honor, I have no further questions.

21          THE COURT:  All right.

22          Any redirect?

23          MR. FREEBURG:  No, Judge.  Thank you.

24          THE COURT:  Any objection to excusing and releasing

25  this witness?

1          MR. FREEBURG:  Yes, Your Honor -- I apologize.  That

2    wasn't directed at me.

3          THE COURT:  I can't hear you.

4          MR. FREEBURG:  I apologize for interrupting, Judge.  I

5    don't think your comment was directed to me.

6          THE COURT:  For the Government?

7          MS. MARTENS:  I have no objection, Your Honor.

8          THE COURT:  All right.  Thank you, ma'am, very much.

9    You're excused and released from your subpoena.  Safe travels.

10          THE WITNESS:  Thank you very much, Your Honor.

11          MR. FREEBURG:  Judge, at this time the defense would

12    rest.

13          THE COURT:  All right.

14          Any redirect -- excuse me -- any rebuttal case?

15          MS. MARTENS:  Um, the only thing I would have in

16    rebuttal, Your Honor, I've marked Exhibit 1003.  It is a public

17    record.  I have also brought -- and requires no authentication

18    or witness for its admissibility.  It is a section of the CFR

19    which is a key to the symbols that the national park uses on

20    its signage.

21          THE COURT:  So is that a motion to admit 1003?

22          MS. MARTENS:  Yes, Your Honor, it is.

23       (Discussion held between prosecutor and defense counsel.)

24          MR. FREEBURG:  Judge, no objection.

25          THE COURT:  Exhibit 1003 is admitted.

1    (Government's Exhibit 1003 received.)

2         MS. MARTENS:  Your Honor, the Government has nothing

3    else.

4         THE COURT:  All right.

5         The evidence is closed.  At this time we will take a

6    recess.  I have some matters to attend to before we can move to

7    the instructions on the evidence.

8         I think we will recess until 1:00.

9         Any objection from counsel?

10        MS. MARTENS:  None, Your Honor.

11        MR. FREEBURG:  None, Your Honor.

12        THE COURT:  All right.  At that time we will begin

13   with the Court's instructions on the evidence.  Then we will

14   hear closing arguments from counsel.  I will have one last

15   instruction to guide your jury deliberation process and cover a

16   few housekeeping matters.

17        And please know that -- perhaps the courtroom deputy

18   or jury administrator has already addressed this, but the jury

19   will be deliberating here in the courtroom because it is

20   important that you deliberate together, and our jury

21   deliberation rooms are quite small, as you know; you have been

22   broken into two.

23        Consequently, we will vacate the courtroom; the doors

24   will be locked, and, as indicated right now, there will be

25   barriers on all the windows and you will be left here for

1 deliberations. There's a process where you can access the

2 bathrooms in the jury deliberation rooms that you have been

3 divided into, and the court bailiff will provide access back

4 into the courtroom because those back doors are locked and

5 inaccessible to anyone besides badged employees.

6 With that general overview, is there any other matter

7 that I should attend to with the jury present?

8 From the Government?

9 MS. MARTENS: No, Your Honor.

10 THE COURT: From defendant?

11 MR. FREEBURG: No, Your Honor.

12 THE COURT: All right. We'll recess until 1:00.

13 Please, again, remember the admonition against

14 discussing this case with anyone, including each other; against

15 researching anything about this case. Please keep an open

16 mind. While the evidence is closed, it has been my experience

17 that closing arguments are helpful and warrant close attention

18 and an open mind, just as the evidence presentation has.

19 So with that -- those reminders, we will stand in

20 recess until 1:00.

21 (Following out of the presence of the jury.)

22 THE COURT: My thought is to have you back for our

23 charging conference at 11:00 or shortly thereafter, depending

24 upon what your desires might be. We will have our charging

25 conference -- you can bring food, if you wish, as I indicated,

1  but I can't imagine that our charging conference will invade

2  the lunch hour.

3      Hopeful that arrangement will provide some time --

4  actually, our first order of business will be to hear arguments

5  again, if there are any other arguments or a renewal of the

6  argument made pursuant to Rule 29.  That will be the first

7  matter.

8      Are there any objections to that overview of how we

9  will proceed?

10      Yes, Mr. Freeburg.

11      MR. FREEBURG:  Judge, I believe the Court said 11:00,

12  which is in nine minutes.  Is it 11:00 or noon that we should

13  be back for the charging conference?

14      THE COURT:  My thought is 11:00, unless you wish some

15  time to confer with your client.

16      MR. FREEBURG:  No, Your Honor, I think we're prepared.

17      And just if the Court could remind me, how long for

18  closing arguments?

19      THE COURT:  What's the Government's pleasure?

20      MS. MARTENS:  Originally we were quite pressed for

21  time, so I'd cut it to something fairly short, but I was

22  thinking something in the neighborhood of a half hour or so.

23      THE COURT:  Any objection to 30 minutes?

24      And, Ms. Martens, in making that suggestion, you will

25  need to reserve any time, or please ask the courtroom deputy to

1  give you an alert, because closing arguments are timed, if you

2  wish rebuttal argument.

3          MS. MARTENS:  Yes, Your Honor.

4          THE COURT:  Thoughts from defendant?

5          MR. HUGUS:  Judge, we just think 30 is a little bit

6  tight.  If we could have 35 or 40, we don't necessarily

7  anticipate using all of that time, but would just prefer not to

8  have the hard stop.

9          THE COURT:  Any objection to 40 minutes?

10          MS. MARTENS:  Or 45.

11          I'm agnostic on --

12          THE COURT:  Oh, no, no.  I recognize this.  I have

13  raised kids, you know.

14          Any objection to 40 minutes?

15          MS. MARTENS:  No, Your Honor.

16          THE COURT:  For the defendant?

17          MR. FREEBURG:  No, Your Honor.

18          THE COURT:  All right.  We will set it at 40 minutes

19  for closing arguments.

20          As you know, you definitely can display the jury

21  instructions.  The jury will be charged ahead of closing

22  arguments.

23          With that, we will -- I will see you back here in

24  about ten minutes or so for any motions or renewal of motions,

25  and then we will move directly into the charging conference, so

1    please bring either an electronic version or a hard copy of the

2    instructions so that we can address those.

3            Of course, the charging conference will also address

4    the form of the verdict, so be prepared to talk about that.

5            And I will also place on the record the findings

6    associated with the Rule 413 witnesses.

7            All right.  Any questions?  For the Government?

8            MS. MARTENS:  None, Your Honor.

9            THE COURT:  For defendant?

10           MR. FREEBURG:  No, thank you, Judge.

11           THE COURT:  All right.  We will see you in about ten

12   minutes, then.

13       (Recess taken 10:54 a.m. until 11:06 a.m.)

14           THE COURT:  Please be seated.

15           All right.  We're on the record for any motion or

16   renewal of motions following the close of evidence in Docket

17   20-CR-45.

18           For the defendant?

19           MR. FREEBURG:  Yes.  And if I can remain seated so I

20   can have the documents in front of me?

21           THE COURT:  Yes, that's fine.

22           MR. FREEBURG:  Judge, the defendant would renew its

23   motion for judgment of acquittal only with respect to the

24   kidnapping charge, based in part on the evidence provided by

25   Special Agent Olson in relationship to his cross-examination.

1    He testified that in the course of his investigation,

2    he learned that there was an impression from the parents of

3    Ms. Bye's roommates, directly after the alleged kidnapping,

4    that she had consented to go to Yellowstone.

5    He qualified that, based on the totality, he still

6    believed that she was taken against her will or did not

7    voluntarily go to Yellowstone.

8    Nonetheless, the evidence remains that he had a basis

9    for a doubt and no rational jury could discount the fact that

10   his belief or opinion in his investigation was not -- that

11   there was this doubt expressed firmly after the evidence --

12   excuse me -- immediately after this decision -- or incident.

13   Thank you.

14   THE COURT:  Thank you.

15   For the Government?

16   MS. MARTENS:  Do you prefer I sit or stand?

17   THE COURT:  It doesn't matter, whatever you --

18   MS. MARTENS:  As long as there's only a couple of us

19   in the courtroom, is it okay to remove my mask?

20   THE COURT:  Yes.

21   MS. MARTENS:  Thank you, Your Honor.

22   I don't have much to add from what I said yesterday on

23   the motion.  I don't believe the evidence is substantially

24   changed in any way.  But pulling one phrase out of the

25   interview doesn't change the state of the evidence or the

1  standard the Court applies in this case.  So I think the motion

2  should be denied.

3          THE COURT:  Anything further, Mr. Freeburg?

4          MR. FREEBURG:  No, Your Honor.

5          THE COURT:  All right.  I will deny the Rule 29

6  motion, in large part for reasons articulated yesterday.

7          While the agent testified today and testified in

8  relation to his conversations with -- I believe it was the

9  Leathams, it is not my recollection that he expressed doubt.

10  And the Government in redirect further clarified that based on

11  the totality of the interview, it was the agent's opinion --

12  not that he is the ultimate fact finder or is representative of

13  an ultimate fact finder, but it was his opinion that H.B. did

14  not want to go to Yellowstone.

15          So with that, I'd like to turn to the Rule 413

16  witnesses.

17          And it is my finding that the testimony of Albertorio

18  Vazquez and Karson Ceglia was sufficient to establish by a

19  preponderance of the evidence that a reasonable juror could --

20  excuse me -- is sufficient to conclude that a reasonable juror

21  could find by a preponderance of the evidence that the other

22  acts described by those two witnesses occurred.

23          While the Government has not specifically articulated

24  the state or federal law that would be violated in the context

25  of those two witnesses, it seems as though under Rule

1  413(d)(3), they testified each separately as to two separate --

2  or a total of three separate instances that there was a contact

3  without consent between the defendant's genitals or anus and

4  any part of another person's body.

5         However, as to Ms. Guarino, it's my finding that a

6  reasonable juror could not find by a preponderance of the

7  evidence that the other act falling within Rule 413(d)(3)

8  occurred.

9         I reread the realtime, which can't be referred to and

10  it is not my practice to refer to realtime translations, but as

11  an aid to my memory only in the context of her testimony.  The

12  concerns I have with her testimony is that she was very

13  consistent about the conversations she had with Mr. Smith and

14  consistently described them as a discussion of her hesitancies

15  on sex.  In several instances she talked about how she didn't

16  think that they should be doing that, and by "that" I

17  understood actual intercourse as opposed to the other conduct

18  that she testified she was comfortable with, everything that's

19  part of making out.

20         Her testimony about her clothing is troubling, where

21  her clothes came off and apparently stayed off, notwithstanding

22  Mr. Smith's asking her specifically, "Do you think you're

23  ready?"  Her response to that -- because I wanted to have it

24  clearer in my mind -- was that she said, "Oh, no -- like -- not

25  right now.  I don't know.  Very hesitant, not really knowing

1   what to say, but I thought we were on the same page in the

2   matter."

3          We each tried to address her communication, whether it

4   was oral or in the form of body language or expression or what

5   have you, and she was not helpful.

6          She testified that when he came back, she didn't know

7   what to do.  She didn't specifically say as much, but nobody

8   asked her.

9          I felt like the course of her testimony was very clear

10  that she didn't put on any clothes; she didn't move from where

11  she was either laying or reclining or sitting on the couch; she

12  relied upon her internal thought process that the two of them

13  had established that she wasn't ready.

14         I tried to inquire as to whether she did anything to

15  communicate that, given that Mr. Smith, obviously, was very

16  clear in his communication and intention, and the most I could

17  gather was that she was just lying there.

18         It's my view that all of that -- while creepy and

19  constituting a prior bad act, I have to have a finding that we

20  have something in the -- that a reasonable juror could conclude

21  by a preponderance constituted a criminal act, and that's my

22  significant challenge.  And I cannot overcome that challenge,

23  and conclude that her testimony is insufficient in that

24  respect.

25         You saw in the jury instructions the draft instruction

1   striking her testimony, so I suspect the general direction is

2   not of surprise.  We heard some argument yesterday on this

3   point.  I appreciated the opportunity to get that feedback and

4   to really help me better approach the transcript and the

5   application of reason and common sense to her testimony.

6           And I ended up, as indicated, that I cannot make that

7   preliminary finding for purposes of allowing that testimony to

8   stand and be considered by the jury.

9           So does the Government wish to create a further record

10  on that point?  I know we have -- we have had some argument,

11  but I certainly don't want to deprive the Government of an

12  opportunity to establish any additional record warranted.

13          Anything further, Ms. Martens?

14          MS. MARTENS:  I can't think of anything that I would

15  add in addition to what I said yesterday, so I don't have

16  anything further at this time, Your Honor.

17          THE COURT:  Well, those arguments and the objection is

18  noted and preserved.

19          Let's turn to the evidentiary instructions.  It's my

20  practice to, rather than going by number, instruction by

21  instruction -- I find that tedious -- to turn to counsel for

22  the Government first for edits and revisions to the

23  instructions.  They are numbered for the record so that we can

24  all follow the recommendations for changes.

25          So, Ms. Martens, do you have objections or edits that

1  you would like to suggest by instruction number?

2        MS. MARTENS:  I do.  And I think -- so, first of all,

3  I see in this packet we don't have the standard witness

4  credibility instruction, but I think I understand the reason

5  for that, and I just want to check my understanding.

6        THE COURT:  Yes, go ahead.

7        MS. MARTENS:  So I think that the jury is going to get

8  that instruction for their deliberations.  Just because it was

9  in the opening instructions, we're not repeating here.

10        THE COURT:  That's exactly correct.  The same with the

11  instruction that the indictment is not evidence.  I always hate

12  to reread instructions that have already been read, and I will

13  make sure that the jury understands that the full set of

14  instructions must be considered as the instructions on the law.

15        MS. MARTENS:  Okay.  Perfect.  That was my

16  understanding, but I just wanted to double-check.

17        With that, I have just a couple little suggestions for

18  the Court.

19        I think the first one would be Instruction No. 18

20  which is the kidnapping instruction.

21        THE COURT:  Yes.

22        MS. MARTENS:  This instruction doesn't include the

23  date range, and I think that's also true for the elements

24  instruction on the sexual contact.  So I think we should

25  include the dates on both of those instructions.

1          And the sexual contact is 19.

2          THE COURT:  Yes.

3          MS. MARTENS:  And then Mr. Freeburg and I were

4   discussing it -- 18 and 19, I think we're both in agreement

5   that we should probably name Hannah Bye in those instructions.

6          THE COURT:  Rather than the initials?

7          MS. MARTENS:  I think it would be clearer for the jury

8   since we've been talking about her as Ms. Bye, and I think in

9   the kidnapping instruction her name was omitted entirely, so I

10  think it would just be nice for them to match and use her full

11  name.

12         THE COURT:  Yes.

13         As to the elements instructions, I agree as to the

14  date, "on or about."

15         What about the location?  Those -- we've -- we've sort

16  of -- we have the location, "within the boundaries of

17  Yellowstone National Park," but nothing about the District of

18  Wyoming, and we just sort of dive into the conduct portions of

19  the charged offenses.

20         So your observations on that?

21         MS. MARTENS:  I would prefer the instruction to

22  say "within the District of Wyoming."

23         THE COURT:  And similarly on kidnapping, it would then

24  read "within the District of Wyoming and elsewhere," because,

25  obviously, we do have the interstate component there.

1        MS. MARTENS:  Yes.

2        THE COURT:  Any objection to that addition?

3        So we will be adding to -- two additional elements to

4    kidnapping:  The date range and the location.  And we will add

5    one additional element in the -- in Count Two, the date range,

6    and we will somewhat modify the articulated location to be "in

7    the District of Wyoming and within Yellowstone National Park."

8        Mr. Freeburg.

9        MR. FREEBURG:  Judge, no objection.  But just for

10   clarification, so there's an italicized *first, second, third,*

11   *fourth*, which sets forth the elements, so there would be an

12   added *fifth* and *sixth*?

13       THE COURT:  No, the first one -- the first two would

14   be in the -- would be the new ones, and then everything is

15   pushed down and numbered according -- renumbered accordingly.

16       And then in the second one, the first one would be the

17   date range "on or about," and then everything else would be

18   renumbered accordingly.

19       MR. FREEBURG:  Thank you for the clarification.

20       And no objection.

21       THE COURT:  All right.

22       Back to the Government.

23       MS. MARTENS:  Also with regard to kidnapping, the

24   Government proposed an instruction which was found at page 14

25   of our proposed instructions which is the pattern instruction

1   on the motive for kidnapping.

2        THE COURT:  If you could hang on a minute, I have that

3   electronically.  I always find it a little better if I can

4   actually find to what you're referring.

5        MS. MARTENS:  Certainly, Your Honor.

6        THE COURT:  Do you have a page number for your

7   reference?

8        MS. MARTENS:  Are you asking for the page number in my

9   proposed?

10       THE COURT:  Yes.

11       MS. MARTENS:  Yes.  That was page 14.

12       THE COURT:  Thank you.

13       So which -- is there something specific within the

14  first or second paragraph of page 14 in your proposed set of

15  instructions that you believe needs to be added?

16       MS. MARTENS:  I would prefer both sentences be added

17  someplace in the instruction packet as they are both correct

18  statements of the law and are not currently in the packet.  I

19  guess the second paragraph --

20       THE COURT:  The "random or reward," my concern is that

21  I think that creates confusion.  There's nothing about any of

22  that in the evidence, so it just seems like we're putting

23  something in that could cause confusion without the value of

24  clarifying.

25       MS. MARTENS:  I think I see your point, Your Honor.

1   And I think that, certainly, the first paragraph/sentence is

2   the more important of the two.

3          THE COURT:  But we have that in the elements.

4          Again, I'm not trying to argue with you, that "the

5   defendant kidnapped the person for some purpose or benefit," is

6   there something that is missing there that you believe the

7   evidence in the case warrants supplementation?

8          MS. MARTENS:  It is that unanimity.  They don't have

9   to specifically agree.  And I think that this goes hand in hand

10  with another suggestion that I have on -- regarding Instruction

11  19, which is our sexual contact instruction.

12         As written right now, the sexual contact instruction

13  in the third element talks about "and," so it is the

14  "intentional touching, directly or through the clothing, of the

15  genitalia, anus, groin, breast, inner thigh and buttocks."

16         So I would suggest there that we should have the --

17  there's a fairly standard instruction that we get where the

18  Government can charge in the conjunctive and prove in the

19  disjunctive.  We don't have to prove all of those contacts to

20  prove sexual contact.

21         And my thought with the unanimity piece of the

22  kidnapping instruction is a juror may think that they need to

23  unanimously decide that, for example, Mr. Smith kidnapped

24  Ms. Bye to touch her breasts versus her inner thigh or get sort

25  of in the weeds that way, which is certainly not something that

1    they would need to do.

2         THE COURT:  Well, in the second element as stated, we

3    have "purpose or benefit," so we don't have any conjunction

4    there.  And I'm -- and I'm struggling to understand how

5    unanimity could become a problem in the current wording of that

6    or why we would need to elaborate.

7         So I am -- I would deny the proposed instruction.

8         As to the sexual conduct, it seems, rather than to add

9    an additional instruction relating to proof in the conjunction

10   and disjunction -- which I think is virtually incomprehensible

11   to normal people -- I wouldn't be opposed to changing the "and"

12   to an "or" in the element, although that doesn't track the

13   indictment, to avoid the problem that people might believe that

14   there needs to be touching everywhere here, or -- and I don't

15   see a problem with some people concluding -- or maybe finding

16   is the better word -- that he touched one part, another person

17   finding that he touched another part, given that, as you made

18   that point, I think, in opening -- or maybe it was just to

19   me -- I'm not sure -- that we have touching confirmed in the

20   areas that are covered or --

21        MS. MARTENS:  I think changing element 3 so that it

22   reads "inner thigh or buttocks" -- I think that that takes care

23   of the concern.  And I think that the jury will understand the

24   packet, especially with the instruction that the indictment is

25   just a charge, that they shouldn't be looking at the

1    indictment; they should be looking at the elements as

2    instructed.  So I think that that should be okay.

3              THE COURT:  All right.

4              Any objection to changing that word?

5              MR. FREEBURG:  No objection to changing the word "and"

6    in the third element of Instruction 19 to "or."

7              THE COURT:  All right.  So back to you, Ms. Martens.

8              MS. MARTENS:  Just take me a second to --

9              THE COURT:  No, that's fine.  Take your time.

10       (Discussion held.)

11             MS. MARTENS:  I think we covered everything with

12   Instruction 19, so I think we're good there.

13             THE COURT:  Any issues with the form of verdict?

14             MS. MARTENS:  No.

15             THE COURT:  All right.

16             Let's turn to you, Mr. Freeburg, for edits.

17             MR. FREEBURG:  You know, Judge, I suppose I feel like

18   I ought to say something, and this is nitpicky, but Instruction

19   No. 25, which is the stock instruction for evidence, it uses

20   the words, "The evidence is what was said in court," and I

21   think in some ways that unduly emphasizes the words coming out

22   of the witness's mouth, whereas it is also their demeanor and

23   what they didn't say and so forth, so we might

24   suggest "communicate."

25             THE COURT:  Any objections?

1        MS. MARTENS:  Struggling with the pages.

2        THE COURT:  I know.  I was looking for page 25 instead

3   of Instruction 25 and got off the mark there.

4        MS. MARTENS:  As was I.

5        MR. FREEBURG:  It is page 15 of 26.

6        MS. MARTENS:  No objection, Your Honor.

7        THE COURT:  All right.  We'll change that word.

8        Anything else?

9        MR. FREEBURG:  No, Judge.

10       THE COURT:  Please know that defense counsel usually

11  has nothing to say.

12       MR. FREEBURG:  Okay.  Thank you.

13       THE COURT:  So you're just right in the pack.

14       MR. FREEBURG:  Okay, good.  I've got one thing.  I've

15  put it up.

16       THE COURT:  You've got more than most people.

17       And every time I read these instructions I think, oh,

18  that needs to be reworded," and then I can't remember -- Sandy,

19  if you can find the instruction that talks about "the attorneys

20  may properly refer," because it suggests that I haven't already

21  instructed them on the law.  There's some instruction that's

22  either worded in the current tense or the past tense that is

23  incorrectly worded.  And if you can't find it --

24       THE LAW CLERK:  I've got it.

25       THE COURT:  -- please know that I read that every time

1  and have trouble with it, because I think these stock

2  instructions were done at a time when judges didn't instruct

3  until after closing.  So it is just the wrong tense because

4  I've already instructed.

5        And, again, feel free to put -- you know, take your

6  version and put it on Elmo or however you want, if that will

7  help in your closing arguments.

8        Any comment or objection on the form of the verdict?

9        MR. FREEBURG:  None from the defense, Your Honor.

10       THE COURT:  All right.

11       And please know that we do have forms in the -- in

12  this notebook that the jury can use for questions.  Sometimes

13  they write their questions out on a notepad.  The forms are

14  just done for their convenience with the caption of the case so

15  it goes into the docket, but we've had jurors either not find

16  or not use those forms.  They're not required to.

17       What's in the notebook -- please let me know if you

18  have any questions -- is the form of the verdict, a copy of the

19  indictment which, as a matter of routine, I include.

20  Notwithstanding, I agree with you, Ms. Martens, that we're past

21  the charging document.  And I don't -- I don't include it in

22  all cases, such as when witnesses -- when defendants have pled

23  and their names appear and it causes the potential for

24  confusion or improper inferences.

25       It also includes the joint evidentiary stipulations

1  which are also admitted and in evidence as well as the

2  questions -- form for questions for the jury if they wish to

3  use that form.

4      All instructions, including the opening instructions,

5  the instructions on the evidence and the instructions on the

6  deliberation process is in this notebook, and nothing else is

7  in the notebook.

8      If you have any questions, feel free to see Sandy.

9      Anything else that might benefit the case by way of a

10 discussion?

11     THE LAW CLERK:  Judge, I just have a question on what

12 you would like the instruction to read.  It says, "The lawyers

13 may properly refer to some of the governing rules of law in

14 their arguments."

15     What do you want that to say?  It is in 15.

16     THE COURT:  And that may not be the one that always

17 bothers me.  This time I will make a note.

18     It is not that one.  It is some other one.  I'm sorry.

19 I can't find it.  But it relates -- it relates to the use of

20 the wrong tense.

21     And, obviously, there has been nothing judicially

22 noticed, given that the stipulation that the parties entered

23 into covered the matter concerning the state boundaries.

24     Anything else?

25     For the Government?  Maybe you already responded.

1          MS. MARTENS:  Um, I think maybe my only question is

2   we're rewording both elements instructions?

3          THE COURT:  Yes.  We will give you the pages that we

4   replace in the notebook.

5          MS. MARTENS:  Perfect.  Yeah, I just wanted to make

6   sure, if I was going to refer to them, that I had the "final"

7   final version.

8          THE COURT:  Yes, we will give you replacement pages.

9   My preference is to not reprint the entire instructions, but I

10  leave that up to Sandy.  But you will have, at a minimum, the

11  replacement pages that we've talked about.

12         MS. MARTENS:  Perfect.  Thank you, Your Honor.

13         THE COURT:  Anything?  Any questions?

14         MR. FREEBURG:  No, Your Honor.  Thank you.

15         THE COURT:  All right.  Thank you for your time today.

16  I'd ask that you be available to start around 1:00, but please

17  know that we have to have the jury in the jury room before we

18  can ask the Marshals to bring the defendant up, so there may be

19  a slight delay.  All right?

20         MS. MARTENS:  Thank you, Your Honor.

21         MR. FREEBURG:  Thank you.

22         THE COURT:  We'll stand in recess until 1:00.

23      (Proceedings recessed 11:41 a.m., May 13, 2021.)

24      (Proceedings reconvened 1:15 p.m., May 13, 2021.)

25      (Following in the presence of the jury.)

1          THE COURT:  Please be seated.

2          We're back on the record in 20-CR-45, with the jury

3     present.  Roll call is waived.  Counsel and their clients are

4     present.

5                    * * * * * * * * * *

6          (Evidentiary Jury Instruction Charge not transcribed.)

7                    * * * * * * * * * *

8          THE COURT:  Is the Government prepared to begin its

9     closing argument?

10         MS. MARTENS:  It is, Your Honor.

11         Ladies and gentlemen, Cody Smith did not take no for

12    an answer.  He takes what he wants, regardless of the

13    protestations of the other person.  You heard from three young

14    women this week, and each of them began their encounters with

15    the defendant in innocuous pleasant ways:  high school dating

16    relationship, make-out session, meeting a giraffe, trip to the

17    beach, the possibility of making a new friend and maybe a trip

18    to Yellowstone National Park.  But for each of these young

19    women, those encounters took a dark turn.

20         Hannah Bye is what we're here for today.  She is the

21    reason, so let's talk about Hannah Bye.

22         In the fall of 2019, she was 18 years old, attending

23    classes at BYU in Rexburg.  She was social, outgoing, upbeat,

24    making friends, taking classes.  And then she meets the

25    defendant.

1      She thinks she's going to make a new friend, meet a

2  boy.  She chatters with that -- about that with her roommates

3  as teenaged girls do.  There was a plan.  They were going to

4  the McDonald's for french fries or ice cream.  She had already

5  had ice cream earlier that day.  She met another boy, frozen

6  yogurt, basketball, a walk through the park.  She shared that

7  plan.

8      And you don't have to just take Hannah Bye's word for

9  what the plan was.  You have been provided with other evidence

10  what the plan was:  the Tinder conversation where she met the

11  defendant; he offers to take her to Yellowstone.  She expresses

12  interest in going to Yellowstone generally, but then says, "I

13  can't go today."  Then, "Maybe we'll meet."

14      The roommates all understood her plan was to go to the

15  McDonald's and be home that night.  She wasn't dressed for an

16  overnight camping outing.  She was wearing athletic shorts and

17  a hoodie.  She made plans with Ellie Perkins to get a ride

18  home.

19      And there's been plenty of uncomfortable testimony in

20  this trial, but getting right down to bodily functions.  She

21  was menstruating.  She didn't pack anything extra.  You saw her

22  blood-stained underwear.  The plan was to go home.

23      The defendant didn't care.  He wanted what he wanted,

24  regardless of her protestations.

25      He took her to the McDonald's, and in the McDonald's

1  parking lot she says she told him, "I want to go home.  Take me

2  home."  But he took her to the Park.

3  　　　She protested repeatedly.  He kept driving.  We have

4  the Life 360 app showing them driving to and from the Park.

5  The parties agreed that they traveled that night from Rexburg,

6  Idaho, to Yellowstone National Park.  Somewhere along the

7  drive, the knife makes it into the center console.  The

8  defendant habitually keeps a knife in the car.

9  　　　At some point the roommates check in.  You saw the

10  text messages.  She says she's okay.  She's already in a

11  situation where she said, "I don't want to be here."  She's

12  seen the knife.  He's sitting right there.

13  　　　Then they make it to Yellowstone National Park.  It is

14  dark.  It is cold.  She doesn't see any other people.

15  　　　Getting out of the car, she gets her phone back, goes

16  to the bathroom.  And there the defendant follows her into the

17  bathroom and stands outside of the bathroom stall while she

18  tries to get service.

19  　　　At some point, he goes out of the bathroom, and she

20  takes a picture.  Hannah Bye is the kind of person who makes

21  light of a serious situation, who laughs when she should

22  probably cry.

23  　　　At this point she didn't know the extent of what was

24  in store for her.  She leaves the bathroom.  She goes to the

25  tent.  And in the tent there's the knife.  She doesn't have her

1  cell phone anymore.  At some point he takes it away from her.

2  And she's in the tent with the defendant for about six hours,

3  and about four of which are an assault.  It is an all-night

4  wrestling match.

5          She described to you what occurred.  He forcibly

6  kissed her, grabbed her face to keep her from turning away, and

7  he even bit her, pulling on her lip and ripping it.

8          You heard Karson Ceglia tell you about how the

9  defendant forcibly kissed her and bit her and tried to rip her

10  lip off.

11          Ms. Bye couldn't remember the name for that piece of

12  flesh that connects your gums and your upper lip.  It is a

13  frenulum.  And you have the pictures in evidence of her injured

14  lip.  And she told you that it was only once she was bleeding

15  from her mouth, that the defendant stopped kissing her.  But he

16  did other things, continued to do other things.

17          He held her down just like he held Ms. Ceglia down.

18  He touched her all over her body, her breasts, her butt, her

19  inner thigh.  He kept trying to get his fingers inside of her

20  underwear, and she told you about how she had to keep pulling

21  his hand away, just like Ms. Ceglia told you about how the

22  defendant held her down while he stuck his hands down her pants

23  and digitally penetrated her, all while she protested and

24  fought and how she had to use both of her hands to pull his

25  hands out of her pants.

1        Ms. Bye struggled, told him no all night long.  He

2   pulled her bra down.  He groped her breasts.  All while she

3   protested.  He got on top of her, he choked her, and he humped

4   her until he ejaculated.

5        You heard Ms. Albertorio talk about how she was a

6   consensual partner, how she cared for the defendant, and yet it

7   is not enough.  He takes what he wants without care for the

8   protestations of the other person.

9        Ms. Albertorio consented to consensual sex, and when

10  they were interrupted by his little sister coming home, he

11  moved that sex into the closet.  She's afraid of small spaces.

12  She says no, but he won't stop, not until he's gotten what he

13  wanted, not until he's gotten his orgasm.  Then he's done.

14       She told you about the car.  Again, she's a consenting

15  partner, but that's not enough.  He wants more than that.  He

16  wants anal sex, so without her permission, he penetrates her

17  anally, which is painful, and she cries.  She says no.  And it

18  is not over until he gets what he wants, until he's satisfied

19  and he finishes.

20       The encounter in the closet left Ms. Albertorio

21  bleeding.  Hannah Bye didn't -- he didn't penetrate Hannah Bye,

22  but he got what he wanted.  He satisfied himself using her body

23  against her wishes, violating her all the way.

24       He choked Hannah Bye just like he choked

25  Ms. Albertorio.  He restrained her like he restrained

1  Ms. Ceglia.  And she described that for you.  He used one hand

2  to pin her hands over her head while he used the other hand to

3  touch her in all the ways that he desired while she protested.

4  This only stopped when he was done.

5          The alarm goes off in the morning.  She told him that

6  she needed to go back to town.  She had church.  People would

7  be missing her.

8          Get out of the tent.  Get into the car.  She doesn't

9  see other people.

10          He drives her back to town, and as soon as there's

11  cell connectivity, she starts to message with the roommates.

12          Ms. Perkins told you that she knew something was wrong

13  immediately when she saw that text message about never online

14  dating again.  And the roommates knew that something was wrong.

15  She was communicating with them.

16          The voicemail from the police comes through.  She

17  communicates all the way to town about what's going on.  She

18  says, "Help," and, "I'm scared."  The roommates who had worried

19  about her all night -- because the plan was for her to come

20  home that night; she wasn't dressed to be out; she'd expressed

21  her intentions -- they were missing her.

22          They called for advice:  parents, church leaders.

23  They reached out to the police earlier on, and they devised a

24  plan.  They tried to intercept her, tried to get the license

25  plate number.  They had multiple cars set up.  They recruited

1  other people, all to try and protect her.  But they missed the

2  drop-off.

3        Regardless, minutes later they pick her up.  And they

4  told you about how she was when they picked her up and who was

5  in the car with her when they picked her up.

6        Ms. Romao told us that she was frightened, curled up

7  in her hoodie, looking like someone who had been persecuted.

8        They drive.  They tell her that they're going to the

9  police.  She protests.  She's not exactly excited about going

10 to the police, and the reason for that is she knew if she

11 reported this, she would have to see him again, possibly get

12 dragged through a process like this.  And who can blame her?

13 It has been a rough week.  She goes to the police, and she

14 reports anyway.

15       Dr. Lindberg told us that most folks who suffer trauma

16 seek to avoid that trauma.  Dealing with it is hard.  It is

17 painful.  And that's what reporting forces you to do.  But she

18 did it anyway.

19       We know about what happened later on that day.  She

20 went with one of her roommates, went to the parents' house.

21 She wanted to take a shower.  She felt gross.  She had been out

22 all night, covered in her own blood from her period.  And then

23 she takes photographs of her injuries:  Her torn frenulum, the

24 marks on her breasts, the marks on her neck.  Ms. Romao told us

25 about the bruises on her back.

1        And then there's the other follow-up.  The Government
2  didn't simply take her word for what happened.  The
3  investigation set out to verify those facts, collected the
4  plate readers, the cell phone data, the camping receipt, the
5  DNA, looked for trace prints.
6        That all goes to show that being out overnight with
7  Cody Smith was not the plan.  She was going to go home that
8  night from the McDonald's.  Maybe she would have gone to
9  Yellowstone National Park a different day, under different
10  circumstances, but that night she was just meeting a boy for
11  some McDonald's.
12        Dr. Lindberg's testimony helps us understand how
13  people respond in terrifying situations.  A prefrontal cortex
14  doesn't get as much blood as it is supposed to, and that's the
15  part of the brain that helps you reason and act rationally.  It
16  is the part of the brain that helps us do things that would
17  make sense.  But without the aid of that part of your brain,
18  you don't make the best decisions.
19        He also talked to us about traumatic bonding, about
20  how when folks are in terrible situations, they don't always
21  run; they don't always flee.  Even though the defendant hurt
22  Ms. Albertorio more than once, she stayed with him.
23        Everyone responds differently.  But Ms. Bye protested.
24  She physically tried to fight him off and received marks as a
25  result.  It was only when she fled that he stopped kissing her.

1  But the assault didn't stop.  She did so much more than what

2  was required of her to broadcast her protestations, to tell him

3  no.

4          But he doesn't take no for an answer.  He didn't take

5  no for an answer with Ms. Ceglia or Ms. Albertorio either.  He

6  just took what he wanted, and it was only once he got what he

7  wanted that he relinquished, that he stopped.

8          Ladies and gentlemen, this evidence shows that Cody

9  Smith took Hannah Bye to Yellowstone National Park against her

10  will, touched her sexually over her protestations, all while

11  using force against her.

12          The Government will be asking you for a guilty

13  verdict.  Thank you.

14          THE COURT:  Thank you, Ms. Martens.

15          For the defendant.

16          MR. HUGUS:  Ladies and gentlemen, thank you for

17  listening over the past four days.

18          When we met on Monday, I had a confession to make,

19  which was that I had some fears about being here.  And the

20  truth is, a big piece of that hasn't changed.  Part of me is

21  still scared, scared that I didn't say the right things, ask

22  the right questions.  And I know I made some mistakes in this

23  case.  But I can't go back.

24          I am also honored to be here, and I'm honored to be

25  here with my co-counsel, Mr. Freeberg, and, more importantly,

1   my client, Mr. Smith.

2           Through the course of trial, we've heard just a little

3   bit about Cody Smith, not a lot, at least from his perspective.

4   And you have already been instructed about that.  You

5   understand a little bit why that is.

6           But he's a son.  You heard that he's an older brother,

7   a sailor in the Navy.  He's a person like all of us.

8           And because of that, I'm eager to share with you -- I

9   have mixed feelings.  I'm honored, scared and excited to share

10  with you because we have been waiting for a while to try this

11  case, for someone to hear this case.  You are the only folks

12  who can hear us now.  You're the only folks that can give

13  Mr. Smith -- the person, not Mr. Smith, the defendant -- the

14  protection he's entitled to under the law.

15          I was thinking earlier today about this space.  My --

16  my wife is a pastor of a church in Casper where I live, and it

17  meets in a -- like a community kind of events space, and

18  there's nothing sacred about the building at all.  There just

19  isn't.  It is just a building.  But what makes it sacred is

20  what happens there inside the building.

21          And I think the same thing with this.  There's nothing

22  especially remarkable about a federal courthouse, but what

23  happens here, what's happening here right now is really sacred.

24  It is sacred because we're equal here.  Each of your voices

25  matters as much as the person sitting next to you.

1       And on Monday we spent some time talking about

2   different beliefs that we have and how we think about different

3   things.  And some of them were shared and some of them weren't.

4   But today it doesn't matter.  It doesn't matter if you're a man

5   or a woman.  It doesn't matter your religious beliefs, your

6   race, your experiences.  All of those things don't matter.  And

7   really, throughout the history of this country, men and women

8   have defended our Constitution, and that is in part what makes

9   this a sacred space.

10      So I'm thankful that it is you, jurors -- not a king,

11  not a president, not a minister, not the government, not even

12  the judge -- who says what has happened -- what's going to

13  happen here.  It is the people.  It is you.  And that's

14  special.

15      And so you have the opportunity to enforce

16  constitutional protections and decide whether or not, for this

17  accused person, Mr. Smith, those constitutional protections

18  will continue after today or whether they get stripped off

19  today.

20      But right now, like every other person in this room,

21  he enjoys those protections, and he will through trial, if your

22  verdict is not guilty.

23      What exactly are the protections that we're talking

24  about?  The first is that a defendant is innocent until the

25  prosecution rules out even the slimmest degree of reasonable

1  doubt.  And the judge shared with you on day one, that's the

2  highest standard known to any judicial system in the world.

3         There's another standard called preponderance of the

4  evidence, which is a big lawyer word that means more likely

5  than not.  So if I was a scale and it tipped just a little one

6  way, that's preponderance; more likely than not.  But that's

7  not what this is.  If you think it is more likely than not that

8  he did the things he's accused of, he's still not guilty.

9         The next standard or another standard is clear and

10  convincing evidence.  And that's even higher.  And that's how

11  sure the Government has to be before they come into your home

12  and take your kids out of your home against your protests

13  because they think you're not doing a good job.  If they

14  establish that, they can come in there and do that.

15         But that's not good enough for us today either.  It is

16  beyond a reasonable doubt.  And it can be small, and it can be

17  just one, but if you have one reasonable doubt, no matter how

18  big it is, the law says not guilty.

19         After I sit down, each of you are going to have three

20  decisions to make -- or I should say three jobs.  One is to

21  make a decision about the case.

22         Another is to make sure that everyone on the jury,

23  your fellow jurors, follow the law.  The law is what the judge

24  has given you and instructed you on.  And none of your fellow

25  jurors has a right to ask you to step outside of that.  None of

1   your fellow jurors has a right to ask even one of you to find

2   differently if you, individually, have just a small, single

3   reasonable doubt.

4          The third thing that I hope that you do as part of

5   your job is to explain to each other why you feel the way you

6   feel.  Talk about it.  Engage.  I know I asked on day one if

7   you will engage a little bit, I will try to shut up.

8   Hopefully, it will be easier to do that after having spent some

9   days together.

10         So what does it mean to rule out reasonable doubt?

11  Well, the prosecution doesn't have to show that a reasonable

12  doubt is unlikely.  It has to be eliminated altogether.  And if

13  one of the witnesses that the prosecution has called says

14  something that creates a logical possibility that he or she

15  might not be reliable about a number of -- about something that

16  he or she said, then there's a reasonable possibility, there's

17  a reasonable doubt that a number of things that that person

18  said may also not be reliable.

19         And if one of the witnesses that we as a defense

20  called said something that, if true, would mean that Cody Smith

21  is not guilty, and if you can't rule out all reasonable doubt

22  that that's wrong, you must take the statement in the light

23  favorable to the defendant.  That means not guilty.

24         Before we get into some of the evidence that we have

25  heard over the past few days, I want to talk to you about some

1    of the testimony from yesterday, not the things Mr. Smith is

2    accused of for this case, but some of the argument from today

3    and some of the testimony from yesterday.  The prosecution has

4    spent a lot of time talking to you about it, both in the form

5    of testimony and even here today in closing argument.

6          Some of your fellow jurors might say to you, "You

7    know, the stories that we heard yesterday from those two young

8    women sound horrific."  And in spite of what we heard as

9    motivations for why some of those statements may have been

10   made -- there's testimony about wanting to get back at

11   Mr. Smith, testimony about wanting to get back together with

12   Mr. Smith.  But despite that, some of you may hear and remember

13   those moments and believe those statements.

14         And if you believe those things happened, you're

15   probably angry at Cody Smith.  And if you're angry at him for

16   what you heard, I'm not going to tell you that you're wrong for

17   being angry.  I won't tell you you're wrong for having those

18   feelings, and I wouldn't tell you that you're wrong for wanting

19   to punish him for -- for what you heard, if you believe that.

20         But I can only tell you that even if you want to

21   punish him, the law says no, not today, not for those things,

22   'cause he's not on trial for what we heard about yesterday.

23   He's on trial today because he was accused of kidnapping

24   Ms. Bye.  And when you make your decision, the law says you

25   must make it without sympathy for Ms. Bye or the young women

1  that we heard from yesterday.  And you must make it without

2  prejudice against Mr. Smith.

3       Now, you're likely to hear some comments about various

4  pieces of evidence, and I would like to address some of those.

5  One piece of evidence that we heard is that Ms. Bye was in

6  shorts.  If she's in shorts, why would she be going camping?

7  That's a good question.  It is a fair question.

8       One reasonable doubt is that she didn't really

9  understand camping.  And she told you that.  She told you she

10  had never been camping before.  She didn't know what she didn't

11  know.

12       Another reasonable possibility is she left expecting

13  not to go camping until the next day.  That's what she

14  communicated on Tinder.  She was asked if you want to go to

15  Yellowstone.  She said, "Bet, LOL."  We heard what that means.

16  That means, "Sure, I'm down."  And then she changed her mind.

17  It is reasonable for people to change their mind.  It is a

18  reasonable thing for people to make a plan and think, "I'm

19  going to do that tomorrow," and there's an opportunity and you

20  do it today.

21       I can't prove to you that that's what happened.

22  That's just reasonable doubt.

23       Her roommate, Ms. Bye's roommate, Sarah Romao, she

24  also thought it might be reasonable for Ms. Bye to change her

25  mind.  And, in fact, that's how she calmed herself down,

1    because she heard from Ms. Bye before midnight.  She said, "I'm

2    okay."  And about an hour later she didn't hear from her again.

3    She said, "I'm going to calm myself down and figure she's on

4    her way back."  She calmed herself down by thinking, "Maybe she

5    changed her plans and she went up there and she's on her way

6    back from the Park and lost signal."

7          If her own roommate thought that that was reasonable

8    that maybe she changed her mind, why couldn't it be a

9    reasonable possibility?

10         She had an out.  We heard a couple of witnesses

11   testify to that:  Ms. Romao and Ms. Perkins.  She said, "Look,

12   things don't go so well or whatever, could you come get me?

13   Can I contact you?"  "Sure.  Yeah, we'll come give you a ride."

14   But there's no text to that effect.  There's no call.

15         So someone may say, "Well, there was a knife

16   involved."  We don't really know a lot about the knife.  You

17   were shown a picture of a knife in Mr. Smith's car in Florida.

18   There's no evidence that any knife was ever used to threaten

19   her, brandished at her, held to her.  It is not even really

20   clear what kind of knife we're talking about.

21         We heard yesterday that it was a fixed-blade knife

22   about that long (indicating).  What we learned today is that

23   Investigator Olson came to understand it was a pocket knife, a

24   folding pocket knife.  She knows the difference because she

25   made sure she told us that yesterday.  And she was

1    asked: "Well, did you only learn about the difference as a

2    result of this?"  "No, I know the difference between a folding

3    knife and a fixed-blade knife."

4         And the testimony today was she described it like

5    that, fingers almost touching -- we can't tell for sure, but

6    about like that (indicating).

7         But Agent Olson said, "No, not this (indicating).

8    That's almost twice as long."

9         Why?  Why tell that story differently?

10        Am I presenting or may I present?  Thank you.

11        You were read this instruction, and you will have time

12   to spend some time with it.  I want to draw your attention to

13   this element:  Transportation in interstate commerce.

14        So the idea did some -- is somebody unlawfully taken

15   from one state jurisdiction to another?  That's how we end up

16   in federal court.  It's not within the state; there are other

17   states involved.

18        And here's what we saw today.  10:43 p.m. to 12:02

19   a.m. -- and, now, remember, these are an hour off, so the times

20   that I just gave you are the correct times, not what's written.

21        And you see the state border here.  You see this is

22   just over the state border.  And that's this right here

23   (indicating).  There's the state border to West Yellowstone.

24   It is about 9 minutes.  Now, I'm not going to tell you it took

25   them exactly 9 minutes on their trip.  We're talking about

1   reasonable doubt based on reason, based on logic.  And it is

2   reasonable that it would have taken them 9 minutes.  That is a

3   reasonable amount of time it could have taken them.  And that's

4   from this border to West Yellowstone.

5        Well, if you remember, there's a text message:  "You

6   good, Hannah?" at 11:47.

7        Now, when we go back right here -- that's 12:02, so we

8   go back 9 minutes, that ends in West Yellowstone.  You can see

9   it right there (indicating).  So at 12:02, we go back 9

10  minutes, so now it is 11:53.

11       Well, at 11:48 she responds and says, "Yeah, I'm

12  good."  Just 5 minutes before, 5 minutes before she leaves

13  Idaho to go into Montana, she says, "Yeah, I'm good."

14       She's not being taken unlawfully at that point when

15  she crosses that border.

16       And then she goes from West Yellowstone across the

17  Wyoming border right there, and this is what that looks like

18  (indicating).  Another 7 minutes.  So 5 minutes before she goes

19  from one state into another state, crosses jurisdictions, she

20  says, "I'm fine."  And then 7 minutes and now she's into

21  Wyoming.

22       And then the photos that have become the subject of a

23  lot of attention in this case from the bathroom at Yellowstone

24  National Park, those are about at 12:35, so just about 30

25  minutes later.

1        So even if you thought, well, she didn't want to go,

2   maybe changed her mind, didn't change her mind, at the point

3   that she's going across those borders from Idaho into Montana

4   and then Montana into Wyoming, it's 5 minutes after she just

5   texted and said, "I'm fine."  "Did you kiss him?"  "No, ha-ha."

6        It is all in there.  It is Exhibit 200, page 152.

7   "Yeah, I'm good."  There it is, 11:48:  "Did you kiss him yet?"

8   11:49 she says, "No.  Ha-ha-ha."

9        Why would you be talking like that with your

10  kidnapper?  Why would you talk about your kidnapper that way:

11  "No, I haven't kissed my kidnapper yet"?  It doesn't make

12  sense.

13       That's reasonable doubt.

14       Sometimes it is hard to know -- we heard during the

15  closing of the prosecution sometimes it is hard to know what

16  she means.  She laughs at the wrong times.  That just makes the

17  issue of whether she wanted to go all the more confusing.  If

18  we can't understand what it is that she means because she

19  communicates in a different way, as we're told, and laughs when

20  you're supposed to cry and cries when you're supposed to laugh,

21  then what are we to make of the claims that, "Well, I didn't

22  want to go," and how that was communicated?

23       She said, "Text is not how we" -- "not how I present

24  my true self."  Do you remember that?  So when she said, "Yeah,

25  I'm fine," she didn't mean it; she meant something completely

1    different.  There was testimony he was watching her phone, so

2    he was apparently driving while it is dark in Yellowstone

3    National Park and also looking over so that he can read from 4

4    feet away the text messages on a little screen.  I had to go

5    like this just to read off of my iPad.

6              Doesn't make any sense.

7              But then she said, "No, our true self is communicated

8    via Snapchat.  That's how we do it."  But then when she was

9    asked about, "Well, how do you explain the smile?"  "Well,

10   that's also not really accurate about how I was feeling

11   either."

12             How do you win?  How could we ever know, then, what it

13   is she wanted, what she didn't want?

14             There's another charge, sexual contact, abusive sexual

15   contact.  "Did that dude try anything?"  "Of course he did.  I

16   can definitely handle myself."

17             Regarding the DNA, I don't want to spend a lot of time

18   with it, but there's no DNA evidence of abusive sexual contact.

19   They found Mr. Smith's DNA on her black sweatshirt, the same

20   sweatshirt that she wore underneath his sweatshirt and his

21   puffy vest which he offered to her when they got to the

22   campsite and she said, "I'm cold."  So he gave her his clothes

23   to wear.  Those are the same clothes that she's wearing in the

24   selfie picture, happy to be wearing the clothes of her captor.

25             We would expect to find his DNA there.

1          Now you heard and some -- one of your fellow jurors

2     may say, "Yeah, but she could feel he was wet because he came

3     in the tent.  That's what she said."  She also said she never

4     felt an erection even though he was supposedly dry humping her

5     while she laid facedown.  He was essentially, the testimony,

6     straddling her, on top of her.  She can feel that he's wet

7     while she's laying facedown, but can't feel his erection.

8          And the place where she would feel that he's wet is

9     her backside.  But those shorts were tested.  Her underwear was

10    tested.  No seminal fluid whatsoever.  There's no DNA evidence

11    of Mr. Smith anywhere on her shorts or on her underwear.

12         Next charge.  She may talk about biting.  One of your

13    fellow jurors may talk about that; we heard about that, biting

14    on the lip, making out, hickies, those kinds of things.

15         I want to be clear, when you look at this instruction,

16    Instruction No. 19, that's not anywhere.  That kissing, hickie,

17    that's not abusive sexual contact under this statute, so be

18    mindful of that.  The biting, that does not meet the definition

19    of the crime that is charged here.

20         So that leaves us with this issue which is force

21    sufficient to overcome, but there's reasonable doubt about

22    that.  She said, "I can handle myself."  She said that after

23    the fact.  She didn't go into it saying, "I think I can handle

24    myself."  In hindsight, she reflected back, "I can handle

25    myself."

1     And it makes sense if he had used force necessary to

2   overcome her and he wanted to have sex -- and we heard

3   testimony that he did.  We heard that he said, "You're missing

4   out."  He said, "You're missing out," not, "Well, I'm going to

5   anyway."  Why didn't he force sexual intercourse?  He tried,

6   she says, to touch her on the vulva, the vagina area.  She

7   didn't let that happen.  How is it that he doesn't have the

8   force or never exercised the force to touch her on the vulva or

9   to use his fingers to penetrate her vagina or to have sexual

10  intercourse but then had force to do other things that she

11  couldn't stop?  The evidence was that he never overcame her to

12  initiate genital touching because she can handle herself.

13    There's some reasonable doubt about this campsite.

14  You can look at it.  It is Exhibit OO, I believe.  112 sites

15  there and, look at them; they're just all over.  There's

16  camping sites everywhere.  We heard that the traffic starts to

17  taper off after Labor Day.  It had just been Labor Day.  We did

18  not hear it goes like that and everybody stops camping by the

19  7th of September.  A hundred campsites in there?

20    In this photo, look at where these campsites are --

21  campsite, campsite, campsite.  I mean, look at that distance.

22  And the evidence is it is 25 feet.  So there's reasonable

23  doubt.

24    I want to move on to Dr. Lindberg.  Lindberg never

25  treated Ms. Bye.  He never evaluated her.  He never even met

1    her.  And yet he came to offer you an opinion to say -- I don't

2    really know what.  Why didn't he meet with her?  Why didn't

3    anybody do a psychological or mental health evaluation that

4    could use -- that could be used to support her claims?  That

5    doesn't make any sense.  That's reasonable doubt.

6          He did talk about a grab bag of psychological

7    principles, though, that you can use to support virtually any

8    theory that you want.  And one of those actually happened to be

9    confirmation bias which is basically applied to somebody who is

10   interviewing somebody and they have a preconceived notion and

11   they have a bias towards their own beliefs.  And we have a good

12   example of that:  Agent Olson.

13         Dr. Lindberg also talked about the sunk cost theory,

14   confirmed that as a theory where there's a human behavior

15   pattern where if we spent a lot of time and money on a thing,

16   we just stick with it, even when it doesn't make sense.

17         And you heard what he said today.  He said, "I have a

18   gazillion hours, so of course I believe you."  He didn't say

19   "and."  He said, "So of course I believe you.  I believe you

20   because I've sunk a bunch of time into it, a gazillion hours."

21   Now, we understand he said a thousand or so, but you know what

22   he had sunk into it.  He had sunk 70 percent of that thousand

23   hours before he even knew about this photo in the bathroom.

24         What a blow.  That's not his fault.  Those photos were

25   deleted just a few hours before Ms. Bye went to the Rexburg

1  Police Department for her interview with the investigators

2  there.

3        There's some other weird things about the

4  investigation.  You know, I don't know.  Never once did Agent

5  Olson go to the campground and try to look at the campsite to

6  try to get some information about it, how far away the

7  campsites were.

8        You heard from Wendi Leatham that Ms. Bye had said,

9  "Fine, I'll go.  I'll go."  And Ms. Bye had gone to their house

10 just hours after returning.  But he never followed up with

11 Ms. Leatham again about that claim or anyone else specifically

12 about where did that come from.

13       What hasn't been asked and another reasonable doubt

14 that hasn't been eliminated is, well, what is the motive?  What

15 is the motive here?  Why do any of this?  And that's a good

16 question.  But I'm not the best person to explain that.

17       Can you all see that?

18       Howdy.  I'm the BYU honor code.  I exist to create a

19 wholesome and healthy environment for college students.  My

20 job's an important one.  I used to like my job.  But today,

21 right now, I'm feeling pretty angry about it.

22       See, over time my job has been manipulated and

23 misused, misused by institutional forces, referred to as

24 ecclesiastical endorsement from the Mormon church, that throw

25 me around and enforce me pretty harshly against the very

1   students I'm supposed to be helping, students just leaving

2   their teenage years, enforced so harshly that they're set up to

3   fail, set up to be punished, set up to risk the very college

4   and careers and education they came to get.

5          Nowadays even roommates are supposed to get other

6   students in trouble for violating me instead of using me to

7   help and encourage.  I could also be manipulated by students

8   who risk being kicked out of school and risk their college

9   education, students who are so desperate to avoid those fears

10  of consequences on their future that they lie and stretch the

11  truth as far as necessary to avoid getting kicked out of

12  school.

13         And that's what happened here.  Ms. Bye signed me.

14  She -- she agreed to obey me.  But the system in some ways --

15  the system is set up for failure, and she failed.  She pushed

16  the curfew envelope a little bit, which is risky business at

17  our school.  She risked getting kicked out.

18         And we might have just avoided it all, but once her

19  friends got the police involved and the parents and the local

20  bishop, once they found out she was past curfew, and with a

21  boy, no less, the risk of getting kicked out for not doing what

22  she would when she signed me -- for not doing what she said she

23  would when she signed me was too great for Ms. Bye.

24         And the risk was great for all of her friends, too,

25  for if they didn't report her, they risked getting in trouble,

1  too, by not following the letter of the law.  And it became a

2  bit of a runaway train.

3          Ms. Bye hopped on that runaway train.  Her roommates,

4  the police and I was forced to join it also.  Once the police

5  were called, it's too late.  The only option Ms. Bye had at

6  that point was to go along with the kidnapping narrative

7  because she wouldn't get in trouble for violating me.

8          So even though she was okay and even though she

9  ultimately chose to go to Yellowstone National Park and even

10  though just moments before her curfew she was already an hour

11  and a half away texting and sending happy pictures, it all came

12  unravelled.

13          BYU and the bishop found out that she was gone, and it

14  had been overnight, and it was with a boy.  And the only way

15  the leadership at BYU would allow her to stay -- to stay out

16  overnight camping with boys if they found out she broke that

17  agreement is if she had no choice, if she was kidnapped.  Then

18  it wouldn't be her fault, and they couldn't punish her.  So she

19  was kidnapped by a boy she went to Yellowstone National Park

20  with.

21          But two wrongs don't make a right.  It makes me a bit

22  sick to my stomach to know I've been used this way.  You're the

23  only ones who could stop that runaway train.  Please help.

24          There are three faces of reasonable doubt in this

25  trial.  The first was Ms. Egbert, and she was clear you could

1   get kicked out of BYU for a curfew violation.  She was shown

2   right up here that bathroom photo for the first time yesterday.

3   She never saw it because, remember, Ms. Bye deleted it just

4   before going to the police.

5          She was clear they would not have called 911 if they

6   had seen that photo.  They knew what that picture meant.  They

7   know what that face meant.  And you remember her face when for

8   the first time she saw that.  That's the face of reasonable

9   doubt.

10          Ms. Perkins, too, she hadn't seen that photo until

11  yesterday either.  You saw her.  Stunned.  She was stunned.

12  That's reasonable doubt.

13          She was concerned.  She said, "If I saw that photo, I

14  could still be concerned, but not for her well-being.  I would

15  be concerned because she was out breaking curfew."

16          And then, of course, this is the last face of

17  reasonable doubt.  I can't answer the question for you.  You

18  have to answer it for yourself.  But is that the face of

19  reasonable doubt, smiling two hours from home, past midnight,

20  wearing somebody else's clothes with a thumb's up?  She wants

21  you to believe that that's the face of someone who has been

22  kidnapped and that Mr. Smith is guilty.  But if you have even

23  one reasonable doubt as to whether that's the face of someone

24  who is kidnapped, you must say not guilty.

25          COURTROOM DEPUTY:  Time, Counsel.

1          MR. HUGUS:  Thank you.

2          THE COURT:  Thank you, Mr. Hugus.

3          Ms. Martens.

4          MS. MARTENS:  Thank you, Your Honor.

5          Defense counsel spent some time talking to you about

6    reasonable doubt.  The Court has instructed you about

7    reasonable doubt.  I'm not going to instruct you.  Defense

8    counsel can't instruct you.  The Court instructs you.  Refer to

9    that instruction.

10          There is no reasonable doubt about what Cody Smith

11   did.  And that's what we're here about:  Cody Smith and what he

12   did; not what Hannah Bye did, not what Laura Albertorio did or

13   Karson Ceglia did, what Cody Smith did.

14          Defense counsel says he's afraid that he's made some

15   mistakes, and he stands here accusing Ms. Hannah Bye of making

16   mistakes.  We're not here about her mistakes.  She's 18 years

17   old.  She's immature.  All of these girls were immature.  We

18   all, through our own human experience, know that teenagers are

19   kind of dumb, especially if you have children or know children,

20   know that teenagers don't always respond like we would hope

21   they should or would.

22          We're not here about how teenagers acted under

23   pressure or in terrible situations.  We're here about the

24   terrible situation the defendant created.

25          Mr. Hugus talked to you about Ms. Albertorio,

1    Ms. Ceglia.  It is true, we are here and you can only convict

2    the defendant for what he did to Hannah Bye.  The evidence

3    offered through Ms. Albertorio and Ms. Ceglia is appropriately

4    used for us to understand the defendant's motive, his tendency

5    to do this kind of thing.

6            He has done this before.  He chokes girls.  He bites

7    girls, tries to rip their lips off.  And he holds them down.

8    He gets what he wants, regardless of what the other person says

9    or does.  We are here about his conduct.

10           We have already talked through the evidence.  You've

11   received the evidence, and you need to rely on your

12   recollection of that evidence.

13           I would submit to you that in talking to you just now,

14   Mr. Hugus, his recollection of the evidence doesn't matter,

15   because while Mr. Hugus and I disagree about what that evidence

16   is or how it was said, what you remember matters.

17           That statement, "Just go," Ms. Bye explained that.

18   She said in the McDonald's parking lot, "I don't want to go.  I

19   want to go home."  And so after saying that, when she says,

20   "Just go," it means, "Take me home."

21           And that phrase taken out of context, relayed through

22   a witness who never testified, maybe you could try and make

23   something out of that.  But you heard Special Agent Olson talk

24   about his impression based on the entire interview was that she

25   didn't want to go.  That was not what she meant.  And she

1   confirmed that for you on the stand:  sworn, under oath.

2           Let's talk a little bit about Jake Olson.  The defense

3   talks about confirmation bias and simultaneously criticizes

4   Dr. Lindberg.  He wants to use part of that testimony, but not

5   the other.  Which is it?  Dr. Lindberg told you why he was

6   here, to help educate you as the jury so that you would have

7   additional tools in considering the evidence and the testimony

8   presented to you.  That's why he's here.

9           If you find him credible, with his decades of

10  experience, living in the field of psychology, understanding

11  these concepts as they developed, you can apply them in helping

12  you understand who you think you should credit and understand

13  behavior by all of these folks that might not make sense to you

14  at first blush.

15          Dr. Lindberg was around when Stockholm Syndrome was

16  developed.  He lived through the research that turned it into

17  traumatic bonding, and he explained to you that in these

18  terrifying situations, people do weird things.  It affects

19  memory formation.  It affects the brain and the way you

20  operate.

21          So confirmation bias, we should credit that part, but

22  not the rest of it.  Why?  Well, is the Government working too

23  hard or not enough?  They haven't picked one.

24          Let's talk about that text message:  "I can definitely

25  handle myself."  Defense counsel essentially just argued that

1    because Cody Smith didn't manage to penetratively rape Hannah

2    Bye, he must not have used force against her because she can

3    handle herself.

4         So we're right back around to which is it?  Could she

5    manage to defend herself at least in part?  Must not have been

6    a problem at all?  He tore her lip.  He dug his fingernails

7    into her breasts.  He left bruises on her back.  Which is it?

8         The physical evidence, those photos, they speak for

9    themselves.

10        Let's talk about the knife.  So you watched the

11   defense show Special Agent Jake Olson what they represented was

12   a still shot out of a video from an interview with Hannah Bye,

13   and then there was some gesturing.  Well, Special Agent Olson

14   testified on the stand that that shot from the interview didn't

15   represent all of her hand movements, but sure, at some point --

16   smaller, bigger -- she had an estimation.  And he also told you

17   that that was consistent with what she did on the stand in

18   front of you.

19        So what if she didn't get a good look at the knife?

20   Cody Smith had a habit of carrying a knife, and she told you

21   how he used it.  He never waved it at her.  But it was there.

22   And that's enough, enough to be afraid.  Jake Olson explained

23   to you that even a small knife can be awfully effective.

24        And this all boils down to, sure, maybe there was a

25   plan to go to McDonald's and come home, but we want you to

1  believe that she simply changed her mind and decided to go to

2  Yellowstone National Park with Cody Smith.  That's not

3  reasonable doubt.

4         Look at the rest of the evidence.  Look at those

5  photographs.  Does someone who is planning to be out all night

6  put themselves in a situation to soil their clothing, to be

7  completely unprepared to do exactly that?  You decide whether

8  you think any of that is reasonable or gives you any doubt.

9         But I submit to you that there is no reasonable doubt

10  as to what happened here.  Cody Smith does not take no for an

11  answer, and he takes what he wants, regardless of the

12  protestations of the people around him.  He has done that

13  before, and he did it here.  Thank you.

14         THE COURT:  Thank you.

15                    * * * * * * * * * *

16     (Deliberative Instruction Charge not transcribed.)

17                    * * * * * * * * * *

18     (Proceedings recessed 3:00 p.m., May 13, 2021.)

19     (Proceedings reconvened 5:33 p.m., May 13, 2021.)

20     (Following out of the presence of the jury.)

21         THE COURT:  For the record, the Court has been advised

22  that the jury is ready to return its verdict.

23         Is there any business prior to bringing the jury in

24  for the verdict?

25         For the Government?

1          MS. MARTENS:  Nothing for the Government.

2          MR. FREEBURG:  Nothing from the defense, Your Honor.

3          THE COURT:  All right.  Thank you.

4     (Following in the presence of the jury.)

5          THE COURT:  Please be seated.

6          In Docket 20-CR-45, United States of America versus

7  Cody Donovan Smith, the Court notes the presence of the jury

8  with roll call waived, the presence of counsel, their clients.

9  The Court has also been advised that the victim is here as

10 well.

11         I was alerted that the jury is ready to report and

12 return its verdict.

13         Who speaks as the presiding juror?

14         JUROR NO. 5:  I do, Your Honor.

15         THE COURT:  Juror 5.

16         JUROR NO. 5:  5.

17         THE COURT:  Has the jury deliberated and is the jury

18 ready to return a unanimous verdict?

19         JUROR NO. 5:  Yes, Your Honor.

20         THE COURT:  And the form is completed and signed; is

21 that correct?

22         JUROR NO. 5:  Yes, Your Honor.

23         THE COURT:  If you could pass the form to the

24 courtroom deputy, I will inspect the form.

25         The verdict appears in proper form.  I would ask the

1   courtroom deputy to please read and record the verdict.

2          To the jury, please harken unto your verdict.  After

3   the courtroom deputy has announced the verdict here in open

4   court, I will ask her to poll the jurors to verify unanimity.

5          COURTROOM DEPUTY:  As to the charge contained in Count

6   One of the indictment charging the defendant Cody Donovan Smith

7   with kidnapping, in violation of 18 United States Code Section

8   1201(a)(1), we unanimously find the defendant not guilty.

9          As to the charge contained in Count Two of the

10  indictment charging the defendant Cody Donovan Smith with

11  abusive sexual contact, in violation of 18 United States Code

12  Section 2244(a)(1), we unanimously find the defendant not

13  guilty.

14         Dated this 13th day of May, 2021, signed by the jury

15  foreperson.

16         THE COURT:  I would ask the courtroom deputy to please

17  poll the members of the jury by juror number to verify

18  unanimity.

19         COURTROOM DEPUTY:  Juror No. 29, was this and is this

20  your verdict?

21         JUROR NO. 29:  Yes, ma'am.

22         COURTROOM DEPUTY:  Juror No. 39, was this and is this

23  your verdict?

24         JUROR NO. 39:  Yes, ma'am.

25         COURTROOM DEPUTY:  Juror No. 17, was this and is this

1      your verdict?

2              JUROR NO. 17:  Yes, ma'am.

3              COURTROOM DEPUTY:  Juror No. 5, was this and is this

4      your verdict?

5              JUROR NO. 5:  Yes, ma'am.

6              COURTROOM DEPUTY:  Juror No. 12, was this and is this

7      your verdict?

8              JUROR NO. 12:  Yes, ma'am.

9              COURTROOM DEPUTY:  Juror No. 37, was this and is this

10     your verdict?

11             JUROR NO. 37:  Yes, ma'am.

12             COURTROOM DEPUTY:  Juror No. 35, was this and is this

13     your verdict?

14             JUROR NO. 35:  Yes, ma'am.

15             COURTROOM DEPUTY:  Juror No. 2, was this and is this

16     your verdict?

17             JUROR NO. 2:  Yes, ma'am.

18             COURTROOM DEPUTY:  Juror No. 41, was this and is this

19     your verdict?

20             JUROR NO. 41:  Yes, ma'am.

21             COURTROOM DEPUTY:  Juror No. 44, was this and is this

22     your verdict?

23             JUROR NO. 44:  Yes, ma'am.

24             COURTROOM DEPUTY:  Juror No. 14, was this and is this

25     your verdict?

1          JUROR NO. 14:  Yes, ma'am.

2          COURTROOM DEPUTY:  Juror No. 15, was this and is this

3    your verdict?

4          JUROR NO. 15:  Yes, ma'am.

5          THE COURT:  Polling verifies unanimity.  I would ask

6    the courtroom deputy to record the verdict.

7          To the members of the jury, thank you very much for

8    your time, attention and action and deliberating in this case.

9    As I announced at the outset of jury selection -- or somewhere

10   close to the beginning -- the jury is the -- is a

11   constitutional office, along with the president, the

12   legislature, and the judiciary.

13         Without the constitutional office held by individual

14   members of jurors -- comprising the jury, willing to serve,

15   dedicate their time, attention, to the course of business

16   during a jury trial, our democracy would fail.  It is really

17   through the jury that the community sees direct democracy at

18   work, where the jury finds the facts, applies the law and

19   reaches a fair and impartial verdict.

20         Again, it is direct democracy at work.  I'm proud of

21   the jury and the jury service.  So thank you very much on

22   behalf of all the judges in this district for your service.

23         The rules applicable in our court prevent others from

24   thanking you.  It's considered that you did the business that

25   you're charged with.  And please know, though, that we all

1  appreciate the significance of jury service and the principle

2  of the rule of law that is supported by the jury.

3          I should note that individuals can contact jurors to

4  ask for feedback about the case.  It is entirely up to you as

5  to whether you respond to requests for information or feedback.

6          If you choose not to respond or answer, that is your

7  right.  If somebody continues to persist in questioning you,

8  please bring that to my attention, because that does violate

9  our rules.

10         If you choose to make any response to questions, I

11 would ask that you respect the privacy of the jury deliberation

12 process and only remark about your experiences.

13         With that, is there any other matter that the Court

14 should attend to prior to excusing and releasing the jurors

15 from jury service?

16         From the Government?

17         MS. MARTENS:  Nothing, Your Honor.

18         THE COURT:  For the defendant?

19         MR. FREEBURG:  No, Judge.

20         THE COURT:  Again, I would like to thank each and

21 every one of you for your time and attention.  I will be

22 sending out letters with certificates personally thanking you

23 from me.  So when you get correspondence from the clerk's

24 office, don't say, "Well, I've served," and throw it away.  I

25 mean, it is up to you what you do with it, but I do want to

1  provide each of you with a tangible certificate of appreciation

2  for your time as a juror in this case.

3          With that, I will excuse and release all of you from

4  jury service.

5          Please stand for the jury to be excused and released.

6      (Following out of the presence of the jury.)

7          THE COURT:  Please be seated.

8          With the verdict, Mr. Smith, you are free to go.  If

9  you have items in the U.S. Marshal Service custody or at the

10  facility, please advise and make arrangements for the return of

11  your property.  All right?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  Is there anything else that we should

14  address before we recess?

15          MS. MARTENS:  Nothing from the Government, Your Honor.

16          THE COURT:  For the defendant?

17          MR. FREEBURG:  No, Your Honor.  Thank you.

18          THE COURT:  Thank you.

19          Thank all of you, again, for your patience and

20  courtesy through the course of this case.  We will stand in

21  recess subject to call.

22      (Proceedings concluded 5:45 p.m., May 13, 2021.)

23

24

25

1    C E R T I F I C A T E

2

3

4

5        I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter, Federal Certified Realtime

8    Reporter, and Certified Realtime Reporter, do hereby certify

9    that I reported by machine shorthand the foregoing proceedings

10   contained herein on the aforementioned subject on the date

11   herein set forth, and that the foregoing pages constitute a

12   full, true and correct transcript.

13

14       Dated this 13th day of May, 2021.

15

16

17

18                    /s/  *Janet Davis*

19                    _____

20                    *JANET DAVIS, RDR, FCRR, CRR*
                      *Federal Official Court Reporter*

21

22

23

24

25